The Honorable Barbara J. Rothstein
Trial Date: January 8, 2024
*Without Oral Argument*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHANDRASI GAEKWAR,<br><br>Plaintiff,<br><br>v.<br><br>AMICA MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | No. 2:22-cv-01551-BJR<br><br>PLAINTIFF'S RESPONSE TO AMICA'S MOTION FOR PARTIAL SUMMARY JUDGEMENT RE: EXTRACONTRACTUAL CLAIMS |

## I. EVIDENCE RELIED UPON

Submitted herewith is the Declaration of David J. Balint identifying evidence which has been adduced in this case. This includes the Amica insurance claims file. Amica assigned Bate numbers to documents in its file[1]. For the ease of the Court, references to Bate numbers are set forth in this brief and the accompanying Declaration of Counsel where available. The claims file attached to the Balint declaration as Exhibit 1 is the latest version with Bate numbers 1 through 3006. All exhibits referenced in this brief are to the Declaration of Counsel unless otherwise specified.

[1] The Bate numbers in the Amica claims file are in reverse date order, so the oldest document has the highest number.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

# II. FACTS

## II. A - BACKGROUND FACTS

On January 25, 2020 the plaintiff, Chandrasi Gaekwar, was rear-ended while driving in Everett, Washington. The tortfeasor, Edgar Garcia, was insured by Nationwide Ins. with $50,000 liability limits. There are no issues of liability, the tortfeasor was deemed 100% at fault.

Mr. Gaekwar promptly submitted a report of the collision to his insurance company, the defendant herein, Amica Insurance. The Amica policy contained a $300,000 UIM limits and $10,000 in personal injury protection coverage. [EX 2] Mr. Gaekwar had this policy with Amica continuously for 38 years. [EX 16] It is conceded that Mr. Gaekwar, at all times, complied with his obligations to Amica under the policy, including the duty to cooperate.

Mr. Gaekwar was injured in the collision. His primary injury was to his left knee, and he also suffered orthopedic injuries to his neck and back. Amica concedes that he was injured and that his initial medical treatment was reasonable, necessary, and caused by the collision. Amica disputes that the collision was a cause of Mr. Gaekwar's left knee replacement surgery of December 13, 2021, and its associated medical care. Amica promptly assigned a PIP adjuster. Amica paid the first $10,000 of medical bills without any problems.

## II. B - ADJUSTER BRITTANY AM (Exhibit 7)

A lawsuit was filed against the tortfeasor in the Superior Court of Snohomish County. Plaintiff requested that Amica open a UIM file and it did so in early August 2020, assigning adjuster Brittany Am [EX 1, Bate 2979-2977]. On November 4, 2020, a demand letter was sent to Nationwide attaching and referencing a number of documents, including medical records both predating the collision by 5 years and treatment records to the date of that letter.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

[EX 3] A copy of the letter, with full documentation, was copied to Amica. The first paragraph of the November 4, 2020, letter contained a sentence directed to Amica asking them to fairly evaluate the claim, both for the purposes of UIM settlement and *Hamilton* waiver:

> "In order to aid its independent evaluation for settlement and for a Hamilton buyout decision, a copy of this case analysis is also directed to Amica along with the documents referenced."

The demand letter contained precrash medical records and referenced the fact that Mr. Gaekwar had pre-existing arthritis in his left knee, which had been asymptomatic for a significant period before the crash and was "lit up" in the collision. The applicable Washington law, as summarized in Washington Pattern Instruction 30.18, was quoted on page 5 of the letter. Amica waived its rights under *Hamilton* to buy out the position of Nationwide and agreed to waive PIP subrogation [EX 1, Bate 2968]. Nationwide promptly paid its limits. Amica opened a UIM claim file and assigned Ms. Brittney Am to adjust the claim. At the same time, Mr. Alex Rottler, a claims supervisor in Amica's home office, reviewed the case and set Amica's Reserves at $40,000 [EX 1, Bate 2970].

A second demand letter dated February 9, 2021 was emailed to Amica outlining additional care as well as the need for probable left knee replacement surgery. This letter also described the relevant medical care. The demand was for $140,000 new money. [EX 4]

Ms. Am responded with an offer of $1,000 new money. [EX 6] The only basis for such a nominal offer was her feeling that Mr. Gaekwar had already benefited from Nationwide and Amica's PIP waiver. [EX 7, p. 26, 48]



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

Ms. Am testified [EX 7] that she relied on the fact that Mr. Gaekwar had pre-existing arthritis. She did not incorporate the fact that, pre-crash, Mr. Gaekwar had no active symptomology. She did not review precrash medical records, nor ask for them. [EX 7, p. 24] She does not know why she did not ask for pre-accident medical records. [EX 7, p. 53] She admitted that, in due diligence, facing a $140,000 demand, Amica should have ordered pre-crash medical records and investigated whether the arthritis in his left knee was asymptomatic at the time of the crash. They also should have inquired at to his functioning during a hike in the Himalayas, which took place 3 months before the collision. [EX 7, p. 44-45] She never asked for additional information. [EX 7, p. 18-19] At no time did she consult with a medical expert. [EX 7, p. 14, 22-23] She did not understand the key medical terms. [EX 7, p.34, 45-46] At no time did she seek legal assistance as to the Washington law about pre-existing dormant conditions. [EX 7, p. 53] In fact, she did not recall receiving any training as to the applicable laws in Washington. [EX 7, p.19] At no time did she seek to interview Mr. Gaekwar to determine the effects his injuries had on his life and activities. [EX 7, p. 13] She acknowledged the right to conduct an Examination Under Oath under the policy, but failed to do so. [EX 7, p. 17] She did not ask Mr. Gaekwar to submit to a medical examination, or ask permission to do so. [EX 7, p. 59] Ms. Am admitted she conducted no active investigation whatsoever, except to review the two demand letters and some of the records submitted by Mr. Gaekwar. [EX 7, p. 39] She could not explain how she calculated an offer of $1000 new money other than to recited the settlement with Nationwide and the Amica PIP waiver [EX 7, p.33], especially in light of the fact that by this time the Reserves had been set at $40,000. [EX 7, p. 62] In the process of her claims handling, Ms. Am agreed



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

it would not be fair to cherry pick facts to justify a low offer and that adjusters are taught to evaluate the whole claim. [EX 7, p.28-29] The cherry picking (and misinterpretation of medical records) is exemplified by Ms. Am's evaluation that within two months of the crash, Mr. Gaekwar was out hiking.

In the Amica claims file at bate number 2963 and 2959, Amica denigrated the continuing nature of their insured's knee problems with an entry they tribute to the Overlake medical records of March 26, 2020: "Two months after MVA, patient is having no physical complaints at this time, gait is strong in good. Patient went on a hike." Had the adjusters done even a minimal investigation, Amica would have, and should have, realized that these references were to the pre-crash October 2019 climb that Mr. Gaekwar did in the Himalayas, to which he experienced no knee problems. Exhibit 8 is a packet of medical records that were available to Amica. On September 3, 2019 Mr. Gaekwar consulted with Dr. Kriseman about whether his asthma condition would present any difficulties for a mountain climb. The February 13, 2020, record references a report from Mr. Gaekwar affirming that he did hike in the Himalayas without any difficulties. The March 26, 2020, entry (which Amica misrepresents) does not refer to any hike other than the hike **at altitude**, i.e., the Himalayas. Not one of the adjusters and supervisors at Amica ever inquired about the Himalayas trip. A cursory investigation, let alone a "thorough" investigation, would have and should have revealed the error of their interpretation of Mr. Gaekwar's precrash functioning. This is especially relevant because Plaintiff's demand letters to Nationwide and Amica refer to this Himalaya experience as being evidence of the asymptomatic condition of his left knee before the underlying tort. Ms. Am also mentioned that plaintiff returned to biking. Again, the



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

records only reflect he could do only 11 minutes on a stationary bike, which was part of his physical therapy routine. [EX 9]

## II. C - SUPERVISOR THOMAS VAN KOOTEN (Exhibit 12)

Mr. Thomas Van Kooten was deposed on July 25, 2023. [EX 12] He was Brittany Am's supervisor. [EX 12, p. 23] He agreed that it would be important to know if Mr. Gaekwar's left knee was asymptomatic before the crash, and that it would be important to know about how he functioned 3 months before the crash in a climb in the Himalaya Mountains, which was up to 17,000 feet. He agreed he would also want to know if Mr. Gaekwar experienced any problems during a world tour prior to the crash. [EX 12, p. 73-74] Contrary to both Amica adjusters, he agreed that there was a continuing duty to give equal consideration to the insured's interests as compared to Amica's own interest. [EX 12, p. 75] On the same page, Mr. Van Kooten agreed Amica had the duty not to refuse to pay claims without conducting a reasonable investigation. He agreed it would be important to know what relevant pre-existing conditions the claimant had. He agreed that if there were records referenced as attached to a demand letter, it would not be unreasonable for the adjuster to ask for those records if they were left out. [EX 12, p. 35-36] He agreed if there were any noticeable inaccuracies in an attorney's recitation of the facts in a demand letter that it should have been noted in the claims file. [EX 12, p. 38] He agreed it would be important for an adjuster evaluating a claim to know if the condition that was at issue was active at the time of the crash or was dormant. [EX 12, p. 41] On pages 42 – 44, Mr. Van Kooten admits that an adjuster should get all available information, and that adjusters ask plaintiff attorneys for pre-existing injury or medical information all the time. He admitted that if no pre-existing



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

medical records were received with the initial demand, it should have been requested. Mr. Van Kooten agreed that during his time at Amica neither he, nor Brittany Am, conducted an active investigation as opposed to passively interpreting information that was being provided by the claimant's attorney. His answer was, except for the police report, that reviewing the provided records was the extent of the investigation. [EX 12, p. 49] He admitted that, at no time, did anyone at Amica try to interview Mr. Gaekwar, either directly or via Mr. Gaekwar's attorney. [EX 12, p. 54-55] He admitted that an adjuster has the power to ask for an Examination Under Oath, but did not do so with Mr. Gaekwar. [EX 12, p. 55] He agreed Amica had the duty to reasonably investigate this claim before rejecting an offer. [EX 12, p. 59-60] He repeated his testimony that it would be important for evaluating a case under Washington law to know if the condition complained of was active or not at the time of the tort. [EX 12, p. 61] On page 73, Mr. Van Kooten agreed that there was no indication that Mr. Gaekwar, or his attorney, failed to cooperate.

## II. D - ADJUSTER THOMAS GRUNDY (Exhibit 10)

When Plaintiff rejected the $1,000 Amica offer, Mr. Rottler increased the Reserves to $95,000 and replaced Ms. Am with a more experienced adjuster, Mr. Tom Grundy. [EX 1, Bate 2960] Mr. Grundy's superior suggested a Medical Records Review. [EX 1, Bate 2959] At this stage, no threats of litigation had been made.

Mr. Grundy's deposition was taken on July 28, 2023. [EX 10] He testified that he retained a doctor to review the medical records selected and provided by Amica. On June 23, 2021, Amica received the records review by Dr. Sean Kearney, MD. [EX 11] Amica relies on this paper review, however, they failed to provide Dr. Kearney with any pre-



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

collision medical records. As such, Amica had no chance of a full and fair evaluation of Mr. Gaekwar's left knee condition, including whether it was causing him any problems prior to the collision. The pages of Dr. Kearny's report detail the information that was provided to him by Amica. For the report, Amica did not ask Dr. Kearney to evaluate the effect of the pre-crash asymptomatic condition of claimant's left knee. It should also be noted that Dr. Kearney is not available to testify, either for deposition or for cross-examination at trial, because he is apparently deceased. The Dr. Kearney report was provided to Amica on June 23, 2021, but was not provided to plaintiff until September 2021, 3 months later, and only then after a direct request to Mr. Grundy to provide it. The was a lack of any due diligence in Amica's investigation is exemplified by Mr. Grundy's attitude that Amica had no duty to provide information or keep claimant advised about the status of Amica's evaluation, but only had a passive duty to respond to requests from a claimant. [EX 10, p. 34, 65, 78]

When Mr. Grundy took over the claims handling, he never had a conversation with Brittney Am during the transition. [EX 10, p. 10] He never asked for additional records, with one exception noted below. [EX 10, p. 14] Why didn't he ask for pre-accident records, or any other records? Because he felt they had enough information to make up his mind and he didn't need to know any more. [EX 10, p. 14] There are no pre-crash medical records in Amica's claim file. He consulted with no one about the Washington law outlined in the demand letters, including the law regarding pre-existing conditions. He agrees it was the Amica training that adjusters need to complete a timely and thorough investigation. [EX 10, p. 26] The only "investigation" he did was to retain the medical records reviewer, Dr. Sean Kearney, MD, and to review the documents provided by claimant, including the demand



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

letters. [EX 10, p. 27] Even though he repeatedly testified about his familiarity with Washington law, Mr. Grundy did not know the difference between a dormant asymptomatic condition and an aggravation of an of a symptomatic condition. [EX 10, p. 28-29] He never reviewed pre-accident medical records, nor did he ask for clarification of Mr. Gaekwar's pre-existing condition of his left knee. [EX 10, p. 30] He did not know the specifics behind the pre-existing arthritis and could not answer any question about the impact this arthritis had on Mr. Gaekwar's activities before the crash. [EX 10, p. 31] Even though acknowledging receiving records referencing Mr. Gaekwar's climbing the Himalayas in October 2019, Mr. Grundy never asked for clarification about this trip. [EX 10, 32] He agreed that Amica was not disputing that Mr. Gaekwar was injured in the crash, especially concerning his left knee. [EX 10, p. 33] After he saw a couple of 'favorable' (to Amica) post-accident records he didn't feel it was his responsibility to ask for any other records as he believed the "burden of proof" is on the claimant, not Amica, and that Amica had no duty to investigate beyond the records provided. [EX 10, p. 34] He noted the medical records reviewer, Dr. Kearney, did not request any additional records. [EX 10, p. 39] Mr. Grundy believed the $50,000 paid by Nationwide, plus the Amica waiver of $10,000 PIP subrogation, was full compensation. [EX 10, p. 39] When asked why the original offer was made for $1,000 if he believed that Mr. Gaekwar had been fully compensated, Mr. Grundy repeated, several times, that it was offered as a "compromise" offer and not based on any facts. He apparently determined that a lowball offer would justify a belief that the dispute was just over value. He made up his mind early on that any surgery on Mr. Gaekwar's left knee was not related to the crash, so any new information provided to Amica was not of interest to him. [EX 10, p. 42, 50-56, 69] The only



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

basis for the increased offer for $5,000 new money was "his own experience." [EX 10, 45] When the declaration of the surgeon, Dr. Robert Goldman, [EX 13] was provided to Amica, Mr. Grundy never reviewed it. He was aware of it via references in postsurgical communications, [EX 13.1, 13.3] but didn't care to see it, [EX 10, p. 50] nor did he tell claimant's attorney that it was not provided.

When shown the language in the declaration of Dr. Goldman that: "From May 2017 to the date of the collision, January 25, 2020, Gaekwar had no complaints of active symptoms in his knee," Mr. Grundy testified he could not agree or disagree. [EX 10, p. 60] Mr. Grundy admitted he was not sure if the claimant had active symptoms in his left knee at the time of the crash. [EX 10, p. 61-62] When Mr. Grundy was asked why he didn't request pre-existing records or the missing declaration of Dr. Goldman, he testified that Amica's policy is to review all medical records provided, and that Amica does not ask for more information or clarification even though they might know of information that might help in a fair evaluation of a claim. In other words, Amica was not responsible for any active investigation. In fact, Mr. Grundy testified and identified that he received and reviewed the documents contained in Mr. Gaekwar's June 30, 2022 letter, thereby actively misleading plaintiff's counsel that there were records allegedly missing. [EX 13.2]

Following the surgery Mr. Gaekwar's medical bills were over $155,000. Amica did not express an opinion as to whether the charges for treatment were reasonable, nor does Amica dispute the necessity for the knee replacement surgical care. [EX 10, p. 75-76] When asked about the duty of an insurance company to give equal consideration to the claims of a first party claimant to Amica's financial interests, Mr. Grundy pretended not to understand



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

what "equal consideration" meant. [EX 10, p. 93-94] His understanding of the law in Washington is that first party UIM claims are adversarial. [EX 10, p. 95]

Mr. Grundy acknowledged he received the medical record review from Dr. Kearney on June 23, 2021, but did not provide it to Mr. Gaekwar's counsel until September 27, 2021, and then only after it was requested by plaintiffs' counsel. He testified Amica had no responsibility to keep the claimant updated with information on the status of the investigation, and therefore had no obligation to provide the medical record report until it was requested. [EX 10, p. 97-98] He acknowledged that the insurance standard is to keep a claimant fully informed at least every 30 days, but did not think it important to provide the very report Amica most relied upon until 3 months later. [EX 10, p. 100-104] Like Ms. Am, Mr. Grundy didn't investigate Mr. Gaekwar's pre-accident life, daily functioning, activities, or any other aspect of his life that may have been impacted by the collision. [EX 10, p. 105-106] The claims file is bereft of any analysis of Mr. Gaekwars pain, suffering, or loss of enjoyment of life. Mr. Grundy admitted the full extent of his investigation, besides reviewing records that plaintiff provided, was asking for a medical records review. He did ask for the surgical records of claimant's left knee replacement surgery upon hearing about the surgery, although there is no evidence that he reviewed the surgical records provided. [EX 10, p. 110]

Finally, when asked, Mr. Grundy could not think of anything he could have done better because he is a "seasoned adjuster." [EX 10, p. 111] In other words, going to the heart of this case, when evaluating a first party UIM claim, Amica feels it has no responsibility to do anything other than make the claimant do the investigation and to evaluate what is



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

provided, at least until they reach an opinion as to causation, after which no further information would matter, nor is there any need for continuing re-evaluations.

While Mr. Grundy was the assigned adjuster, behind-the-scenes the home office had raised the risks posed by the $140,000 demand letter by increasing the reserves to $95,000. [EX 1, Bate 2960]

## II. E - SUPERVISOR BARKLEY FINSTERBUSH (Exhibit 19)

Mr. Finsterbush's deposition was taken on July 20, 2023. [EX 19] He was the supervisor of adjuster Tom Grundy. [EX 19, p.14] Mr. Finsterbush agrees that it is important in the adjusting process to understand if the claimant had any pre-existing injuries related to the injuries being claimed. [EX 19, p.24] He agrees if a record is referred to by a claimant but was not provided, Amica would be interested in seeing it. He agrees there is no reason why the medical records reviewer hired by Mr. Grundy would not have been provided with pre-crash medical records. [EX 19, p. 37] He agrees a claimant should be kept up to date as to Amica's investigation, so he does not have an explanation for why the medical records report was not provided until some 3 months later. [EX 19, p. 38, 42-43] He agrees that an adjuster should be open and honest with a claimant. He agrees the standard of Amica is to make an offer, and that it is standard to provide an explanation for the figure offered. [EX 19, p. 41]

Mr. Finsterbush testified that in his understanding, the burden of proof is on the claimant to prove an injury. [EX 19, p. 45] He agrees an adjuster should not cherry pick records, but rather they should look at the entirety of the medical records and make an evaluation on all the records. [EX 19, p. 45-46] He doesn't feel that it's a requirement at



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

Amica to incorporate all the available medical records to evaluate the case. [EX 19, p. 53] He doesn't know why an adjuster would not incorporate or reference the opinions from a treating physician. [EX 19, p. 54-57] In reference to the records provided to the medical records reviewer, Mr. Finsterbush does not know a reason for not providing the reviewer with all available records up to that point. [EX 19, p. 58-60].

On pages 63-72, Mr. Finsterbush agreed that good faith handling of a claim would mean a complete investigation (he did not understand what "thorough" meant); that Amica had a duty to act in good faith; that Amica looks to make a fair and prompt settlement; that he does not understand what "equal consideration" means; although he says there should never be a situation where the investigation should not be unreasonable, but does not know what "reasonable investigation" means.

## II. F - OPINIONS OF SURGEON, DR. ROBERT GOLDMAN (Exhibit 14)

Dr. Robert Goldman expressed his opinions under oath on three occasions: his declaration of May 10, 2022 [EX 13], his Report of June 11, 2023 [EX 14] and his deposition on August 21, 2023. Dr. Goldman has cared for Mr. Gaekwar as a surgeon since 2014. His report and declaration verify that Mr. Gaekwar's medical treatments for the injury to his left knee were reasonable, necessary and caused by the crash of January 25, 2020. Amica took Dr. Goldman's deposition, but did not order the transcript.

## II. G - OPINIONS OF MEDICAL EXPERT, DR. BRIAN WICKS (Exhibit 15)

The report of Dr. Brian P. Wicks [EX 15] likewise supports, on a more probable than not basis, the injury claim of Mr. Gaekwar, including causation. Amica took Dr. Wicks deposition, but did not order a transcript.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

## III. DISCUSSION

## III. A - GENERAL PRICIPLES OF INSURANCE CLAIMS LAW

The purpose of insurance is to provide the benefits and security of coverage. A purchaser of insurance reasonably and legally expects more than just the pieces of paper constituting the policy. Insureds purchase the potential benefits and security of coverage. When an insured is denied those benefits, the insurer engages in acts of bad faith and breaches its duty of fair dealing. *Salois v. Mut. of Omaha Ins. Co.*, 90 Wn.2d 355, 360, 581 P.2d 1349, 1351, 1978 Wash. LEXIS 1217, *9

An insurance company must act in good faith, even in handling UIM claims. *Escalante v. Sentry Ins. Co*., 49 Wn. App. 375, 384-385, 743 P.2d 832, 837 (1987). The duty of good faith handling of a claim continues even in UIM litigation. *Babai v. Allstate Ins. Co.,* No. C12-1518 JCC, 2015 WL 1880441, at 4 (W.D. Wash. Apr. 24, 2015). *Ellwein v. Hartford Acc. & Indem. Co.,* 142 Wn.2d 766, 780, 15 P.3d 640 (2001).

An insurance company must never cherry pick facts to benefit itself by creating an argument denigrating a claim. *Scanlon v. Life Ins. Co. of N. Am.*, 670 F. Supp. 2d 1181, 1195-96 (W.D. Wash. 2009) (holding that insurer conducted a bad faith investigation where it denied the insured's claim by relying upon single doctors two sentence memorandum, ignoring multiple medical professionals' conflicting conclusions, and failing to further investigate claim).

It is not a reasonable basis to deny a claim based on speculation or conjecture. Likewise, an insurer must make a good faith investigation <u>before</u> denying a claim. It is not a reasonable investigation if an evaluation is based on any asserted ‘facts’ which a reasonable investigation would have proved to be unfounded.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> "An insurer does not have a reasonable basis for denying coverage and, therefore, acts without reasonable justification when it denies coverage based upon suspicion and conjecture." *Indus. Indem. Co. v. Kallevig,* 114 Wn.2d 907, 917, 792 P.2d 520 (1990) (holding that "an insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit"). As explained in *Bryant,* where "reasonable minds could not differ as to a finding that [the adjuster's] incuriousness and her failure to inquire further" into the claim constitutes a failure to conduct a reasonable investigation of the claim, summary judgment is warranted. *Bryant,* 414 F. Supp. 2d at 1000 (granting summary judgment where insurer did not dispute that it made its coverage decision based on assumptions and misinformation regarding facts surrounding policyholder's death).
> *Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1236, 2008 U.S. Dist. LEXIS 59515, *19-20

To constitute a 'reasonable investigation," the investigation must be timely before denying a claim:

> "The implied covenant of good faith and fair dealing in the policy should necessarily require the insurer to conduct any necessary investigation in a timely fashion and to conduct a reasonable investigation before denying coverage. In the event the insurer fails in either regard, it will have breached the covenant and, therefore, the policy." *Coventry Associates v. American States Ins. Co.* 136 Wn.2d 269, 281, 961 P.2d 933, 938 (1998); *Industrial Indemnity Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 792 P.2d 520, 526 (1990); 15A Couch, CYCLOPEDIA OF INSURANCE LAW, § 58:180 (2d rev. ed. 1983).

Insurance company low ball offers can result in insurance company liability under all the theories of liability. The principle is that an insurance company may not make a low ball offer if the offer is not based on a reasonable evaluation of what it knew, <u>or should have known,</u> at the time of the offer. *Morella v. Safeco Ins. Co.*, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032

*Morella* held that:



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> "…where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied."

See, also, *Langley v. GEICO General Ins. Co*., 89 F.Supp.3d 1083 (E.D. Wash. 2015).

Exhibit 16 is the facing page of plaintiff's answers to Amica's interrogatories, together with pages 14 through 15 of those answers, as well as the signature page dated March 13, 2023. This is a description of many of the effects the collision of January 25, 2020 imposed on Mr. Gaekwar. This is submitted to the court as an indication of what Amica should have learned had it done a reasonable investigation. As described in *Morella, supra,* the requirements in Washington are to adjudicate an insurer's conduct based on what it knew, or should have known, at the time it was adjusting the claim. Mr. Gaekwar's recitation describes what Amica should have known.

Lessons can be learned from *Heide v. State Farm Mutal Auto. Ins. Co.*, 261 F. Supp. 3d 1104, 1107-1108, 2017 U.S. Dist. LEXIS 81341, *4-6,

> "IFCA provides that any "first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action . . . to recover the actual damages sustained." RCW 48.30.015(1). Decisions in this district, including one from this Court, have concluded that the "payment of benefits" prong of IFCA covers scenarios where an insurer makes an unreasonably low offer. *See, e.g., Kovarik v. State Farm Mutual Automobile Insurance Co.*, 2016 U.S. Dist. LEXIS 118467, 2016 WL 4555465, at *3 (W.D. Wash. Aug. 31, 2016) (Zilly, J.); *Morella v. Safeco Ins. Co. of Ill.*, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032, at *3 (W.D. Was. Apr. 12, 2013) The reasonableness of State Farm's offer here turns on whether plaintiff's internal bleeding can be traced to plaintiff's use of NSAIDs he took to manage pain resulting from the car accident. If it was unreasonable



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> for State Farm to determine that plaintiff's gastro-intestinal bleeding was unrelated to his use of NSAIDs, then its offer was unreasonable and in violation of IFCA because State Farm offered an amount it knew, in light of the medical evidence it received from plaintiff, was significantly less than the value of plaintiff's claim. *See Morella*, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032, at *4 (holding that, as a matter of law, an insurer's offer was an unreasonable denial of the payment of benefits where it valued the claim internally between $11,194.80 and $15,694.80 but offered only $1,500 to settle the claim)."

A good summary of the insurance law relating to low ball offers (including under IFCA and the CPA) can be found at *Taladay v. Metro. Grp. Prop. & Cas. Ins. Co.*, 2016 U.S. Dist. LEXIS 87659, 2016 WL 3681469 and cases cited therein. Magistrate Judge James P. Donahue held:

> "This Court has recognized that "a refusal to pay a demand for coverage reasonably promptly is an unreasonable denial of benefits, even if only temporary." *Id. See also Freeman v. State Farm Mut. Auto. Ins. Co.*, No. 11-761-RAJ, 2012 U.S. Dist. LEXIS 98457, 2012 WL 2891167, at *3 (W.D. Wash. July 16, 2012) ("For purposes of an insured's extracontractual claim, a failure to pay the amount the insured requests is a denial of coverage. Were it otherwise, an insurer could avoid extracontractual liability merely by conceding coverage, paying its insured one dollar, and refusing to pay any more."). When considering whether the statutory language "denial of payment of benefits" requires an outright refusal by the insurer to pay a specific benefit promised by the policy or whether an unreasonably low payment also triggers the statute, this Court has previously held:
>
> [A]n insurer cannot escape IFCA simply by accepting a claim and paying or offering to pay an unreasonable amount. The benefits to which the first-party insured is entitled are generally described as payment of the reasonable expenses or losses incurred as a result of an insured event. Where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied. If, on the other hand, the insurer makes a reasonable payment based on the known facts or is making a good faith effort to appropriately value the loss, the fact that the insured did not immediately



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> get all of the benefits to which it may ultimately be entitled does not establish an "unreasonable denial of payment of benefits." *Morella v. Safeco Ins. Co. of Illinois*, No. 12-0672-RSL, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032, at *3 (W.D. Wash. April 12, 2013). Thus, under IFCA the question is whether MetLife's conduct amounted to an unreasonable denial of a claim for coverage or payment of benefits to which plaintiffs were entitled under the policy."

**<u>III. B - MR. GAEKWAR'S CONSUMER PROTECTION ACT CLAIM</u>**

> "The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance." RCW 48.01.030

Amica's discussion of Mr. Gaekwar's Consumer Protection Act claims are on pages 19 through 21 of its brief. The CPA is RCW 19.86.010 through .920. The elements of a private consumer protection act claim were established in *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531, 533, 1986 Wash. LEXIS 1190:

> "We hold that to prevail in a private CPA action and therefore be entitled to attorney fees, a plaintiff must establish five distinct elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation."

Defendant misunderstands the CPA in the context of Insurance. Defendant's brief focuses only on the applicability of the consumer protection act to business losses. There is a large number of Washington and Federal cases in the context of insurance that Amica does not cite to this Court. It is disingenuous for Amica to ignore the declared public policy of our state regarding insurance matters as stated in RCW48.01.030, pursuant to which a violation of the regulations promulgated by the Insurance Commissioner create per se violations of the CPA. An insurer's breach of regulations promulgated by the insurance commissioner,



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

particularly WAC 284-30-330, constitutes a per se unfair trade practice violation and 'insureds may bring a private action against their insurers for breach of duty of good faith under the CPA. *Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 697, 17 P.3d 1229 (2001) (quoting *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 394, 715 P.2d 1133 (1986)); *accord Perez-Crisantos v. State Farm Fire & Cas. Co.*, 187 Wn.2d 669, 685, 389 P.3d 476 (2017) ("A CPA claim can be predicated on a violation of WAC 284-30-330.").

## III. C - MR. GAEKWAR'S BAD FAITH CLAIMS

"Bad Faith" is a common-law claim. In ordinary language that term has connotations of intent to deceive. In the law of insurance, the claimant does not have to prove intent, or malice, or acts of dishonesty. The claimant must prove that the insurance company's conduct was unreasonable, frivolous, or unfounded. *Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 78 P.3d 1274, 2003 Wash. LEXIS 739. Insurance companies occasionally revert to the common meaning and claim as defenses such things as innocent mistakes in evaluating claims. There are no such defenses.

Insurance bad faith also incorporates and overlaps with the principles of a Consumer Protection Act claim. A claimant can prove liability if the insurance company violates the specific claims handling regulations found in the Washington Administrative Code 284-30-330 *et.seq*. see, e.g. *Tank v. State Farm Fire & Casualty Co*., 105 Wn.2d 381, 715 P.2d 1133, 1986 Wash. LEXIS 1078. A bad faith theory allows the claimant to recover some of the overlapping damages with the other theories, such as the CPA. Our courts have recognized that the insurance relationship carries with it benefits to the insured in addition to monetary damages, such as a benefit to have a full and fair investigation of the claim at the



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

insurer's expense. Failure to do so creates harms to the insured. It is deemed insurance bad faith even when the insured's allegations of failure to investigate would ultimately have shown no coverage for the claimed loss. See*, Coventry v. American States Ins. Co*., 136 Wn.2d 269, 961 P.2d 933, 1998 Wash. LEXIS 589.

In a bad faith case, the insured may recover all consequential damages, both economic and noneconomic, including emotional distress damages. See *Anderson v. State Farm Mut. Ins. Co.,* 101 Wn. App. 323, 2 P.3d 1029, 2000 Wash. App. LEXIS 977*; Schreib v. Am. Family Mut. Ins. Co.,* 129 F. Supp. 3d 1129, 2015 U.S. Dist. LEXIS 118189.

## III. D - LIABILITY UNDER THE INSURANCE FAIR CONDUCT ACT (IFCA)

IFCA provides a cause of action when an insurance policy claimant is "unreasonably denied a claim for coverage **or** payment of benefits by an insurer." RCW 48.30.015(1). A prevailing party is entitled to "actual damages sustained, together with the costs of the action;" these "costs of the action" specifically comprise "reasonable attorneys' fees and litigation costs," RCW 48.30.015(1), including expert witness fees, RCW 48.30.015(3). In addition, the court can award enhanced damages, "not to exceed three times the actual damages." RCW 48.30.015(2). *Schreib v. Am. Family Mut. Ins. Co.,* 129 F. Supp. 3d 1129, 1134-1135, 2015 U.S. Dist. LEXIS 118189, *7.

Defendant cites *Perez-Crisantos v. State Farm Fire & Cas. Co.,* 187 Wn.2d 669, 389 P.3d 476, 2017 Wash. LEXIS 92, 2017 WL 448991 but misinterprets the holding. *Perez* dissects the IFCA statute, RCW 48.30.015. It contains 8 subsections. The first subsection is the introductory provision where it states a first party claimant to a policy of insurance who is unreasonably denied a claim for coverage **or** payment of benefits may bring an action in



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

the Superior Court to recover actual damages together with costs, reasonable attorneys fees, and litigation costs, including expert fees. The 2nd subsection allows a court to increase the total award of damages in an amount not to exceed 3 times the actual damages after finding that an insurer has acted unreasonably in denying the claim for coverage, **or** payment of benefits, or has violated a rule in (5). Subsection 3 requires the court to award reasonable attorney's fees and costs after a finding of unreasonable denial of a claim for coverage or payment of benefits.

The *Perez* court did establish that a violation of the WAC claims handling regulations alone did not establish a per se violation under IFCA. What is basically required is that the claimant present evidence that, in the language of subsection 1: "any first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits."

Several cases after the holding in *Perez-Crisantos* held that unreasonable conduct by insurance companies, including failure to reasonably investigate a claim or unreasonably making offers, will support IFCA liability. See, e.g., *Hopkins v. Integon Gen. Ins. Co.,* 2020 U.S. Dist. LEXIS 53311, 2020 WL 1467346 in which Judge Marsha J. Pechman held:

> "IFCA provides a cause of action when an insurance policy claimant is "unreasonably denied a claim for coverage or payment of benefits by an insurer." RCW 48.30.015(1). "Where the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied." *Morella v. Safeco Ins. Co. of Illinois,* No. C12-0672RSL, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032, at *3 (W.D. Wash. Apr. 12, 2013); *Heide v. State Farm Mut. Auto. Ins. Co.,* 261 F. Supp. 3d 1104, 1107 (W.D. Wash. 2017). "A determination of whether an offer effectively denies an insured the



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> benefits of the insurance policy should focus 'primarily on what [the insurer] knew or should have known at the time the offer was made." Heide, 261 F. Supp. 3d at 1107-08 (quoting *Morella*, 2013 U.S. Dist. LEXIS 53255, 2013 WL 1562032, at *4)."

The *Hopkins* court further held:

> "However, this Court previously concluded that an expert witness fee constitutes "actual damages" under IFCA. *Wall v. Country Mut. Ins. Co.,* 319 F. Supp. 3d 1227, 1235 (W.D. Wash. 2018). In *Wall*, the Court applied the reasoning of *Coventry v. American States Ins. Co*., 136 Wash.2d 269, 281-83, 961 P.2d 933 (1998), which held that expert witness fees constitute "harm" in bad faith actions. Finding it is not possible to have an "unreasonable denial" by an insurer that does not amount to bad faith conduct, this Court held that if Plaintiffs were to succeed in establishing an unreasonable denial on the part of the Defendant, their expert witness fees would constitute "harm.""

In the *Wall* case, cited in *Hopkins*, the court held that an insurance company's failure to reasonably investigate would support IFCA liability even when the facts ultimately showed no entitlement by the claimant for coverage. This holding establishes that a full and fair investigation is a paramount benefit in any insurance policy.

**III. E - MR. RICHARD DYKSTRA'S EXPERT REPORT (Exhibit 17)**

Mr. Dykstra's Expert Report dated June 12, 2023 is provided as exhibit 17. He has vast experience in the insurance industry, has been qualified numerous times as a claim's handling expert, lectures on claims disputes, has helped train adjusters, and is frequently consulted on bad faith and related cases. His CV is Ex. A to his Report. Ex. B to his report is his testimonial history and history of past expert reports. Ex. C to his report is a list of the documents he had available for his report. His report avoids 'legal' opinions (see ftnote 1). Mr. Dykstra's opinions are carefully sourced in the body of his report and in extensive footnotes. Attached to the Balint declaration as exhibits 17.1-17.5 are the Amica training



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

documents referred to in Mr. Dykstra's report. These citations are to industry standards and to Amica's training materials provided in discovery.

Mr. Dykstra's report is segregated by time periods. Mr. Dykstra summarized the general insurance claims handling standards not followed by Amica in Summary Opinion 1, pp.3-5. The Amica failures are outlined in the rest of his report, which the Court is encouraged to read in full.

Mr. Dykstra was deposed on August 7, 2023. [EX 18] His testimony closely follows his report. Of particular interest, defense counsel asked him to explain Reserves, the purpose of setting them, the basis for setting them, and the required accuracy in valuing a claim. (p.53-58) It is to be noted that none of the Amica witnesses, including its FRCP 30(b)(6) witness, explained how its pre-suit reserves were broken down between assessment of the value of Mr. Gaekwar's injuries, costs and attorneys fees.

## IV. <u>AMICA'S IRRELEVANT, MISLEADING AND INCOMPLETE CITATIONS</u>

Amica's summary judgment brief contains a number of case citations having little, if anything, to do with the issues in the instant case. For example, on page 13 of the brief, *Travelers Indem. Co. v. Bronsink*, 2010 U.S. Dist. LEXIS 2118, *1, 2010 WL 148366 is cited. Judge Robart had earlier granted Travelers partial summary judgment motion finding that the insured had voluntarily canceled his insurance policy prior to the fire loss. Accordingly, when Travelers sought dismissal of the extracontractual claims, the former insured did not even contest the dismissal and the court granted it.

More mysterious is Amica's reliance on *Cardenas v. Navigators Ins. Co*, 2011 U.S. Dist. LEXIS 145194, 2011 WL 6300253, cited on page 14 of its motion. In *Cardenas*, a



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

construction insurance case, Cardenas was sued by a construction client. Cardenas was insured by Navigators Insurance Company. Cardenas tendered a claim of defense to its insurance company but sent the notice to the wrong address. When finally notified of the claim, the insurance company immediately opened a claim file. A case alleging a delay of a few days in accepting its duty to defend has nothing to do with our case.

Defendant cites another highly tangential case (on p. 14): *Weinstein & Riley, P.S. v. Westport Ins. Corp.,* 2011 U.S. Dist. LEXIS 26369, 2011 WL 887552**,** [Affirmed at *Weinstein & Riley PS v. Westport Ins. Corp.,* 484 Fed. Appx. 121, 2012 U.S. App. LEXIS 11402, 2012 WL 2024770]. This case is not a summary judgment case, but rather Findings of Fact (90 of them), and Conclusions of Law and Judgment following trial to the bench of Judge James L Robart in 2010. The primary issues in the case were not a violation of the duty to properly investigate claim, but rather was primarily a duty to defend, as well as the insured's assertion that it had the right to choose defense counsel, and other collateral issues**.**

A 2012 case is relied upon and cited on page 14: *Country Preferred Ins. Co. v. Hurless*, 2012 U.S. Dist. LEXIS 134201, 2012 WL 4127727. The citation is a decision by Judge Ricardo Martinez denying a motion for reconsideration. The underlying case was about the failure by the insured plaintiff to offer any evidence as to the permanency of Mr. Hurless' injuries prior to an arbitration hearing, after which the insurer, Country Preferred, promptly paid its UIM limits. The underlying case did not deal with the adequacy of the insurer's investigation, but almost solely of the failure to provide the insurer with any evidence of permanency. *Country Preferred Ins. Co. v. Hurless*, 2012 U.S. Dist. LEXIS 86334, 2012 WL 2367073.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

*Lease Crutcher Lewis WA, LLC v. Nat'l Union Fire Ins. Co.,* 2010 U.S. Dist. LEXIS 110866, 2010 WL 4272453, a 2010 ruling by Judge Robert S Lasnik on cross motions for summary judgment, is relied upon on pages 13-14 of Amica's brief. Lease Crutcher, the insured, was sued for damages from a crane collapse on a construction project. The Court granted the insured motion for summary judgment on its CPA and bad faith claims based primarily of violating Washington's make whole doctrine. The ruling dismissed insured's IFCA complaint because the insured did not allege denial of a claim or payment, instead improperly relying solely on per se violations of WAC 284-30-330.

In 2011 Judge Marsha J. Pechman ruled on an insured's motion for summary judgment in a fire loss case: *MK Lim, Inc. v. Greenwich Ins. Co.,* 2011 U.S. Dist. LEXIS 126395, cited by Amica on page 13 of its brief. Greenwich made a series of payments to its insured, eventually paying the full amount of the loss. The lawsuit claimed additional damages due to allegations of substantial business interruption costs. The insurer admitted per se violations of the CPA. The court declined to dismiss the CPA claim for business interruptions because the insured submitted an expert's opinion on the amount of the losses. The court did dismiss the IFCA cause of action holding that a delay of payment, in and of itself, did not constitute a denial of payment. *MK Lim* was not a UIM claim, nor a failure to investigate case.

*GCG Assocs. LP v. Am. Cas. Co. of Reading Pa.,* 2008 U.S. Dist. LEXIS 61921, 2008 WL 3542620 is a decision cited on page 15 of Amica's motion. It is a 2008 decision by Judge Benjamin H. Settle in a construction defects case. The main issue was a question of coverage surrounding the definition of 'collapse' in the insurance policy. The insured



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

hired its own expert that drilled holes in the building cladding to determine if water damage affected the structural integrity of the building and when it occurred. American Casualty wanted more investigation and, after initial resistance by the plaintiff, the building's owner, the insurance company experts were allowed to drill more inspection holes. The method used by the insurance experts was based on sampling based on all the holes drilled. The building owners wanted the entire cladding to be torn off to inspect the extent and aging of all possible damage. The insured offered no expert proof that the sampling method was not sufficient. Judge Settle noted that 'reasonableness' of an investigation is highly fact and context dependent.

A modern opinion, and more directly on point opinion, from Judge Settle can be found at *Curtis v. State Farm Mut. Auto. Ins. Co.,* 2023 U.S. Dist. LEXIS 139856, 2023 WL 5152560. *Curtis* is a UIM case. The insurer sought summary judgment of all extra-contractual claims, trying to characterize the dispute as "merely the value of the UIM claim." Judge Settle provides a review of the various theories of liability in the 1st party UIM context. Like Amica in our case, State Farm obtained a records reviewer's medical opinion. Like the case at bar, the reviewer cherry picked certain entries and concluded that the insured's knee injury had resolved. It is worth quoting in full Judge Settle's summary of the paper review's conclusion:

> 'In March 2022, State Farm obtained a report from an independent medical examiner, Dr. Alan Brown, who reviewed Curtis's medical file. *Id.* …. Brown further remarked that a note from a physical therapy appointment in August 2021 indicated that Curtis "report[ed] 0/10 left knee pain and [that] the plan was for discharge from physical therapy." *Id.* at 5. Brown stated, however, that this same physical therapy note stated that Curtis continued to experience "persistent crepitation" in her left knee. *Id.* at 6.



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

Both because Curtis reported no pain at her last physical therapy appointment and because Brown concluded that Curtis most likely did not require further treatment, State Farm took the position that Curtis's patellofemoral chondrosis was not permanent. [The adjuster] similarly concluded that Curtis did not require further treatment because Curtis reported no pain and was discharged from physical therapy… [The adjuster] further interpreted the physical therapy discharge note as stating that Curtis's patellofemoral chondrosis was entirely asymptomatic because Curtis no longer experienced pain. *Id.* State Farm accordingly did not change its evaluation of Curtis's UIM claim.'

The Court framed the issues as follows:

"However, all these arguments can be narrowed down to this—a fact issue exists as to whether State Farm failed to reasonably both investigate the severity of an injury to Curtis's left knee and, in turn, account for this injury in evaluating her UIM claim."

Then the Court summarized the law as to each theory of insurer liability and held that:

"Genuine issues of material fact exist concerning each of Curtis's extracontractual claims. Regarding the bad faith and IFCA claims, a fact issue exists as to whether State Farm reasonably investigated and evaluated Curtis's UIM claim."

Like our case, the insurer in *Curtis* maintained that since it "stands in the shoes" of the tortfeasor it is not required to give equal consideration to the interests of the insured, but has the right to be adversarial in all matters. Judge Settle disagreed, limiting the "standing in the shoes argument" to issues of liability. Once liability is determined to be solely on the tortfeasor the first party obligations of the insurance company remain in effect. The court held:

'In any event, *Ellwein* holds that, because UIM insurers "'stand[] in the shoes' of the tortfeasor," "UIM insurers are allowed to assert *liability* defenses available to the tortfeasor." 142 Wn.2d at 780 (emphasis added); *accord Craft*, 572 F.2d at 568 ("[T]he insurer



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

> stands in the shoes of the uninsured motorist with regard to the question of *whether the latter was negligent* and with regard to his *defenses such as contributory negligence*" (Emphases added)). State Farm does not seek to assert any liability defenses that would otherwise be available to Gibbs, the underinsured motorist. It instead concedes that "Ms. Gibbs [was] 100% at fault for the collision." Dkt. 22 at 3. *Ellwein* is therefore of no aid to State Farm.'

*Dayton v. Farmers Ins. Group*, 124 Wn.2d 277, 876 P.2d 896, 1994 Wash. LEXIS 450, cited on pages 15-16 in Amica's brief, was a case involving issues on a confirmation of an arbitration award. The Superior Court confirmed the award, but also awarded the insured attorneys fees and costs pursuant to the narrow circumstances of *Olympic S.S. Co. v. Centennial Ins. Co.,* 117 Wn.2d 37, 811 P.2d 673 (1991). Our Supreme Court reversed the award of attorneys fees. The Court held that the arbitration issue was solely a matter of valuation. There was no issue of reasonable investigation. The court observed that compensatory damage awards are highly individual and highly dependent on the facts of each case, especially in personal injury cases, which involve special and general damages. In and of itself this is not controversial. What is objectionable is Amica's unsupported framing of the case that adjuster's damages evaluations are speculative (on page 15 of Amica Brief):

> "In a UIM claim the adjuster's task of evaluation is necessarily a speculative undertaking and bodily injury damages evaluations are, therefore, necessarily afforded a broad range of latitude…"

Tellingly, Amica does not cite, or discuss, *Beasley v. GEICO Gen. Ins. Co.,* 23 Wn. App. 2d 641, 517 P.3d 500, 2022 Wash. App. LEXIS 1844, 2022 WL 4353226. The plaintiff was a passenger in a car driven by a GEICO insured, whose coverage also included $100,000 UIM limits. As a passenger, the plaintiff was accordingly a first party claimant. The *Beasley* court noted that the causes of action against GEICO were many and varied, giving the court



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

an opportunity to discuss the relief available under each cause of action. The issues were framed as follows:

> "Jerymaine Beasley was injured in a car accident that occurred when he was the passenger in [a driver's] vehicle. The accident was caused by the driver of the other car, who had policy limits of $25,000 and therefore was "underinsured." … [The driver's] insurance policy with GEICO included UIM coverage. Beasley demanded that GEICO pay the $100,000 limit of [the] UIM policy. GEICO offered to pay $10,000 to settle Beasley's UIM claim. Beasley rejected the offer as insufficient, but his counsel requested that GEICO pay the $10,000 as an undisputed UIM amount. GEICO did not issue the $10,000 payment.
>
> Beasley sued GEICO. Among other claims, Beasley alleged that GEICO had violated RCW 48.30.015 of IFCA, breached the duty of insurance good faith, breached its fiduciary duty, violated the Consumer Protection Act (CPA), acted negligently, and breached the insurance contract. The case proceeded to a jury trial."

The *Beasley* court first held that IFCA damages include noneconomic damages, such as pain and suffering, and loss of enjoyment of life. Then the court discussed the available remedies under the different theories forming the basis of the suit. The Court held that failure to pay even the minimum amount evaluated by the insurer constituted bad faith.

## V. CONCLUSION

The various adjusters and supervisors at Amica were questioned closely in deposition about what active investigation they undertook to evaluate the harms and losses to Mr. Gaekwar. Much of their testimony is detailed above. In its summary judgment brief, Amica asserts an ultimate issue of fact which is disputed, did "Amica performed a prompt and reasonable investigation into Mr. Gaekwar's claims and fairly determine that Mr. Gaekwar's pre-existing condition was not related to the incident." Here is the sum of Amica's admitted responsibility and actions to investigate Mr. Gaekwar's claim: (1) the adjusters reviewed



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

some of the medical records provided by plaintiff's counsel; (2) Amica hired Dr. Kearney to review selective records provided to him; (3) being aware of the scheduling of Mr. Gaekwar's surgery of his left knee, they asked for the surgery records.

Except for the limited actions listed above, none of the adjusters could cite any other active investigation. In fact, the adjusters all admitted that they were making Mr. Gaekwar and his attorney do all of the investigation. The failure to even a rudimentary investigation is extraordinary. These failures are described above.

Amica would like to characterize the dispute as merely over the value of the harms and losses to Mr. Gaekwar. Such a facile characterization is flawed. The real dispute is over the failure of Amica to comply with its duties to fully and fairly investigate his claims before rejecting his demands. The failures at all levels of Amica's claim handlers should be shocking. These failures more than justify the denial of its summary judgment motion and justifies a finding of misconduct under all applicable legal principles, contract, common law bad faith, the CPA, and IFCA. This is exemplified by the testimony of both adjusters, and their supervisors, that they could not identify anything they could have done better in the handling of Mr. Gaekwar's UIM claim. The experience of Mr. Gaekwar seems to be typical of Amica's treatment of Washington insureds.

Respectfully submitted this 31st day of August 2023.

BALINT & ASSOCIATES, PLLC

By: s/ David J. Balint

David J. Balint (WSBA #5881)
Attorney for Plaintiff



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729

## CERTIFICATE OF SERVICE

I hereby declare under the penalty of perjury under the laws of the State of Washington that I have served a true and correct copy of the foregoing, except where noted, upon the individual(s) listed by the following means:

Rory Leid, III (WSBA# 25075)
Lucy Wilhelm (WSBA# 57130)
Wathen, Lied, Hall, Rider, PC
222 Etruia Street
Seattle, WA 98109 – 1659

[ ] U.S. Postal Service (First Class)
[ ] Facsimile to ________________
[ ] Hand Delivery ________________
[ ] Via Legal Messenger for Service by ABC Legal
[X] E-Service

DATED: 8/31/23

By: *Reno Ettienne*
Name: Reno Ettienne
Title: Paralegal



BALINT & ASSOCIATES, PLLC
5950 SIXTH AVE. S., #200
SEATTLE, WA 98108
Phone: (206) 728-7799
Fax: (206) 728-2729