# Exhibit 1

**By:** -Grundy, Thomas W. (07/26/2022 04:56 PM)

[redacted]

**By:** -Grundy, Thomas W. (07/26/2022 10:28 AM)

[redacted]

| | |
|---|---|
| **By:** | **-Grundy, Thomas W. (07/25/2022 05:57 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Sent email to DC Rory Leid. If they can accept we will forward over a copy of the file.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

**By:** -Finsterbush, Barkley (07/25/2022 05:51 PM)

| | |
|---|---|
| **Topic:** | **Review** |
| **Text:** | **Hey Tom,**<br><br>**Thanks for notifying me of this IFCA complaint. As discussed, please forward the file to DC and have them review. Please let me know if there are any questions.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (07/25/2022 05:33 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Barkley,**<br><br>**Please be advised that we have recd:**<br><br>**$ccDocLink(94588891)**<br>**$ccDocLink(94588042)**<br>**$ccDocLink(94588334)**<br><br>**PC notes: A hard copy has been sent via regular mail to Amica, as well as the Office of the Insurance Commissioner, and advises, "Hopefully, Amica will take the time this 20-day notice period to make an effort to treat its inured fairly."** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (07/18/2022 03:24 PM)** |
| **Topic:** | **Other** |

| | |
|---|---|
| **Text:** | **PC advised:**<br><br>**I received your letter of July 12 repeating Amica's offer of $5000. I am disappointed that the updated medical information, photo, and surgeon's sworn declaration and analysis did not change Amica's offer. Unfortunately, this forces Mr. Gaekwar to file suit so that a jury can decide fair compensation. An IFCA letter will be drafted and sent as a required prelude to filing a lawsuit. Your concluding line about mediation is evidence of bad faith when no amount of damages material provided to you changes the pre-surgery offer. My client is anxious to settle and remains willing to negotiate but Amica displays little effort to be fair to its insured.**<br><br>**---------------**<br><br>**Responded with:**<br><br>**I respectfully disagree with you that offering to Mediate this case is bad faith.**<br><br>**As you are aware, the MRR expert opined that the surgery would be unrelated to the accident and related to a degenerative condition.**<br><br>**We have a valid disagreement on value of the case and your demand has drastically increased.**<br><br>**I am willing to review a new demand but we are very far apart at this point, which is why I thought Mediation may help bridge the gap. Please let me know if you would like to continue negotiations.** |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Crocker, Benjamin A. (07/18/2022 11:12 AM)** |
| **Topic:** | **Demand** |

| | |
|---|---|
| **Subject** | **Demand Reviewed** |
| **Text:** | **Demand response issued.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Barefield, Dana L. (07/13/2022 11:40 AM)** |
| **Topic:** | **Review** |
| **Text:** | **Rec'd incoming call from provider wanting to verify UIM adjuster contact information.** |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Finsterbush, Barkley (07/12/2022 10:47 AM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **TLD response issued** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (07/12/2022 10:33 AM)** |
| **Topic:** | **Other** |
| **Text:** | **Proposed response letter sent to Supp for review. Rejecting demand, offer** |

| | |
|---|---|
| | of $5K remains, and offer to mediate. |
| | Thx-TG. |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Finsterbush, Barkley (07/11/2022 05:14 PM) |
| **Topic:** | Review |
| **Text:** | Hey Tom, |
| | Thanks for your review. Ok to proceed as recommended. |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Grundy, Thomas W. (07/11/2022 03:43 PM) |
| **Topic:** | Other |
| **Text:** | As a recap, the initial demand was $140K. TF limits were $50K and $10K Pd in PIP. Prior adjuster had offered $1k new money. |
| | PC was claiming that sx is inevitable. PC claims that Dr. Scott advised Clmt would benefit from a left total knee replacement with avg cost of $30K. |
| | Clmt has a hx of arthritis and treating physician noted it was severe enough that someday he would need the sx, |
| | We retained an MRR expert. Key finding was the examiner's opinion that this condition was pre existing and neither caused by nor permanently aggravated by the motor vehicle accident and therefore any surgery proposed |

for this condition would be considered unrelated to the motor vehicle accident of January 25, 2020. If the claimant were to proceed with left total knee arthroplasty, this would be considered outside of the claim.

--------------------

We increased our new money offer to $5,000 on 12/6/2021. This was rejected. POA screens are updated.

The Sx went forward in December of 2021. PC advised that the surgery bill from AHS Hospital was for $81,009.91 and the rehab bill from Atlantic Rehab for $26,342.02. PC advised this treatment was approved by Mr. Gaekwar's surgeon and approved by Medicare as reasonable and unnecessary (typo?)

I am reviewing: $ccDocLink(94172631)

- Dated 6/30/2022
- Notes the previous meds totaling $19K
- Claiming an additional $136K in specials from 5/4/31-12/4/21 inclusive of adtl conservative care and left knee sx fees.
- Claiming total meds at $155K.

- PC is claiming that he had no active issues to his left knee prior to the MVA.

- PC includes a photo of his left knee allegedly taken shortly after the MVA. There is an open wound and scar.

- PC claims that our MRR report will not suffice.
- Demand is now $275K new money including waiver of PIP.
- PC will assume all liens.

--------------

Review of new Meds:

$ccDocLink(94282785)

- 10/21/21- Seen for left knee pain. Notes rt knee replacement 3 years

prior.
- x-rays confirm severe osteoarthritis.
- At this point the patient has undergone six months of physical therapy.
He has not had much improvement with this. He has been on meloxicam 15 mg a day for pain, but he has had multiple cortisone shots and hyaluronic acid injections, and it has not been very effective for him. He would like to proceed now with left total knee replacement. The procedure was reviewed in detail. He understands this and would like to have it scheduled for the near future.

- Sx took place on 12/13/2021. He went to inpatient rehab after surgery and continues to be there. He is making good progress with therapy and should be discharged from inpatient rehab tomorrow.

$ccDocLink(94283515)

- 12/13/21. Pre Op Recs.
***Pre-Opp Diagnosis is localized osteoarthritis of the left knee.

$ccDocLink(94283708)

- PT recs.  Noted Clmt is known from previous course of care.
- Recs for post sx PT.
- Knee is improving but not bending.
- Recs note the left knee replacement "due to OA"***(Not due to MVA).
- Post opp progress appears good.
- Tx is through 4/29/2022.

$ccDocLink(94283521)
$ccDocLink(94283532)
$ccDocLink(94283239)
$ccDocLink(94282841)

Set one pg 33 notes: A 76-year-old male with history of primary osteoarthritis of the left knee, presents to Arthritis Center for testing for their upcoming surgical procedure for a left knee arthroplasty, total replacement which is scheduled for 12/13/2021. This is considered intermediate-risk surgical procedure. Reports that he has had Synvisc injections into left knee with short-term pain relief. He had physical

therapy on the left knee for the last 1.5 years. Pain level in left knee ranges from a 6 to a 7 on a scale 0-10 with 10 being the worst. He reports that his left knee pain has gotten worse since January 2000 after a motor vehicle accident when his knee hit the dash board. Left knee pain worsens when going down stairs.

- Pg 115 Dr notes: I Confirm: The hospital inpatient services are reasonable and necessary and appropriately ordered in this case. And: For Medicare Part A patients I expect that they will stay at least 2 midnights, except for those that bill under the exceptions defined in 42 CFR 412.3. Patients will require 2 midnights in order to manage post-operative anemia, treat gait disturbances and ensure home safety.

- Recs include PT/OT post sx.

-----------------------------------------------

After review of the newly provided left knee surgery records, this does not change our evaluation of the case. PC is claiming bills now totaling $155K. POA shows $145K. There were significant Medicare adjustments on the sx, Ortho, and PT bills. For instance, the $85K sx bill was adjusted by $65K. Medicare pd just $16K.

Regardless, it would appear that the left knee issues stemmed from severe osteoarthritic changes which are even confirmed within the records and pre sx diagnosis.

I believe this claim has value with my authority and feel that we should stick with our $5K new money offer. We can offer to mediate this case. If negotiations stall, we should look to send the new records to the MRR expert in preparation for an updated report/litigation.

Please review and advise if you agree with the plan as outlined. If so, I will send proposed demand response for review.

Thx-TG.

**Related To:** (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.

| | |
|---|---|
| **Home Office:** | **No** |
| | |
| **By:** | **-Finsterbush, Barkley (07/08/2022 03:53 PM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **Duplicate.** |
| **Related To:** | **(4) Uninsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| | |
| **By:** | **-Grundy, Thomas W. (07/06/2022 01:00 PM)** |
| **Topic:** | **Other** |
| **Text:** | **TL is 7/22/22 which is a Friday.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| | |
| **By:** | **-Grundy, Thomas W. (07/06/2022 12:58 PM)** |
| **Topic:** | **Other** |
| **Text:** | **I note the pending demand. We are waiting on the disc to arrive with enclosed meds and provider affidavit.**<br><br>**TLD is due on 7/24/2022. If disc is not in file shortly, we may need to seek an extension from PC.** |
| **Related To:** | **Entire Claim File** |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-Rottler, Alex J. (07/06/2022 11:24 AM)** |
| **Topic:** | **Reserve Review** |
| **Text:** | **Following Defense MRR, plaintiff went forward with knee surgery.**<br><br>**Met with new demand of $275k new money(Including waive of PIP)** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **Yes** |
| **By:** | **-Crocker, Benjamin A. (07/05/2022 10:08 AM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **Loss/Policy State: WA**<br>**Number of Claims: 1 PIP 1 UDBI**<br>**Limits: $300,000 CSL; No PUP**<br>**TF Limits: $50,000**<br>**Type of Offset: Damages**<br>**Conversion Criteria Met: Yes**<br>**Date of Demand: 6/30/22**<br>**Date of Receipt: 6/30/22**<br><br>**05UDBI - Chandrasi Gaekwar:**<br>**Injuries: Knee instability/arthritis; Soft tissue neck, back, knee**<br>**Treatment: ER; PT; Imaging; Arthroscopic surgery**<br>**Specials: $155,732.44**<br><br>**Demand: $275,000**<br>**Time Limit: 7/24/22** |

| | |
|---|---|
| | **Conditions:**<br>**1. Waive subro**<br>**2. Payment instructions**<br>**3. Tender** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (07/01/2022 11:21 AM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **Under review** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Finsterbush, Barkley (06/30/2022 05:37 PM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **Primary Injury Claimed: Knee Sx**<br>**Policy Limits: 300**<br>**Extension Requested: N**<br><br>**Hey Tom,**<br><br>**Please see this $275K new money (including waiver of PIP) demand dated 6/30/22. A response is due on or before 7/24/22. As 7/24/22 is a Sunday, setting TLD response for 7/22/22.** |

| | |
|---|---|
| | **Condition:**<br>**Checks should be made out to Balint & Associates, PLLC only.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (05/31/2022 03:41 PM)** |
| **Topic:** | **Other** |
| **Text:** | **PC advised:**<br><br>**Tom, thanks for the inquiry. We are in the final stages of gathering all updated medical information and bills as well as subro info. I hope to be able to present all of these records to Amica for analysis within the next few weeks. David** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-Grundy, Thomas W. (05/31/2022 11:16 AM)** |
| **Topic:** | **Other** |
| **Text:** | **Sent f/u email to PC for the records.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Rottler, Alex J. (04/26/2022 12:22 PM)** |
| **Topic:** | **Review** |
| **Text:** | **Awaiting additional records. Plaintiff back to work now.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **Yes** |
| **By:** | **-Grundy, Thomas W. (04/04/2022 01:49 PM)** |
| **Topic:** | **Other** |
| **Text:** | **PC advised:**<br><br>**Reno is returning to work next week. By copy of this email I'll have him email the records and bills you don't already have. Our client is still in rehab following surgery. Thanks for your patience.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (04/04/2022 11:16 AM)** |

| | |
|---|---|
| **Topic:** | **Other** |
| **Text:** | **Sent email to PC:**<br><br>**Just wanted to see if you had received the records in yet?** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (02/01/2022 01:49 PM)** |
| **Topic:** | **Other** |
| **Text:** | **PC provided: $ccDocLink(91568082) which went forward on 11/29/2021.**<br><br>**PC advised:**<br><br>**Attached are the client copy of the surgery bill from AHS Hospital for $81,009.91 and the rehab bill from Atlantic Rehab for $26,342.02. This treatment was approved by Mr. Gaekwar's surgeon and approved by Medicare as reasonable and unnecessary. We are ordering the supporting medical records.**<br><br>**I will review once in. I think PC made a typo and intended to say "necessary".** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (01/31/2022 04:25 PM)** |
| **Topic:** | **Other** |
| **Text:** | **PC advised:** |

| | |
|---|---|
| | An offer of $5k is not really an offer and is rejected. Once Mr. Gaekar recovers a bit more from surgery and we know if there will be any residuals, then we will proceed to suit. David<br><br>Responded with:<br><br>I respectfully disagree that $5K new money is not a real offer given the prior money paid, review of the records, and expert's review.<br><br>Can you please provide me with the surgery records? I would also encourage your client to make a counter demand. Perhaps we can work together to reach a fair agreement. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (01/31/2022 12:19 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Sent email to PC:**<br><br>**I just wanted to follow up on below. Have you had the opportunity to run this by your client yet?** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (12/06/2021 05:21 PM)** |
| **Topic:** | **Other** |
| **Text:** | **PC advised:** |

| | |
|---|---|
| | Tom, Thank you for your persistence. Without being disrespectful, the Amica number was not a real offer nor a realistic assessment of Amica's exposure. We'll be happy to negotiate but not starting with Amica's number. All the best, David<br><br>-------------<br><br>Responded with:<br><br>Our offer of $1,000 was taking into consideration that he had already been compensated $60,000 in prior payments (underlying limits and PIP). In an effort to reach a fair settlement, I can increase our offer to $5,000 new money. Please run this by your client and let me know your thoughts. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (12/06/2021 04:13 PM)** |
| **Topic:** | **Other** |
| **Text:** | PC has provided $ccDocLink(90646799). He is scheduled for a left knee total replacement on 12/13/2021.<br><br>He also noted that he reviewed the Defense MRR report and it does not change the case valuation.<br><br>I have Responded with:<br><br>Dr. Kearney noted that your client had pre-existing moderate-to-severe left knee tricompartmental osteoarthritis with associated varus malalignment prior to the accident. He further noted that any ongoing treatment would not be related to the accident.<br><br>Furthermore, his unrelated tricompartmental osteoarthritis of the left knee would be a condition would continue to worsen over time, especially given |

| | |
|---|---|
| | the moderate-to-severe changes noted on imaging.<br><br>That being said, I wanted to see if you wanted to present a counter demand to our last offer. |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Grundy, Thomas W. (11/29/2021 10:51 AM) |
| **Topic:** | Other |
| **Text:** | Sent follow up email to PC:<br><br>Just wanted to follow up and see if you had the opportunity to review the MRR report? Are you free this week to discuss this claim? |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Rottler, Alex J. (10/25/2021 03:09 PM) |
| **Topic:** | Review |
| **Text:** | MRR completed. provided to PC. Awaiting response to our previous $1K offer.<br><br>$140k previous demand. |
| **Related To:** | Entire Claim File |
| **Home Office:** | Yes |
| **By:** | -Grundy, Thomas W. (10/25/2021 12:53 PM) |

| | |
|---|---|
| **Topic:** | **Other** |
| **Text:** | **Sent email to PC:**<br><br>**Have you had the opportunity to review the MRR report yet?** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (09/27/2021 09:35 AM)** |
| **Topic:** | **Other** |
| **Text:** | **Spoke with PC. He requested a copy of the MRR report for their review. I see no issues with forwarding to them. I have emailed as requested.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (09/20/2021 03:52 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Called out to PC and LVM for contact back.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (09/14/2021 10:55 AM)** |
| **Topic:** | **Other** |
| **Text:** | **Call set with PC for Monday at 1pm.** |

| | |
|---|---|
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (09/13/2021 02:28 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Sent email to PC: I wanted to see if you had any availability this week or next week to discuss your client's claim?** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Rottler, Alex J. (07/12/2021 12:57 PM)** |
| **Topic:** | |
| **Text:** | **MRR returned. See below.**<br><br>**Handler following up to discuss with PC** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **Yes** |
| **By:** | **-Grundy, Thomas W. (06/23/2021 11:54 AM)** |
| **Topic:** | **Other** |
| **Text:** | **We have recd: $ccDocLink(87489163). Favorable MRR.**<br><br>**Key Takeaways:** |

**- It is the examiner's opinion that the diagnoses specifically related to the motor vehicle accident of January 25, 2020, have resolved. These would include diagnoses of left knee strain/ contusion, cervical strain, right shoulder strain, lumbar strain, and scalp laceration. Physical therapy notes dated May 21, 2020, support resolution of these diagnoses. It is the examiner's opinion that any ongoing symptoms would be related to the pre-existing left knee moderate-to-severe tricompartmental osteoarthritis.**

**- The claimant had pre-existing moderate-to-severe left knee tricompartmental osteoarthritis with associated varus malalignment prior to the motor vehicle accident of January 25, 2020. This diagnosis was neither caused by nor permanently aggravated by the motor vehicle accident. The natural history of this condition is that symptoms will arise and will continue to worsen over time. It is the examiner's opinion that these symptoms would have arisen regardless of the motor vehicle accident of January 25, 2020.**

**- Any treatment beyond May 21, 2020, would be considered unrelated to the motor vehicle accident of January 25, 2020. It would be considered related to the pre existing left knee tricompartmental osteoarth.**

**- It is the examiner's opinion that this condition was pre existing and neither caused by nor permanently aggravated by the motor vehicle accident and therefore any surgery proposed for this condition would be considered unrelated to the motor vehicle accident of January 25, 2020. If the claimant were to proceed with left total knee arthroplasty, this would be considered outside of the claim. Expected outcomes are good with this procedure and recovery from this surgery typically takes four to six months of formal postoperative physical therapy. Again, this would be considered unrelated to the claim.**

**- The claimant can return to work with no restrictions.**

**- It is the examiner's opinion that all of the conditions related to the claim of January 25, 2020, have resolved and the claimant has reached pre-accident status.**

**------------------------**

| | |
|---|---|
| | I believe our current eval is fair. |
| | I have a call out to PC to discuss this case and MRR report. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (06/02/2021 06:29 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Recs sent to MES via secure share.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (06/02/2021 04:51 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Dr. Ghidella is unavailable. Assigning MES.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-Grundy, Thomas W. (06/02/2021 04:37 PM)** |
| **Topic:** | **Other** |
| **Text:** | **DC recommend Dr. Sean Ghidella for the MRR. Awaiting contact info from DC.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (06/01/2021 06:15 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Sent email to PC:**<br><br>**Please be advised that I have been reassigned to handle you client's UIM claim. I look forward to working with you.**<br><br>**We will be lining up a Medical Record Review at this time. Upon receipt of that report, I will be in touch so we can continue settlement discussions.**<br><br>**Please let me know if your client has had any additional treatment that we are not aware of.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Grundy, Thomas W. (06/01/2021 06:06 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Reviewing new reassignment.**<br><br>**Chief complaint is to the left knee. 75 M.** |

| | |
|---|---|
| | History of bilateral osteoarthritis - known persistent osteoarthritis that was aggravated by mva. History of synvisc injection lmt rec injections.<br><br>Recs support on 3/26/2020 -2 months after mva, patient is having no physical complaints at<br>this time, gait is strong and good. Patient went on a hike<br><br>TOTAL Medical Specials $20,925.38<br><br>Demand requested $140K in new money and adjuster offered $1K.<br><br>PC claims that sx is inevitable. PC claims that Dr. Scott advised Clmt would benefit from a left total knee replacement with avg cost of $30K.<br><br>In review of the recs, it notes that the pt is not ready for opp tx which is very reasonable as he had recd good relief from Synvisc One previously.<br><br>He is aware that his arthritis is sever enough that some day he may need sx.<br><br>Sent email to local DC for ortho referral for an MRR. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Finsterbush, Barkley (05/05/2021 12:33 PM)** |
| **Topic:** | **Review** |
| **Text:** | **Hi Tom,**<br><br>**Please see this new WA reassignment. TF resolved for $50K. We also paid out $10K in PIP. $60K in damages offsets. PC is alleging the need for a future sx and injections every six months. We may want to to consider an MRR/IME at this point.** |

| | |
|---|---|
| | CSL 300 |
| | Diary set for review and response. |
| Related To: | Entire Claim File |
| Home Office: | No |
| By: | -Macdonald-Conill, Kim (05/05/2021 09:40 AM) |
| Topic: | |
| Text: | UDBI reassignment from BAm to TGrundy |
| Related To: | (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M. |
| Home Office: | No |
| By: | -Rottler, Alex J. (05/04/2021 10:31 AM) |
| Topic: | Review |
| Text: | Offer of $1K new money rejected. Per PC, client moving forward with surgery. Increasing rsv to $95k |
| Related To: | Entire Claim File |
| Home Office: | Yes |
| By: | -Am, Brittany A. (04/21/2021 04:43 PM) |
| Topic: | Investigation |
| Subject | Auto Status Update |
| Text: | CLAIMS PENDING: |

| | |
|---|---|
| | 5UDBI Chandrasi Gaekwar<br><br>NEW INFORMATION:<br>Received letter from PC - rejected settlement offer of $1,000 new money. PC advised insd knee injury is a direct result of the mvc and knee surgery is inevitable. Insd has reached a plateau in his care and will continue to get injections every six months until surgery. PC asks us to change our position or they will be in contact once Mr. Gaekwar has scheduled a surgery date.<br><br>Medical specials: $20,925.38<br>Insd received $50,000 from TF and $10,000 in PIP payments, offset of $60,000<br><br>O/B call to PC - left vm with Reno - requested callback to discuss insd possible knee surgery and to discuss claim value; advised insd progressed throughout treatment prior to covid, received $50K from TF and $10K in PIP, provided contact information, thanked<br><br>RECOMMENDATIONS:<br>-Monitor for contact from PC<br>-Set 30 day diary |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Am, Brittany A. (03/19/2021 12:28 PM) |
| **Topic:** | Investigation |
| **Subject** | Auto Status Update |
| **Text:** | CLAIMS PENDING:<br>5UDBI Chandrasi Gaekwar<br><br>NEW INFORMATION:<br>Sent demand response 3/4 - no contact from PC to date |

| | |
|---|---|
| | Sent $ccDocLink(85929101)<br><br>RECOMMENDATIONS:<br>-Monitor for contact from PC<br>-Set 30 day diary |
| Related To: | Entire Claim File |
| Home Office: | No |
| By: | -Van Kooten, Thomas (03/05/2021 11:37 AM) |
| Topic: | Demand |
| Subject | Demand Reviewed |
| Text: | The demand has been responded to - $ccDocLink(85641713) / $ccDocLink(85638884). |
| Related To: | (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M. |
| Home Office: | No |
| By: | -Am, Brittany A. (03/04/2021 06:47 PM) |
| Topic: | Demand |
| Subject | Demand Reviewed |
| Text: | Sent $ccDocLink(85638884) - POA screen updated |
| Related To: | (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M. |
| Home Office: | No |
| By: | -Am, Brittany A. (03/04/2021 01:58 PM) |

**Topic:** Investigation

**Text:**

5UDBI Chandrasi M Gaekwar
DOB: 9/22/1945, Age: 75, Male

DEMAND
Medical Specials $20,925.38
Demand $140,000 new money

LIMITS
Insd has a $300,000 UD limit

MEDICAL RECORDS
Evergreen Health
1/31/2020
X-ray left knee - no fractures

Overlake Medical Center and Clinics
Diagnosis: medial left knee pain, primary osteoarthritis of left knee
History of right knee replacement
3/26/2020 -2 months after mva, patient is having no physical complaints at this time, gait is strong and good. Patient went on a hike

Innova Physical Therapy
Initial Evaluation 2/4/2020
Diagnosis: pain in right shoulder, pain in left knee, unspecified injury of left lower leg, effusion, left knee, strain of muscle at neck level, strain of muscle, lower back
Impression: moderate to advanced tri-compartmental osteoarthritis, diffuse demineralization
Exam: left knee radiography
Findings: diffuse demineralization. No fracture or aggressive osseous lesion
3/10/2020 - pain resolved, more stiffness
3/26/2020 - no discomfort, patient is feeling good with progressing his exercises and biking more for exercise without any flares in knee pain
3/31/2020 - patient is feeling pretty good and tolerated increased resistance in exercises without difficulty or pain.

| | |
|---|---|
| | 4/16/2020 - missing PT due to covid, took a step backward in progression<br>5/26/2020 - remaining dysfunction in left knee - whole body is otherwise holding good function<br>7/30/2020 - knee has better ROM, better strength - Discharge date 9/30/2020<br>-Missing SOAP notes<br><br>Proliance Orthopedics & Sports Medicine<br>2/18/2020<br>History of bilateral osteoarthritis - known persistent osteoarthritis that was aggravated by mva. History of synvisc injection<br>3/4/2020 - left knee injection<br>12/24/2020 - left knee injection<br>-Patients arthritis is severe enough that at some point the injections may no longer be effective. Patient wishes to proceed with injections and will return as needed.<br><br>MEDICAL BILLS<br>Overlake Medical Clinic $1,156.28<br>Proliance Orthopedics & Sports Medicine $1,650.00<br>Innova Physical Therapy $15,974.50<br>Radia $117.60<br>Evergreen Hospital $357.00<br>Proliance Orthopedics & Sports Medicine $1,670.00<br><br>TOTAL Medical Specials $20,925.38 |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Glazier, Samuel L. (02/11/2021 02:01 PM)** |
| **Topic:** | **Demand** |
| **Subject** | **Demand Reviewed** |
| **Text:** | **Reviewed for TLD activity.** |

| | |
|---|---|
| | Appropriate diaries set to ensure response. Setting diary to confirm response. |
| **Related To:** | (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M. |
| **Home Office:** | No |
| **By:** | -Van Kooten, Thomas (02/11/2021 11:57 AM) |
| **Topic:** | Demand |
| **Subject** | Demand Reviewed |
| **Text:** | Primary Injury Claimed:<br>Left knee osteoarthritis<br><br>Policy Limits:<br>The insured has a $300,000 UD limit. 5UDBI is the only pending claim.<br><br>The insured has received $50,000 from the TF for his BI claim and $10,000 from Amica for his PIP claim. We have waived our rights to recovery for these payments. We are able to count these payments as an offset for damages. As such, any offer will be "New Money" in addition to the $60,000 that the insured has received.<br><br>Extension Requested:<br>TBD<br><br>The demand requests $140,000 in new money. Claimed medical specials total $20,925.38. A response to the demand is requested by 3/8/21. |
| **Related To:** | (5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M. |
| **Home Office:** | No |
| **By:** | -Am, Brittany A. (02/10/2021 06:35 PM) |

| | |
|---|---|
| **Topic:** | **Investigation** |
| **Subject** | **Auto Status Update** |
| **Text:** | **CLAIMS PENDING:**<br>**5UDBI Chandrasi Gaekwar**<br><br>**NEW INFORMATION:**<br>**Received $ccDocLink(85208174)**<br><br>**RECOMMENDATIONS:**<br>**-Respond to demand**<br>**-Set 30 day diary** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (01/11/2021 02:35 PM)** |
| **Topic:** | **Investigation** |
| **Subject** | **Auto Status Update** |
| **Text:** | **CLAIMS PENDING:**<br>**5UDBI Chandrasi Gaekwar**<br><br>**NEW INFORMATION:**<br>**Settled with AIC - No demand to date**<br>**Sent $ccDocLink(84702185)**<br><br>**RECOMMENDATIONS:**<br>**-Monitor for update/ demand from insd atty**<br>**-Set 30 day diary** |
| **Related To:** | **Entire Claim File** |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (12/09/2020 03:24 PM)** |
| **Topic:** | **Investigation** |
| **Subject** | **Auto Status Update** |
| **Text:** | **CLAIMS PENDING:**<br>**5UDBI Chandrasi Gaekwar**<br><br>**NEW INFORMATION:**<br>**O/B call to insd atty David, advised they have settled with nationwide for policy limits but received no payment to date. Advised he is in the process of creating settlement demand for Amica, thanked for update**<br><br>**RECOMMENDATIONS:**<br>**-Monitor for update/settlement demand from insd atty**<br>**-Set 30 day diary** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (12/02/2020 06:15 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **PIP subro is being waived.**<br><br>**file assigned to BI for further handling.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-Am, Brittany A. (12/02/2020 06:02 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **Hi Lanesheia,**<br>**Yes we are waiving subro rights** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (12/02/2020 03:38 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **Hello Brittany,**<br><br>**Will be be waiving our PIP Subro?** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (11/18/2020 04:04 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Sent $ccDocLink(83875795)** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

**By:** -Rottler, Alex J. (11/12/2020 11:42 AM)

**Topic:**

**Text:** ***NEW CONVERSION - MEDS EXCEED $12k***

APPLICABLE LAW:
-WA Policy / WA Loss
-Pure Comparative
-No Tort Threshold
-3 yr SOL(3rd) / 6 yr SOL(1st)

APPLICABLE POLICY:
-$300k UMBIPD
-PIP - $10k

TORTFEASOR:
-Edgar Garcia - Owner/Operator
-$50K Nationwide. Authority granted to waive subro

ACCIDENT:
-1/25/20 - Everett, WA(Snohomish) - Insured made a left turn on Fifth Ave West and was attempting to make a right into a mobile gas station & was rear ended by claimant. Liability doubtful.

05UDBI - CHANDRASI GAEKWAR
-Age 75, Male, Single, Represented

Injuries:
Treatment:
-PCP - 2 days post accident - Neck/back, laceration on top of the head, left knee swollen. Dx: Left thigh contusion, neck muscle strain, and lower back pain.
-Physical therapy
-Left knee pain/underlying osteoarthritis. Xrays showed significant varus deformity of the left knee with valgus pseudo laxity, which impacted his gait. Arthroplasty discussed, but he had been getting along well before the

| | |
|---|---|
| | crash, he elected to save the option of surgery for last.<br>-Synvisc-one injection to knee.<br><br>Medical Specials:<br>-$19,255.38<br><br>RESERVE:<br>-Based on current information, setting $40k rsv |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **Yes** |
| **By:** | **-Rottler, Alex J. (11/12/2020 11:33 AM)** |
| **Topic:** | **Authority Request** |
| **Text:** | **I am in agreement with waiving subro and signing off on the underlying settlement. Thank you** |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Crozier, Todd F. (11/10/2020 04:16 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **Alex,**<br><br>**See recent notes in file in support of the current request. Although the adverse Dec Page is heavily redacted, it shows limits ($50k), loss vehicle (2012 Camry), TF operator and policy number. While the policy period is not shown, the policy number when cross referenced against the policy report verifies it was enforce on date of loss or TF would have been cited for no insurance.** |

| | |
|---|---|
| | I agree with request to allow 5 UDBI to settle with adverse carrier, declining the Hamilton buyout option. Do you agree? |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Vito, Benjamin L. (11/10/2020 04:00 PM)** |
| **Topic:** | |
| **Text:** | **BV for TVK:**<br><br>**Todd,**<br><br>**Please see below from Brittany, OK to waive 50k subro rights and decline Hamilton?** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (11/09/2020 06:04 PM)** |
| **Topic:** | **Investigation** |
| **Text:** | **$ccDocLink(83695848)**<br><br>**Based on information on file, I don't think there are any significant assets. I recommend we waive subrogation rights, please advise** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (11/09/2020 03:11 PM)** |

| | |
|---|---|
| **Topic:** | **Investigation** |
| **Subject** | **Auto Status Update** |
| **Text:** | **CLAIMS PENDING:**<br>**5UDBI Chandrasi Gaekwar**<br><br>**NEW INFORMATION:**<br>**Received $ccDocLink(83664541) to AIC for policy limits**<br><br>**Received $ccDocLink(83676581) - split bodily injury limits of $50,000/$100,000**<br><br>**Tortfeasor Eduardo Campos Garcia**<br>**$ccDocLink(83695847) - policy in effect**<br>**$ccDocLink(83695848) - 1 past property deed, no other assets**<br><br>**RECOMMENDATIONS:**<br>**-Respond to Hamilton Buyout**<br>**-Review/ Respond to Demand**<br>**-set 30 day diary** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Blie, Victoria E. (11/05/2020 12:36 PM)** |
| **Topic:** | **Other** |
| **Text:** | **Log noted for UDBI.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-Van Kooten, Thomas (11/05/2020 12:12 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **$ccDocLink(83675166)** |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Van Kooten, Thomas (11/05/2020 11:53 AM)** |
| **Topic:** | **Review** |
| **Text:** | **$ccDocLink(83664541) has been added to file.**<br><br>**The letter does not contain any supporting documents. Rather, it is a copy of the BI demand letter that has been sent to the TF's insurance carrier.**<br><br>**The letter requests the TF's policy limits of $50,000 (we do not have AIC's dec page at this time).**<br><br>**This letter serves as a Hamilton buy-out request. As such, I have submitted an asset check for the TF so that we may properly respond.** |
| **Related To:** | **(5) Underinsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Van Kooten, Thomas (11/05/2020 11:52 AM)** |
| **Topic:** | **Other** |
| **Text:** | **UM opened in error. I am opening a UD claim.** |
| **Related To:** | **(4) Uninsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (10/30/2020 01:03 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **I called the atty office and I spoke w/ DAvid. he stated that the insrd is still treating they have not sent a demand yet but when they do they will try to negotiate. i thankd call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (09/23/2020 01:38 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **pending subro atty office**<br><br>**diary reset** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (09/09/2020 05:45 PM)** |
| **Topic:** | **Investigation** |
| **Subject** | **Auto First Report** |
| **Text:** | **LIMITS: UD/UMBI single limit of $300,000. PIP coverage $10,000**<br><br>**COVERAGE: TF had active insurance on DOL, atty has requested UMBI claim** |

| | |
|---|---|
| | **ACCIDENT: This MVA took place on 410 West Casino Rd and 5th Ave West in Everett, WA. Insd was rear ended when turning right into gas station**<br><br>**POLICE: $ccDocLink(79097405) - favorable to the insd as the clmt was following too closely**<br><br>**WITNESSES: No witnesses**<br><br>**NAMED INSURED/INSURED OPERATOR - NAME: Chandrasi Gaekwar DOB: 9/22/1945, Age: 74, Male**<br><br>**COLLISION: Chandrasi Gaekwar**<br>**2015 Toyota Highlander - rear end and driver side quarter panel damage**<br><br>**TORTFEASOR: Edgar Campos Garcia - Coverage with Nationwide**<br>**20212 Toyota Camry - total loss, front, p/s bumper damage**<br><br>**LIABILITY: TF carrier has accepted liability as clmt was following too closely and rear ended insd**<br><br>**4UMBI Chandrasi Gaekwar**<br>**Claimed Injury: neck and back pain, left knee pain**<br>**Claimed Treatment: clinic, physical therapy**<br>**Claimed Medical Specials: $11,664.21**<br>**Claimed Disability/Lost Wages: Unknown to date**<br>**PIP Exhausted $10,000**<br><br>**RECOMMENDATIONS:**<br>**-Monitor for contact from insd atty - TF limits exhausted? Injury status?**<br>**-Set 60 day diary** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Am, Brittany A. (09/03/2020 01:35 PM)** |

| | |
|---|---|
| **Topic:** | **Investigation** |
| **Text:** | **O/B call to atty office 206-728-7799, provided with atty email Brenna Holscher bholscher@balintlaw.com Sent $ccDocLink(82528684) - requesting update, TF limits exhausted?** |
| **Related To:** | **(4) Uninsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| | |
| **By:** | **-White, Lanesheia N. (08/27/2020 04:03 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **pending subro atty office**<br><br>**diary reset** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| | |
| **By:** | **-Am, Brittany A. (08/06/2020 02:45 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **I/B call from insd atty - advised he is in process of making demand for Nationwide, I explained my involvement of UD coverage once TF limits are exhausted, atty understood, agreed to check in next month, thanked.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| | |
| **By:** | **-Am, Brittany A. (08/04/2020 06:23 PM)** |

| | |
|---|---|
| **Topic:** | **Contact** |
| **Text:** | **O/B call to insd atty 206-728-7799 left vmm - advised TF had coverage at the time of the accident with Nationwide, provided contact information for further questions, thanked.** |
| **Related To:** | **(4) Uninsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Van Kooten, Thomas (08/04/2020 11:23 AM)** |
| **Topic:** | **Review** |
| **Text:** | **Brittany, please see this new WA UMBI assignment. The insured's $10,000 in PIP has been exhausted at this time. The notes on file suggest that Nationwide has accepted liability for this accident. Since the tortfeasor had active insurance on the DOL, this Uninsured motorist BI claim is unnecessary. However, it appears that the insured's attorney has requested that we open up an underinsured motorist BI claim. Please make sure that the insured's attorney is aware of Nationwide's involvement.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Macdonald-Conill, Kim (08/03/2020 03:07 PM)** |
| **Topic:** | |
| **Text:** | **UMBI assigned to BAm** |
| **Related To:** | **(4) Uninsured Motorist Bodily Injury - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-Macdonald-Conill, Kim (08/03/2020 01:01 PM)** |
| **Topic:** | |
| **Text:** | **Lanesheia - As per your note earlier today, OK for you open UM claim. This will trigger an activity to an assignment queue where an Assignment Coordinator will assign the claim to the appropriate handler. Thks.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-White, Lanesheia N. (08/03/2020 11:05 AM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd a clal from Reno w/ the atty office. he stated that they are requesting UIM. I advised that I will put in a request. he will send a letter. thankd call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (07/29/2020 04:26 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **Pending PIP subro atty office**<br><br>**diary reset** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (06/05/2020 03:20 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **PIP exhausted**<br><br>**denial letter sent to Innova and atty ccd.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-White, Lanesheia N. (06/02/2020 11:10 AM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **denial sent to Innova and the atty ccd.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (06/01/2020 06:06 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd a vm msg from Anita w/ Innova Pt, looking to get payment status. 4256584980**<br><br>**I called Anita and I advised that payment was issued on 5/9 and letter was sent as pip is exhausted. thankd call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Hall, Kaeleigh (06/01/2020 01:31 PM)** |
| **Topic:** | **SCOW** |
| **Text:** | **I/c from Anita with Inova Physical Therapy, looking for update on PIP claims. Attempted to reach F/H, not available. Transferred to F/H voicemail.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-White, Lanesheia N. (05/29/2020 12:43 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **Payment issued to**<br><br>**Innova Physical Therapy LLC**<br>**date of service 2/7,2/10, 2/20, 4/16, 4/20,4 23,**<br>**4/27, 4/30,5/4,5/6,5/11.....$2609.72**<br><br>**pip is now exhausted. partial payment letter sent to provider and atty ccd.**<br><br>**denial sent to Evregreen and atty ccd.**<br><br>**payment notification letter emailed to atty w/ bills/records and payment ledger.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Cretors, Kellie A. (05/26/2020 12:51 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **SUBROGATION-**<br><br>**Received and credited payment from the Adverse Carrier**<br><br>**CHECK CREDITS**<br>**$3,972.27**<br><br>**DEDUCTIBLE**<br>**Advanced**<br><br>**REDUCTIONS** |

| | |
|---|---|
| | -$1,518.56 ( See Note Dated May 11, 2020) |
| **Related To:** | **Nationwide Mutual Ins Co.** |
| **Home Office:** | **No** |
| **By:** | **-Cretors, Kellie A. (05/15/2020 04:07 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **SUBROGATION-**<br><br>**Subro Demand Accepted by Nationwide** |
| **Related To:** | **Nationwide Mutual Ins Co.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (05/11/2020 06:49 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd a vm msg from Jennifer w/ Nationwide. she wanted to get an update on pip 720-889-3184 claim # 143745GK**<br><br>**i called Jennifer and I left a vm msg. I advised that the insrd is atty rep and they will need to contact the atty for any update. I provided the atty name and #.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Cretors, Kellie A. (05/11/2020 06:18 PM)** |
| **Topic:** | **Subrogation** |

**Text:**

**SUBROGATION-**

**New Information Request Received**
**Please find attached the ControlExpert review documentation for the demand presented.**
**Please contact us with any questions or to discuss. Phone: (323) 538-4107**
**Email: m.haines@controlexpertus.com . Thank you. Mark**
**$ccDocLink(80518509) Variance -1,518.56 (Wheel & Hatch)**

**Wheel:**
**Alloy Wheel ORDER FROM DEALER**
**-507.47**
**Wheel can be repaired**

**4 Liftgate:**
**Liftgate Shell 67005-**
**-792.04**
**Liftgate repairable per support provided**

**NOTE**
**CE did not submit a counter offer to Amica they never do; therefore, I could not send an acceptance to their offer. I am hoping they submit partial**
**payment so I can proceed against them for the difference.**

**I did submit a response**
**New Information Request Submitted by Amica**
**ACCEPTANCE: We hold that If the claimant elects to have the vehicle repaired at the shop of his or her choice, the insurer shall not limit or discount the reasonable repair costs based on charges that would have been incurred had the vehicle been repaired by the insurer's chosen shop.(WA Insurance Code - WAC 284-30-390 ). We hold that Nationwides contained adjustments are unsopported and unreasonable as supporting documentation was not provided. The following concessions are accepted for the sole purpose of reaching an amicable settlement. It is to be understood that that this agreement is not an acceptance of liability or the reduction of damages caused by the Nationwide driver and that we retain the right to file Arbitration and to rescind the accepted concession should it be**

| | |
|---|---|
| | necessary." |
| **Related To:** | **Nationwide Mutual Ins Co.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (05/11/2020 05:55 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd email from atty office that they would like a updated pip ledger.**<br><br>**I emailed the atty office and I provided the pip ledger that we sent to them on 4/29. I advised them that going forward documents will be emailed so that I am not duplicating my work** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (04/29/2020 06:35 PM)** |
| **Topic:** | **Medical issues** |
| **Subject** | **payment** |
| **Text:** | **payment issued to**<br><br>**Overlake Medical Clinic**<br>**date of service 3/26.......$289.07**<br><br>**Innova Physical Therapy**<br>**date of service 2/27,3/3, 3/5,3/10,3/12, 3/17, 3/19, 3/24, 3/26, 3/31.....$2417.00**<br><br>**Proliance Orthopaedics**<br>**date of service 3/4.....$1,410.00** |

| | |
|---|---|
| | notification letter sent to the atty office w/ bills/records and payment log |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (04/01/2020 03:04 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd call from Reno w/ the atty office. he wanted to know if we could provide the pip pay out amount and he stated that a providers office advised the insrd that we denied their billings because they need to bill medicare.<br><br>i advised him of the amount paid. i advised that we have not advised any providers that medicare needed to be billed. we are primary so all medical needs to come to us. he stated that he would call the providers office and make sure that they have what the need from us. he also asked me to send them a copy of the repair est. i emailed the est to them. thankd call ended** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (03/31/2020 12:33 PM)** |
| **Topic:** | **Medical issues** |
| **Subject** | **Payment** |
| **Text:** | **Payment issued to<br><br>Innova Physical Therapy** |

| | |
|---|---|
| | date of service 2/25.....$245.00<br><br>Proliance Orthopaedics<br>date of service 2/18.....$240.00<br><br>notification letter sent to the atty office w/ bills/records/payment log |
| **Related To:** | (3) Personal Injury Protection - Gaekwar, Chandrasi M. |
| **Home Office:** | No |
| **By:** | -Cretors, Kellie A. (03/25/2020 01:04 PM) |
| **Topic:** | Subrogation |
| **Text:** | SUBROGATION-<br><br>Submitted a Demand to Adverse Via E-Subro Hub-<br><br>Ded: Advanced Gross: $5,490.83<br><br>The Amica Insured has No Interest in the SRU File |
| **Related To:** | Nationwide Mutual Ins Co. |
| **Home Office:** | No |
| **By:** | -Cretors, Kellie A. (03/24/2020 07:12 PM) |
| **Topic:** | Subrogation |
| **Text:** | SUBROGATION-<br><br>Hunter, the documents on this file are labeled perfectly for Subrogation in order to submit to the Adverse Carrier. Thank You! |
| **Related To:** | Entire Claim File |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-Cretors, Kellie A. (03/24/2020 07:05 PM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **SUBROGATION-<br>Received a New Subrogation Activity-<br><br>From Hunter Timothy-<br>SRU ready, cannot change to subro status as PIP open still. Please proceed** |
| **Related To:** | **Nationwide Mutual Ins Co.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (03/24/2020 06:38 PM)** |
| **Topic:** | **Post Claim Follow Up** |
| **Text:** | **Email from IA advising insd paid for repairs OOP. Sup paid to insd 3/19** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (03/23/2020 12:25 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **request for itemized billing and records sent to Radia, insrd ccd.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-White, Lanesheia N. (03/23/2020 11:56 AM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd email from the insrd regarding Radia biling which he attached**<br><br>**I responded to the insrds email and I called and left hi a vm. I advised that we rcvd the billing. the quickest way to get this resolved is for him to call the dr office and give them the claim info, address and my contact info. I will send the dr office a request for hifca/records. i advised the insrd that this process takes time and will cause delays in the billing get paid. i advised that once we do receive the info we need we will review for payment. payments are issued once per month.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Suleiman, Linda M. (03/20/2020 06:45 PM)** |
| **Topic:** | **Contact** |
| **Subject** | **Phone call** |
| **Text:** | **Insured called and wanted to know the last date of service paid and if there are any more bills on file. I provided the info and bill date pending. He stated the last date what 2-27-20. i stated the last provider bill was paid that date. He stated he sent over an email and wants to make sure she received it. He stated there is a bill for $117.60 from Radiology Inc PS, he wants to make sure that was received. He stated to check her email. I stated I would let her know in a note on file and if she does not have, she would reach out to him and let him know. He wants to make sure his bills are paid on time, no collection agency.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-Harris, Erin T. (03/20/2020 05:14 PM)** |
| **Topic:** | **Rental** |
| **Text:** | **I/c call from Insd Mr. Gaekwar seeking rental reimbursement. He states he sent to FH's email. I advised to send to me and I will get the reimbursement check out today. Insd also seeking information about medical payments, I tried to assist but advised he will need to speak to the PIP adjuster. He requested to speak to someone else, but no one was available at the time. Insd did not want to leave a message. No other questions at this time.** |
| **Related To:** | **(2) Rental Reimbursement - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-User, System (03/20/2020 05:13 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Payment(s) have been issued on claim 60003757148. Please log in to www.amica.com/mcc to view details.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Messenger, Claims (03/20/2020 03:39 AM)** |
| **Topic:** | **Inbound Web Message** |
| **Text:** | **From: Chandrasi M. Gaekwar** |

| | |
|---|---|
| | **Hunter:**<br><br>**Did you get my email with car rental receipt.**<br>**Please confirm.**<br>**Thanks,**<br>**Chandu Gaekwar**<br>**425.501.6240** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-User, System (03/19/2020 01:54 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Payment(s) have been issued on claim 60003757148. Please log in to www.amica.com/mcc to view details.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Schucht, Lynnette K. (03/19/2020 01:53 PM)** |
| **Topic:** | **Outbound Web Message** |
| **Text:** | **To: Chandrasi M. Gaekwar**<br>**From: Lynnette K. Schucht**<br><br>**Hello Mr. Gaekwar,**<br><br>**Thank you for reaching out to us regarding the supplemental you paid directly to the shop. We are issuing you a reimbursement check for $1,515.84 today. If we can help you with anything else related to this claim, please let us know.** |

| | |
|---|---|
| | Kind regards,<br><br>Lynn Schucht<br>Amica Claims Department |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Schucht, Lynnette K. (03/19/2020 01:40 PM) |
| **Topic:** | Contact |
| **Subject** | Supplemental |
| **Text:** | o/b call to Kirkland Auto Body @ 425-822-8030, spoke to Peter, confirmed Insrd paid sup for $1,515.84 directly to the shop. Pete said he told Insrd that he wasn't required to pay the shop, but he wanted to take care of the sup and said he would get reimbursed. |
| **Related To:** | Gaekwar, Chandrasi M. |
| **Home Office:** | No |
| **By:** | -Messenger, Claims (03/18/2020 02:09 AM) |
| **Topic:** | Inbound Web Message |
| **Text:** | From: Chandrasi M. Gaekwar<br><br>Hunter:<br><br>Your appraiser Max Becker has sent you updated estimate with a supplemental amount for claim file number 60003757148. I have paid the body shop the supplemental amount so please reimburse this additional repair cost as soon as possible. |

| | |
|---|---|
| | Thanks,<br><br>Chandu Gaekwar<br>425.501.6240 |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Harris, Erin T. (03/11/2020 07:07 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **I/c call from Anita w/ Inova 425-658-4980 calling to check status of 2.25,<br>I advised bill rcvd 3.3<br>she then inquired about 2.20 & 2.18 dos<br><br>I advised payment of $242 was for 2.18 dos<br>payment of $1,323.00 was for 2.4, 2.7, 2.12 & 2.20** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (03/11/2020 11:53 AM)** |
| **Topic:** | **Contact** |
| **Text:** | **Email from IA requesting call to discuss sup for tail lights.<br><br>Called IA Max 206-582-9945. IA advised the shop purchased the tail lights already, IA advised as the liftgate had to be replace, the hatch loosened interior pieces and caused leaking in the tail lights. The damage appears to have caused a small gap near tail lights. IA advised it could be related and the insd very strongly that it is related. IA advised sup will be under $400. Advised to proceed with sup. Thanked.** |

| | |
|---|---|
| **Related To:** | **(1) Collision - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (03/04/2020 06:33 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd a vm msg from Colleen w/ Balint Assoc. she stated that they rcvd some pip docs however they cannot find the client. she asked me to call them back. 4255282482**<br><br>**I called Colleen. she stated that they do not represent the insrd. maybe we sent the docs to the wrong Balint Assoc. I looked up the LOR and the address is different than what we have in the system. I updated the address to the address on the LOR**<br><br>**I advised Colleen to please shred the docs and send a email to me. thankd call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Cretors, Kellie A. (03/04/2020 09:55 AM)** |
| **Topic:** | **Subrogation** |
| **Text:** | **SUBROGATION-**<br>**Received a Review for Subrogation Activity -**<br><br>**Nationwide Accepted Liability, Deductible Advanced**<br><br>**SRU PENDING**<br>**Assignment** |

| | |
|---|---|
| **Related To:** | **Nationwide Mutual Ins Co.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (03/02/2020 06:52 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd a vm msg from Wanona w/ Proliance, she wanted to get info on pip claim. 425-507-0814**<br><br>**I called Wanona and I advised that we do have pip open. we do not preauthorize treatment. thankd call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/27/2020 06:01 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **notification letter of payment details/bills/records/payment log sent to atty office.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/27/2020 05:39 PM)** |
| **Topic:** | **Medical issues** |
| **Subject** | **Payment** |

| | |
|---|---|
| **Text:** | **Payment issued to**<br><br>**Evergreen Hospital Medical Center**<br>**date of service 1/31/20.....$357.00**<br><br>**Overlake Medical Center Clinics**<br>**date of service 1/27, 1/31, 2/13.....$867.21**<br><br>**Innova Physical Therapy LLC**<br>**date of service 2/4, 2/7, 2/10, 2/12.....$1,565.00** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/27/2020 02:27 PM)** |
| **Topic:** | **Investigation** |
| **Subject** | **ISO** |
| **Text:** | **ISO reviewed**<br><br>**9/2/18 coll/rental/pd claim #60003322313**<br>**4/16/18 coll/rental/pd/bi claim # 60003153491**<br>**10/26/17 coll claim #60002984096**<br><br>**no prior injury losses/no matches** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/26/2020 12:57 PM)** |
| **Topic:** | **Medical issues** |

| | |
|---|---|
| **Text:** | **rcvd email from atty office, they asked if we have statement from the insrd.**<br><br>**written statement came in on 2/20, I emailed the statement to the atty office.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/20/2020 03:31 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd pip apps/release/medicare forms. completed/signed/dated.**<br><br>**no wage loss indicated** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/18/2020 06:48 PM)** |
| **Topic:** | **Medical issues** |
| **Text:** | **rcvd atty repd letter.**<br><br>**I responded to the letter and I provided the atty w/ the policy/dec pages, photos of the veh, est, bills/records to date, pip apps.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-User, System (02/18/2020 04:23 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Payment(s) have been issued on claim 60003757148. Please log in to www.amica.com/mcc to view details.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/18/2020 04:17 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Email from Nationwide FH advising that they have accepted liability and asked if we are taking care of IV. Replied advising that we are taking care of damage to IV, I will advance ded. Thanked.<br><br>Called insd 425-501-6240. No answer, left message on vm. Advised AC accepted liability so I am sending check for ded reimbursement** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/12/2020 11:56 AM)** |
| **Topic:** | **Contact** |
| **Text:** | **Called Nationwide FH Dalia Rosales 720-889-3249 Claim #143745GK. No answer, left message on vm. Requested cb to discuss liability. Asked if PR received, Emailed PR to rosald1@nationwide.com<br><br>Also emailed insd a copy of PR as requested** |

| | |
|---|---|
| **Related To:** | **(1) Collision - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/12/2020 11:25 AM)** |
| **Topic:** | **Investigation** |
| **Text:** | **Police report received. Narrative states: both vehs traveling SB. C was following too close and hit insd's rear bumper.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/07/2020 04:05 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Email from IA with updated estimate that included the addl comment about how liftgate didn't open during inspection. Emailed insd a copy of the updated estimate** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/06/2020 06:59 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Vm from insd asking if we received the PR and if we were able to open claim with AC. Insd advised to cb or email.**<br><br>**Emailed insd advising we do not have the PR yet. Advised this can sometimes** |

| | |
|---|---|
| | take weeks to receive. Advised we were able to open a claim with AC, they are now investigating. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Clark, Helen G. (02/06/2020 01:40 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **I/C from Insd Mr. 425-501-6460 Insd upset with FH. Wanted her supervisor gave him her supervisor name and Ext. Wanted FH physical address. Gave him this info. Insd will be sending us doc for Hunter. Asked insd can we pls get you over to FH, insd said yes, Put him on hold and did a warm transfer** |
| **Related To:** | **(1) Collision - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/06/2020 01:39 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Email from insd with statement form. Another email from insd asking if we got the PR and question on estimate<br><br>Call from insd. Insd is concerned that there is going to be a supplement. Tried to explain to the insd multiple times that no matter what the sup is for, sup needs to go through the IA. Shop needs to discuss with IA any sup. Insd wants the appraiser to add a note to his report that he could not open the trunk lid. Insd is concerned that the addl damage is under the trunk. Advised insd we will take care of anything related to the accident to get IV back to condition it was before the accident. Insd then wants a copy of the report once that is ordered. Thanked.** |

| | |
|---|---|
| | Called IA Max 206-582-9945. Explained insd wants a sentence added to IA report advising that IA was unable to open the trunk lid. IA to add and submit later today. Thanked |
| **Related To:** | (1) Collision - Gaekwar, Chandrasi M. |
| **Home Office:** | No |
| **By:** | -Messenger, Claims (02/05/2020 05:58 PM) |
| **Topic:** | Inbound Web Message |
| **Text:** | From: Chandrasi M. Gaekwar<br><br>Hunter:<br>Would you please call me at 425.501.6240 at your earliest.<br><br>Trust you received my e-mails that I sent to you on February 3 and February 4.<br>Looking forward to talk to you soon.<br><br>Thanks,<br><br>Chandu Gaekwar<br>425.501.6240 |
| **Related To:** | Entire Claim File |
| **Home Office:** | No |
| **By:** | -Knauss, Wendy L. (02/04/2020 12:40 PM) |
| **Topic:** | Contact |
| **Subject** | Nationwide |
| **Text:** | Nationwide 800-421-3535 Claim had been filed |

| | |
|---|---|
| | **Claim #143745GK**<br>**FH: Dalia Rosales**<br>**720-889-3249**<br>**PO Box 182068**<br>**Columbus OH 43218-2068** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-White, Lanesheia N. (02/03/2020 05:15 PM)** |
| **Topic:** | **Medical issues** |
| **Subject** | **1st PIP contact** |
| **Text:** | **I called the insrd Chandrasi and I advised that I will be his main contact for the medical portion of the claim. I confirmed his injuries. I advised that we can cover his medical for 3 yrs and his limit is $10k. I advised that he needs to give the claim # to the dr office and all bills need to come to us. i advised that he will be sent PIP 4 forms that he needs to complete and send back to us. all the forms are required including the medicare forms. if something does not apply to him to please write in NA and if something is unknown to please write in unknown. i advised that we will seek reimbursement from the aic/or the clmt upon completion of his treatment. He thankd. no questions call ended.** |
| **Related To:** | **(3) Personal Injury Protection - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/03/2020 12:52 PM)** |
| **Topic:** | **Contact** |
| **Text:** | **Vm from insd asking why we are sending check with C at fault. Insd asked if** |

| | |
|---|---|
| | PR received.<br><br>Called insd 425-501-6240. Advised we sent insd check as insd filed claim through us, we are taking care of damage to IV. Reviewed sup process. Emailed insd a copy of estimate to share with shop of choice. Advised as well, we are still trying to figure out if C was insured with Nationwide, AC was not able to find a policy when we called. Insd read policy number again, thinks some of the numbers/letters may be wrong as on scene C was waving insurance card around and it was hard to get the number. Advised we ordered PR as well but not sure how long it will take to get that back. Advised we will call Nationwide again and keep insd updated. Advised will let insd know once we are able to open claim with AC. Insd advised he is treating for injuries, opened PIP. Advised PIP handler to get in touch. Thanked. |
| **Related To:** | **(1) Collision - Gaekwar, Chandrasi M.** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (02/03/2020 11:14 AM)** |
| **Topic:** | **Investigation** |
| **Text:** | **IVIPS received, we had C's name wrong. Updated last name and address** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (01/31/2020 04:59 PM)** |
| **Topic:** | **Investigation** |
| **Text:** | **SIU carrier discovery and asset check submitted** |
| **Related To:** | **Entire Claim File** |

| | |
|---|---|
| **Home Office:** | **No** |
| **By:** | **-User, System (01/31/2020 04:54 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Payment(s) have been issued on claim 60003757148. Please log in to www.amica.com/mcc to view details.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Knauss, Wendy L. (01/31/2020 12:49 PM)** |
| **Topic:** | **Contact** |
| **Subject** | **Nationwide** |
| **Text:** | **Nationwide 1-800-421-3535 Bryon Policy #WDL29RB0D83B isn't a valid policy #. He tried every which way to find a policy. Was not successful. They need plate or address, phone number etc before they can identify the policy.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (01/31/2020 10:16 AM)** |
| **Topic:** | **Contact** |
| **Text:** | **Vm from insd asking if we received PR**<br><br>**Called insd 425-501-6240. No answer, left message on vm. Reviewed estimate,** |

| | |
|---|---|
| | sending check less ded with a copy of estimate. Advised of sup process. Asked if C has any addl info on C, Nationwide was unable to locate a policy with what we have. Advised we will further investigate and keep insd updated. Thanked.<br><br>ISOs reviewed, no issues, sending check |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Timothy, Hunter O. (01/28/2020 04:28 PM)** |
| **Topic:** | **Insured First Contact** |
| **Text:** | **Called insd 425-501-6240. No answer, left message on vm. Advised I am the fh. Advised IA set up, I will contact insd once I receive the estimate.<br>Left my info** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-Reed, Thelma S. (01/27/2020 02:36 PM)** |
| **Topic:** | **First notice of loss** |
| **Subject** | **FNOL** |
| **Text:** | **COVERAGES: Coll $500// RR 50/1500// PIP $10K<br><br>CONTACT INFORMATION: Verified<br><br>SERVICES: Text Alerts- enrolled//Direct Bill RR//Appraiser Assigned //Amica.com//Offered DRP - declined//Subro Explained<br><br>OTHER: Adv insured that PIP is covered under his policy. Adv claim # and** |

| | |
|---|---|
| | f/h info. Adv the appraiser will contact the insured in 24/48 business hours. Insured was informed that the at fault party is responsible for his medical and I adv that his PIP coverage would apply. Insured is concerned about how PIP impacts his rates. |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |
| **By:** | **-User, System (01/27/2020 02:35 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Auto appraiser from Meridian Adjusting and Appraisals, Inc. will contact you soon. Contact: 425-481-3507.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

| | |
|---|---|
| **By:** | **-User, System (01/27/2020 02:35 PM)** |
| **Topic:** | **Automated Outbound Text** |
| **Text:** | **Amica: Auto claim #60003757148, representative is Hunter Timothy. Contact: 800-882-6422 x59309, HTIMOTHY@AMICA.COM.** |
| **Related To:** | **Entire Claim File** |
| **Home Office:** | **No** |

# Exhibit 2

# Amica Mutual Insurance Company

Lincoln, Rhode Island



**DECLARATIONS** **PERSONAL AUTO POLICY NO.** 90054621TQ

**NAMED INSURED AND ADDRESS**
CHANDRASI M. GAEKWAR
2825 E LAKE SAMMAMISH PKWY NE
SAMMAMISH WA 98074

**POLICY PERIOD: 12:01 A.M., STANDARD TIME**
**From:** MAY 28, 2019
**To:** MAY 28, 2020

| Auto No. | DESCRIPTION OF AUTO(S) OR TRAILER(S) | LOSS PAYEE |
|---|---|---|
| 1 | 2015 TOYOTA HIGHLANDER LIMITED/PLATIN UTILITY - VIN 5TDDKRFHXFS139121 USE: AVERAGE DAILY MILEAGE 10 MILES | |
| | | |
| | | |
| | | |
| | | |
| | | |

The Auto(s) or Trailer(s) described in this policy is principally garaged at the above address unless otherwise stated on the coverage pages.

SAFE DRIVER RATES APPLY.

**RATES ARE BASED ON THE FOLLOWING HOUSEHOLD DRIVERS**

| Driver | NAME | DRIVER'S LICENSE NUMBER | Date of Birth Mo. | Day | Year | Male or Female | Married or Single | Date First Licensed Mo. | Year |
|---|---|---|---|---|---|---|---|---|---|
| 1 | CHANDRASI M. GAEKWAR | G01181207409452 | 09 | 22 | 45 | M | S | 09 | 61 |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |

# Amica Mutual Insurance Company

Lincoln, Rhode Island



## CONTINUATION OF DECLARATIONS FOR PERSONAL AUTO POLICY NO. 90054621TQ

**NAMED INSURED**
CHANDRASI M. GAEKWAR

COVERAGE IS PROVIDED WHERE A PREMIUM AND A LIMIT OF LIABILITY IS SHOWN FOR THE COVERAGE

| COVERAGES | LIMIT OF LIABILITY | PREMIUMS | | | AUTO 1 2015 TOYO |
|---|---|---|---|---|---|
| A. LIABILITY | $ 300,000 each accident | | | | $ 342.00 |
| B. MEDICAL PAYMENTS | $ each person | | | | |
| C. UNINSURED MOTORISTS | $ each accident | | | | |
| D. DAMAGE TO YOUR AUTO | (ACV means Actual Cash Value) | | | | |
| 1. Collision Loss ACV minus deductible of | AUTO 1 $ 500 | | | | $ 244.00 |
| 2. Other Than Collision Loss ACV minus deductible of | AUTO 1 $ 500 | | | | $ 48.00 |
| TOWING AND LABOR COSTS | $ 100 each disablement | | | | $ 8.00 |
| OPTIONAL TRANSPORTATION EXPENSES AUTO 1 $ 50 DAY/ $1,500 MAX | | | | | $ 20.00 |
| *UNDERINSURED MOTORISTS $ 300,000 EACH ACCIDENT BODILY INJURY AND PROPERTY DAMAGE INCLUDES UNINSURED MOTORISTS | | | | | $ 189.00 |
| $10,000 WA BASIC PERSONAL INJURY PROTECTION | | | | | $ 34.00 |
| FULL SAFETY GLASS COVERAGE | | | | | $ 26.00 |

**GARAGING LOCATION**
1-IN GARAGE 2825 E LAKE SAMMAMISH PKWY NE SAMMAMISHWA 98074

TOTAL PREMIUM $ 911.00

# Amica Mutual Insurance Company

Lincoln, Rhode Island



## CONTINUATION OF DECLARATIONS FOR PERSONAL AUTO POLICY NO. 90054621TQ

**NAMED INSURED**
CHANDRASI M. GAEKWAR

### SPECIAL DISCOUNTS

PASSIVE RESTRAINT DISCOUNT AUTO 1
ANTI-THEFT DEVICE DISCOUNT AUTO 1
FWD COLLISION WARNING SYS DISC AUTO 1
MULTI-LINE DISCOUNT-HOME
ELEC STABILITY CONTROL DISCOUNT AUTO 1
MULTI-CAR DISCOUNT
LOYALTY DISCOUNT
PAID IN FULL DISCOUNT
AUTOPAY DISCOUNT

### Form and Endorsements made part of this policy at time of issue:

| | |
|---|---|
| PP 00 01 01 05 | PERSONAL AUTO POLICY |
| PP 03 03 04 86 | TOWING AND LABOR COSTS COVERAGE |
| PP 04 75 06 98 | SINGLE UNDERINSURED MOTORISTS LIMITS - WASHINGTON |
| PP 05 69 07 16 | PERSONAL INJURY PROTECTION COVERAGE - WASHINGTON |
| PP 03 02 06 98 | OPTIONAL LIMITS TRANSPORTATION EXPENSES COVERAGE |
| PP 13 06 01 09 | CUSTOM EQUIPMENT EXCLUSION ENDORSEMENT |
| PP 23 16 10 13 | PERSONAL VEHICLE SHARING PROGRAM EXCLUSION ENDORSEMENT |
| PP 01 62 07 10 | AMENDMENT OF POLICY PROVISIONS - WASHINGTON |
| AM 00 28 11 18 | AMENDMENT OF PERSONAL AUTO POLICY PROVISIONS |
| PP 03 09 01 05 | SINGLE LIABILITY LIMIT |
| PP 13 01 12 99 | COVERAGE FOR DAMAGE TO YOUR AUTO EXCLUSION ENDORSEMENT |
| PP 04 81 09 15 | UNDERINSURED MOTORISTS COVERAGE - WASHINGTON |
| PP 23 40 10 15 | PUBLIC OR LIVERY CONVEYANCE EXCLUSION ENDORSEMENT |
| AM 00 70 12 09 | FULL SAFETY GLASS COVERAGE |

This policy shall not be valid unless countersigned by our authorized agent or representative.

Countersigned by: Dinari DuPont (signature)

Authorized Representative

# Exhibit 3

Scan Date: 11/10/2020 6:38:22 AM

***BALINT& ASSOCIATES, PLLC***
***ATTORNEYS AT LAW***
***5950 Sixth Avenue South, Suite 200***
***Seattle, Washington 98108***
***Telephone: (206) 728-7799***
***Facsimile: (206) 728-2729***
***Cell: 206-947-7988***
***E-mail: dbalint@balintlaw.com***
***Website: balintlaw.com***

*David J. Balint (Ext. 111)*
*Donald J Horowitz, Of Counsel*

November 4, 2020

**SENT VIA EMAIL AND US MAIL**

Jennifer Witter
Nationwide Insurance
PO Box 182068
Columbus OH, 43218
Wittejz2@nationwide.com

**FOR SETTLEMENT PURPOSES ONLY**

| | | |
|---|---|---|
| Re: | Our Client: | Chandrasi Gaekwar |
| | Our File No.: | 2814 (P-17) |
| | Date of Collision: | January 25, 2020 |
| | Nationwide Insured: | Edgar Campos Garcia |
| | Nationwide Claim No.: | 143745GK |

Dear Ms. Witter,

The purpose of this letter is to give Nationwide the opportunity to settle the claims of Chandrasi Gaekwar without the need of going to trial. Our analysis of his harms and losses are set forth below and in the documents accompanying this letter. The damages to our client more than justify the settlement limits demand of $50,000. In order to aid its independent evaluation for settlement and for a Hamilton buy out decision, a copy of this case analysis is also directed to Amica along with all the documents referenced.

The enclosed disc contains the following documents, and the numbers refer to my document control system:

Scan Date: 11/10/2020 6:38:22 AM



| Doc. No. | Document Description |
|---|---|
| 1 | Police Report |
| 5 | PD Photos Provided by Gaekwar |
| 5.1 | Amica PD Photos for Gaekwar's Vehicle |
| 5.3 | Revised PD Estimate from Amica |
| 6 | Injury Photos of Chandrasi Gaekwar |
| 10 | Letter from Dr. Kriseman to Suspend Gym Membership |
| 14.1 | 7/28/15 - 3/26/20 Overlake Primary Care Clinic Records |
| 14.2 | 1/27/20 - 3/26/20 Overlake Primary Care Clinic Bills |
| 15 | 1/31/20 Radia Bill |
| 16.1 | 2/4/20 – 9/30/20 Innova PT Records |
| 16.2 | 2/4/20 – 9/30/20 Innova PT Bills |
| 17.1 | 6/14/17 - 3/4/20 Proliance Orthopedics Records |
| 17.2 | 2/18/20 - 3/4/20 Proliance Orthopedics Bills |
| 18.1 | 1/31/20 Evergreen Health X-Ray Record |
| 18.2 | 1/31/20 Evergreen Health X-Ray Bill |
| 7 | Proof of Medicare Form |

## COLLISION

On January 25, 2020 Mr. Gakewar was traveling southbound on 5th Ave West in Everett, Washington when he slowed to turn into a shopping complex parking lot. His turn signal was on and his brake lights were functioning. Your insured, Edgar Campos Garica, was also traveling southbound on 5th Ave West, directly behind Mr. Gaekwar. Following too close, your insured was unable to slow in time, causing his vehicle to collide with the back of Mr. Gaekwar's car. Liability and the absence of contributory negligence is clear in this matter.

As a result of the collision Mr. Gaekwar's vehicle suffered $5,292.02 in property damage. Photographs of my client's car post-crash, as well as the property damage repair bill, are included on the enclosed disk.

The impact threw him forward and back several times and rendered him shocked and numbed. He hit his left knee on the dashboard, and hit his head, resulting in a laceration on his forehead which bled. Mr. Gaekwar experienced pain at the neck, left knee, and lower back. It was difficult for him to turn his head, and stepping when walking would shoot pain through his knee. Initially following the collision, Mr. Gaekwar's left knee swelled, but since icing it, the swelling had marginally subsided by the time of his first medical appointment.

## TREATMENT

Two days after the collision and still in pain, Mr. Gaekwar sought medical attention. He was evaluated by his primary care provider, Dr. James Kriseman at the Overlake Medical Clinic in Redmond on January 27, 2020. The examination documented neck and back pain, as well as a laceration on the top of Mr. Gaekwar's head with swelling. His left knee was also still swollen

Scan Date: 11/10/2020 6:38:22 AM



up to the thigh. Mr. Gaekwar was diagnosed with left thigh contusion, neck muscle strain, and lower back pain.

On January 31, 2020, Mr. Gaekwar was further examined by Dr. Sadia Habib at the Overlake Medical Clinic in Redmond. He continued to suffer from the injuries. To alleviate some of his pain and difficulty walking, Mr. Gaekwar wore ace bandages around his left knee. Dr. Habib ordered X-rays, and prescribed physical therapy.

Mr. Gaekwar attended his first physical therapy session at Innova Physical Therapy on February 4, 2020. He was treated for left knee pain, lower back pain, shoulder pain, and cervicalgia. Our client reported that his symptoms were intensified by crouching and walking, particularly up the stairs, as well as prolonged sitting, lifting, and performing activities that required a range of motion. His sleep was also disturbed. Richard Bonilla, the physical therapist, found all symptoms to be consistent with Mr. Gaekwar's diagnosis, and noted other issues, such as forward head posture, rounded shoulders, increased thoracic kyphosis, increased lumbar lordosis, antalgic gait, and restrictions with range of motion, particular at the knees and at the right shoulder, with accompanying edema. Treatment included therapeutic exercise, manual therapy, and therapeutic activity.

Mr. Gaekwar continued attending physical therapy sessions at Innova Physical Therapy. He diligently performed prescribed at-home exercises and used pain gel to alleviate some of the pain of his symptoms. Walking continued to be difficult for him, particularly when going up stairs. The February 10, 2020 medical record stated that Mr. Gaekwar was fully compliant with his home exercise program, but due to the pain, he was exhibiting fear avoidance and guarding. By February 12, 2020, Mr. Gaekwar continued to suffer knee pain and stiffness. His range of motion was also restricted. The physical therapist, Richard Bonilla, added neuromuscular re-education into the rotation of care Mr. Gaekwar was receiving.

On February 13, 2020, Mr. Gaekwar was reevaluated at the Overlake Medical Clinic in Redmond. X-rays were reviewed, showing muscle tightness in the back and left knee effusion. The X-rays also showed moderate osteoarthritis, which may have existed before the January 25, 2020 collision, but the crash lit up the condition, making it more difficult to bear. Mr. Gaekwar was advised to see an orthopedist for further evaluation, with the possibility of needing injections, and to continue physical therapy.

On February 18, 2020, Mr. Gaekwar followed the referral and was examined at Proliance Orthopedics & Sports Medicine. He was seen for left knee pain and underlying osteoarthritis that was exacerbated by the January 25, 2020 collision. An examination and X-rays showed significant varus deformity of the left knee with valgus pseudo laxity, which impacted his gait. An arthroplasty was discussed for the left knee, but Mr. Gaekwar had been getting along well before the crash, so he elected to save the option of surgery for last.

Mr. Gaekwar continued to regularly attend his physical therapy appointments and comply with the home exercise program. He had physical therapy on February 20 and 25, 2020. More physical therapy was prescribed.

Scan Date: 11/10/2020 6:38:22 AM



On March 4, 2020, Mr. Gaekwar received the discussed injection of a Synvisc-One, which is designed to supplement fluid in the knee joint to help lubricate and cushion the joint. To supplement the positive effects of the injection, Mr. Gaekwar continued with his prescribed physical therapy at Innova Physical Therapy with the therapists, Richard Bonilla and Bret Swigard, DPT. After the injection, Mr. Gaekwar was initially given a non-weight bearing protocol on March 5, 2020, but by the next session of March 10, 2020, he was returned to his normal exercise program, which was tailored to strengthen Mr. Gaekwar's lower extremities and to reduce his left knee pain. On March 12, 2020, Richard Bonilla, PT conducted a re-evaluation of Mr. Gaekwar's condition to monitor his improvement. At that time, stairs were still a challenge for Mr. Gaekwar, and the pain he experienced was great enough to limit movement. He was judged a fall risk due to his non-optimal performance with balance activities. The therapist hoped that with continued physical therapy, Mr. Gaekwar would continue to improve, opining that further treatment was medically necessary. As suggested, Mr. Gaekwar moved forward with physical therapy, all the while maintaining his home exercise program.

On March 26, 2020, Mr. Gaekwar was seen at the Overlake Medical Clinic in Redmond for a check in. He reported improvement in his condition with physical therapy, which Dr. James Kriseman agreed was helping with strength and stability. Mr. Gaekwar also still tested positive for muscle tightness in the back. He was encouraged to continue physical therapy.

Because physical therapy was so helpful to Mr. Gaekwar's rehabilitation, for the next three months through June 15, 2020, he continued attending regular sessions. His condition remained consistent throughout this period with ups and downs. While he was able to tolerate an increase in exercise intensity, Mr. Gaekwar was still experiencing knee pain, which was slow to improve. On April 16, 2020, Mr. Gaekwar was able to fully extend his knee for the first time, and on April 20, 2020, he reported being able to walk up to a mile despite pain. His tolerance for physical activities in regards to his left knee was marginally improving.

In the hopes of making further improvement, Mr. Gaekwar continued with his care with Innova Physical Therapy for the next several months, eventually being discharged on September 30, 2020. While at Innova Physical Therapy, Mr. Gaekwar treated for a total of seven months with consistent care, expect in regards to the disruption of COVID-19 where medical offices were closed by the state Governor's mandate. During this time he showed slow improvement. Over time his strength and stability increased, which allowed his balance and endurance to improve, as well as his range of motion. Although unable to fully reach his pre-collision physical state, Mr. Gaekwar's therapists at Innova felt he had reached maximum medical improvement and that they had done all they could. As such, Mr. Gaekwar was released from care. Before being discharged, Mr. Gaekwar was given various tools, techniques and resources to continue his HEP program. He was encouraged to continue self-care at home for maintenance of his lingering pain, stiffness and balance issues. His pain and disabilities are continuing and have plateaued.

Before becoming a victim of Mr. Garcia on January 25, 2020 Mr. Gaekwar was very healthy. He had no active pre-existing back, neck or left knee symptomology whatsoever. He did have preexisting congenital defects in both knees making him more susceptible for injury in the event of trauma. He also had right knee replacement surgery in 2018. However, any remotely relevant historical conditions were dormant by the time of this crash. The law is clear. Washington courts

Scan Date: 11/10/2020 6:38:22 AM



take into consideration when a party has a pre-existing condition that is asymptomatic and caused to light up due to the conduct of the defendant. Under the Washington Pattern Jury Instruction 30.18, Previous Infirm Condition, a jury would be instructed in this case, to hold the defendant accountable for the full extent of the injuries, even if plaintiff's injuries are worse than they would have been if the plaintiff did not have any asymptomatic pre-existing conditions WPI 30.18 instructs the jury as follows:

> "If [your verdict is for the *[plaintiff*, and if] you find that:
> (1) before this occurrence the *[plaintiff]* had a *[bodily]* condition that was not causing pain or disability; and
> (2) because of this occurrence the pre-existing condition was lighted up or made active, then you should consider the lighting up and any other injuries that were proximately caused by the occurrence, even though those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition."

## DAMAGES

Mr. Gaekwar's medical bills to date as a result of the January 25, 2020 collision are as follows:

| PROVIDERS | | TOTAL CHARGES |
|---|---|---|
| Overlake Medical Clinic - Redmond | | $1,156.28 |
| Proliance Orthopedics & Sports Medicine | | $1,650.00 |
| Innova Physical Therapy | | $15,974.50 |
| Radia | | $117.60 |
| Evergreen Hospital | | $357.00 |
| **TOTAL TREATMENT CHARGES** | | **$19,255.38** |

At the present time, we have documented $19,255.38 in medical bills. This does not account for any future care needed to manage the lingering symptoms caused by the crash.

The medical bills alone are not indicative of my client's total damages. Directly after the incident, Mr. Gaekwar was very shaken by the violence of the collision, causing him to sit down on the curb to calm down. He was shaking from head to toe, as well as bleeding from his forehead due to a cut he received as a result of the impact from hitting his head. It was a very traumatic experience for him. It is clear from the medical records that my client has done everything he can to make as full recovery as possible and has not prolonged his medical treatment.

Prior to the collision, Mr. Gaekwar led a very active lifestyle, which involved regular gym participation with a rigorous routine and included biking from Sammamish to Woodinville and

Scan Date: 11/10/2020 6:38:22 AM



back every Saturday and Sunday. Mr. Gaekwar made sure to be physically active and exercise every day of the week. He has not been able to participate in these activities since the incident. He has even been advised by his primary care provider, Dr. Kriseman, to halt his gym membership. See the provided medical advisory slip on the disk of exhibits. Being as active as he was, Mr. Gaekwar was in good health before the collision. Now he has constant pain and instability in his left knee, severely limiting his once active lifestyle. He is currently trying to reintroduce these beloved activities back into his normal routine, but progress has been slow. Also, my client lives in an apartment with multiple flights of stairs to the entryway. This has put a strain on his injuries, causing him to live with pain that was not there before the collision. Mr. Gaekwar was born on September 22, 1945. By the life expectancy tables utilized by our courts, he has 11 more years to endure the residual problems caused by Mr. Garcia.

## CONCLUSION

Plaintiff hereby gives Nationwide the opportunity to settle for Mr. Garcia's policy limits of $50,000. This is subject to a *Hamilton* buy out by Amica. Mr. Garcia's answers under oath to Interrogatories are also required to finalize a settlement so that, among other things, we can be satisfied that he has no other available insurance Please respond to this settlement demand by December 2, 2020, at which point the offer is withdrawn. The settlement check should be made payable to the Balint & Associates, PLLC Trust Account only. I will not disburse until my client has signed standard release documents, in the form attached and I have returned them to you. Our firm tax identification number is 91-2046896.

Very truly yours,
BALINT& ASSOCIATES, PLLC

David J. Balint
Attorney at Law

Enclosures

CC: Brittany Am
Amica Mutual Insurance Company (w enclosures)
PO Box 9690
Providence, RI 02940-9690
bam@amica.com
Amica Claim No.: 60003757148

Cc: Client

# Exhibit 4

***BALINT& ASSOCIATES, PLLC***
*ATTORNEYS AT LAW*
***5950 Sixth Avenue South, Suite 200***
***Seattle, Washington 98108***
*Telephone: (206) 728-7799*
*Facsimile: (206) 728-2729*
*Cell: 206-947-7988*
*E-mail: dbalint@balintlaw.com*
*Website: balintlaw.com*

*David J. Balint (Ext. 111)*
*Donald J Horowitz, Of Counsel*

February 9, 2021
**SENT VIA EMAIL**

Brittany Am
AMICA
BAM@amica.com

**FOR SETTLEMENT PURPOSES ONLY**

| | | |
|---|---|---|
| Re: | Our Client: | Chandrasi Gaekwar |
| | Our File No.: | 2814 (P-17.1) |
| | Date of Collision: | January 25, 2020 |
| | AMICA Claim No.: | 60003757148 |

Dear Ms. Am,

The purpose of this letter is to give AMICA the opportunity to settle the Under Insured Motorist claim of Chandrasi Gaekwar without litigation You have previously received a copy of the demand package that was sent to Nationwide Insurance, as well as declined the opportunity for a Hamilton buyout. As of December 1, 2020, we settled with Nationwide for the policy limits of $50,000. Attached is a copy of the Release of All Claims with Nationwide, the Nationwide Declaration Page, as well as an affidavit of No Additional Coverage from the at fault driver.

The demand is for $140,000 new money to settle this claim.

At this time Mr. Gaekwar is still treating on a maintenance level. Listed below is a summary of the additional care that my client has received since the demand to Nationwide Insurance. Also included is an analyses of the future care that will be needed to maintain the chronic pain brought on by the collision related injuries.

**ADDITIONAL/FUTURE TREATMENT**

On December 24, 2020, still suffering from knee pain and stiffness, Chandrasi Gaekwar returned to Proliance Orthopedics & Sports Medicine and met with Dr. Trevor Scott. A thorough intake and exam was completed. In the records it is noted that Mr. Gaekwar is very active and enjoys cycling. He visited Proliance Orthopedics & Sports Medicine in March of 2020 and received a Synvisc One injection, which helped, but the symptoms are now beginning to reoccur. Currently he suffers from pain with weight bearing activities, which is worse with twisting and pivoting,

and he has pain when using stairs, particularly when going down them. With the physical exam there was noted swelling of the left knee, as well as tenderness over the medial, lateral joint line. New x-rays were taken and compared to those from 2/18/20 for a comparison. Dr. Scott noted that the left knee injury is severe enough that at some point the injections will no longer be an effective method to control the pain and that Mr. Gaekwar would benefit from a left total knee replacement. The average cost of a knee replacement is about $30,000 for the hospital and surgeon only. We have not costed the necessary follow-up rehabilitation and physical therapy. Mr. Gaekwar notes that his previous unrelated right knee replacement had severe complications including hospitalization. In making this offer we are assuming no complications. At the end of the exam, Mr. Gaekwar was given a Synvisc injection to the left knee. The Synvisc injections are to be repeated every six months at the cost of approximately $1,200 each.

## DAMAGES

Mr. Gaekwar's medical bills to date as a result of the January 25, 2020 collision are as follows:

| PROVIDERS | | TOTAL CHARGES |
|---|---|---|
| | | |
| Overlake Medical Clinic - Redmond | | $1,156.28 |
| Proliance Orthopedics & Sports Medicine | | $1,650.00 |
| Innova Physical Therapy | | $15,974.50 |
| Radia | | $117.60 |
| Evergreen Hospital | | $357.00 |
| **TOTAL TREATMENT CHARGES** | | **$19,255.38** |

At the time of settlement, we have documented $19,255.38 in medical bills. This does not account for any future care needed to manage the lingering symptoms caused by the crash, the cost of future surgery or the cost of continued injections.

| PROVIDERS | | ADDITIONAL CHARGES |
|---|---|---|
| | | |
| Proliance Orthopedics & Sports Medicine | | $1,670.00 |
| **TOTAL TREATMENT CHARGES** | | **$20,925.38** |

Since that time, Mr. Gaekwar has returned to Proliance Orthopedic & Sports Medicine and had another injection, incurring additional bills in the amount of $1,670, bringing the total treatment charges up to $20,925.38

The medical bills alone are not indicative of my client's total damages. As a result of the crash, Mr. Gaekwar is left with lingering pain and stiffness in his left knee, something that will need to be managed with continued care, Synvisc/cortisone injections and eventually surgery. As stated

by Dr. Scott, injections will eventually become ineffective and Mr. Gaekwar will need to have a knee replacement surgery. Although the time frame for when this will occur is unknown, the surgery is inevitable. Until that time, Mr. Gaekwar will continue to need these injection every 6 months.

From the demand package sent to Nationwide, you can see that prior to the collision Mr. Gaekwar led an active lifestyle, which included regular gym participation and bicycling long distances. Although he has made improvements, he still suffers from knee pain and stiffness, which affects his balance, which in turn affects his ability to ride his bicycle. Mr. Gaekwar highly values his physical health and personal fitness, something which has allowed him to live an active lifestyle even into his later years. His injuries make it difficult to maintain the same fitness level and physical condition he had before the collision. Despite his home exercise program prescribed to him by his physical therapist, he continues to live with knee pain and stiffness.

The records show that Mr. Gaekwar's symptomology, disabilities and suffering from the effects of the January 25, 2020 collision have plateaued and have not changed much over time. A total knee replacement is likely as outlined in the December 24, 2020 orthopedic record. He also risks a future second replacement. His surgeon informed him that delaying the surgery for as long as possible was in his interest because knee replacement surgeries are generally only good for 10 years and so the longer he can delay the first surgery the better off he would be. For settlement purposes only one replacement is assumed.

Mr. Gaekwar was born on September 22, 1945. By the life expectancy tables utilized by our courts, he has 11 more years to endure the residual problems caused by Mr. Garcia. However, Mr. Gaekwar is in excellent shape except for the effects of the collision and he comes from a long line of long lived relatives.

**CONCLUSION**

Plaintiff hereby gives AMICA the opportunity to settle the UIM claim for Mr. Gaekwar for $140,000 new money. Please respond to this settlement demand by March 8, 2021, at which point the offer is withdrawn. The settlement check should be made payable to the Balint & Associates, PLLC Trust Account only. Our firm tax identification number is 91-2046896.

Very truly yours,
BALINT& ASSOCIATES, PLLC

David J. Balint
Attorney at Law

Enclosures

Cc: Client

# Exhibit 5

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM

***BALINT & ASSOCIATES, PLLC***
***ATTORNEYS AT LAW***
***5950 Sixth Avenue South, Suite 200***
***Seattle, Washington 98108***
***Telephone: (206) 728-7799 // Facsimile: (206) 728-2729 // Cell: (206) 947-7988***
***Email: dbalint@balintlaw.com***

*David J. Balint*
*Donald J Horowitz, Of Counsel (Dec.)*

June 30, 2022

Thomas Grundy
AMICA – UIM Dept.
PO Box 9690
Providence, RI 02940-9690

**Sent via Email &**
**Regular Mail:**
tgrundy@amica.com

| | |
|---|---|
| Client: | Chandrasi Gaekwar |
| Our File No.: | 2814 (P-17) |
| Case No: | 60003757148 |
| Date of Incident: | 01/25/2020 |

Dear Mr. Grundy,

Over a year ago Mr. Gaekwar's offer to settle with AMICA Insurance for $140,000 new money expired. For background, see the demand letter dated February 9, 2021. That offer was based on the uncertainty that Mr. Gaekwar would need further surgical intervention on his injured left knee. After much effort to treat his knee conservatively, it became clear surgery was the best option. Said surgery took place on December 13, 2021. My client has now completed an extensive course of pre and post-surgical physical therapy, much of which required inpatient care.

Included with the demand letter of February 2021, the known medical charges were $19,255.38. See the summary below.

| PROVIDERS | | TOTAL CHARGES |
|---|---|---|
| | | |
| Overlake Medical Clinic - Redmond | | $1,156.28 |
| Proliance Orthopedics & Sports Medicine | | $1,650.00 |
| Innova Physical Therapy | | $15,974.50 |
| Radia | | $117.60 |
| Evergreen Hospital | | $357.00 |
| **TOTAL TREATMENT CHARGES** | | **$19,255.38** |

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM



Since then, Mr. Gaekwar continued with conservative care, which eventually plateaued, leading to the left knee surgery of December 13, 2021. The following is a summary of these updated providers, their dates of service and the amounts billed.

| **PROVIDERS – UPDATED & SURGERY RELATED** | | **TOTAL CHARGES** |
|---|---|---|
| | | |
| 05/24/21 - 11/22/21 Advantage Physical Therapy | | $8,351.00 |
| 10/21/21 - 01/25/22 Tri-County Orthopedics | | $9,520.00 |
| 11/29/21 - 12/15/21 Morristown Memorial Hospital | | $83,153.91 |
| 12/01/21 - 3/31/22 Professional PT & Training | | $9,109.13 |
| 12/15/21 - 12/24/21 Atlantic Rehab Institute | | $26,342.02 |
| **TOTAL UPDATED & SURGERY RELATED CHARGES** | | **$136,476.06** |

The total medical bills arising from this crash now total $155,732.44. All of the medical records and bills listed are submitted herewith on a disk. This should facilitate a crosscheck by AMICA of the information listed in my chronology. The surgeon, Dr. Robert T. Goldman, MD, submitted a sworn declaration delineating the cause of the surgery, the need for surgery and the reasonableness of the medical care provided. A copy of his declaration, along with his curriculum vitae, is also enclosed on the disk. Dr. Goldman notes in his conclusion that "[Mr. Gaekwar] still has some residual pain and disability so, going forward, I prescribed physical therapy for him as needed." A careful review of the medical records will support the fact that prior to this crash with the underinsured driver, Mr. Gaekwar had no active conditions with his left knee. Since you may not be familiar with Washington law, when a dormant condition is lit up and made active, the tortfeasor is liable for all of the effects of the incident. The jury instruction summarizing the law that would be given to a jury after trial is as follows:

> "WPI 30.18 Previous Infirm Condition:
> If you find that:
>
> (1) before this occurrence the plaintiff had a bodily condition that was not causing pain or disability; and
>
> (2) because of this occurrence the pre-existing condition was lighted up or made active,
>
> then you should consider the lighting up and any other injuries that were proximately caused by the occurrence, even though those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition."

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM



In order to assist you, included on the provided disk is a photograph of Mr. Gaekwar's left knee taken shortly after the crash. As you can see, there is a distinct open wound and scar from the suffered abrasion, a direct result of the force of the impact from hitting the dash.

I remind you that prior to the collisionMr. Gaekwar, at age 75, was in excellent physical condition and led a very active lifestyle. Just months before, my client had completed a multiple day hiking vacation in the Himalayan mountains, able to easily reach an elevation of over 17,000 feet. The photos from his vacation are included on the provided disk. Mr. Gaekwar was an avid cyclist, able to complete a multiple mile circuit with ease. This was one of his favorite pastimes, one that brought him great pleasure and allowed him to enjoy the great outdoors while helping to reduce his stress levels. Since the collision, despite all his efforts, he has not been able to return to this hobby. Although Mr. Gaekwar has made improvements from his accident-related injuries, he is far from pre-accident condition.

In order to help facilitate the best and fastest recovery possible, on recommendation of his doctors, Mr. Gaekwar completed an intense round of physical therapy before the surgery. The purpose of these treatments was to strengthen the muscles around his knee to prepare for the trauma and lack of use during his recovery. This would put him in the best possible position to begin aggressive physical therapy as soon as possible, not to mention shorten his recovery time. This was important to Mr. Gaekwar as he was proud of his physical condition prior to the collision. He was very active for his age, able to travel, hike, cycle and maintain an intense workout routine at the gym. Since the collision, he has been doing his best to reach that same pre-collision status. As a result, after the surgery, Mr. Gaekwar was placed in an in-house rehab facility, Atlantic Rehabilitation Institute. This was a necessity due to past surgical recovery problems such as anemia and the risk of blood clots. This was also the only way Mr. Gaekwar could receive his aggressive physical therapy, which consisted of 1.5-hour sessions, twice a day. This in-house rehab care was prescribed by his surgeon and was paid in full by Medicare. It was related and necessary.

My client has suffered through an intense surgery and extensive medical care causing him a great deal of pain, suffering and disability. It has been more than two years

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM

since the crash. He has at least 9.82 years to endure the continuing problems according to the life expectancy tables utilized by our courts.

The report provided by the opinion witness hired by AMICA, Dr. Sean Kearney, will not suffice over the personal knowledge and expertise of the surgeon, Dr. Robert T. Goldman, MD, who has been following Mr. Gaekwar's knee condition since 2014. The opinion of Dr. Kearney is deficient in several particulars, including the fact that he did not physically exam Mr. Gaekwar, nor did he talk with him about the present left knee condition.

As a Under Insured Motorist carrier, AMICA owes a duty of good faith in resolving a claim brought by its insureds. A part of this good faith includes the duty to investigate thoroughly the documentation provided. If, after reading the materials enclosed on the disk, AMICA requests other information or documentation, please do not hesitate to ask.

Given that the uncertainties presented with the offer of February 2021 no longer exist, the opportunity is hereby extended to AMICA to resolve the claim of Mr. Gaekwar for $275,000 new money (including waiver of PIP) which is within available limits. This offer will expire, unless AMICA reasonably requests more information, by the close of business on Friday, July 24, 2022. Checks should be made to the order of the trust account of Balint & Associates, PLLC only. Out of the proceeds all outstanding subrogation interests, including Medicare and Medigap, will be resolved.

Very truly yours,
BALINT & ASSOCIATES, PLLC

David Balint
Attorney at Law

Cc: Client

# Exhibit 6

Claims Processing - Amica Scan Center
PO Box 9690
Providence, RI 02940-9690

Toll Free: 1-877-97-AMICA
(1-877-972-6422)
Fax: 1-888-818-2386

March 19, 2021

Balint & Associate, PLLC
5950 Sixth Ave S
Ste 200
Seattle, WA 98108

File Number: 60003757148
Date of Loss: January 25, 2020
Your Client(s): Chandrasi M. Gaekwar
Our Insured: Chandrasi M. Gaekwar

Dear Attorney Balint :

This letter will confirm our most recent correspondence of March 4, 2021 in which we made a settlement offer of $1,000 to your client. We have not received a response from you. Please present our settlement offer to your client as soon as possible and let us know of the response.

Sincerely,

Brittany A. Am

Brittany A. Am
Claims Department
877-972-6422 x21875
BAM@AMICA.COM



Amica Mutual Insurance Company Amica Life Insurance Company Amica Property and Casualty Insurance Company
Amica General Agency, LLC Amica General Insurance Agency, LLC

# Exhibit 7

# Deposition of Brittany Am

# Gaekwar v. Amica Mutual Insurance Company

# July 19, 2023

BUELL REALTIME REPORTING
COURT REPORTING AND LEGAL VIDEO

206.287.9066 l 800.846.6989
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com

Certified WBENC Women's Business Enterprise

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANDRASI GAEKWAR, )
)
Plaintiff, )
)
vs. ) No. 2:22-cv-01551-BJR
)
AMICA MUTUAL INSURANCE )
COMPANY, a foreign )
corporation, )
)
Defendant. )

Videoconference Deposition Upon Oral Examination
of
BRITTANY AM

9:08 a.m.
July 19, 2023

Witness Location: Boston, Massachusetts
(All participants appeared via videoconference.)

REPORTED BY: Karmen Knudson, RPR, CRR, CCR #1935



APPEARANCES

FOR THE PLAINTIFF:

DAVID J. BALINT
BALINT & ASSOCIATES
5950 Sixth Avenue South
Suite 200
Seattle, WA 98108
dbalint@balintlaw.com

FOR THE DEFENDANT:

LUCY WILHELM
COLE WATHEN LEID HALL P.C.
222 Etruia Street
Seattle, WA 98109
lwilhelm@cwlhlaw.com

COURT REPORTER:
KARMEN KNUDSON, RPR, CCR
BUELL REALTIME REPORTING
1325 Fourth Avenue
Suite 1840
Seattle, Washington 98101

ALSO PRESENT: RENO ETTIENNE



I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| Mr. Balint | 4 |


EXHIBIT INDEX


| EXHIBIT MARKED | | PAGE |
|---|---|---|
| 1 | Claim notes AMICA 2038 to 2129 | 11 |
| 2 | Overlake medical record dated 02/13/2020 *CONFIDENTIAL* | 43 |




BRITTANY AM, witness herein, having been duly sworn by the Certified Court Reporter, testified under oath as follows:

EXAMINATION

BY MR. BALINT:

**Q. Could you please state your full name and residence address for the record, please.**

A. Sure. My first name is Brittany, my last name is Am. My address is 20 South Point Drive -- excuse me -- Apartment 114, Boston, Massachusetts, 02125.

**Q. And that's where you're dialing in from today? Boston?**

A. Correct.

**Q. And do you have an email address, Brittany?**

A. Yes.

**Q. What is it?**

A. It is brittam3610@gmail.com.

**Q. Okay. Tell me a little bit about yourself. I want to know your educational history, please, starting --**

A. Sure.

I graduated from the University of Rhode

Page 5

Island. I'm currently working. I work at a company called PTC. I'm a program manager.
**Q. What degree do you have?**
**(Crosstalk)**
A. I have a degree in communications.
**Q. And when did you get that?**
A. I graduated in 2015.
**Q. And give me a little bit about your job history from the time you graduated until now.**
A. Sure. I worked at Amica Mutual Insurance as an insurance adjuster just shy of two years.
I worked at Fidelity Investments. I worked as a customer relationship advocate. I worked there about nine, eight months, maybe.
And then currently in my role as a program manager, I've been with this company for a year and a half now.
**Q. Okay. So if I got your chronology right, you started out with Amica --**
A. Correct.
**Q. -- from 2015 to 2017? 2017?**
A. Oh. My mistake. I graduated college in 2019. I started Amica in 2019. My mistake. Sorry.
**Q. All right. Well --**
**(Crosstalk)**

Page 6

**Q. Pardon me.**
**So from 2019, when did you start with Amica? Give me the starting date to the best of your recollection.**
A. I know it. September 16th, 2019.
**Q. And your last day?**
A. I believe I ended July of 2021.
**Q. And what were the circumstances of your leaving? Why did you leave Amica?**
A. The role I had was located in Costa Mesa, California. I'm from Rhode Island, so I just wanted to move closer to home.
**Q. When you were working for Amica, were you working in the office or are you working remotely?**
A. It was during the pandemic, so it was in the office but turned to remote.
**Q. So if you were working remotely, what difference would it make where you were living? Why did you make this change?**
A. Amica had you move to the state where you're sent to work in. So they moved me to California. I didn't have a choice.
**Q. So how did you get assigned this case, which is not a California case?**
A. When you're assigned in California, you get

Page 7

to handle a few other states depending on what you're licensed in. Washington state was one of those states.
**Q. And what licenses did you have while you were working for Amica?**
A. I had a few. I don't remember all of them.
**Q. Give me the ones you do remember, though.**
A. Rhode Island, Connecticut, California, Washington state. I don't remember the rest.
**Q. And what licenses were they?**
A. I forget the name of it, but for an insurance adjuster.
**Q. There's an actual certificate that goes with that?**
A. I believe it's a license.
**Q. License?**
**So if I were to look up licenses, I would find you in Washington, licensed at that time as an adjuster?**
A. I believe so, yes.
**Q. Okay. Good. What's the name of that license?**
A. I don't remember.
**Q. Certified adjuster? Do you remember what it is at all?**
A. Something along those lines. I don't

Page 8

remember exactly.
**Q. Oh, okay.**
**Do you have any legal background?**
A. No.
**Q. Do you have any medical background?**
A. No.
**Q. When you're a licensed adjuster like that, do you have to take courses to keep your license current?**
A. Correct.
**Q. The whole time you were at Amica, did you take those courses?**
A. Continuously, yes.
**Q. Do you have a list of those courses that you took?**
A. I don't. Amica Mutual Insurance keeps a log of the courses you need to uphold.
**Q. Okay. And tell me, when you started with Amica in September 2019, tell me about your training and your introduction to Amica.**
A. Sure.
When I got hired at Amica, I had to go through a seven-weeks paid training at their headquarters in Rhode Island. That training consisted of learning of different claims procedures, things like that.

**Q. Did they give you a training manual of some kind?**
A. Yes.
**Q. And did the manual consist of both written items as well as video courses?**
A. Yes.
**Q. Okay. And what were you trained to be? What kind of adjuster did Amica want you to be when you finished that course?**
A. A bodily injury adjuster.
**Q. Okay. So you never did property damage?**
A. No.
**Q. And your bodily injury assignment, what did it include? Did it include all sorts of bodily injury? Third-party, first-party, underinsured motorist, all of that?**
A. Correct.
**Q. How did you get assigned this case of Chandrasi Gaekwar?**
A. It's a random assignment. The supervisor that you have assigns you different claim files.
**Q. And who was your supervisor at the time? If there was more than one, let me know who those are.**
A. Within my career at Amica, I had more than one, but my primary supervisor was Tom Van Kooten.



**Q. What did you review to prepare for this deposition today? It's my morning, but I'll say "this morning."**
A. Sure.
Nothing really. The exhibits were sent to me, including the claim file. I briefly looked at the claim file to jog my memory.
**Q. Okay. And did you review those materials?**
A. One of them, yes.
**Q. What did you review?**
A. The claim file, to see my involvement.
**Q. So let's pull up that claim file so we can bracket your time. Okay?**
MR. BALINT: Reno, can you do that?
A. I have all of them.
MR. BALINT: We're not seeing anything yet, Reno.
We're not seeing anything. Can you hear me?
MR. ETTIENNE: Yeah, I can hear you. I have it on screen share.
MS. WILHELM: You might just have the specific, like, program shared, if that makes sense.
THE COURT REPORTER: Do you want to go off the record and figure this out?
MR. BALINT: Yeah, let's go off.



(Discussion off the record.)
**Q (By Mr. Balint) There are -- in the lower right-hand corner, Ms. Am, there are Bates stamp numbers.**
A. Correct.
**Q. And I'd like to start with Bates stamp 2099, 2099.**
MS. WILHELM: And are we marking this?
MR. BALINT: Yeah. I think that the claims file that we're looking at should be marked as Exhibit 1.
(Exhibit No. 1 introduced.)
**Q (By Mr. Balint) Okay. So we have page 2099 on the screen, Ms. Am. Can you see it?**
A. Yes.
**Q. Okay. So it looks to me that Lanesheia White on 8/3 was dealing with the property damage and it looks like you were going to be assigned as the adjuster for the underinsured motorist claim.**
**Do you see where she requested a UIM?**
A. Yep.
**Q. Okay. And then on the next page, which is 2098 -- I'm sorry, but that's the order they were given to us, so reverse order. So 2098, it looks like at that time, you got assigned by somebody named Kim Macdonald-**



**Connil to be the person that's dealing with the underinsured motorist.**
A. Correct.
**Q. Who is that person?**
A. She's someone that works at Amica. She assigns the different claim files.
(Crosstalk)
**Q. Okay. All right. So if I'm right, we're looking at 8/3/20 that your first involvement occurred.**
A. (Witness nods head.)
**Q. Okay. During the time that you were assigned the adjuster starting with this August 3, 2020, about how many other files were you handling in total?**
A. At this point, I probably had a backlog of a hundred, over a hundred claims.
**Q. And while you were handling this claim, what was your settlement authority, if any?**
A. Ooh. That, I don't remember. The settlement authority goes through the supervisor.
**Q. And who was the supervisor?**
A. Tom Van Kooten.
**Q. Okay. So if there's a demand that's received, do you have to deal with a supervisor to get authority?**
A. Correct. The supervisor reviews the demand.

Page 13

**Q. Okay. We have an answer to interrogatories that said you had a thousand-dollar settlement authority. Is that accurate or did you have any independent authority at all?**
MS. WILHELM: Object to the form.
Ms. Am, you can answer.
A. I think I had authority maybe up to 5,000. I don't remember specifics.
**Q (By Mr. Balint) Okay. And then on that same -- on page 2097 --**
MR. BALINT: Do you have that?
Yep.
**Q (By Mr. Balint) -- there's a note to you from Mr. Van Kooten assigning this to you.**
**Let's see here. This reverse order is...**
**What did you do initially to familiarize yourself with the case that's been assigned to you?**
A. From looking at this, I know I had to make first contact. So contacting any of the involved parties is one of the first steps.
**Q. Okay. Do you recall at any time handling the file that you spoke personally with the insured?**
A. That, I don't remember.
**Q. If you did, it would be in this log we're looking at somewhere, would it not?**

Page 14

A. Correct.
**Q. Okay. At any time while you were handling the claim, did you consult with any medical-trained personnel to help evaluate the claim of Mr. Gaekwar?**
A. That, I don't remember.
**Q. But if you did, it would be in the log, or would it not be in the log if it was some internal consultation?**
A. If there was internal consultation, it would be in the claim log.
**Q. Okay. So anytime, did you speak with anybody at Nationwide, the underlying insurance company for the tortfeasor?**
A. That I don't remember.
**Q. And again, if you did, it would be in the claims log; correct?**
A. Correct. Every call has to be recorded in the claim log.
**Q. If another person at Amica wanted to just see what was going on in the claims handling, if they clicked into the file, would that be recorded in the claims log or could they do it anonymously?**
A. That, I don't know.
THE COURT REPORTER: Can you repeat that, Brittany?

Page 15

THE WITNESS: Sorry. I said if they were to simply look at the claim file, I don't know that that will be logged.
**Q (By Mr. Balint) And you said this was during a time of COVID, so you were working remotely?**
A. Correct.
**Q. Up until the time you got assigned this claim, what kind of experience did you have in handling personal injury claims?**
A. At this point, I had been working since September of 2019 with Amica. The claim load on the West Coast was pretty heavy, so I had -- I can't tell you how many claims I had, but I had a good number.
**Q. Okay. So when you're handling claims, do you have any way to reference which claims you were handling that was from Washington state?**
A. The claim file notes which state the incident occurred.
**Q. So is there any way of finding out how many cases you handled during the time you were assigned to this claim that arose from Washington state?**
A. I'm not sure of that. I don't know if Amica has those metrics.
**Q. Okay. In terms of your caseload at the time you were handling this, can you estimate for us how**

Page 16

**much -- what percentage you were dealing with underinsured motorist or uninsured motorist claims as opposed to third-party claims?**
A. That, I don't know.
**Q. Were you given any training in the difference in handling underinsured or uninsured motorist claims versus third-party claims?**
A. Yes
**Q. Can you summarize that for me, please.**
A. I don't remember entirely, but we had manuals, example claim files, documents, and one-on-one training with supervisors to learn the difference of all kind of claims.
**Q. And that was your training period that we talked about before?**
A. Yes.
**Q. Were you provided -- as you're looking at a personal injury claim of any kind, were you provided with any checklists or any other items that you could follow to make sure that you were doing the job as well as you could?**
A. We had a manual for certain aspects of the claim, but I don't remember if there was a checklist.
**Q. Okay. So you're now assigned -- as we're looking at this, you're assigned the claim of**

Page 17

**Mr. Gaekwar. Take me through what you initially did in that file.**
A. I know you have to make first contact, calling the insured or the claimant, whoever is involved in the claim. Reviewing any documents that are on file. If an involved party is attorney represented, I only speak with the attorney, usually sending letters, things like that.
**Q. In the entire time you were handling Mr. Gaekwar's claim, did you, at any time, request that he submit to an examination under oath?**
A. No, not that I remember.
**Q. Okay. Do you remember what the criteria were at Amica for your authority to ask for an examination under oath?**
A. I don't think I had those abilities.
**Q. So you would have to get some approval higher up if you were going to do that; is that correct?**
A. Correct. Mm-hmm.
**Q. In your claims handling while you were at Amica, did you ever ask for an examination under oath of anybody?**
A. No.
**Q. In this particular case, is there anytime where you requested records, medical records, or bills**

Page 18

**from any provider directly?**
A. That I don't remember. Looking at this claim file, I know that the insured was attorney represented, so any request of medical records would go through the attorney.
**Q. Okay. Did you ever file -- did you ever send the attorney a request for medical records, in other words, a consent for you to get medical records -- directly from providers?**
A. I don't remember sending that specific letter, but that is part of the claim process.
**Q. So part of the claims process, even in underinsured or uninsured motorist claims, was to submit a request to the represented person, the attorney, to sign it, have the client sign a consent form so that Amica could get the records directly?**
MS. WILHELM: Objection to form.
MR. BALINT: What's the objection there, Lucy? I'd like to correct it.
MS. WILHELM: I don't have to necessarily give you a basis for the objection, but this has been asked and answered.
MR. BALINT: Okay. That's -- all right. I'll restate it.
**Q (By Mr. Balint) Part of the process that you**

Page 19

**said is to get medical records directly from providers, but you have to go through the attorney; correct?**
A. Correct.
**Q. Okay. That would require an Amica form to be sent to the attorney to be signed by the client giving permission for the provider to provide those records; yes?**
A. Yes.
**Q. Okay. Did you ever do that in this case?**
A. That, I don't remember. If you reviewed the claim file, I'm sure I sent a number of letters, since I'm working with an attorney.
I don't know whether or not that consent form is in one of those letters.
**Q. Okay. If you did send such a consent form, it would be in the claims file, like the other things we've talked about; correct?**
A. Correct. All the letters would be in the claim file.
**Q. Did you, at any time, receive any training -- before or while you were handling this claim of Mr. Gaekwar, did you receive any training specific to Washington state, the laws of Washington?**
A. That, I don't remember.
**Q. Okay. What records would be in your**

Page 20

**personnel file, if you know, that would show the training you got?**
A. Can you rephrase the question?
**Q. Yeah.**
**We don't have your personnel file, so I don't know what specific training you had, and I'm trying to find out what specific training you had in regard to Washington law.**
A. I don't have it personally, but I know Amica Mutual Insurance has something like a license -- a licensing department and they keep a record of all of the current licenses you have or courses that you need to take in order to uphold these licenses.
**Q. Okay. And that would include, I assume, then, Washington law if you were licensed in Washington?**
A. Correct.
**Q. Do you know what agency issues those licenses in Washington?**
A. I do not.
**Q. At any time during your handling of this claim or before, while you were at Amica, did you ever have access to the Washington Administrative Code sections relating to claims adjustment?**
A. That, I don't remember.
**Q. Do you remember ever dealing with the**

Page 21

**Washington Administrative Codes, the acronym of which is W-A-C, WAC?**
A. I don't remember.
**Q. Would it be part of your process -- if you were handling a claim in Washington, would it be part of your process in handling the claim to refresh your knowledge of the local law, like Washington law?**
A. We do a lot of research and speaking with supervisors when we have a claim. I'm assuming brushing up on certain specifics would be part of that conversation.
**Q. But that conversation would not be recorded in the claims file, would it?**
A. I don't think so.
**Q. What kind of records would we have of who you consulted with in handling Mr. Gaekwar's claim?**
A. Every request, every note, is in the claims file. I'm sure you might see a conversation asking Mr. Tom Van Kooten for advice or next steps, and that will be in the claim file.
**Q. Who participated in the evaluation of plaintiff's claim while you were the assigned adjuster?**
A. Can you rephrase the question?
**Q. We have a lot of claims that are showing up in the claims file, but I want to know who actively**

Page 22

**assisted you, if anybody, in adjusting this UIM claim.**
A. From what I remember, I would do an evaluation and that evaluation gets, say, approved or moved on to the next step by my direct supervisor, Tom Van Kooten.
**Q. And so when you requested this evaluation assistance, you did an evaluation, sent it to Mr. Van Kooten, what materials did you supply him with, or did he just access the file?**
A. As an adjuster, it's my role to go through all the documents that are in the claim file, specifically medical records, letters from the attorney, things like that. So they would be highlighted. We can link them in the note in the claim file.
**Q. So if you did consult with anybody, including Mr. Van Kooten, it would be recorded in the claims file; correct?**
A. Correct.
**Q. Okay. While you were at Amica, did you supervise any other adjusters or were you always the primary adjuster?**
A. I was a mentor at one point, but it was short-lived.
**Q. In your training at Amica prior to and during the handling of the Gaekwar claim, what training did you**

Page 23

**have in terms of reviewing the medical records that were provided?**
A. We would have medical examiners give us like -- I wouldn't say seminars but training courses throughout my career at Amica. I don't know the cadence, but every once in a while.
**Q. And that would be like if somebody had a broken shoulder, there would be something in the file to tell you how to deal with a broken shoulder case? Is that kind of an example -- I want to find out what it consisted of.**
A. Sure.
It's more like a general training, how to handle certain kind of injury, what we're looking for, things like that. And I wasn't the only one. It would be like a class of adjusters would attend this training.
**Q. While you were handling Mr. Gaekwar's claim, did you ever consult in-house or out of Amica with any medical-trained person to help evaluate the claim?**
A. That, I don't remember.
**Q. When you're handling a UIM claim such as this, how were you trained to deal with that claim? was it, in your mind, an adversarial process or was it a collaborative process trying to work with the claimant to fairly adjust the claim?**

Page 24

A. I believe in this case, I would be working with the attorney to get all the necessary information to get the whole picture of what this claim entails; injuries, prior history, things like that.
**Q. In terms of Mr. Gaekwar, what information did you have about any pre-crash records; in other words, medical records preexisting his injury?**
A. Reviewing the claim file, I saw that I did review medical records. So -- and there was no, like, prior history or preexisting injury, something like along those lines. So any of the information that was provided through those medical records, I suppose.
**Q. So if you had requested -- from a represented person, if you had requested pre-injury historical medical records, that request would be -- if it was made, would be in the claims file; correct?**
A. (Witness nods head.)
**Q. Yes? I didn't hear you.**
A. Yes. Sorry.
**Q. In trying to evaluate the claim, did you have access to jury verdict information about similar cases?**
A. That, I don't remember.
**Q. Do you remember in general if you ever consulted with any sort of database that had the values of similar claims?**

A. No.
**Q. When you were trained in your duties to the insureds in a UIM case, would you agree that you were trained that Amica had the duty to act in good faith in the handling of UIM claims?**
A. Yes.
**Q. And in your memory, did that require giving equal consideration to the insured's interest as to Amica's own interest?**
A. Could you rephrase the question?
**Q. Okay. Do you think that good faith -- in your training, were you trained that good faith in handling claims requires you as the adjuster to give equal consideration to the insured's interest as to Amica's own interest?**
A. Yes. We're trained at Amica to act in due diligence and handle claims fairly.
**Q. In your handling of the claim, how did you come up with the only offer you made while -- the only offer that was made to settle the case, how did you come up with a $1,000 new money offer?**
A. Upon review of the claim file for this, I think the insured was awarded from the tortfeasor like $50,000 and then he also had $10,000 from PIP, I believe it was called. So in the handling -- and I think the



medical specials were about $20,000.
So I guess upon my review and evaluation, this was brought up to Mr. Tom Van Kooten, and then from there, we're given kind of guidance on what we should offer.
**Q. But I take it from your prior testimony that you would have analyzed the file before you talked to -- or gave any information to Mr. Van Kooten, you would have made your own recommendation. Or did you have any say-so in that offer of $1,000?**
A. That, I don't remember. A lot of claim files, you work so closely with your supervisor. It could have been instructed by him or we spoke, you know, outside the claim file and then we made that note.
**Q. Okay. But I guess I'm asking in terms of the offer that you made, the $1,000 offer you made of new money, why $1,000? Why not $1500? Why not $5,000? Why not $15,000?**
**How did you come up with that specific number of $1,000?**
A. The specifics, I don't remember why the monetary amount of a thousand dollars, but from my memory from working with those special damages, it seemed the insured was already paid.
**Q. It seemed to you that he was already paid?**



A. Correct.
**Q. Okay. And what was the basis for you assuming that this underlying limits by Nationwide and the waiver of PIP was sufficient to cover his damages?**
MS. WILHELM: Object to the form.
A. I don't remember. This role was a while ago for me.
I don't remember.
**Q (By Mr. Balint) In your evaluation of the claim and the $1,000 offer, did you have any information that Mr. Gaekwar's injury was not continuing?**
A. In review of the claim file -- can you hear me?
**Q. Yes.**
A. In review of the claim file, looked at the notes. I believe there was progression in his medical evaluation.
**Q. Can you explain that? I don't think I understand that.**
A. In review of the note that I made, it seemed he was hiking, he made progress, reported no pain, things like that.
**Q. Do you think that in your role as a UIM adjuster, that it would be proper and in good faith to cherry-pick individual items out of a medical record and**



**go to the entries that are most favorable to Amica, or would you consider the entire medical record?**
MS. WILHELM: Objection to form.
**Q (By Mr. Balint) Do you understand what I'm asking?**
A. I do.
**Q. I'm really asking if you feel it would be proper to cherry-pick information out of the medical records files.**
A. I believe we look at the whole claim file. And my evaluation is also reviewed by my supervisor, so...
**Q. Okay. But you're the adjuster assigned to it. I think your role -- you said your role was to make recommendations, to write up a summary and make a recommendation.**
A. Mm-hmm.
**Q. But when you were giving -- when you were doing that, did you recommend $1,000 new money or did you just give it to Mr. Van Kooten and let him decide?**
A. That, I don't remember.
**Q. Okay. So going back to my question, if there is an entire claims file that -- medical records, I mean, that are there, do you think it's proper only to pick out those entries that are favorable to minimizing**

Page 29

**the claim?**
A. No, I don't think that's fair. But I also think that Amica teaches you to evaluate the whole claim file.
**Q. Okay.**
A. The whole medical.
**Q. But you would agree if there were -- well, let's look at -- let me see if I can figure out that page in the claims file.**
**While I'm looking for that, let me ask you another question.**
**If material was sent to Amica while you were working there that was information that was on paper copy, how would that show up in the claims file?**
A. Amica has like a scanning distribution type center. You send it to -- or, rather, we request attorneys to scan paper files, scan it to email, and they end up in the claim file.
**Q. And if a disc was sent, how would you get access to that disc?**
A. Same scenario: send to the distribution center.
**Q. Have you ever seen a -- so you were cut off from the actual records that were provided. Before they get to you, they get to a central location; correct?**

Page 30

A. Correct.
**Q. So you would not know, would you, if a material you were looking at was from a disc or was from paper copies?**
A. I don't remember those specifics.
**Q. While you were handling Mr. Gaekwar's claim, what was the Reserves that were set by Amica?**
A. That I don't remember.
**Q. Did you have any say in recommending the amount of reserves?**
A. No.
**Q. So is it fair to say -- did you even have any knowledge of what the reserves were at any point in time?**
A. I don't remember.
**Q. How would you be advised of reserves if there were any that were set?**
A. I'm sure --
(Crosstalk)
A. I'm sure it would be noted in the file.
**Q. You wouldn't have any access outside of the claims file to knowing what Amica had reserved for the claim, for any particular claim, would you?**
A. No.
**Q. Would you have any say-so in deciding**

Page 31

**whether, as part of a resolution of a claim, whether PIP should be waived if Amica had provided any medical -- paid any medical bills under personal injury protection?**
A. I believe I can make the recommendation.
**Q. And the recommendation would go to who?**
A. My supervisor. And then from my supervisor, usually someone higher up.
MR. BALINT: Let's go, Reno, to page 2086.
MS. WILHELM: Is this going to be Exhibit 1 again?
MR. BALINT: Yes. It's all Exhibit 1.
It's small print. Is that 2086?
Yeah, it is.
**Q (By Mr. Balint) In this part of the claims file, which is apparently dated February 11, 2021, the demand was made for $140,000 new money.**
**Do you see that?**
A. Correct. Yep, I see it.
**Q. Okay. And by that time, the medical specials, would you agree, were that $20,925 that's shown, as far as you know?**
A. Yes.
**Q. Okay. Then let's go to the next page, which is 2085.**
**Sorry for the reverse item.**

Page 32

**This is a -- looks like the summary we were talking about before of the pertinent facts in deciding whether to make an offer. Right?**
A. Okay.
**Q. Okay. And is this summary here something that you wrote?**
A. Yes, I believe so. If you scroll up, it should say who the author of the note is.
**Q. Or scroll down.**
A. Sorry. Scroll down, maybe.
**Q. Yeah.**
**Page 2086 looks like it's you, 2/10/21.**
A. (Witness nods head.)
**Q. Okay. All right. So your note in here that he has a history of bilateral osteoarthritis that was -- and you have known persistent osteoarthritis that was aggravated by the motor vehicle accident. Correct?**
A. Yes.
**Q. Okay. And then you were aware that he had an injection in that left knee. Right?**
A. From these notes, yes.
**Q. And, in fact, he had, your notes show, more than one injection in the left knee. Right?**
A. Yes.
**Q. And this note says somewhere in the medical**

**records, you saw that the patient's arthritis is severe enough that at some point the injections may no longer be effective. Patient wishes to proceed with injections and will return as needed.**
**That was something you got from the medical records?**
A. I'm assuming, since they're under the evaluation.
**Q. From this, why was your assumption that he was no longer suffering from the effects of the motor vehicle accident?**
A. I don't remember the specifics. If you scroll down or up, maybe they're included in the notes.
**Q. Well, this is what I have from what you gave to Mr. Van Kooten, apparently, to come up with a $1,000 new money offer.**
**So I'm asking, what was the -- on what basis -- let me ask this.**
**Did you assume by the time that $1,000 offer was made, that he was not continuing with problems with that left knee?**
A. That, I don't remember.
**Q. Okay. So if he was still under treatment and still suffering from the effects of that injury, to his mind at least, in the medical records, why would you**



**come up with a $1,000 offer instead of a higher figure?**
MS. WILHELM: Object to the form.
MR. BALINT: Okay, I scratch that. That was too chopped up.
**Q (By Mr. Balint) Do you know what, on this page 2085, what a Synvisc injection consists of?**
A. No.
**Q. In evaluating Mr. Gaekwar's claim, did you try to do any medical research on your own?**
A. I don't remember.
**Q. If you did do background work like that, would that necessarily be in the claims file?**
A. I don't think so.
**Q. Without knowing what that kind of injection is, how could you evaluate his claim?**
A. I don't know if there was background research done. My job was simply to evaluate the medical records that came in.
**Q. Right. But you're not a doctor. We've already established that.**
**How would you evaluate records without knowing what the terminology is and what the treatments consisted of?**
A. I don't remember.
**Q. On that page, there's a question about the --**



**there's a reference to a Samuel J. Glazier. He says -- it looks like he says "reviewed for TLD activity."**
**Can you explain who Mr. Glazier is and what that entry means?**
A. I don't remember his exact role, but I think his job was to or have a status of a time limit demand on his file, by his note.
**Q. And what does that TLD stand for?**
A. Time limit demand.
**Q. Ah.**
**And then on the -- I'll call it the next page, 2084, is this your summary of the analysis of the claims?**
A. I'm not sure, but I'm assuming it is.
**Q. Okay. So can you explain what medial left knee pain is --**
A. No.
**Q. -- to your understanding?**
**Okay. What relevance did you assign to history of a right knee replacement?**
A. All of these notes I would have gotten from the medical records.
**Q. Well, if it --**
**(Crosstalk)**
**Q. Sorry.**



A. I'm not making -- I'm not making them up. They're written in the medical records, and I would pull all the information.
**Q. And I recognize -- at no point am I trying to imply that you did anything wrong or improper or made something up. I'm not doing that. But you did have to select, from voluminous medical records, certain entries. So I'm asking you why you made certain entries that's somehow deemed important to you to evaluate his $140,000 new money demand.**
A. Sure. I'm sure I picked these with due diligence and part of my Amica training, possibly they have us look for certain notes.
**Q. Okay. And the notes that you have here, you have -- there's some entry on 3/10/20, "pain resolved, more stiffness."**
**Do you see that?**
A. Yep.
**Q. I'll have to find that record that you're referring to, but if he was still having stiffness, would you agree that it was not totally resolved?**
A. I don't know. I haven't been in this role in a long time. I don't remember the specifics of things like that.
**Q. Okay. So if you also -- what's the purpose**

Page 37

**of what we talked about before, that Synvisc injection? What's the purpose of those injections?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Do you know?**
A. Hm-mm.
**Q. Is that a no?**
A. No, I don't know.
**Q. So if he was reporting no pain on a particular occasion, would you want to know why he was reporting no pain?**
A. Again, I don't know.
**Q. Would you agree that many -- in your handling of claims, that many injuries have waxing and waning symptoms?**
MS. WILHELM: Object to the form.
A. Yes.
**Q (By Mr. Balint) Okay. So if you were looking at a medical record and one medical record that you selected that he was having no pain, the record reported no pain, wouldn't you want to know what the surrounding medical records were in terms of treatment that might have explained no pain?**
MS. WILHELM: Object to the form.
A. Well, it would be the attorney's job to give us all the relevant medical records. So if there were

Page 38

surrounding medical records regarding, you know, different pain at different times, we would have to have those records.
**Q (By Mr. Balint) Did you ever, during your handling of this claim, ever ask for any additional medical records?**
A. That, I don't remember.
**Q. If you did, it would be --**
A. It would be in the claim file.
Usually with the time limit demand, we would have had those records on file.
**Q. Okay. At any time, other than the records provided by the attorney, did you feel the need to get any additional records?**
A. I don't remember.
**Q. All right. You indicated that you would rely on the attorney to provide records. Is it the duty of the attorney -- for a claimant in a UIM context, is it the duty of the claimant to do the investigation for Amica or does Amica have an independent duty to do a proper investigation?**
MS. WILHELM: Object to the form.
A. I don't remember those types of specifics.
**Q (By Mr. Balint) Would you agree that the primary duty in settling a UIM claim, resolving a UIM**

Page 39

**claim, would be to do a proper investigation?**
A. Yes.
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) At any time during the handling of the claim, other than passively reviewing materials that were provided by the attorney, what independent investigation did Amica do during your time to settle this -- to resolve this claim or analyze this claim?**
A. I don't remember.
**Q. Was there anything that happened that -- you said you reviewed the claims file. Is there anything in the claims file that indicates that at any time Amica did anything independent other than rely on the claimant's attorney to provide information?**
MS. WILHELM: Asked and answered.
But you can go ahead, Ms. Am.
A. Wasn't this reassigned to Mr. Tom Grundy?
**Q (By Mr. Balint) Well, that's a good question. In that interim period of time when Mr. Grundy was reassigned the claim, did you have any -- what transitional materials did you discuss with him at all? Did you ever discuss anything with Mr. Grundy?**
A. No. It's the supervisor -- sorry, is that better?

Page 40

The supervisor will reassign claim files if it needs to go to, for example, someone like Tom Grundy, who I believe was a specialist.
**Q. Okay. So I recognize that. And I tried to time-frame it a bit differently. And we can go to the page, but it appears to me that the last involvement you had in this claim was on April 21, 2021.**
**Does that comport with your memory or your review of the file?**
A. I don't remember the exact date, no.
MR. BALINT: So I hate to leave these pages and go back and forth, but, Reno, can you go to page 2081?
**Q. (By Mr. Balint) Okay. So it looks like the same person, Kim Macdonald-Connil, reassigned the claim from you to Mr. Grundy on 5/5/21.**
A. Yes.
**Q. Let's see here. Because these are backwards, on that entry on 4/21/21 --**
A. Yes.
**Q. -- that seems to be the last entry that you ever made in this file. Correct?**
A. Okay.
**Q. In your understanding, why did this get reassigned?**

Page 41

A. Probably because plaintiff counsel rejected my offer.
**Q. And in terms of when files are reassigned, at the time you were there, to some other adjuster, was there any procedure for consulting with the adjuster who was originally handling the claim -- in other words, you -- who had worked on the file for some time to get your impressions of the claim and the information you gathered, the completeness of the investigation? Is there any procedure for Mr. Grundy to have gotten the benefit of what you gained in terms of knowledge?**
A. Every evaluation, every contact I had with any involved party, is noted in the file. So there was no procedure. He would just simply review the file.
**Q. Okay. And to your memory, he never asked you any questions or --**
A. Not that I remember, no.
**Q. Do you know what, if anything, happened between -- in terms of any investigation between 4/21/21 and the time that Mr. Grundy picked up the file?**
A. Since these notes are next to each other, seems there may have been no contact from either plaintiff's counsel.
**Q. What effect in your evaluation did any -- I noticed you said you didn't receive or request any**

Page 42

**preaccident medical records, but the records refer to some history of Mr. Gaekwar having osteoarthritis in the left knee. Correct?**
MS. WILHELM: Object to the form.
You can answer.
A. I'm sure any history that's noted in the claim file comes from those medical records on the claim file.
**Q (By Mr. Balint) Okay. So on page 2084 -- it's your summary of what you chose to pick out for relevant claims analysis -- when you have primary osteoarthritis of the left knee, what did you try to investigate about his history of that knee and what it meant in terms of claims evaluation?**
A. I don't remember.
**Q. Was it your impression that it was the osteoarthritis that was causing the problems and not the motor vehicle accident?**
A. Again, I don't remember.
MR. BALINT: Reno, if it's not too much trouble, if you could go to the Overlake record of 2/13/20.
**Q (By Mr. Balint) Okay. This is at a time when you were still handling the file; correct?**
MR. BALINT: We should mark this as Exhibit

Page 43

2, I guess, so we're referring to the same document.
(Exhibit No. 2 introduced.)
**Q (By Mr. Balint) So looking at Exhibit 2, this is at a time when you were still handling the claim?**
A. Yes.
**Q. And then on this record, as -- let's see here.**
**Hold on a second here.**
**Okay. On page 16 of that document, which I think is the second page of this exhibit, in the clinical notes on the top of that page --**
MR. BALINT: Reno, scroll up a little bit on the top of that page.
There you go.
**Q (By Mr. Balint) Do you recall ever seeing this Overlake record from Dr. Kriseman?**
A. No, I don't remember seeing this.
**Q. In trying to evaluate a UIM claim and resolve it fairly for the insured, wouldn't you want to know that he had no active preexisting conditions prior to this motor vehicle accident?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Well, let me rephrase that.**
**Wouldn't you want to know about -- if you're**

Page 44

**evaluating a claim for value, wouldn't you want to know that the claimant was symptom-free in the injured area he was claiming injuries in before the crash?**
**Wouldn't you want to know that he was symptom-free before the --**
MS. WILHELM: Object to the form. Object to form.
I apologize.
**Q (By Mr. Balint) I'll rephrase it again. Getting ahead of myself.**
**Wouldn't you want to know that a claimant had no preexisting active conditions prior to the motor vehicle accident that was the basis for the claim?**
MS. WILHELM: Same objection.
A. I'm sure Amica would have requested prior medical records.
**Q (By Mr. Balint) Well, would that be something that, in due diligence, should be done in any case, especially where the demand is for $140,000 new money?**
MS. WILHELM: Object to the form.
A. Yes.
**Q (By Mr. Balint) So in this record, on the top of the page, the last line of that first paragraph: He also informs me that in October, he climbed Himalayas**

Page 45

**with a guide and went up to over 17,000 feet. He states he had no problems whatsoever.**
**Is there any reason why, in your summary, you never noted that entry about the absence of any activity conditions?**
A. That, I don't know.
**Q. So in doing a summary, is it your goal to find the negative information in a claims file, in a medical records file, to justify a low offer?**
MS. WILHELM: Object to the form.
A. No.
**Q (By Mr. Balint) So you would agree that all relevant information should be considered in evaluating a UIM claim?**
A. Yes.
**Q. Is there any reason why this kind of information in Exhibit 2 would not have been summarized for you --**
**(Crosstalk)**
A. I don't remember -- I don't remember seeing this.
**Q. In your summary of the page we were looking at before --**
MR. BALINT: If it's convenient to go back to it, Reno, 2084 of Exhibit 1.

Page 46

2084.
Okay.
**Q (By Mr. Balint) It looks to me like you point out in the Overlake medical records that he had medial left knee pain.**
**Do you understand what medial is?**
A. No.
**Q. And I think you already said you don't know what osteoarthritis is.**
A. Correct.
**Q. And then you pointed out that he had a history of right knee replacement. Why would you choose that bit of information to include in a summary; that he had an operation on another part of his body?**
A. I don't know.
**Q. Okay. And then you chose one entry from Overlake, 3/26/20: two months after motor vehicle accident, patient is having no physical complaints at this time. Gait is strong and good. Patient went on a hike.**
**That information you chose to do and the way you worded it indicates that, really, his pain is resolved, his injury is resolved.**
**Would you agree that that's the purpose of you choosing this language?**

Page 47

MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Well, this language is not favorable to the claimant, is it?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Well, we already established that you're required to give equal consideration to an insured. I'm just wondering why these entries, this 3/26/20, the 2/4/20, the 3/10 findings, and the information from the physical therapy, why all your summary information seemed to imply that he wasn't really injured or the injury was resolved.**
MS. WILHELM: Object to the form.
Ms. Am, you can answer to the best of your ability.
**Q (By Mr. Balint) Yes.**
A. Truly, I don't know.
**Q. Are you instructed to find material that's favorable to minimizing an insured's claim?**
A. No.
**Q. Did you feel a part of your job was to give the lowest possible offer to a UIM claimant?**
A. No.
**Q. What did you feel your job was in regard to a claimant in terms of resolving a UIM claim? What did you view your job at Amica to be?**

Page 48

A. Review the presented information.
**Q. And do you think part of your job was to resolve the claim not in favor of Amica and not in Amica of the insured but to be fair and balanced?**
A. Yes.
**Q. But would you agree that a $1,000 new money offer was just a nuisance offer?**
MS. WILHELM: Object to the form.
A. No. The insured had already received payment of -- I don't remember the exact figure. $60,000.
**Q (By Mr. Balint) Right. So why offer anything?**
A. That, I don't know. Maybe because there was a time limit demand and --
**Q. Well, if the evaluation is that he had been fully compensated, why would you offer anything, Ms. Am?**
A. I don't know.
**Q. He had other injuries as well. Did you include those other injuries -- the back injury, for example -- in analyzing the claim?**
A. I don't remember.
**Q. Would you agree that in evaluating a claim, you should consider both from the medical records, the injuries that would show continuing problems as well as entries that more implicate -- let me start over again.**

**Would you agree that in evaluating a claim, that the entries you're summarizing here should include things that imply that he's still having problems?**
MS. WILHELM: Object to the form.
A. Yes. One of my --
(Crosstalk)
**Q (By Mr. Balint) Sorry. Go ahead.**
A. I believe some of my notes might highlight that.
**Q. Okay. Which ones?**
A. 4/16/2020, missed PT treatment due to COVID, took a step backward in progression.
**Q. Okay.**
A. Just from looking.
**Q. And the 5/26 entry you can see -- on 5/26/20, which is still your period of time handling the claim, that he had dysfunction still in his left knee, according to the records, according to Overlake Hospital, in physical therapy. Right?**
A. Yes.
**Q. And you felt that was -- well, let's go to the 2085.**
**You see that the entry there is that he had a history of bilateral osteoarthritis, known persistent osteoarthritis, that was aggravated by a motor vehicle**



**accident.**
**So would you -- in your analysis of the claim, coming up with a $1,000 offer, would you agree that he had in fact been injured in that left knee?**
MS. WILHELM: Object to the form. I also don't think that we're looking at the same page.
MR. BALINT: 2085? You're right. Sorry.
You have to go to the top of the page.
Yeah. Sorry. 2085.
MS. WILHELM: Thank you.
**Q (By Mr. Balint) The known persistent osteoarthritis that was aggravated by the motor vehicle accident, was it ever your evaluation that he was not injured in that motor vehicle accident in the left knee?**
A. I don't know.
**Q. Did you have the authority to recommend that the special investigation unit of Amica look at this file?**
A. I don't remember my involvement in that.
**Q. Okay. Did you ever feel that any of the information you were getting was suspicious in any way?**
A. Not that I remember, no.
**Q. Did you ever talk to the personal injury protection adjuster?**
A. Not that I remember.



**Q. Okay. And again, if you did speak with her, would that be noted in the claims file?**
A. Yes.
MR. BALINT: Let's go to 2083 on Exhibit 1, please, Reno.
**Q (By Mr. Balint) Just help me out a little bit here.**
**In the middle of the page, it says "Demand Reviewed." That's an entry saying that you reviewed the demand, right, on 3/4/21?**
A. Yes. And that link below it is the -- most likely the letter sent in response.
**Q. That's what I wanted to ask about. What's this coding here: Sent $ccDocLink, with a number? What is that link.**
**(Crosstalk)**
A. Those are links to the specific documents on the claim file. I think for some reason when they print it, it comes out in code like that.
**Q. Ah, okay. Thank you.**
**At the top of that page, it says the demand was reviewed. And I can't tell if that entry is by you or by Mr. Van Kooten.**
**You might want to compare 2082 to 2083.**
A. I think Tom Van Kooten.



**Q. Okay. In your training of Washington law, were you -- were you informed that what you should be doing is updating the insured or the insured's attorney every 30 days?**
MS. WILHELM: Object to the form.
A. I don't remember specifics, but I think that's practice of Amica Mutual Insurance, we update the involved party.
**Q (By Mr. Balint) While you were handling a claim, was there any time that you felt that Mr. Gaekwar or his attorney were not cooperative?**
A. I don't remember.
**Q. Would any act of noncooperation, whether by an attorney or a claimant, would that be noted in the claims file?**
MS. WILHELM: Object to the form.
A. It would be noted that maybe there was no contact or maybe we're not seeing eye to eye in negotiation, things like that. Anything like that would be noted.
**Q (By Mr. Balint) Is there any time when you felt that you needed more records in order to come up with a resolution offer?**
A. I don't remember.
**Q. Did you ever ask for a recorded statement**

**from Mr. Gaekwar, even though it might not be under oath?**
A. I don't remember if I did.
**Q. Is there any reason why you did not ask for preaccident medical records?**
A. I don't know.
**Q. Do you know the difference between -- in your analysis of claims while you were handling this file, between an aggravation of a preexisting condition and a dormant condition being lit up, if you will, by an injury?**
A. At this time, I don't know.
**Q. Do you think you ever received any instructions on the difference between a dormant condition being lit up by an injury as opposed to a preexisting active injury being aggravated?**
A. Possibly in training, but I don't remember.
**Q. Do you know, then -- you can't remember any difference in how those would be evaluated by you on any claim?**
MS. WILHELM: Object to the form.
(Crosstalk)
**Q (By Mr. Balint) Pardon?**
A. No.
**Q. Would you agree that in fairly evaluating a**



**claim, having a claimant's pre-injury records would be important to have in order to be fair to a claimant?**
A. I'm not sure.
**Q. Why are you not sure? What's the doubt in your mind?**
A. Maybe it would depend on the claim file. I don't know.
**Q. I'm sorry, I didn't catch that. What did you say?**
A. Maybe it would depend on the claim. I don't know.
**Q. Okay. But you're looking at a claim such as -- let's go to Mr. Gaekwar specifically.**
**You evaluated this for a $1,000 new money offer, meaning that you evaluated the case, that his harms and losses were at the $61,000 level; correct?**
A. Correct.
**Q. For a claim of that size, would you agree that it would be important for you, in understanding the effects of this injury on Mr. Gaekwar, to have preexisting records?**
A. (Inaudible).
(Crosstalk)
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Pardon me?**



A. Yes.
**Q. And is there any training you had in asking for preexisting records?**
A. I don't remember.
**Q. In your handling of the claims file in the claim of Mr. Gaekwar, did you ever ask for any other information of any kind?**
A. I don't remember.
**Q. Would you agree that you basically, in terms of your involvement in the case, you basically just reviewed records that were provided to you and that you did not ask for any records at any time?**
A. I don't know if I didn't ask for records.
**Q. Okay. At the time you went off the file, that it was assigned to somebody else, is it your impression that Mr. Gaekwar was continuing with medical treatments in relation to his left knee?**
A. I don't remember those specifics.
MR. BALINT: Reno, could you go to 2081, please?
**Q. (By Mr. Balint) And then the next page, if there's an incomplete -- where it says left voicemail with Reno, requested call back to discuss --**
MR. BALINT: Go to the next page. It continues that sentence.



**Q. (By Mr. Balint) -- to discuss possible surgery and to discuss claim value. Advised insured progressed throughout treatment prior to COVID, received $50,000, et cetera.**
**Q (By Mr. Balint) Did you ask about that possible future surgery?**
A. It seems it would be in the claim file as to when the surgery was.
**Q. Did you ever follow through -- did you ever follow through in getting more information about the possibility of surgery on the left knee?**
A. Seems then the file was reassigned to Tom Grundy.
**Q. Okay. But by the time it was assigned, you were aware that future surgery was at least a possibility?**
A. According to that note, yes.
**Q. I think I may have asked this before, but did you have access to Amica's PIP file?**
A. That, I don't remember.
**Q. Is there any guidance in your training for an injury adjuster such as you to stay away from the PIP file information?**
A. Not that I know of, no.
**Q. So you felt, if you wanted to, you could have**

Page 57

**reviewed the PIP file?**
A. I believe so.
**Q. Pardon?**
A. I believe so, yes.
**Q. And if you did access the PIP file, I take it your answer would be the same -- I hope so -- that it would be noted -- that action by you would be noted in the claims file?**
A. Yes.
**Q. Is there any way we have, Ms. Am, of reconstructing how much time you spent on any particular claims file?**
A. I don't know.
**Q. Was there any time records kept or records in the claims file showing when you logged in, when you logged out?**
**In other words, is there any way of reconstructing if you spent two hours looking at the medical records or ten minutes? Is there any way of knowing that?**
A. Not that I know of. The only timestamp that we have would be from these notes here.
**Q. Which have a date and a time of entry of the records?**
A. Correct. Just the entries, not the amount of

Page 58

time spent.
**Q. While you were at Amica, how did you get paid? What was the basis for pay?**
A. I don't remember what my base salary was.
**Q. But it was a salary?**
A. Yes.
**Q. I'm not asking for the details of how much you were paid, but just --**
A. A salary.
**Q. And were you paid twice a month?**
A. Biweekly.
**Q. Whatever that means.**
A. Yeah.
**Q. Okay. Were you ever given any incentives to settle claims in a certain level? In other words, would you earn a different bonus if you were able to save Amica money?**
A. No.
**Q. And I think you testified you did not have authority independently to demand that the plaintiff submit to an examination under oath. Correct?**
A. Correct. I did not have that authority.
**Q. Did anybody besides yourself at Amica provide a summary of all the medical records other than what's shown in the claims file?**

Page 59

A. Not that I'm aware of after my involvement, no.
**Q. During your involvement, did you have access to any chronology of entries of medical records?**
A. Not that I remember.
**Q. Is that something that you ever had access to while adjusting personal injury claims?**
A. Can you rephrase?
**Q. Yeah. I'm just wondering if it was the procedure at Amica to provide their adjusters with some sort of chronology.**
A. No.
**Q. Was there any procedure at Amica, while you were there, to -- when reviewing medical records, did you actually review the medical records themselves or were you provided with a summary of the medical records?**
A. The medical records themselves.
**Q. Did you have authority while you were handling this claim to ask the claimant to submit to a medical exam by a doctor of Amica's choosing?**
A. That, I don't remember.
**Q. Did you have authority to do that?**
A. No.
**Q. Okay. So that would be, again, you would go to a supervisor and --**

Page 60

A. Right.
**Q. Okay. Is there any reason why, that you're aware of, Amica did not ask Mr. Gaekwar to submit to a doctor of their choosing for an examination?**
A. I don't know.
**Q. We've already shown that you were assigned the UIM claim approximately August 3, 2020. What investigation did you do in the next 30 days, if any?**
A. Other than first contact, since they were attorney represented, I don't remember.
**Q. Were you aware of any State of Washington requirements to resolve a claim in 30 days?**
A. I don't remember.
**Q. What record would we have of your particular training -- we have some information on training from defense counsel, but is there any record of what particular training you had, what courses you took?**
A. I'm sure Amica has a list. The licensing department, I don't know if that's the actual name, but they have all the courses and continued, I guess, education, you could say, on claims handling.
**Q. All right. Again, for Washington law, are you aware of what a Hamilton buyout is?**
A. I don't remember what that is specifically.
**Q. I may have asked this before, but during your**

**time of handling the file, I want to ask, what investigation, if any, did Amica initiate as opposed to simply getting information from the attorney?**
MS. WILHELM: Object to the form.
A. I don't remember.
**Q (By Mr. Balint) While you were handling claims at Amica, was there a claims committee?**
A. I don't know.
**Q. Did you ever refer any of your files to a claims committee?**
A. I don't think we had a claims committee. I don't know what that is.
**Q. Okay. So if there's no claims committee, it would be -- if you had questions about a claim, you would simply ask your supervisor for help?**
A. Correct.
**Q. When I asked you about the reserves that Amica had for this claim of Mr. Gaekwar, what can you tell me about how reserves are set at Amica while you were there?**
A. I don't know.
**Q. Do you know what component parts of a reserve there were between the possible payments to a claimant, attorneys' fees, costs, that sort of thing?**
A. I don't know.



MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Pardon me?**
A. I don't know. I think that may have been above my authority; that information.
**Q. Okay. In making an offer in any sort of a claims file, would you be informed by anybody at Amica what the reserves were for a particular claim?**
A. I don't know.
**Q. If reserves were set at $40,000 at the time you made a $1,000 offer of new money, why would you offer $1,000 and not more closer to the 40?**
MS. WILHELM: Object to the form.
A. I don't know.
**Q (By Mr. Balint) Were you aware, did you ever look for the reserves that are in the claims file?**
A. I don't remember.
**Q. Did you ever, on any claim, review the reserves before making any offers to settle a claim of any kind?**
A. I don't remember if I had access to seeing that. I don't recall.
**Q. Okay. When you made the $1,000 offer, were you given any additional authority -- if the claimant came back and said, you know, "Okay, I'll take $5,000," would you have any authority to accept that on the spot?**



A. I don't know.
**Q. Would you agree that in your case and in handling Mr. Gaekwar's claims, that all authority to settle did not reside in you but in your superiors, your supervisors?**
**(Crosstalk)**
MS. WILHELM: Object to the form.
MR. BALINT: Not enough coffee this morning.
THE COURT REPORTER: I didn't hear an answer if there was an answer.
MR. BALINT: I'll rephrase it.
**Q (By Mr. Balint) Did you ever make any independent settlement evaluations or were you solely dependent on the supervisor reviewing the claim and giving you permission?**
A. A supervisor.
**Q. Okay. So in terms of the circumstances, it would be, while you were handling claimants for bodily injury, when there was a desire to settle it, settle the claim, as far as you were concerned, your personal circumstances, you would always get permission from a supervisor to offer some money; is that correct?**
A. Correct.
MR. BALINT: I have no further questions. That's enough for now. Thank you.



I appreciate your time, by the way.
THE WITNESS: Of course. Thank you.
MR. BALINT: Lucy?
MS. WILHELM: I have nothing. Thank you, Ms. Am.
Give the court reporter a second to see if she needs any spellings, and then she will ask you if you want to reserve signature.
I don't know if you are familiar with that, but you can look over a copy of the transcript to make sure that there aren't any like single-word errors, if you would like to do that.
THE COURT REPORTER: Sorry, do you want to go off the record.
MS. WILHELM: Yes, please.
(Reading and signing was not requested pursuant to FRCP Rule 30(e).)
(Deposition concluded at 10:46 a.m.)
(Reporter officially marked exhibits at conclusion of deposition.)

REPORTER'S CERTIFICATE

I, KARMEN M. KNUDSON, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify that the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was waived; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND and DIGITAL SIGNATURE this 27th day of July, 2023.

________________________________________

Karmen M. Knudson, CCR, RPR, CRR
Certified Court Reporter No. 1935.

# Exhibit 8

# 03/26/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond

## Reason for Visit

### Chief Complaint

- Motor Vehicle Crash (follow up)

### Visit Diagnoses

| Name | Code |
|---|---|
| **MVA (motor vehicle accident), sequela (primary)** | V89.2XXS |
| Medial knee pain, left | M25.562 |
| Primary osteoarthritis of left knee with exacerbation s/p MVA | M17.12 |
| Moderate persistent asthma without complication | J45.40 |

## Visit Information

### Provider Information

| Encounter Provider | Authorizing Provider |
|---|---|
| James D Kriseman, DO | James D Kriseman, DO |

### Department

| Name | Address | Phone | Fax |
|---|---|---|---|
| Overlake Medical Clinics Primary Care Redmond | 7345 164th AVE NE,STE I105 Redmond WA 98052-7800 | 425-635-6430 | 425-635-6431 |

### Follow-up and Dispositions

- Return in about 6 months (around 9/26/2020), or if symptoms worsen or fail to improve, for Recheck, Annual physical.

### Level of Service

| Level of Service |
|---|
| **PR OFFICE OUTPATIENT VISIT 25 MINUTES** |

## Medication List

### Medication List

ⓘ **This report is for documentation purposes only. The patient should not follow medication instructions within. For accurate instructions regarding medications, the patient should instead consult their physician or after visit summary.**

#### Active at the End of Visit

**fluticasone-salmeterol (ADVAIR HFA) 115-21 mcg/actuation inhaler**

Discontinued by: Amy Markezich, MD | Discontinued on: 10/3/2022
Instructions: Inhale 2 puffs into the lungs 2 (two) times daily.
Entered by: Katelynn Benjamin, MA | Entered on: 7/28/2015
End date: 10/3/2022 | Action: Patient not taking

**multivitamin (THERAGRAN) tablet**

Instructions: Take 1 tablet by mouth daily.
Entered by: Katelynn Benjamin, MA | Entered on: 7/28/2015

**UNABLE TO FIND**

Instructions: Take 1 tablet by mouth daily. Quercdin Bromelin
Entered by: Katelynn Benjamin, MA | Entered on: 7/28/2015

**co-enzyme Q-10 30 mg capsule**

Instructions: Take 300 mg by mouth daily.

## 03/26/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

### Medication List (continued)

Entered by: Katelynn Benjamin, MA    Entered on: 7/28/2015

**aspirin 81 MG EC tablet**

Instructions: Take 81 mg by mouth daily.
Entered by: Pheassa Dawkins, MA    Entered on: 4/4/2017

**b complex vitamins capsule**

Instructions: Take 1 capsule by mouth daily
Entered by: Kelsea Arnold, MA    Entered on: 12/4/2018

**iron bis-gly/FA/C/B12/Ca/succ (IRON-150 ORAL)**

Instructions: Take 300 mg by mouth
Entered by: Kelsea Arnold, MA    Entered on: 12/4/2018

**cholecalciferol, vitamin D3, (VITAMIN D3 ORAL)**

Instructions: Take by mouth
Entered by: Kelsea Arnold, MA    Entered on: 12/4/2018

**albuterol (PROVENTIL HFA/VENTOLIN HFA/PROAIR HFA) 90 mcg/Actuation inhaler**

Instructions: Inhale 2 puffs into the lungs every 6 (six) hours as needed for Wheezing or Shortness of Breath
Authorized by: Amy Markezich, MD    Ordered on: 4/22/2019
Start date: 4/22/2019    End date: 4/21/2020
Quantity: 1 Inhaler    Refill: 11 refills by 4/21/2020

**montelukast (SINGULAIR) 10 mg tablet**

Instructions: Take 1 tablet (10 mg total) by mouth daily
Authorized by: Amy Markezich, MD    Ordered on: 1/6/2020
Start date: 1/6/2020    End date: 1/5/2021
Quantity: 90 tablet    Refill: 3 refills by 1/5/2021

**diclofenac (VOLTAREN) 1 % Gel topical gel**

Instructions: Apply 2 g topically 3 (three) times daily as needed
Authorized by: Jocelyn Calimag Dela Rosa, ARNP    Ordered on: 1/27/2020
Start date: 1/27/2020    Quantity: 100 g
Refill: No refills remaining

**Stopped in Visit**

None

### Clinical Notes

**Progress Notes**

**James D Kriseman, DO at 3/26/2020 1300**

Author: James D Kriseman, DO    Service: —    Author Type: Physician
Filed: 3/26/2020 1:48 PM    Encounter Date: 3/26/2020    Creation Time: 3/26/2020 1:42 PM
Status: Signed    Editor: James D Kriseman, DO (Physician)

## Subjective:

**Patient ID:** Chandrasi M Gaekwar is a 74 y.o. male.

## 03/26/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

**Clinical Notes (continued)**

HPI patient is here for follow-up after his motor vehicle accident. This is now 2 months since the motor vehicle accident. He has had an injection performed to his left knee and he is doing much better at this time. He continues with physical therapy. He finds that physical therapy is helping him. He is getting stronger muscles and therefore greater stability in the left knee as well as the right knee. He did have history of right knee replacement. He is having no physical complaints at this time. His gait is strong and good.
Regarding his lungs, he does have a history of moderate asthma without education, he is using inhaler, he has not needed his albuterol and he has not needed any prednisone. He recently went on a hike at altitude and did not need any prednisone at all.
Regarding the present corona virus, he does not have any symptoms at all. He is staying inside and using social distancing.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

Review of Systems
Constitutional: Negative for chills, fatigue and fever.
HENT: Negative for congestion, nosebleeds, sore throat and trouble swallowing.
Respiratory: Negative for cough, shortness of breath and wheezing.
Cardiovascular: Negative for chest pain, palpitations and leg swelling.
Gastrointestinal: Negative for abdominal pain, anal bleeding, blood in stool, constipation, diarrhea, nausea and vomiting.
Genitourinary: Negative for dysuria, flank pain and hematuria.
Musculoskeletal: Positive for myalgias **(muscle tightness of the back which is much improved at this time.)**. Negative for arthralgias, back pain and neck pain.
Skin: Negative for rash and wound.
Neurological: Negative for dizziness, weakness and headaches.
Psychiatric/Behavioral: Negative for sleep disturbance.

**Objective:**

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished. No distress.
HENT:
Head: Normocephalic and atraumatic.
Eyes: No scleral icterus.
**Glasses are worn for appropriate vision.**
Neck: Normal range of motion. Neck supple. No thyromegaly present.
Cardiovascular: Normal rate, regular rhythm, normal heart sounds and intact distal pulses.
Pulmonary/Chest: Effort normal and breath sounds normal. No stridor. No respiratory distress. He has no wheezes. He has no rales.
**Pacemaker the left subclavicular location**
Abdominal: Soft. Bowel sounds are normal. He exhibits no mass. There is no tenderness.
Musculoskeletal: Normal range of motion. He exhibits no edema.
**Evidence of DJD is seen in the knees more so on the right the left, evidence of previous right knee surgery.**
**Evidence of pes planus bilaterally. This does not represent any changes from previous.**
**Good strength of the quadriceps and hamstrings bilaterally. No evidence of atrophy. No effusion seen at the left knee, no patellar ballottement. Evidence of knee replacement on the right.**
Lymphadenopathy:
He has no cervical adenopathy.

## 03/26/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

**Clinical Notes (continued)**

Neurological: He is alert and oriented to person, place, and time. He has normal reflexes. No cranial nerve deficit.
Skin: Skin is warm. No rash noted. He is not diaphoretic. No erythema.
Psychiatric: He has a normal mood and affect. His behavior is normal. Thought content normal.
Nursing note and vitals reviewed.

### Assessment:

1. **MVA (motor vehicle accident), sequela**
2. Medial knee pain, left
3. Primary osteoarthritis of left knee
   with exacerbation s/p MVA
4. Moderate persistent asthma without complication

### Plan:

Health maintenance issues discussed, diet, exercise and weight loss/control discussed. Monitor blood pressure and pulse as an out patient. CV risk reductions discussed. Follow up labs and visit scheduled. Regular eye and dental exams discussed. Questions answered, patient was pleased with the care rendered today.
See AVS for patient information as based on diagnosis and discussed.
No orders of the defined types were placed in this encounter.

### Requested Prescriptions

No prescriptions requested or ordered in this encounter

Return in about 6 months (around 9/26/2020), or if symptoms worsen or fail to improve, for Recheck, Annual physical.
Regarding his knee, at this time he is continuing with physical therapy, strength appears be quite good. He'll continue to follow-up with physical therapy and his orthopedic surgeon. Joint protection discussed.
Regarding his lungs, continue using his Advair as outlined by pulmonary medicine. Side effects discussed today. He also continue on his Singulair daily. He uses this for his episodic rhinitis. Respiratory care issues discussed.
Regarding the present Covid 19 pandemic, isolation and social spacing discussed. Strict handwashing and general viral precautions discussed.
Regarding his blood pressure, please monitor this at home as an outpatient and notify me of any changes.
Cardiovascular risk reduction discussed. Greater than 50% today's 25 minute visit was spent face-to-face.

Electronically signed by James D Kriseman, DO at 3/26/2020 1:48 PM

## 03/26/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

### Clinical Notes (continued)

### Flowsheets

#### ADA Companion Hearing & Speech Needs

| Row Name | 03/26/20 1242 |
|---|---|
| Companion Hearing & Speech Needs | |
| Do you have a companion that has a Hearing and/or Speech Disability that requires further assistance for your visit(s)? | No |

#### Anthropometrics

| Row Name | 03/26/20 1250 |
|---|---|
| Anthropometrics | |
| Weight Change | 0 |

#### Custom Formula Data

| Row Name | 03/26/20 1250 | 03/26/20 1504 |
|---|---|---|
| OTHER | | |
| Systolic BP Difference | 0 | 10 |
| MEWS | 1 | 0 |
| Max Temperature | 36.5 | — |
| Adjusted weight | 71.41 | — |
| Interval Weight Loss (kg) | 0.36 | — |
| BSA (Calculated - sq m) | 1.94 sq meters | — |
| BMI (Calculated) | 27.4 | — |
| IBW/kg (Calculated) Male | 66.1 kg | — |
| IBW/kg (Calculated) FEMALE | 61.6 kg | — |
| BSA Du Bois | 1.91 sq meters | — |
| BSA (Calculated - sq m) | 1.77 sq meters | — |
| Creatinine Clearance Height | 67 | — |
| IBW* | 66.1 kg | — |
| Calculated Total Bolus Volume: 30 mL/kg (Ideal Body Wt) | 1983 mL | — |
| Weight in (lb) to have BMI = 25 | 159.3 | — |
| Percent Weight Change Since Birth | 0 | — |

## 02/20/2020 - Lab in Overlake Medical Clinics Primary Care Redmond (continued)

### Labs (continued)

#### Indications

Elevated C-reactive protein (CRP) [R79.82 (ICD-10-CM)]

#### All Reviewers List

Maritza Stark, CMA on 2/24/2020 06:51
James D Kriseman, DO on 2/22/2020 10:52

### Flowsheets

#### ADA Companion Hearing & Speech Needs

| Row Name | 02/20/20 1402 |
|---|---|
| **Companion Hearing & Speech Needs** | |
| Do you have a companion that has a Hearing and/or Speech Disability that requires further assistance for your visit(s)? | No |

#### Infectious Disease Screening

| Row Name | 02/20/20 1402 |
|---|---|
| **Infectious Disease Screening** | |
| Does the patient report a cough or fever? | No |
| Does the patient report diarrhea or vomiting? | No |

### Communication Tracking

#### Calls/Messages

**Vendor (Outgoing) on 2/18/2020 0010**

Caller name: Gaekwar, Chandrasi M    Phone number: 425-501-6240    User: Batchq Bkgd, User - Do Not Delete

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond

### Reason for Visit

#### Chief Complaint

- Motor Vehicle Crash

#### Visit Diagnoses

- **Medial knee pain, left (primary) [M25.562]**
- Effusion of left knee [M25.462]
- Injury of left knee, initial encounter [S89.92XA]
- Strain of lumbar region, initial encounter [S39.012A]

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

### Reason for Visit (continued)

- MVA (motor vehicle accident), subsequent encounter [V89.2XXD]
- Post-traumatic osteoarthritis of left knee [M17.32]
- Elevated bilirubin [R17]
- Elevated C-reactive protein (CRP) [R79.82]

### Visit Information

#### Provider Information

| Encounter Provider | Authorizing Provider |
|---|---|
| James D Kriseman, DO | James D Kriseman, DO |

#### Department

| Name | Address | Phone | Fax |
|---|---|---|---|
| Overlake Medical Clinics Primary Care Redmond | 7345 164th AVE NE,STE I105 Redmond WA 98052-7800 | 425-635-6430 | 425-635-6431 |

#### Follow-up and Dispositions

- Return in about 6 weeks (around 3/26/2020), or if symptoms worsen or fail to improve, for Recheck.

#### Level of Service

| Level of Service |
|---|
| **PR OFFICE OUTPATIENT VISIT 25 MINUTES** |

### Medication List

#### Medication List

**This report is for documentation purposes only. The patient should not follow medication instructions within. For accurate instructions regarding medications, the patient should instead consult their physician or after visit summary.**

##### Active at the End of Visit

**fluticasone-salmeterol (ADVAIR HFA) 115-21 mcg/actuation inhaler**

Discontinued by: Amy Markezich, MD — Discontinued on: 10/3/2022
Instructions: Inhale 2 puffs into the lungs 2 (two) times daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015
End date: 10/3/2022 — Action: Patient not taking

**multivitamin (THERAGRAN) tablet**

Instructions: Take 1 tablet by mouth daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**UNABLE TO FIND**

Instructions: Take 1 tablet by mouth daily. Quercdin Bromelin
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**co-enzyme Q-10 30 mg capsule**

Instructions: Take 300 mg by mouth daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**aspirin 81 MG EC tablet**

Instructions: Take 81 mg by mouth daily.
Entered by: Pheassa Dawkins, MA — Entered on: 4/4/2017

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

### Medication List (continued)

**b complex vitamins capsule**

Instructions: Take 1 capsule by mouth daily
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**iron bis-gly/FA/C/B12/Ca/succ (IRON-150 ORAL)**

Instructions: Take 300 mg by mouth
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**cholecalciferol, vitamin D3, (VITAMIN D3 ORAL)**

Instructions: Take by mouth
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**albuterol (PROVENTIL HFA/VENTOLIN HFA/PROAIR HFA) 90 mcg/Actuation inhaler**

Instructions: Inhale 2 puffs into the lungs every 6 (six) hours as needed for Wheezing or Shortness of Breath
Authorized by: Amy Markezich, MD — Ordered on: 4/22/2019
Start date: 4/22/2019 — End date: 4/21/2020
Quantity: 1 Inhaler — Refill: 11 refills by 4/21/2020

**montelukast (SINGULAIR) 10 mg tablet**

Instructions: Take 1 tablet (10 mg total) by mouth daily
Authorized by: Amy Markezich, MD — Ordered on: 1/6/2020
Start date: 1/6/2020 — End date: 1/5/2021
Quantity: 90 tablet — Refill: 3 refills by 1/5/2021

**diclofenac (VOLTAREN) 1 % Gel topical gel**

Instructions: Apply 2 g topically 3 (three) times daily as needed
Authorized by: Jocelyn Calimag Dela Rosa, ARNP — Ordered on: 1/27/2020
Start date: 1/27/2020 — Quantity: 100 g
Refill: No refills remaining

#### Stopped in Visit

**predniSONE (DELTASONE) 10 MG tablet**

Discontinued by: James D Kriseman, DO — Discontinued on: 2/13/2020
Reason for discontinuation: No Longer Taking — Action: Patient not taking

### Clinical Notes

#### Progress Notes

**James D Kriseman, DO at 2/13/2020 1320**

Author: James D Kriseman, DO — Service: — — Author Type: Physician
Filed: 2/13/2020 2:09 PM — Encounter Date: 2/13/2020 — Creation Time: 2/13/2020 2:03 PM
Status: Signed — Editor: James D Kriseman, DO (Physician)

**Subjective:**

**Patient ID:** Chandrasi M Gaekwar is a 74 y.o. male.

HPI patient is here for follow-up with me regarding his motor vehicle accident. He states that his knee still hurts under the left knee And at the medial aspect of the left knee. He also states he's been having still some back discomfort. He feels that physical therapy is helping quite a bit. He had x-rays of his left knee done however they were done at

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

**Clinical Notes (continued)**

Evergreen and I only have the report. He also shows me blood work that he had performed in September that revealed a slightly elevated bilirubin at 1.5 and a C-reactive protein elevated at 3.1. He does have elevated blood pressure here, he states that he checks his blood pressure on a regular basis and it is always less than 130/70. He denies any cardiovascular or cardio primary complete at this time. He also informs me that in October he climbed a Himalayas with a guide any went up to over 17,000 feet. He states he had no problems whatsoever.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

Review of Systems
Constitutional: Negative for chills, fatigue and fever.
HENT: Negative for congestion, nosebleeds, sore throat and trouble swallowing.
Respiratory: Negative for cough, shortness of breath and wheezing.
Cardiovascular: Negative for chest pain, palpitations and leg swelling.
Gastrointestinal: Negative for abdominal pain, anal bleeding, blood in stool, constipation, diarrhea, nausea and vomiting.
Genitourinary: Negative for dysuria, flank pain and hematuria.
Musculoskeletal: Positive for arthralgias and myalgias **(muscle tightness of the back.)**. Negative for back pain and neck pain.
Skin: Negative for rash and wound.
Neurological: Negative for dizziness, weakness and headaches.
Psychiatric/Behavioral: Negative for sleep disturbance.

**Objective:**

Physical Exam
Constitutional: He is oriented to person, place, and time. He appears well-developed and well-nourished. No distress.
HENT:
Head: Normocephalic and atraumatic.
Eyes: No scleral icterus.
**Glasses are worn for appropriate vision.**
Neck: Normal range of motion. Neck supple. No thyromegaly present.
Cardiovascular: Normal rate, regular rhythm, normal heart sounds and intact distal pulses.
Pulmonary/Chest: Effort normal and breath sounds normal. No stridor. No respiratory distress. He has no wheezes. He has no rales.
**Pacemaker the left subclavicular location**
Abdominal: Soft. Bowel sounds are normal. He exhibits no mass. There is no tenderness.
Musculoskeletal: Normal range of motion. He exhibits no edema.
**Evidence of DJD is seen in the knees more so on the right the left, decreased joint space. Evidence of pes planus bilaterally. This does not represent any changes from previous.**
**X-ray left knee revealed evidence of effusion along with tricompartmental osteophyte arthritis moderate to severe. No fractures.**
Lymphadenopathy:
He has no cervical adenopathy.
Neurological: He is alert and oriented to person, place, and time. He has normal reflexes. No cranial nerve deficit.
Skin: Skin is warm. No rash noted. He is not diaphoretic. No erythema.
Psychiatric: He has a normal mood and affect. His behavior is normal. Thought content normal.
Nursing note and vitals reviewed.

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

**Clinical Notes (continued)**

### Assessment:

| | | |
|---|---|---|
| **1.** | **Medial knee pain, left** | **Ambulatory referral to Orthopedic Surgery** |
| 2. | Effusion of left knee | Ambulatory referral to Orthopedic Surgery |
| 3. | Injury of left knee, initial encounter | |
| 4. | Strain of lumbar region, initial encounter | |
| 5. | MVA (motor vehicle accident), subsequent encounter | |
| 6. | Post-traumatic osteoarthritis of left knee | Ambulatory referral to Orthopedic Surgery |
| 7. | Elevated bilirubin | Bilirubin, Total(29 Days Old or Older) |
| 8. | Elevated C-reactive protein (CRP) | C-Reactive Protein |

### Plan:

Health maintenance issues discussed, diet, exercise and weight loss/control discussed. Monitor blood pressure and pulse as an out patient. CV risk reductions discussed. Follow up labs and visit scheduled. Regular eye and dental exams discussed. Questions answered, patient was pleased with the care rendered today.
See AVS for patient information as based on diagnosis and discussed.

**Orders Placed This Encounter**

Procedures

- Bilirubin, Total(29 Days Old or Older)
  - Standing Status: Future
  - Standing Expiration Date: 4/13/2020
- C-Reactive Protein
  - Standing Status: Future
  - Standing Expiration Date: 4/13/2020
- Ambulatory referral to Orthopedic Surgery
  - Referral Priority: Routine
  - Referral Type: Surgical
  - Referral Reason: Specialty Services Required
  - Referral Location: PROLIANCE ORTHOPAEDICS & SPORTS MEDICINE REDMOND
  - Requested Specialty: Orthopedic Surgery
  - Number of Visits Requested: 1
  - Expiration Date: 2/13/2021

**Requested Prescriptions**

No prescriptions requested or ordered in this encounter

Return in about 6 weeks (around 3/26/2020), or if symptoms worsen or fail to improve, for Recheck.

## 02/13/2020 - Office Visit in Overlake Medical Clinics Primary Care Redmond (continued)

### Clinical Notes (continued)

I appreciate that he tells me that his blood pressure is well controlled at home but he has not brought me any blood pressure readings. I've asked him to do that for me today. Cardio vascular risk reduction discussed. If his blood pressure is not staying controlled, I do need to change medication. He is reluctant to do anything about medication adjustment at this time.
Regarding his previous motor vehicle accident and his knee trauma, I discussed with him that there is evidence of moderate to severe osteoarthritis and well he may have had it beforehand it was made worse from the accident. I will refer him to orthopedics for further evaluation and treatment. He may do well with injection therapy.
Regarding his back strain, muscle relaxants make him feel sedated so he will prefer not to be on medication. I did advise him to stay on physical therapy, continue with stretching and core strengthening. He informs me that he continues to ride bicycle, he typically rides from his home in Sammamish to Woodinville and back again on Sundays. Joint protection discussed. Home stretching exercises discussed as well. He states he does exercise on a regular basis. There are some days he does upper back and some days lower back. I advise simple range of motion exercises with stretching and core strengthening. He will follow-up with me after he has been seen by orthopedics and after he has run through a course of physical therapy. I will also follow-up with him after I have recheck of his bilirubin and CRP. Greater than 50% today's 25 minute visit was spent face-to-face.

Electronically signed by James D Kriseman, DO at 2/13/2020 2:09 PM

### Labs

#### Bilirubin, Total(29 Days Old or Older) (Completed)

Electronically signed by: **James D Kriseman, DO on 02/13/20 1356** Status: **Completed**
Ordering user: James D Kriseman, DO 02/13/20 1356 Authorized by: James D Kriseman, DO
Ordering mode: Standard
Frequency: Routine 02/13/20 - Class: Clinic Collect
Quantity: 1
Diagnoses
Elevated bilirubin [R17]

**Specimen Information**

| ID | Type | Source | Collected By |
|---|---|---|---|
| — | Blood | — | — |

**Indications**

Elevated bilirubin [R17 (ICD-10-CM)]

#### C-Reactive Protein (Completed)

Electronically signed by: **James D Kriseman, DO on 02/13/20 1358** Status: **Completed**
Ordering user: James D Kriseman, DO 02/13/20 1358 Authorized by: James D Kriseman, DO
Ordering mode: Standard
Frequency: Routine 02/13/20 - Class: Clinic Collect
Quantity: 1
Diagnoses
Elevated C-reactive protein (CRP) [R79.82]

**Specimen Information**

| ID | Type | Source | Collected By |
|---|---|---|---|
| — | Blood | — | — |

# 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus

## Reason for Visit

### Chief Complaint

- Follow-up (AM PT WANTING TO BE SEEN PRIOR TO HIM LEAVING THE COUNTRY TO A HIGH ALTITUDE LOCATION.)

### Visit Diagnosis

- **Moderate persistent asthma without complication (primary) [J45.40]**

## Visit Information

### Provider Information

| Encounter Provider | Authorizing Provider |
|---|---|
| Tyler W Kuhk, ARNP | Tyler W Kuhk, ARNP |

### Department

| Name | Address | Phone | Fax |
|---|---|---|---|
| Overlake Medical Clinics Pulmonary Medicine Hospital Campus | 1231 116th Ave NE, Ste 400<br>Bellevue WA 98004 | 425-454-2671 | 425-990-5260 |

### Follow-up and Dispositions

- Return in about 6 months (around 3/3/2020).

### Level of Service

| Level of Service | Modifiers |
|---|---|
| **PR OFFICE OUTPATIENT VISIT 25 MINUTES** | SIGNIFICANT, SEPARATELY IDENTIFIABLE EVALUATION AND MANAGEMENT SERVICE BY THE SAME PHYSICIAN ON THE SAME DAY OF THE PROCEDURE OR OTHER SERVICE |

## Medication List

### Medication List

ⓘ **This report is for documentation purposes only. The patient should not follow medication instructions within. For accurate instructions regarding medications, the patient should instead consult their physician or after visit summary.**

#### Active at the End of Visit

**fluticasone-salmeterol (ADVAIR HFA) 115-21 mcg/actuation inhaler**

Discontinued by: Amy Markezich, MD — Discontinued on: 10/3/2022
Instructions: Inhale 2 puffs into the lungs 2 (two) times daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015
End date: 10/3/2022 — Action: Patient not taking

**multivitamin (THERAGRAN) tablet**

Instructions: Take 1 tablet by mouth daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**UNABLE TO FIND**

Instructions: Take 1 tablet by mouth daily. Quercdin Bromelin
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**co-enzyme Q-10 30 mg capsule**

Instructions: Take 300 mg by mouth daily.
Entered by: Katelynn Benjamin, MA — Entered on: 7/28/2015

**UNABLE TO FIND**

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

### Medication List (continued)

Discontinued by: Meron Haile, LPN — Discontinued on: 1/31/2020
Reason for discontinuation: No Longer Taking
Instructions: Med Name: Tombramycin and Dexamethasone opthalmic suspension, 2 drops each eyes, 3 times a day
Entered by: Maritza Stark, CMA — Entered on: 1/10/2017
End date: 1/31/2020

**aspirin 81 MG EC tablet**

Instructions: Take 81 mg by mouth daily.
Entered by: Pheassa Dawkins, MA — Entered on: 4/4/2017

**b complex vitamins capsule**

Instructions: Take 1 capsule by mouth daily
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**iron bis-gly/FA/C/B12/Ca/succ (IRON-150 ORAL)**

Instructions: Take 300 mg by mouth
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**cholecalciferol, vitamin D3, (VITAMIN D3 ORAL)**

Instructions: Take by mouth
Entered by: Kelsea Arnold, MA — Entered on: 12/4/2018

**montelukast (SINGULAIR) 10 mg tablet**

Instructions: Take 1 tablet (10 mg total) by mouth daily
Authorized by: Amy Markezich, MD — Ordered on: 12/14/2018
Start date: 12/14/2018 — End date: 12/14/2019
Quantity: 90 tablet — Refill: 3 refills by 12/14/2019

**albuterol (PROVENTIL HFA/VENTOLIN HFA/PROAIR HFA) 90 mcg/Actuation inhaler**

Instructions: Inhale 2 puffs into the lungs every 6 (six) hours as needed for Wheezing or Shortness of Breath
Authorized by: Amy Markezich, MD — Ordered on: 4/22/2019
Start date: 4/22/2019 — End date: 4/21/2020
Quantity: 1 Inhaler — Refill: 11 refills by 4/21/2020

**predniSONE (DELTASONE) 10 MG tablet**

Discontinued by: James D Kriseman, DO — Discontinued on: 2/13/2020
Reason for discontinuation: No Longer Taking
Instructions: Take 4 tablets (40mg) for 4 days, 3 tablets (30mg) for 4 days, 2 tablets (20mg) for 4 days, 1 tablet (10mg) for 4 days then STOP
Authorized by: Tyler W Kuhk, ARNP — Ordered on: 9/3/2019
Start date: 9/3/2019 — End date: 2/13/2020
Action: Patient not taking — Quantity: 40 tablet
Refill: No refills remaining

**Stopped in Visit**

None

### Clinical Notes

**Progress Notes**

**Tyler W Kuhk, ARNP at 9/3/2019 0900**

Author: Tyler W Kuhk, ARNP — Service: — — Author Type: Nurse Practitioner

OVERLAKE
MEDICAL CENTER & CLINICS

Overlake Medical Clinics
Pulmonary Medicine Hospital Campus
BELLEVUE WA 98004

Gaekwar, Chandrasi M
MRN: H002049456, DOB: 9/22/1945, Sex: M
Enc. Date: 9/3/2019

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

**Clinical Notes (continued)**

Filed: 9/3/2019 10:25 AM
Status: Signed
Encounter Date: 9/3/2019
Editor: Tyler W Kuhk, ARNP (Nurse Practitioner)
Creation Time: 9/3/2019 8:17 AM

**OVERLAKE MEDICAL CLINICS - PULMONARY MEDICINE**

OVERLAKE
MEDICAL CLINICS
PULMONARY
MEDICINE

***Follow Up***

### Identifying Data

Chandrasi M Gaekwar is a 73 y.o. male presenting to the pulmonary clinic today for follow-up related to asthma. He is a non smoker and is currently not on home oxygen.

### Interval History

The patient was last seen by Dr. Markezich on 4/22/2019 where he was reportedly doing well with no acute pulmonary issues or interval exacerbations. Plan was to continue his medication regimen and follow up in six months.

The patient presents today for early follow-up given that he will be travelling shortly to high altitude (Northern India). The patient endorses doing quite well since his last clinic visit. There have been no recent exacerbations or episodes requiring antibiotics or oral steroids since his last visit. He denies dyspnea, wheezing and chest tightness currently. No cough, chest congestion or sputum production currently. He has had some postnasal drip as of late. No sinus congestion currently. No GERD.

He is currently on Advair 115/21 2 puffs BID, Montelukast 10mg PO qDay (not taking now, only takes when having allergy symptoms) and PRN Albuterol (not using).

**ACT Total Score:** 24/25

### Allergies

Allergies

| Allergen | Reactions |
|---|---|
| • Pollen Extracts | Shortness Of Breath |
| • Valdecoxib<br>*Acid reflux, Asthma* | Hives |

### Medical & Surgical History

OVERLAKE
MEDICAL CENTER & CLINICS

Overlake Medical Clinics Pulmonary Medicine Hospital Campus
BELLEVUE WA 98004

Gaekwar, Chandrasi M
MRN: H002049456, DOB: 9/22/1945, Sex: M
Enc. Date: 9/3/2019

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

**Clinical Notes (continued)**

**Past Medical History:**

| Diagnosis | Date |
|---|---|
| • Arthritis | |
| • Asthma | 2012 |
| • Pacemaker<br>*not related to heart condition* | |
| • Seasonal allergies | Pollen |

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • KNEE ARTHROSCOPY<br>*R. knee* | | |

### Family & Social History

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Diabetes | Mother | |
| • Heart disease | Brother | |

**Social History**

Social History

| | |
|---|---|
| • Marital status: | Single |
| Spouse name: | N/A |
| • Number of children: | N/A |
| • Years of education: | N/A |

Occupational History
- Not on file.

Social History Main Topics

| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |
| • Alcohol use | No |
| • Drug use: | No |
| • Sexual activity: | No |

| Other Topics | Concern |
|---|---|
| • Not on file | |

Social History Narrative
- No narrative on file

OVERLAKE
MEDICAL CENTER & CLINICS

Overlake Medical Clinics
Pulmonary Medicine Hospital Campus
BELLEVUE WA 98004

Gaekwar, Chandrasi M
MRN: H002049456, DOB: 9/22/1945, Sex: M
Enc. Date: 9/3/2019

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

**Clinical Notes (continued)**

### Current Medications

**Outpatient Prescriptions Marked as Taking for the 9/3/19 encounter (Office Visit) with Tyler W Kuhk, ARNP**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • albuterol (PROVENTIL HFA/VENTOLIN HFA/PROAIR HFA) 90 mcg/Actuation inhaler | Inhale 2 puffs into the lungs every 6 (six) hours as needed for Wheezing or Shortness of Breath | 1 Inhaler | 11 |
| • aspirin 81 MG EC tablet | Take 81 mg by mouth daily. | | |
| • b complex vitamins capsule | Take 1 capsule by mouth daily | | |
| • cholecalciferol, vitamin D3, (VITAMIN D3 ORAL) | Take by mouth | | |
| • co-enzyme Q-10 30 mg capsule | Take 300 mg by mouth daily. | | |
| • fluticasone-salmeterol (ADVAIR HFA) 115-21 mcg/actuation inhaler | Inhale 2 puffs into the lungs 2 (two) times daily. | | |
| • iron bis-gly/FA/C/B12/Ca/succ (IRON-150 ORAL) | Take 300 mg by mouth | | |
| • montelukast (SINGULAIR) 10 mg tablet | Take 1 tablet (10 mg total) by mouth daily | 90 tablet | 3 |
| • multivitamin (MULTIVITAMIN) tablet | Take 1 tablet by mouth daily. | | |
| • UNABLE TO FIND | Take 1 tablet by mouth daily. Quercdin Bromelin | | |
| • UNABLE TO FIND | Med Name: Tombramycin and Dexamethasone opthalmic suspension, 2 drops each eyes, 3 times a day | | |

### Review of Systems

Negative ***unless indicated otherwise:***
CONSTITUTIONAL: Weight loss, fever, chills, weakness, fatigue, recent ill contacts.
HEENT: Eyes: Acute vision changes. ENT: ***Postnasal drip***, sinus congestion, sore throat, earache, trouble swallowing.

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

**Clinical Notes (continued)**

CARDIOVASCULAR: Chest pain, heart palpitations, lower extremity edema.
RESPIRATORY: Shortness of breath, cough, wheezing, PND, orthopnea, hemoptysis.
GASTROINTESTINAL: Heartburn/acid reflux, nausea, vomiting, diarrhea, constipation.
GENITOURINARY: Dysuria, frequency, urgency.
MUSCULOSKELETAL: Muscle, back pain, joint pain, stiffness.
SKIN: Rash.
NEUROLOGIC: Headache, numbness/tingling, tremors, seizures, weakness.
PSYCHIATRIC: Disorder of thought or mood.
ENDOCRINE: Heat/cold intolerance, polyuria, polydipsia.
HEMATOLOGICAL: Easy bruising/bleeding.

### Physical Examination

BP 160/80 | Pulse 74 | Ht 1.702 m (5' 7") | Wt 78.7 kg (173 lb 6.4 oz) | SpO2 98% | BMI 27.16 kg/m²
GENERAL: Pleasant/cooperative; in no obvious distress.
HEENT: Head: Normocephalic, no evidence of trauma. Ears: No discharge/erythema. Eyes: White conjunctivae. Nose: Reddened/inflamed nasal mucosa. Neck: Supple with no adenopathy. Tongue: No evidence of oral thrush.
LUNGS: Clear with no wheezing, coarseness or rhonchi.
CARDIOVASCULAR: Normal JVP, Regular rate, S1/S2, faint murmur noted.
ABDOMEN: Soft/nontender. Active bowel tones.
EXTREMITIES: Warm without clubbing, edema or cyanosis.
NEUROLOGICAL: Alert and oriented to person, place, time and situation. No obvious focal deficits. CN II-XII grossly intact.
PSYCHIATRIC: Calm, appropriate.
SKIN: No obvious abnormalities noted.

### Pulmonary Function Testing

| | |
|---|---|
| **Date** | 9/3/2019 |
| **FEV1** | |
| **FVC** | |
| **FEV1/FVC** | |
| **TLC** | |
| **DLCO** | |
| **FeNO** (ppb) | 49 |

### Studies & Diagnostics

No new/pertinent labs/studies to review.

### Impression & Plan

Chandrasi is a 73 y.o. year old male with
Patient Active Problem List
Diagnosis
- Elevated sedimentation rate
- Elevated C-reactive protein
- Polyarthralgia

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

### Clinical Notes (continued)

- Pacemaker
- Anemia
- Moderate persistent asthma without complication

The main reason(s) for his visit today include:

**1. Moderate persistent asthma without complication**
73 year old male with moderate persistent asthma who is here today for early follow-up related to upcoming travel plans. He is without any significant asthma symptoms at present and there have been no interval exacerbations. He is, however, having some issues with postnasal drip. FeNO is also elevated at 49ppb. Recommend he restart LTRA (Montelukast 10mg PO qDay) with no other changes to his medication regimen at this time. I will prescribe him a taper of oral prednisone to travel with and we discussed circumstances that would warrant starting that (e.g., increased dyspnea, chest tightness/wheezing and/or cough). RTC 6 months.

**Health Maintenance, Immunizations & Advanced Care Planning**

Immunization History

| Administered | Date(s) Administered |
|---|---|
| • FLU VACCINE, TRIVALENT, SPLIT VIRUS PF, 0.5 ML IM | 11/05/2016 |
| • Flu Vaccine High Dose 65+ yrs PF | 11/16/2018 |
| • Pneumococcal (PPSV) Adult | 10/14/2015 |
| • Tdap | 07/28/2015 |

*The plan of care was discussed with the patient in detail. The patient understands and agrees to this plan. Questions were answered and instructions provided.*

*Total time in this appointment was 25 minutes, with >50% of the time face-to-face discussing lab/imaging results, counseling regarding disease process and the subsequent plan of care.*

***Tyler W. Kuhk, MN, ARNP, CCRN-K, AGNP-C***
Overlake Medical Clinics, Pulmonary Medicine
1231 116th Ave NE, Suite 400 | Bellevue, WA 98004

Electronically signed by Tyler W Kuhk, ARNP at 9/3/2019 10:25 AM

### Other Orders

**Medications**

**predniSONE (DELTASONE) 10 MG tablet (Discontinued)**

Electronically signed by: **Tyler W Kuhk, ARNP on 09/03/19 0928** Status: **Discontinued**
Ordering user: Tyler W Kuhk, ARNP 09/03/19 0928 Authorized by: Tyler W Kuhk, ARNP
Ordering mode: Standard
Frequency: Routine 09/03/19 - 02/13/20 Class: Print
Discontinued by: James D Kriseman, DO 02/13/20 1347 [No Longer Taking]
Diagnoses
Moderate persistent asthma without complication [J45.40]
Admin instructions: Take 4 tablets (40mg) for 4 days, 3 tablets (30mg) for 4 days, 2 tablets

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

### Other Orders (continued)

(20mg) for 4 days, 1 tablet (10mg) for 4 days then STOP

**Indications**

Moderate persistent asthma without complication [J45.40 (ICD-10-CM)]

### Flowsheets

**ADA Companion Hearing & Speech Needs**

| Row Name | 09/03/19 0906 |
|---|---|
| Companion Hearing & Speech Needs | |
| Do you have a companion that has a Hearing and/or Speech Disability that requires further assistance for your visit(s)? | No |

**Anthropometrics**

| Row Name | 09/03/19 0908 |
|---|---|
| Anthropometrics | |
| Weight Change | 0 |

**Custom Formula Data**

| Row Name | 09/03/19 0908 | 09/03/19 0913 | 09/03/19 0932 |
|---|---|---|---|
| OTHER | | | |
| IBW/kg (Calculated) Male | 66.1 kg | — | — |
| IBW/kg (Calculated) FEMALE | 61.6 kg | — | — |
| BSA (Calculated - sq m) | 1.77 sq meters | — | — |
| Creatinine Clearance Height | 67 | — | — |
| IBW* | 66.1 kg | — | — |
| Calculated Total Bolus Volume: 30 mL/kg (Ideal Body Wt) | 1983 mL | — | — |
| Weight in (lb) to have BMI = 25 | 159.3 | — | — |
| IBW/kg (Calculated) | 66.1 | — | — |
| Adult VT 6 mL/Kg | 396.6 mL | — | — |
| Adult VT 8 mL/Kg | 528.8 mL | — | — |
| Adult High Range Vt 10cc/kg | 661 mL | — | — |
| IBW/kg (Calculated) | 66.1 kg | — | — |
| Adult VT 4mL/Kg | 264.4 mL | — | — |

OVERLAKE
MEDICAL CENTER & CLINICS

Overlake Medical Clinics
Pulmonary Medicine Hospital Campus
BELLEVUE WA 98004

Gaekwar, Chandrasi M
MRN: H002049456, DOB: 9/22/1945, Sex: M
Enc. Date: 9/3/2019

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

### Flowsheets (continued)

| | | | |
|---|---|---|---|
| Adult VT 5 mL/Kg | 330.5 mL | — | — |
| Adult VT 7mL/Kg | 462.7 mL | — | — |
| Adjusted weight | 71.12 | — | — |
| Interval Weight Loss (kg) | 8.35 | — | — |
| BSA (Calculated - sq m) | 1.93 sq meters | — | — |
| BMI (Calculated) | 27.2 | — | — |
| BSA Du Bois | 1.9 sq meters | — | — |
| Percent Weight Change Since Birth | 0 | — | — |
| Weight Change Since Last Filed (g) | 0 | — | — |
| Systolic BP Difference | 0 | 0 | 10 |
| MEWS | 4 | 4 | 1 |
| **Vitals** | | | |
| Pct Wt Change | 0 % | — | — |
| **Measurements** | | | |
| Weight Change Since Birth (g) | 0 | — | — |

### Encounter Vitals

| Row Name | 09/03/19 0908 | 09/03/19 0913 | 09/03/19 0932 |
|---|---|---|---|
| **Enc Vitals** | | | |
| BP | 170/88 | 170/87 | 160/80 |
| Pulse | 74 | — | — |
| Weight | 78.7 kg (173 lb 6.4 oz) | — | — |
| Height | 5' 7" (1.702 m) | — | — |

### Infectious Disease Screening

| Row Name | 09/03/19 0906 |
|---|---|
| **Infectious Disease Screening** | |
| Does the patient report a cough or fever? | No |
| Does the patient report diarrhea or vomiting? | No |
| Do you have a fever, cough or rash? | No |
| Have you had measles or the measles vaccine? | Yes |

### Oxygen/NIOX

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

### Flowsheets (continued)

| Row Name | 09/03/19 0913 |
|---|---|
| Oxygen Therapy/Pulse Ox | |
| SpO2 | 98 % |
| Activity | At rest |
| O2 Device | None (Room air) |
| NIOX | |
| ppb | 49 |

### Patient Instructions

#### Medications

Please restart **MONTELUKAST (aka SINGULAIR)** 1 pill (10mg) by mouth daily. It is recommended you take it at night as there is a slight risk of drowsiness associated with this medication.

If any increased asthma symptoms (shortness of breath, chest tightness/wheezing or coughing), start using **ALBUTEROL** more often (3-4 times/day). If symptoms are persisting start a **PREDNISONE TAPER**: Take 4 tablets (40mg) daily for 4 days, then 3 tablets (30mg) daily for 4 days, then 2 tablets (20mg) daily for 4 days, then 1 tablet (10mg) daily for 4 days, then **STOP.** Be sure to take Prednisone earlier in the morning **and with food**. *Common side effects of more short-term use of prednisone include: high blood pressure, fluid retention, increased appetite/weight gain and sometimes mood disturbances. Longer term use of prednisone can affect the immune system, cause osteoporosis and can also cause eye problems.*

No other changes to medications.

#### Instructions From Today's Visit

Your lungs sound great today but you do have some airway inflammation today (due to asthma).

Follow up in six months, sooner if needed.

#### Additional Education

## 09/03/2019 - Office Visit in Overlake Medical Clinics Pulmonary Medicine Hospital Campus (continued)

## Clinic Coding Summary

### Diagnoses

| | Codes | Comments |
|---|---|---|
| **Moderate persistent asthma without complication** - Primary | J45.40 | |

### Other Charges

| Charge ID | Procedure Code | Description | Qty. | Modifiers | Charge Entry User | Diagnosis |
|---|---|---|---|---|---|---|
| 30440091 | 95012 | PR NITRIC OXIDE EXPIRED GAS DETERMINATION | 1 | | Tyler W Kuhk, ARNP | Moderate persistent asthma, uncomplicated |
| 30442304 | 99214 | PR OFFICE OUTPATIENT VISIT 25 MINUTES | 1 | 25 | Tyler W Kuhk, ARNP | Moderate persistent asthma, uncomplicated |

# Exhibit 9

**Innova Physical Therapy**
8630 164th Ave NE Ste 203
Redmond, WA 98052-3606
Phone: (425)658-4980
Fax: (425)658-4977

# Daily Note / Billing Sheet

INNOVA PHYSICAL THERAPY TRANSFORMED

**Patient Name:** Gaekwar, Chandrasi
**Date of Birth:** 09/22/1945
**Referring Physician(s):** Kriseman, James DO

**Date of Daily Note:** 03/26/2020
**Injury/Onset/Change of Status Date:** 02/04/2020
**Diagnosis:** ICD10: M25.511: Pain in right shoulder, M25.562: Pain in left knee, S89.92XA: Unspecified injury of left lower leg, initial encounter, M25.462: Effusion, left knee, S16.1XXA: Strain of muscle, fascia and tendon at neck level, initial encounter, S39.012A: Strain of muscle, fascia and tendon of lower back, initial encounter

**Date of Original Eval:** 02/04/2020
**Treatment Diagnosis:** ICD10: M25.511: Pain in right shoulder, M25.562: Pain in left knee, S89.92XA: Unspecified injury of left lower leg, initial encounter, M25.462: Effusion, left knee, S16.1XXA: Strain of muscle, fascia and tendon at neck level, initial encounter, S39.012A: Strain of muscle, fascia and tendon of lower back, initial encounter

**Visit No.:** 16
**Insurance Name:** Amica

## Subjective

**Current Complaints / Gains:** He felt fine after our last session; wasn't in any discomfort and felt good to bike 11 minutes after our treatment session.
**Current Functional Limitations:**
**Self Care:**
**Changing & Maintaining Body Position:**
**Mobility: Walking & Moving Around:**
**Carrying, Moving & Handling Objects:**
**Home Health Care:** No
**Medical History:** No Known Significant PMH To Affect Treatment
**Complicating/Personal Factors:** Multiple Treatment Areas (L knee, L/S, C/S and R shoulder)
**Mental Status/Cognitive Function Appears Impaired?** No

## Objective

| CPT® Code | Direct Timed Codes | Units |
|---|---|---|
| GP:97110 | Therapeutic Exercise ( 55 min.) | 4 |

Standing calf stretches (gastroc and soleus) - showed how to replicate in HEP - using stair or standing at wall

Stationary Bike: level 2, 5 min; review bike recommendations

Reformer footwork with 2 red sp from heels - narrow and wide 12-15x and from toes narrow 10x

Bridge with red TB resisted ABD 15x
Single leg bridge 10x B
SLR with cues for quad set + core 10x B
supine LTR 5x B
open book stretch 3x B
supine 90/90 toe taps for core training 4-5x3 B
quadruped single leg extensions for gluteal training 6-8x2 B
quadruped bird dog 5x2 B
heel slides for knee AROM

*CPT copyright 2019 American Medical Association. All rights reserved.*

| | |
|---|---|
| Objective Findings | Functional calf length is reduced on L compared to R. L foot ER. L knee in genu valgum. |
| Direct Minutes | 55 |
| Treatment Minutes | 55 |
| Total Direct Treatment Time today | 55 minutes for activities performed in direct (one-on-one) patient contact. |

## Assessment



Powered by WebPT™

**Innova Physical Therapy**
8630 164th Ave NE Ste 203
Redmond, WA 98052-3606
Phone: (425)658-4980
Fax: (425)658-4977

# Daily Note / Billing Sheet

**Patient Name:** Gaekwar, Chandrasi
**Date of Birth:** 09/22/1945
**Document Date:** 03/26/2020

**Assessment/Diagnosis:** Patient is feeling good with progressing his exercises and biking more for exercise without any flares in knee pain. He has follow up with his doctor today and plans to continue with PT to restore strength and balance in LEs and neck mobility for ADLs.

**Rehab Potential:** Good

**Short Term Goals:**

1: (3 Weeks) | Goal Met | Pt will be independent with a com prehensile HEP |

2: (4 Weeks) | Pt will be able to perform 5xSTS in less that 15 sec without discomfort. | 26 sec

**Long Term Goals:**

1: (6 Weeks) | 50% | Pt will be able to ambulate more than a mile without discomfort. |

2: (5 Weeks) | Pt will be able to ascend 2 flights of stairs without discomfort. |

3: (6 Weeks) | Pt will improve his ODI to below 15% |

4: (6 Weeks) | Pt will improve his NDI to below 15% |

5: (6 Weeks) | 50% | Pt will improve his LEFS to above 65/80 | 45/80

## Plan

**Instructions:** Progressing Patient Next Visit
Review knee strengthening from HEP.
Restore neck rotation R for driving/ADLs

Megan Weidlich, DPT
License #PT60291071
*Electronically Signed by Megan Weidlich, DPT on March 26, 2020 at 1:05 pm*



Powered by WebPT™

# Exhibit 10

# Deposition of Thomas Grundy

# Gaekwar v. Amica Mutual Insurance Company

# July 28, 2023

BUELL REALTIME REPORTING
COURT REPORTING AND LEGAL VIDEO

**206.287.9066 l 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com

Certified WBENC Women's Business Enterprise

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CHANDRASI GAEKWAR, )
Plaintiff, )
v. ) No. 2:22-cv-01551-BJR
AMICA MUTUAL INSURANCE COMPANY, )
a foreign corporation, )
Defendant. )

VIDEOCONFERENCE DEPOSITION UPON
ORAL EXAMINATION OF
THOMAS GRUNDY

Witness located in Fair Oaks, California
(All participants appeared via videoconference.)

DATE TAKEN: July 28, 2023
REPORTED BY: Nicole A. Bulldis, RPR
AZ No. 50955 | CA No. 14441 | WA No. 3384



A P P E A R A N C E S

FOR PLAINTIFF:
(via Zoom) DAVID J. BALINT
Balint and Associates PLLC
5960 6th Avenue S, Suite 200
Seattle, WA 98108
(206) 728-7799
dbalint@balintlaw.com

ALSO PRESENT: RENO ETTIENNE, Paralegal

FOR DEFENDANT:
(via Zoom) RORY W. LEID III
LUCY B. WILHELM
Wathen | Leid | Hall | Rider, P.C.
222 Etruria Street
Seattle, WA 98109
(206) 622-0494
rleid@cwlhlaw.com
lwilhelm@cwlhlaw.com

--o0o--



DEPOSITION OF THOMAS GRUNDY

EXAMINATION INDEX


EXAMINATION BY PAGE
Atty Balint........................................ 4


EXHIBIT INDEX


EXHIBITS FOR IDENTIFICATION PAGE
1 Claims File.................................... 4
2 Claims File Excerpts [2056-2079]................ 4
5 Training Slide: Good Faith Essentials........... 4
6 Training Slide: What is "good faith?"........... 4
7 Training Slide: When am I exposed?.............. 4
9 Ettienne/Grundy Email - 6/30/22................. 4
11 Goldman Declaration - 5/10/22.................. 4
12 Demand Response Letter - 7/12/22................ 4
22 Demand Letter - 11/4/20........................ 4
24 UIM Demand Letter - 6/30/22..................... 4
25 Medical Record Release Stipulation............. 4
26 Overlake Medical Record - 2/13/20............... 4


--o0o--



REPORTED REMOTELY FROM MARICOPA COUNTY, ARIZONA
Friday, July 28, 2023; 7:56 a.m.
--o0o--
(Exhibit Nos. 1, 2, 5, 6, 7, 9, 11, 12, 22, 24, 25, and 26 marked.)

THOMAS GRUNDY, witness herein, having been first duly sworn on oath, was examined and testified as follows:

E X A M I N A T I O N
BY ATTY BALINT

**Q. Mr. Grundy, could you please state your full name and residence address for the record?**
A. Yup. My full name is Thomas William Grundy. I'd rather not provide my personal address, but I do reside in Fair Oaks, California.
**Q. Okay. And do you have an email address?**
A. Yeah, it's first initial, last name at Amica.com, so that would be tgrundy@amica.com.
**Q. Okay. Have you ever had your deposition taken before, Mr. Grundy?**
A. No.
**Q. Okay. And what preparation have you done for**

**today's deposition?**
A. I just prepared with Counsel, Rory.
**Q. Okay. And what documents did you have a chance to review before we started a few minutes ago?**
A. I reviewed the claim file, the claim file notes.
**Q. Okay. Anything else? Any deposition transcripts or any other documents that you reviewed?**
A. I reviewed some prior deposition transcripts as well.
**Q. Of whom?**
A. I think it was Brittany Am -- actually, no, Barkley Finsterbush.
**Q. Okay. And not Brittany Am's deposition?**
A. I don't believe I reviewed her transcript.
**Q. Okay. And when did you do all this so I know how fresh it is in your mind?**
A. I believe it was last week.
**Q. Okay. All right. Tell me -- tell me a thumbnail sketch of your educational history starting with high school, please.**
A. I attended Smithfield High School, and that's in Smithfield, Rhode Island. I graduated in 2006. And then I attended Endicott College, which is in Beverly, Massachusetts. It's right outside of Boston. And I



graduated Endicott in 2010, and then, from there, I received a master's degree at Endicott as well, in 2011; a master's in business.
**Q. And same -- same question, starting with after high school, your job history, please, including your dates -- inclusive dates, please.**
A. Sure. So throughout -- do you want, like, my jobs through high school?
**Q. No, after high school.**
A. So after high school, and throughout college, you know, on breaks, I would work with my dad. He owns a plumbing and heating company in Rhode Island so I worked with him. I also worked at a local Ace Hardware, which is in Smithfield, Rhode Island, over the summertime.
Through college, I did multiple internships. One of those was with StudentCity, which is a student traveling company. I was involved with their marketing efforts, and I also worked an internship for -- it was called Aqx. It's a shoe company in Beaverton, Oregon, so I worked out there for three months as an internship. And then I also worked in the Rhode Island State House for Senator John Tassoni. He was also in charge of the AFL-CIO Union, so I did an internship with him as well.
**Q. And, eventually, I think you got to Amica, did**



**you not?**
A. Eventually, I made it to Amica. Yeah.
**Q. Okay. Tell me the inclusive dates that you've been working at Amica in the case there are any breaks.**
A. Sure. There wasn't any breaks. I started at Amica in 2011 as an associate adjuster in our intense seven-week training program at our home office. I was promoted to adjuster in 2012. And, at that point, I was basically transferred to our Central Massachusetts branch where I lived the Boston for about two years.
In 2013, I was promoted and moved to California where I reside in Sacramento, and I worked as a multiline adjuster, so I would do, you know, a mix of property and casualty cases. I did roadwork, investigations, you know, settled thousands of different claims. And then from there, I was promoted to a casualty -- sorry, a claims specialist in 2016, I believe, where I managed a lot of independent adjusters; you know, provided them with authority to, you know, settle different cases, homeowners, and casualty.
And then, in 2018, I was promoted to a casualty claims analyst where all of my work was casualty-based cases, where I investigated and handled all of those. In 2021, I believe, I was promoted to senior casualty claims analyst. And then my current



position is a casualty claims specialist, which I was promoted to in 2022.
**Q. So during the time you were -- you were involved in the Gaekwar claim, you were a senior -- if I got my dates right here, a senior casualty specialist?**
A. I -- I think it was senior casualty claims analyst.
**Q. Claims analyst, okay.**
A. The titles kind of changed often.
**Q. Okay. And what were your -- what were your duties in that position during that time?**
A. What do you mean "duties"? For that specific claim or?
**Q. No. For -- for the -- did you -- what duties did you have at Amica? Describe what that job title encompassed.**
A. Yeah. A lot of my job involved investigating cases, reviewing medical records, reviewing demands, you know, working to settle cases, basically.
**Q. Okay. And did you -- were you supervising anybody at that time?**
A. No.
**Q. Okay. All right. So what -- since you've reviewed the -- the file, can you tell me what the inclusive dates were that you were involved in the**

**Gaekwar claim? And what I can do is refer you to -- do you happen to have the claims file? It was provided to you as an exhibit.**
A. Me?
**Q. Yeah. Were you provided with any exhibits that we're going to use today?**
A. I think we were provided with some yesterday, but I don't have access to my email right now. I just have this up.
**Q. Okay. So I'll take you through the exhibit -- the excerpts we have that look like they involve you, so we'll start with -- with Exhibit 2. I'll try to bracket your time frame when you were involved in the case.**
ATTY BALINT: So, Reno, if you could pull up Exhibit 2.
And, Court Reporter, we've marked -- do you have copies of 26 exhibits? Okay. We've marked them in the upper right-hand corner if that's sufficient for marking the exhibits.
**Q. (By Atty Balint) Okay. So up in the upper right-hand corner, you see that this is marked Exhibit 2. That's what we're going to be referring to, and these are in -- these are in a reverse order.**
ATTY BALINT: So if -- Reno, if you can go to AMICA Bate No. 2081. We're at 79 now. Can we go



to 81? Yes? No?
MR. ETIENNE: The file stops at 2079. Do you want me to pull it up on Exhibit 1?
ATTY BALINT: Yeah. Exhibit 1 is the complete claims file. If you can pull that up, and go to -- we'll use that for now.
**Q. (By Atty Balint) Okay. I'm showing you what's part of Exhibit 1, which is AMICA Page 2081. Do you have a clear shot of that?**
A. Yeah. Sorry. The date -- the 2081 is rather small, but I see it.
**Q. Okay. At the top of the page, there is a reference to -- on 5/5/21 to a Macdonald-Conill, Kim, and it says: "UDBI reassigned from BAm to TGrundy." Do you see that?**
A. Yes.
**Q. And then what -- do you know the reason why you were assigned to this file and Brittany Am was taken off?**
A. I do not.
**Q. At any time, did you have a conversation with Brittany Am about what her findings were or what her investigation consisted of? Did you ever have a conversation with her or any communication with her?**
A. No.



**Q. Did you have any communication with the PIP adjuster that preceded even Brittany Am?**
A. No.
**Q. Okay. So when you were evaluating the file originally, you were relying on the claims file itself, I take it; is that true?**
A. Well, I would -- yeah, I'd review the notes, but I'd also review all of the records and bills that, you know, Brittany had reviewed as well and demand letters, demand package, things of that nature.
(Unreportable simultaneous crosstalk.)
**Q. (By Atty Balint) Sorry, go ahead.**
A. Oh, just to get up to speed on the case.
**Q. Okay. And when you say you reviewed the -- the records, did that include a review of the medical records and bills in the PIP file?**
A. No.
**Q. Why not?**
A. Because we -- I wasn't assigned to the PIP case. I was assigned to the UDBI case.
**Q. But the -- didn't the claims file contain the notes of the PIP adjuster?**
A. Yeah. The claim file notes would have those in them. I mean, I would've reviewed those notes as part of my review, but I wouldn't have reviewed any



records that were associated to a PIP claim.
**Q. Okay. And then on the next page, which is 2080 of Exhibit 1, do you see that? It says -- it says here that the -- that Barkley Finsterbush was giving you this assignment. Do you see that?**
A. Yes.
**Q. And can you identify your relationship at the time -- business relationship to Barkley Finsterbush?**
A. Yeah, he was my supervisor.
**Q. Okay. And the -- this note was prepared by who? I assume Mr. Finsterbush, as far as you know, yes?**
A. I would assume so.
**Q. Okay. And it says that the: "Plaintiff's counsel is alleging the need for a future surgery and injections every six months. We may want to consider an MRR/IME at this point."**
**Do you see that?**
A. I do.
**Q. Okay. What authority did you have at the time without -- without consulting Mr. Finsterbush or anybody else to order an IME or a medical records review?**
A. I didn't have any authority to order that. It would go directly through him.
**Q. Okay. And the -- in these records, just to know, there's a -- just for me to know, it says "related**

Page 13

**to" towards the bottom of that page, "entire claim file." Do you see that?**
A. Correct.
**Q. And then it says, "Home Office: No."**
**At what -- at what stage would "Home Office: Yes," be the entry there?**
A. I have not -- I'm not sure.
**Q. So if the home office was reviewing something, that -- that would still probably be the same as a "no"?**
A. I don't know. I honestly haven't even recognized that before.
**Q. Okay. Well, that's the problem with litigation. We try to cover everything.**
**At -- you testified a moment ago, and I want to make clear, you -- you actually went through the medical records that were produced up to that point in time; is that correct?**
A. Yes.
**Q. Page by page?**
A. Most likely, yes.
**Q. Okay. And did you have any questions as you were going through that as to whether the -- whether there were any more records you would have liked to have seen?**
ATTY LEID: Object to the form.

Page 14

Go ahead.
THE DEPONENT: Yeah. I don't recall at this point.
**Q. (By Atty Balint) At any time, during your involvement in this file, did you ever submit a request for more medical records?**
A. Not that I'm aware of.
**Q. Is it -- you had the authority, did you not, to ask for the consent of the insured to go directly to providers to get medical records, did you not?**
A. Yes.
**Q. Did you ever do that?**
A. No.
**Q. And why not?**
A. I didn't think it was necessary on this case.
**Q. Why not? Explain that. Go ahead.**
A. What was that? Sorry, go ahead.
**Q. Oh, go ahead. I just wanted an explanation for that.**
A. I felt like we had enough information from the records that you had provided where we didn't need to request prior records.
**Q. Okay. At any time, did you ask for or review or, in any way, come in contact with records, medical records that preceded the date of the collision in this**

Page 15

**case?**
A. I don't recall. I mean, if I did, it'd be within the claims file.
**Q. Okay. And what would the entry look like in a claims file if you reviewed records prior to January 25, 2020?**
A. Possibly in the form of a note.
**Q. Okay. So if it's -- you would agree, I take it, from what you're just saying, that if it's not in the claims file, it didn't happen?**
A. That's not necessarily true.
**Q. Okay. What would be the exceptions to that in terms of reviewing pre-crash records?**
**(Unreportable simultaneous crosstalk.)**
**(Stenographer requests clarification.)**
ATTY LEID: Object to the form.
THE DEPONENT: Could you repeat the question again for me?
**Q. (By Atty Balint) Yeah. I'm asking, really, about the completeness of the entries in the claims file. Would there be -- if it's not in the claims file, can we assume that it didn't happen?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No, you can't assume that.

Page 16

**Q. (By Atty Balint) Okay. Under what exceptions would it be that there would not be an entry of something that was significant involvement in your -- in the case?**
A. Well, it was significant, it would -- it would be within the claims file.
**Q. Okay.**
A. I mean, among other things, I think, you know, quick calls might not be documented. But if there's something significant that occurs, that we think is important, it would most likely be documented within the notes section of the claim file.
**Q. Okay. And -- okay. And then I want to bracket the ending of your involvement in the case.**
**Can you tell me the circumstances in which you last were involved in the -- in the adjustment of this claim?**
A. What do you mean by "circumstances"?
**Q. Well, I want to know what the closing date was. What's your last involvement in this file?**
A. I don't know the exact date.
**Q. Okay. Let's -- let's see if I can -- I can help with this.**
ATTY BALINT: Reno, if you can go to page -- I guess we can stick with the entire claims

file.
If we can go to Page 2056 of Exhibit 1.
**Q. (By Atty Balint) 2056 is on the -- on the screen, and it references a note to you from Barkley Finsterbush dated 7/25/22. Do you see that?**
A. Yes.
**Q. And it says: "Hey Tom, Thanks for notifying me of this IFCA complaint. As discussed, please forward the file to" -- I think "DC" stands for "defense counsel -- "and have them review. Please let me know if there are any questions."**
**Do you see that?**
A. Yes.
**Q. As far as you know, was there any other entries you made anywhere in the claims file, involvement after 7/25/22 after the IFCA complaint was provided?**
A. I mean, there's a -- there's an entry from me right above Mr. Finsterbush's, but beyond that, I don't -- I don't recall making any other entries.
**Q. Okay. When -- in Washington, you were trained in the Washington applicable legal standards, were you not, for adjusting claims?**
A. Absolutely. We train constantly on Washington.



**Q. Okay. So you would say, at this time, at least, you were up to speed on developments in Washington insurance law that affected claims adjustment; correct?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Yeah. Correct. I mean, we were trained on it. If there was anything, you know, specific, we might reach out to local counsel for assistance.
**Q. (By Atty Balint) Okay.**
A. Yeah.
**Q. And during your involvement in the case, do you recall, at any time, consulting with any legal counsel or anybody else about the claims file prior to Mr. Leid's entry?**
A. There was one point where I had requested a referral from defense counsel in regard to medical record review referral for an expert.
**Q. Okay. And we'll get back to that. But other than that, that's all you can recall of seeking legal assistance in helping adjust this claim; correct?**
A. Correct.
**Q. Do you, yourself, in your -- in your education or training or continuing education since that time, do**



**you have any legal background?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Like am I -- like a law degree or?
**Q. (By Atty Balint) Or any familiarity, paralegal, law degree, or anything like that.**
A. No. I'm not a paralegal or a lawyer, no.
**Q. Okay. And what medical background do you have, if any?**
A. I mean, we train on medical constantly. We train on causation, we train on terminology.
**Q. Okay.**
A. I'm not a doctor, so I'm not representing myself to be a medical professional, but we train on it.
**Q. So the training is within the Amica training? I'm asking you: The source of your training was at Amica, and Amica documents and Amica training?**
A. There's some -- there's some Amica training, but there's also a lot of other external training. And we're constantly training for CE, continuing education credits, so we need to do a lot of training there, webinar training, seminars, in-person seminars. It comes from a variety of different places.
**Q. What's the -- what's the requirements, if any,**



**at Amica for that -- for continuing education?**
A. The continuing educational portion is more so a state-mandated amount of training. So, for instance, I am -- I'm a licensed adjuster in the State of Florida, which is reciprocal to many states, and they require 24 hours of CE training, and I believe every state is a little bit different.
**Q. And what's the requirements in Washington, if any?**
A. For CE training?
**Q. Yes.**
A. I'm not sure offhand.
**Q. Okay. And are there any other outside sources of medical training during your time at Amica?**
A. Nothing that I can recall offhand.
**Q. So tell me your understanding of an IFCA letter -- warning letter in Washington at the time.**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: What do you mean by my understanding of it? This was the first case I've ever seen one on a file.
**Q. (By Atty Balint) Say that again. I'm sorry. I didn't hear you.**
A. This is the first case that I have seen an

Page 21

IFCA complaint come in.
**Q. Did you know what it was when it came in?**
A. Yes.
**Q. And what's your understanding of the significance of the IFCA letter?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: My understanding is that it's a complaint for a first-party case.
**Q. (By Atty Balint) And did you have any involvement after that letter came in, in getting information to anybody or -- yeah, getting information to anybody on the background of the -- of the case?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No, not that I'm aware of.
**Q. (By Atty Balint) So during the 20 days following the IFCA complaint, do you know what involvement, if any, you had?**
A. No.
**Q. At the time you were involved in this case that we've now bracketed, what was your caseload like?**
A. I believe --
ATTY LEID: Object to the form.
Go ahead.

Page 22

THE DEPONENT: I believe, at this time, my caseload was between 100 to 130 cases, somewhere in that range.
**Q. (By Atty Balint) Was there any metric by which Amica measured your performance during the time you were involved in this claim?**
A. We do annual performance reviews, so that would possibly be the metric.
**Q. Okay. And what -- what's the review based on? Is it the number of cases handled, the number of cases closed? Tell me what the criteria is for judging your standards -- your work ability and standards at Amica.**
A. I don't think it necessarily has to do with the number of cases closed. I think it has more to do with, you know, performance, your willingness to assist others, you know, different things outside of claims-handling. You know, we get a lot of compliment letters, so that might be something that goes into the review. There's a lot of different things that go into it. But I don't write reviews, and I'm not part of the review process, so I -- I couldn't give you a full picture on it.
**Q. Was there any criticism about the handling of this case, in any way, that you had from Mr. Finsterbush or anybody else senior to you at Amica?**

Page 23

A. No.
**Q. Do you know if there was any criticism of any kind as to the handling of the case by Brittany Am before you took over the case?**
A. I'm not aware.
**Q. What's your -- what was your settlement authority during the time that you were involved in this case? And I'm asking really what your independent settlement authority was, if any.**
A. At the time of this case, I believe it was $25,000 in new money settlement authority.
**Q. And you had that independent? You didn't have to consult with anybody else to get that permission to --**
A. Correct.
**Q. Okay. And, in this case, was there any other -- was there ever a time when you asked for more authority than the authority that you were given to plaintiff's counsel?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Could you say that again?
ATTY BALINT: Yeah. Rory, what's the problem with that? Help me out here.
ATTY LEID: Yeah. So I think the way you

Page 24

phrased it was not particular to this claim, and it was also confusing as to whether you -- he had ever asked in a single claim to settle it above the authority or whether he had ever asked to have the authority raised. And so that was my "object to form" based on the wording I heard.
ATTY BALINT: Okay. Thank you. And it helps me with another question.
**Q. (By Atty Balint) So as far as this case is concerned, did you ever ask for permission to offer -- to make an offer? We'll start with that.**
A. No, I didn't need permission.
**Q. Okay. And did you ever, in this -- while you were handling this case, in regard to this case, did you ever ask for more authority?**
A. No.
**Q. And in -- in your claims handling, in general, did you ever have an occasion to ask for more authority than you had independently?**
A. Are you referring to other cases?
**Q. Yes, all of them.**
A. Absolutely.
**Q. Okay. And what would the circumstances be where you would ask for more authority?**
A. I think that's a pretty hypothetical question,

but if I felt that the evaluation was a lot high -- I mean, if I felt that it required additional authority, and my evaluation was above my authority and I felt it was into somebody else's, then I would certainly send up an authority request.
**Q. Okay. And that would be a formal request that would be documented in the file?**
A. Correct.
I'm sorry. The screen just kind of shaked a bit.
**Q. Okay. Do you know how you were -- what the criteria was for assigning the case to you?**
A. No.
**Q. Did it have anything to do with more experience or higher authority?**
A. I don't know. I'm not in charge of that portion.
**Q. Are you still adjusting claims or supervising adjusting of claims in Washington State?**
A. I adjust claims in Washington State.
(Pause in the proceedings.)
ATTY BALINT: If we could pull up Exhibit 5, please, Reno.
**Q. (By Atty Balint) Do you see the Bates Stamp number of that? It's kind of obscured at the bottom of**



**the page. I'm going to have a discussion with Rory about this, but it's a -- it looks like confidential information, Bates Stamp 413. Anyway, I'll represent that to you.**
ATTY BALINT: And, Rory, these are -- I'm going to discuss some of the confidential productions subject to if we ever produce this in court to a protective order. Okay?
ATTY LEID: Agreed. Thank you. Appreciate that.
**Q. (By Atty Balint) All right. So this is -- can you identify this page? What it was? Do you recognize this page?**
A. I don't recall. I mean, it looks like an Amica PowerPoint slide.
**Q. Okay. So in terms of the -- of the training, you would agree that you've satisfied that first bullet point, "Know your specific state regulations"; right?**
A. Yes.
**Q. Okay. For Washington?**
A. Yes.
**Q. And do you think that it was within your training to complete a timely and thorough investigation?**
A. Yes.



**Q. Do you believe in this -- in this case, as far as your involvement was concerned, that you did a timely and thorough investigation?**
A. Yes.
**Q. Other than material that -- that plaintiff's counsel provided, what investigation did you -- did you do outside of that information that was provided? In other words, I'm asking for what active investigation you did during your involvement in the file.**
A. The first thing we did was we retained a medical expert to provide a medical record review.
**Q. Okay. What else?**
A. I personally reviewed the demands that you had sent after that and the additional records that you had provided.
**Q. Okay. And what else -- what else did you do that was independent of materials I provided?**
A. That's all I can recall at this point.
**Q. And would you agree that if you did anything else, it would be reflected in the claims file?**
A. What do you mean "anything else"?
**Q. If you did -- if you did any other investigation, other than what we've --**
A. Oh, just investigation? Most likely, yes.
**Q. Okay. And then that last bullet point, I**



**agree -- I think you would agree that you complied with "Watch your file notes. Document everything, but be objective"?**
A. Yes.
**Q. You complied with that?**
A. The only thing, "Document everything" is a little broad. You don't document every little thing that occurs. Like every little time I pick up the phone and have a conversation with you, and if it's just something that's not extremely pertinent, maybe that's not in there, but the pertinent information is documented.
**Q. Okay. If you were -- if you were updating yourself on Washington legal standards, could you explain to us your understanding of the difference in Washington between an aggravation of a pre-existing condition and the lighting up of a dormant condition?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Are you referring to like the statute that deals with that?
**Q. (By Atty Balint) I'm just referring to any understanding you have of the difference between those two concepts.**
A. Could you state that again, your initial

Page 29

question?
**Q. Yeah. Do you know -- do you know the difference in Washington between an aggravation of a pre-existing condition that was dormant and an active -- and a lighting up of a dormant condition?**
A. So you're asking if I know the difference between "lighting up" and "aggravating"?
**Q. Yes.**
A. I can't recall offhand.
**Q. Okay. Did you ever -- did you ever explore the -- in any way, the -- any pre-existing conditions that Mr. Gaekwar had prior to January 25, 2020?**
A. Explore how?
**Q. Investigate.**
A. If they were documented within the medical records that you had provided.
**Q. Were there -- were there any records that were -- that you looked at in the file that were medical records that were -- that predated January 25, 2020?**
A. I don't recall.
**Q. Okay. So would it be your understanding that -- and as far as pre-existing conditions is concerned, you would have reviewed the post-January 25, 2020, records for references to the -- any prior conditions; correct?**

Page 30

A. Correct. If there were prior records in the file related to the UIM claim, I would've reviewed those.
**Q. Okay. And there were -- did you ever ask for any clarifications of Mr. Gaekwar's pre-existing conditions particularly related to his left knee?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Are you asking if I asked you for clarification?
**Q. (By Atty Balint) Or anybody else.**
A. No.
**Q. What was your understanding of his pre-existing condition? And we'll just focus on the left knee.**
A. Sure. My understanding is that he had severe tricompartmental osteoarthritis of the left knee.
**Q. And what is that condition in your understanding?**
A. I mean, in my understanding, it's a degenerative condition that continues to worsen over time.
**Q. But what is -- what is arthritis tricompartmental?**
ATTY LEID: Object to the form.

Page 31

Go ahead.
THE DEPONENT: I don't know the specifics behind it. I know it's a degenerative condition.
**Q. (By Atty Balint) So that's the extent of your knowledge that you were aware of when you were making -- when you were handling this file; correct?**
A. Yes, which is why, you know, we retained the expert to provide their opinion as well.
**Q. Okay. And as of the -- as of January 25, 2020, the date of the collision in the underlying case, was Mr. Gaekwar's arthritis of his left knee creating any functional problems for him whatsoever, as far as you know?**
A. I'm not sure. I don't know.
**Q. I know you're not sure, but what -- did you ever explore his pre-crash functioning?**
A. I think I testified that we didn't request prior records.
ATTY BALINT: Okay. I just want to -- let's go to -- we're going to -- I think we're going to flip back and forth between exhibits, but let's go to Exhibit 26 for a moment, Reno, please.
**Q. (By Atty Balint) The -- do you recognize this letter as part of the claims file? It would be -- let's see. I don't have my Bates Stamps on this one. Hold on.**

Page 32

**(Pause in the proceedings.)**
**Q. (By Atty Balint) All right. I don't have a Bates Stamp on this, so let me ask a general question.**
**Were you aware that, in October of 2019, he had climbed the Himalayas up to 17,000 feet with a tour guide with no problems in his knee?**
A. I wasn't aware of that. I -- I believe one of your demand letters referenced something about hiking. I also note one of the post-accident records indicated that he was hiking as well. I think it was like two months after the accident, but I'm not sure exactly where he was hiking.
**Q. Okay. In the -- in the letter you referred to from me, it said he was hiking in the Himalayas up to 17,000 feet. Do you remember that?**
A. I don't recall the specifics.
**Q. Okay. Would it be important for you to -- I guess you don't recall the specifics, but did you ever ask for clarification as to -- as to that -- as to that trip that he was on?**
A. I did not ask for clarification on his trip.
**Q. Did you ever ask for any information as to his level of functioning in regard to the left knee before the January 25, 2020, collision?**

Page 33

A. Not that I recall.
(Pause in the proceedings.)
**Q. (By Atty Balint) As far as pre-existing conditions are concerned, do you think it would've been important for Amica and its claims adjusting of this case, to know what his pre-crash functioning was with regard to the left knee?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I think the records that you had provided to us kind of provided us with the information that we needed to know. We didn't feel there was a need to request previous records. We're not disputing that he sustained a knee strain from the subject accident and had knee pain from the subject accident.
**Q. (By Atty Balint) Okay. And I appreciate that. I want to know that if there was a fairly exhaustive claim in the Himalayas up to 17,000 feet without any problem two months before this crash, why wouldn't you want to know anything about that?**
A. Why wouldn't you provide that? If you thought it was so pertinent, why didn't you provide that to us?
**Q. Well, I guess that comes to a fundamental question. To what extent did you feel that plaintiff's**

Page 34

**counsel had the responsibility to do the investigation for Amica?**
A. You have the burden of proof on the claim. We felt that we didn't need to request prior records because we weren't disputing the fact that he sustained a strain in the subject accident.
**Q. Okay. But --**
A. And the records also provided that he was actually progressing well, roughly two months after the accident.
**Q. So you never felt the need to get any information about his pre-crash level of functioning in regard to the left knee; is that correct?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: My testimony is that we never requested prior records.
**Q. (By Atty Balint) Okay. And without -- without prior information about his level of functioning before the -- before the crash of his left knee, how would you know if that condition was active at the time of the crash or was dormant?**
A. The records that you provided indicated that his degenerative issue was an active issue.
**Q. And what records are you referring to there,**

Page 35

**please?**
A. Well, among other records the pre- and post-op surgical records indicate that the diagnosis was osteoarthritis.
**Q. Okay. I'm asking a particular question.**
**How would you know, as of the date of the crash, if he was having any problems whatsoever that were -- that were causing any pain or discomfort on January 25, 2020?**
A. I don't know.
**Q. Okay. In the -- in the demand letter to Nationwide that you were provided a copy of --**
ATTY BALINT: Can we pull that exhibit up, please, Reno? It's -- let's see here. I think it's Exhibit 22. Let me check. Exhibit 22, please.
**Q. (By Atty Balint) Okay. And this is a -- a letter that you indicated you had reviewed during your claims handling of this case?**
A. Yes.
ATTY BALINT: Going to -- these also have Amica Bates Stamp numbers. Go to Amica 64, please?
**Q. (By Atty Balint) Okay. Showing you the last page of this exhibit, Bates Stamp 64. Is that the correct address for providing documents to Amica in regard to a claim, a personal injury claim?**

Page 36

A. Are you referring to the PO Box?
**Q. Yes?**
A. I believe that's the scan center's address, yeah.
**Q. Okay. And the -- the letter itself -- oh, darn. The letter itself references a disk that was enclosed. Did you review the materials on that disk?**
A. And for clarification, this was the one that was sent to Brittany Am?
**Q. Yes, with a copy to Amica.**
A. Yes, I would have.
**Q. And going to --**
A. Because essentially -- sorry. Just, essentially, they get -- they get uploaded to the file from the scan center.
**Q. Okay. Do you know how they handle discs that are provided?**
A. I have no idea.
ATTY BALINT: Go to Amica 63, please, Reno.
**Q. (By Atty Balint) On Page 63 of the Amica records, there's a reference here to the Washington pattern instructions. Do you see that at the top of the page?**
A. Yes.

Page 37

**Q. Did you ever review this for accuracy as far as the difference between a bodily condition that was not causing pain or disability at the time of the crash and the -- having a dormant condition, as it says there? Did you ever cross-check this legal citation with anybody?**
A. With anybody?
**Q. Yeah.**
A. Did I cross-check it with, like, legal counsel? Is that what you're asking?
**Q. Or your own investigation. Did you ever see if this information about the standards for judging -- for judging an injury in Washington as to pre-existing -- when it's -- there's a pre-existing condition. Let me start over again.**
**If there's a pre-existing condition that was dormant at the time, not causing any pain or disability, there's a certain consequence for that. Did you ever cross-check this with anybody or your own investigation?**
A. Well, I'm aware of that statute. Is there an additional paragraph that goes along with that statute or is that the full statute there?
**Q. That's the way handling dormant conditions are -- are handled in Washington.**
A. There's -- there's indication in Washington

Page 38

that the -- if the natural progression of that, you know, disease or degenerative issue, so to speak, was to cause the need for a surgery, then it necessarily doesn't mean it's related to the accident from an exacerbation standpoint.
**Q. Okay.**
A. Maybe that's not word for word, but that's my understanding.
**Q. But I'm just asking: Did you ever explore Mr. Gaekwar's functioning level of that left knee as of the time of the crash, whether it was dormant or active?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I think I testified before I didn't request prior medical records.
**Q. (By Atty Balint) Did you -- and I take it you never requested prior medical records either, did you?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Could you just repeat that last question?
**Q. (By Atty Balint) And you never requested any -- any such records, pre-existing records, did you?**
A. No. We felt we had enough information based on the records that were provided.

Page 39

**Q. Okay.**
A. And, furthermore, Dr. Kearney also -- after his review, he didn't request any additional records as well.
**Q. Well, that's -- we'll get to Dr. Kearney in a few moments.**
A. Sure.
**Q. When you were reviewing this Nationwide initial demand, did you have any criticism of their -- of the valuation they had of the case of the $50,000 policy limits?**
A. I wasn't involved in their evaluation of the case.
**Q. Right, but it provided a basis for money that was already provided to Mr. Gaekwar. Did you have any -- and didn't you -- you weren't involved in the decision to waive Hamilton; right?**
A. No, no.
**Q. Okay. Did you have any criticism of Brittany Am asking for permission to waive the PIP?**
A. No, and it wouldn't have come up to me either.
**Q. Okay. So did you -- did you feel that the $50,000 plus the waiver of PIP of 10,000 was full compensation to Mr. Gaekwar?**
A. I believe it was.

Page 40

**Q. Okay. So there was really no purpose in offering -- Brittany Am offering $1,000 or you offering $5,000 to settle the case, was there?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I think it was a compromise. The thousand dollars was a compromise offer. And then when I took over, I -- like you said, you said it wasn't a real offer. I disagreed with that, and then you asked me to increase that offer and I increased it to $5,000.
**Q. (By Atty Balint) Okay. Go ahead.**
A. As a compromise.
**Q. As a compromise?**
A. Correct.
**Q. Now, in reviewing that, why would you offer anything if you felt that Mr. Gaekwar had already been compensated by the underlying Nationwide payment and waiver of PIP? Why would you offer anything?**
ATTY LEID: Sorry. Object to the form.
Go ahead.
THE DEPONENT: Well, I think it's a compromise to ultimately release -- you know, reach a settlement agreement.
**Q. (By Atty Balint) Did you feel that the -- that**

**the $5,000 offer that you made was subject to more negotiation?**
A. I suspected that you would basically provide us with a counterdemand to that.
**Q. All right. And did you have any authority beyond the $5,000, or was this the maximum you were willing to offer at the time you offered the 5,000?**
A. My authority level, like I testified previously, was up to 25,000.
**Q. And my question is a little bit more particular. Let me restate it.**
A. Sure.
**Q. Was that your final offer to settle this case?**
A. Absolutely not.
**Q. Okay. What was -- what was your evaluation as to how high you were willing to go?**
A. That's a little speculative. I think it would depend on if you were willing to engage in settlement discussions. If we were to go to mediation, I mean, I think we could have possibly been able to reach an agreement.
**Q. Okay. But I'm asking you how high were you willing to go? You had authority up to, I think you said, 25-. Were you willing to go up to that, if necessary, to settle the case?**



ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Possibly.
**Q. (By Atty Balint) Okay. So why didn't you -- why wouldn't you offer -- instead of offering 5,000, why wouldn't you offer the -- the true valuation that you had of this case?**
ATTY LEID: Object to the form.
THE DEPONENT: The true --
ATTY LEID: Go ahead.
THE DEPONENT: -- evaluation of the case was that he was compensated by the underlying settlement.
**Q. (By Atty Balint) Okay.**
A. The additional money was a compromise to work to get the case settled for him, and, you know, put it to bed.
**Q. All right. So the additional information that was provided, including the surgery, et cetera, was not -- you were never going to evaluate that surgery as related to the crash, were you?**
A. Well, the expert said that the surgery wasn't related to the crash.
**Q. Okay. The -- and you relied -- are you saying you relied solely on Dr. Kearney's report to evaluate**



**the -- the value of this case, that he was fully compensated?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No, I relied on my investigation. I investigate cases in Washington all the time. I handle thousands of cases, and so it's -- it's my review of the medical records. It's using record review vendors like Dr. Kearney. So it's -- it's an all-inclusive investigation.
**Q. (By Atty Balint) All right. I appreciate your characterization of your investigation, but I'm asking you whether you relied on Dr. Kearney in coming up with a -- essentially, a zero valuation of the case?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I didn't come up with a zero valuation of the case. I just testified that the case was valued within the underlying settlement. That's how we evaluated it.
**Q. (By Atty Balint) Okay. So you evaluated this case as having a value, a total value of $60,000; is that correct?**
A. Yeah, the underlying waiver of PIP.
**Q. Okay. And at what point in time was that**



**determination made, before the referral to Dr. Kearney or after receiving his report?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I believe Brittany Am had made that determination previously, and I agreed with that determination.
ATTY BALINT: Okay.
ATTY LEID: Good time for a break, Mr. Balint?
ATTY BALINT: Yeah. Sure. How much time do you want?
ATTY LEID: Okay. Thanks.
So we'll go off the record, Nicole.
(A break was taken from 8:53 a.m. to 9:01 a.m.)
**Q. (By Atty Balint) Mr. Grundy, when you -- when you made your determination that Mr. Gaekwar had been fully compensated, did you, or anyone else you know of at Amica, check with jury verdict forms to -- for similar-type cases to come up with a valuation?**
A. No.
**Q. What guidance did you, as an adjuster, have in putting a dollar value to a personal injury claim?**
ATTY LEID: Object to the form.

Page 45

Go ahead.
THE DEPONENT: Sorry. Can you just restate that one?
**Q. (By Atty Balint) Yeah. What guidance did you have in putting a dollar value to any bodily injury claim in your training or your updated continuing education or anything? How did you come up -- how did you value claims?**
A. Yeah. So, I mean, like I said before, we train constantly. I evaluate thousands of different cases, so in my experience, I'm pretty familiar with case settlement values and evaluating cases.
**Q. Okay. So you're relying on your own experience is mostly what you're relying on?**
A. My own experience and training.
**Q. Okay. Were there any other --**
A. And others -- sorry, just to back up a little bit. Others, as well, I mean, if we roundtable, you know, different cases to get input from other adjusters.
**Q. But this case was never referred to a claims committee or a claim supervisor by you for evaluation, was it?**
A. I don't even know what a claims committee is.
**Q. Okay. Did you -- did you have to clear your $5,000 offer with a superior?**

Page 46

A. No.
**Q. Okay. I want to go through this Exhibit 1, I guess, in a little bit more -- more detail.**
ATTY BALINT: Let's start out with Page 2081.
Okay. Are we at 2081? Yes.
**Q. (By Atty Balint) Okay. So the initial information you got from Mr. Finsterbush was reflected on this page, 2081; correct?**
A. I don't see anything from Finsterbush on that page.
ATTY BALINT: Oh, I'm sorry. 2080, do we still have that?
(Pause in the proceedings.)
ATTY BALINT: We have that. I'm sorry.
THE DEPONENT: Yeah, correct.
**Q. (By Atty Balint) Okay. You -- Mr. Finsterbush indicated to you that: "We may want to consider an MRR or IME at this point."**
A. I see that.
**Q. Do you see that language?**
**Did you -- did you feel that an MRR or an IME would be of help in valuing the insurance claim?**
A. I did, yeah.
**Q. And what help do you think an MRR could've**

Page 47

**provided for you that wasn't already in the file encompassing Ms. Am's $1,000 offer?**
A. Well, one thing a record review can do is it can help you with, you know, the causation. It's not just -- I mean, Dr. Kearney's report basically stated the surgery wasn't related. But if his report were to say, "Hey, guys. You know, this is related," that's something that would actually support our insured's case so we would, you know, reevaluate the case at that point.
**Q. So then why wasn't an MRR or IME requested prior to this? Do you know?**
A. It's fairly typical to request a medical record review first.
**Q. Before what?**
A. An IME. I mean, sometimes we just request the record review.
**Q. Okay.**
A. IMEs aren't necessarily scheduled on every case.
**Q. All right. So you would agree that at the time of the -- of Brittany Am's handling of the case, there was no MRR, medical record review, requested; right?**
A. I'm not sure if she did or not.

Page 48

**Q. Okay. And you would agree, would you not, that an MRR would be useful in valuing a case?**
A. I think an MRR is a tool that we use within our investigation, as part of the investigation.
**Q. As part of the investigation.**
**But you would agree that it's useful -- you wouldn't have ordered -- you wouldn't have gone along with this recommendation if you didn't feel it would help you in valuing the case, did you?**
A. I felt that it would help with the evaluation.
**Q. Did you -- did you think that it would help in keeping the value of the case low?**
A. No. I mean, one of the -- one of the things I say to myself all the time at Amica is: Pay what we owe when we know we owe it. So if the record review came back and said, "Hey, this is related," it's something that we're going to consider as related.
**Q. What if the actual surgeon in the case submitted to you a declaration that it was related?**
A. I mean, the medical records kind of speak for themselves. I think the surgeon in this case -- was it Goldman?
**Q. Yes.**
A. He indicated that the pre- and post-op diagnosis was osteoarthritic changes, which --

Page 49

(Unreportable simultaneous crosstalk.)
**Q. (By Atty Balint) Go ahead.**
**(Pause in the proceedings.)**
**Q. (By Atty Balint) But -- but you see in the declaration -- we'll get to it in a moment. You've had a chance to review it now; correct?**
A. I haven't reviewed any declaration. The only narrative that I saw from the surgeon -- and I don't know if this was the declaration that you're referring to -- was that the treatment that was rendered was reasonable and necessary as it pertained to, I think, billing for Medicare purposes.
**Q. Have you ever seen the declaration of Dr. Goldman?**
A. No, not that I'm aware of.
**Q. You were aware, though, that it was -- that there was such a declaration, were you not?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I was aware that you referenced it within your email to me at some point, but the declaration -- sorry. Let me back up. The medical records were what we were reviewing and they provided a picture as to the injuries.
**Q. (By Atty Balint) Well, you felt that an MRR --**

Page 50

**a medical record review would be useful; correct?**
A. I did.
**Q. For a medical opinion?**
A. Yes, it's very typical.
**Q. And so why would you not consider a declaration of the surgeon as to causation?**
A. Because we felt there was enough information within the medical records that we could make the evaluation.
**Q. So you felt it was safe to ignore the actual surgeon's opinions as to causation?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: We had enough information from the medical records that were provided, and you advised me that you had provided me with all the medical records.
**Q. (By Atty Balint) Okay. So if you were relying -- and I want to get back to this because it's an important point in this case.**
A. Sure.
**Q. You felt that you could rely on the medical records -- right? -- that were provided.**
A. Yes.
**Q. So why would you need an MRR? If you're**

Page 51

**seeking a medical opinion from a doctor, why would you do that if you felt safe that you had all the information you needed?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I mean, he's a doctor that's reviewing the records in detail, as well. I think it's good to have that second opinion. It's very typical on cases to get a medical record review from an expert.
**Q. (By Atty Balint) Okay. So why would you place his opinion over the opinion in a sworn declaration of the surgeon?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I had never seen a sworn declaration from the surgeon.
ATTY BALINT: Okay. Let's -- let's go to Exhibit 11, please, Reno.
**Q. (By Atty Balint) Okay. This is Exhibit 11. It's a signed declaration, as you can see, from the -- the second page.**
A. I only see one page there.
ATTY BALINT: Yeah. Reno, just go to the second page for a moment?

Page 52

**Q. (By Atty Balint) And you'll note that this does not have any Bates numbers on it; right? Do you see that, sir?**
A. What are you referring to? I'm sorry.
**Q. You will note that -- you will agree that this exhibit shown to you does not have any Bates numbers.**
A. What's a Bates number?
**Q. The numbers that are assigned to each page by Amica.**
A. I don't see anything, no.
**Q. Okay. So I'm just -- in regard to this declaration, you would agree that if you hadn't seen it before, you would agree that you were aware of such a declaration?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Could you rephrase that question?
**Q. (By Atty Balint) Were you aware that there was such a declaration?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: To my recollection, I have never seen this declaration.
**Q. (By Atty Balint) Were you aware that it**

Page 53

**existed?**
A. An email that you sent to me stated that there was a declaration.
**Q. Okay. Okay. And why wouldn't you -- why wouldn't you want to have all the information you possibly had to evaluate this claim?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: If you had provided us with a copy of this declaration, we certainly would've reviewed it.
**Q. (By Atty Balint) Okay. I -- I understand that. But don't you think that a surgeon's opinion in this case would help you in evaluating the case, or had you already just made up your mind and that was it?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No. I'm telling you that we reviewed the medical records that were provided and we felt that we had enough information from the medical records to formulate an evaluation.
**Q. (By Atty Balint) Okay. So you felt it safe not to get the surgeon's opinion?**
ATTY LEID: Object to the form.
Go ahead.

Page 54

THE DEPONENT: I just testified if you provided this to us, we would've reviewed it.
ATTY BALINT: Okay. Let's go to -- briefly, to Exhibit 12, Reno.
**Q. (By Atty Balint) I'm showing you what's been marked as Exhibit 12. You were -- what were you responding to here? I take it you had reviewed the demand letter?**
A. Yeah. I mean, it's pretty self-explanatory. It's a response to the demand.
**Q. And since, you've had the opportunity to review the demand and the enclosures provided; correct?**
A. Correct.
**Q. All right. The enclosures that were referenced in that demand letter included the declaration of Dr. Goldman; correct?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No, I don't believe they did.
ATTY BALINT: Okay. Let's go to that demand letter of June 30, which is -- let's see here. It's Exhibit 9.
It doesn't look like we have this demand letter here, Reno. Oh, we have it -- oh, Exhibit 24.

Page 55

Thank you.
**Q. (By Atty Balint) All right. Showing you what's been marked as Exhibit 24. It's a demand letter, which I think that the Exhibit 12 was referring to, was it not?**
**July 12, 2022, is your letter to me saying: "We have the -- had the opportunity to review the demand and enclosures provided."**
A. Okay.
ATTY BALINT: Okay. All right. And let's -- let's scroll down to the next page.
Hold on a second here. I'm buried in paper.
(Pause in the proceedings.)
**Q. (By Atty Balint) Okay. On the page that you're looking at, which has a Bates Stamp number of 1784, it summarizes the medical bills -- the additional medical bills at the top of the page.**
**And then it says the -- in the following paragraph: "The surgeon, Dr. Robert T. Goldman, MD, submitted a sworn declaration delineating the cause of the surgery, the need for a surgery, and the reasonableness of the medical care provided. A copy of this declaration, along with his curriculum vitae, is also enclosed on the disk."**

Page 56

**Do you see that language?**
A. I do.
**Q. Okay. If there was something missing in what I was providing to you, wouldn't a reasonable investigation ask for the missing documentation?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Well, I testified previously that there was a narrative within the records from Dr. Goldman stating that the procedure was necessary as it related to Medicare coverage. Like I said, also, we'd never received, to my recollection, this declaration.
**Q. (By Atty Balint) And you would agree that you never asked for it.**
A. We reviewed the medical records that were provided, and we -- we didn't feel a need to ask for any additional information at that point.
**Q. I know you didn't feel that you had a need, but I want to make sure that you agree that you did not ask for it.**
A. Correct.
ATTY LEID: Object to the form.
Go ahead.
**Q. (By Atty Balint) And in that same paragraph, it**

Page 57

**says -- it says some language from the declaration: "Mr. Gaekwar" -- I'm putting that in brackets because the letter didn't say that, the records didn't say that.**

**"Mr. Gaekwar still has some residual pain and disabilities so, going forward, I prescribed physical therapy for him as needed."**

**Do you see that language?**

A. I do.

**Q. "A careful review of the medical records would support the fact that prior to his -- this crash with the underlying -- underinsured driver, Mr. Gaekwar had no active conditions in his left knee."**

A. I do see that.

**Q. Okay. And then I, again, summarized the Washington law of pre-existing dormant condition. Do you see that?**

A. I do.

**Q. Okay. So I take it that you felt no need to get the surgeon's opinion as to the cause and -- and the consequences of -- of the crash of January 25, 2020.**

ATTY LEID: Object to the form.

Go ahead.

THE DEPONENT: Again, the medical records, we believed, were enough information. The pre- and post-op diagnosis for the surgery was in relation to

Page 58

specifically his osteoarthritic issue, which is a degenerative condition.

**Q. (By Atty Balint) So you don't care if the doctor -- if the surgeon disagreed with that?**

ATTY LEID: Object to the form.

Go ahead.

THE DEPONENT: He was the one that indicated that.

**Q. (By Atty Balint) You would agree that, at Amica, for claims adjusting for bodily injury, that the adjuster should consider all available documentation and information; correct? Would you agree with that?**

A. I don't think we necessarily need every single piece of documentation, but we'll make a judgment as to, you know, what documentation we think is enough to properly evaluate.

**Q. And so when it's enough, do you ever reevaluate based on new information? For example, a surgeon's declaration in this case?**

A. If this was provided, we would certainly review it. We felt that we had enough within the medical records that were provided.

ATTY BALINT: Okay. Why don't you -- why don't we go back to Exhibit 11 for a moment, Reno.

And I'll have the witness read it to

Page 59

himself since he says he's never seen it before.

(Pause in the proceedings.)

THE DEPONENT: Do you want me to read the declaration?

**Q. (By Atty Balint) Yeah, I want you to read it since you said you've never read it before.**

A. I don't recall ever seeing it before.

**Q. I'm asking you to read it now, sir.**

A. (Deponent reviews exhibit.)

Okay. Can we scroll down?

**Q. On the first page of this, Dr. Goldman states --**

A. Hold on. Can I just finish?

ATTY LEID: Counsel, he was still reading. Sorry.

ATTY BALINT: Oh, sorry.

ATTY WILHELM: No, that's okay.

(Pause in the proceedings.)

THE DEPONENT: Okay.

**Q. (By Atty Balint) Okay. So do you see, in the first page, the language that says: "From May 2017 through the date which the collision occurred, January 25, 2020, Mr. Gaekwar had no complaints or active symptoms in his left knee."**

**Do you see that language?**

Page 60

A. Yeah.

**Q. Did you -- do you agree or disagree with that based on your review of the medical records?**

A. Do I disagree with what the surgeon's stating?

**Q. Yes.**

A. I don't know. I mean, this is the first time I'm reviewing this document.

**Q. Do you agree or disagree with it now, as you're -- now that you've had a chance to review this document?**

A. I stand by our evaluation of the medical records that were provided.

**Q. Okay. I'm asking --**

A. This declaration doesn't change our review of the medical records that were provided.

**Q. Okay. But I'm asking, do you agree? So I'm taking it you disagree with the surgeon saying that -- that he had no complaints or active symptoms in the knee as of the time of the crash. You disagree with that, do you not?**

ATTY LEID: Object to the form.

Go ahead.

THE DEPONENT: I'm not saying that.

**Q. (By Atty Balint) What are you saying?**

A. I'm saying that our review of the records

Page 61

indicated that the surgery was related to his osteoarthritic changes.
**Q. Okay. But we're talking about the condition prior --**
A. Just because he doesn't have active symptoms doesn't necessarily mean that his pre-existing degenerative condition wasn't the cause and the need for the surgery.
**Q. Okay. But I'm -- but -- so you're not disagreeing with the doctor here, you're simply saying that your doctor, at the time, said it was an ongoing condition that would worsen?**
A. Yes, a natural progression.
ATTY LEID: Object to the form.
Go ahead. Thank you, Mr. Grundy.
You're going to have to say it again, because we talked over each other, Mr. Grundy.
THE DEPONENT: Yeah, yeah. Basically, what he was saying is the degenerative issue that he had was a natural progression, which would eventually have led to the surgery anyway.
**Q. (By Atty Balint) Okay. I hear your language that you said several times now.**
A. Right.
**Q. But do you agree or disagree that there were**

Page 62

**no active symptoms in his left knee at the time of the crash?**
A. I don't know. I mean, I'm not sure.
**Q. On the next page, Page 2, Dr. Goldman states under oath that: "In my opinion, the left knee treatments and replacement surgery of December 13, 2021, and the resulting follow-up care, including a stay at an inpatient rehabilitation center and physical therapy, were all reasonable and necessary and related to the crash of January 25, 2020."**
A. I see that.
**Q. Do you see that language, sir?**
A. Yup.
**Q. And I take it that Dr. Kearney disagreed with that.**
A. Correct.
**Q. Okay. If you have -- if you have a situation where a doctor that Amica hired to do a medical records review disagrees with the -- with the treating doctor, do you just ignore the treating doctor's opinion?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: No, we don't ignore. Like I said before, we review the medical records that were provided.

Page 63

**Q. (By Atty Balint) Okay. And so are you agree -- can you agree or disagree that the -- with the surgeon's opinion, that all the care was reasonable and necessary and related to the crash of January 25, 2020?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Could you repeat that question for me?
**Q. (By Atty Balint) Well, let me -- let me summarize. Do you -- do you think that if there's a disagreement between a treating doctor and a doctor that Amica hired to review records, do you think you're free to ignore the surgeon's record -- the surgeon's opinion? Sorry.**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: We don't ignore any documentation that we're provided with. We're evaluating all the documentation that's provided.
**Q. (By Atty Balint) Okay. So I'm asking you a general question. If there is a disagreement between a doctor that Amica hired to review records and a treating doctor, do you feel that you can rely on the -- the MRR doctor as opposed to the surgeon?**
ATTY LEID: Same objection.

Page 64

Go ahead.
THE DEPONENT: We're looking at all the facts.
**Q. (By Atty Balint) Okay. And so all the facts would include, in any case that you have, the opinion of the treating doctors, would it not?**
A. It would include our review of the medical records, our investigation, medical record review investigation, among other things.
**Q. What about the -- what about the treating doctor's opinion, sir?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Like I said before, his -- his diagnosis for the surgery was related to pre- -- a pre-existing issue.
**Q. (By Atty Balint) Okay. That's -- that's from your -- your review of the records and Dr. Kearney's report; correct?**
A. Yeah, the medical records from Goldman.
**Q. Okay. So the -- if you had a -- your review of the records, your opinion as an adjuster with the medical training that you've had, limited to that, and the -- Dr. Kearney's report, you feel free to not consider the opinion of the treating doctor as to**

Page 65

**causation?**
ATTY LEID: Object to the form.
**Q. (By Atty Balint) Is that Amica's policy?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: The policy is to review all the medical records provided.
**Q. (By Atty Balint) Okay. And so you don't have to do any investigation as to anything beyond the medical records. Is that your opinion, sir?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: We'll certainly review documentation that an attorney provides. If they don't provide documentation, you know, that's not on us.
**Q. (By Atty Balint) Uh-huh. Okay. But I'm -- let me -- let me ask this question again so we can get a clear answer.**
**If the surgeon's -- if the treating doctor's opinion differs from your MRR doctor, would you feel free to ignore the doctor -- the treating physician's opinions?**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.

Page 66

THE DEPONENT: Yeah. Can you just -- can you just state that one again, please?
**Q. (By Atty Balint) Okay. I really want to know if you have a situation where a doctor hired by Amica gave one opinion and the medical records were reviewed, and as you interpreted them, have a different view, would you feel that it's not necessary to get the -- to review the opinion under oath of a treating doctor?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I think I testified before that we believed that there was enough information within the medical records to formulate our evaluation.
**Q. (By Atty Balint) Wouldn't you agree that Amica had the duty, the ongoing duty, to continue to evaluate any records that are available?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: What do you mean by records? Like medical records?
**Q. (By Atty Balint) Any information. Wouldn't you agree that Amica has a continuing duty to evaluate a claim?**
A. I think, in this case, we believed that we had enough information based on what was provided to us.

Page 67

**Q. Oh, so your answer is you do not feel, once you reached that opinion, that Amica had any duty to consider new information?**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.
THE DEPONENT: If there was additional medical records that you had provided, we would have certainly reviewed them and continued our evaluation.
**Q. (By Atty Balint) So if this -- if this treating physician's opinion under oath had been provided to you, you would have reconsidered your evaluation?**
A. I would've reviewed it if it was provided to me. But at the end of the day, we had enough information through the medical records that Dr. Goldman -- what you provided from Dr. Goldman to formulate our evaluation.
**Q. I understand that you feel that you had enough, but if new information came in, do you feel that Amica had no ongoing duty to continue to reevaluate the -- the valuation of the case if new information came in?**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.

Page 68

THE DEPONENT: We --
ATTY BALINT: I agree that it's been asked. I don't think it's been answered, but go ahead.
ATTY LEID: I think it's been answered. Go ahead.
THE DEPONENT: Can you repeat the question, please?
**Q. (By Atty Balint) Okay. The question is: Do you believe, as a general matter, that an adjuster at Amica had a continuing duty to evaluate a case if new information came in?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: If new information is provided to us, we will absolutely review it.
**Q. (By Atty Balint) Okay. So if you were -- if you were told that a surgeon had provided a declaration of opinion, why would you not ask for that opinion?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Right. My question to you is: Why wasn't it provided?
**Q. (By Atty Balint) Well, you knew it existed; right?**
A. But why wasn't it provided?

**Q. I'm asking you the questions, and the question is: You knew it existed and you did not ask for information that you felt hadn't been provided.**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: The reason I didn't ask for it is because I felt we had enough information within the medical records.
**Q. (By Atty Balint) Okay. So any new information wouldn't have mattered to you. Is that your summary of your testimony? You already made your decision?**
ATTY LEID: Objection. Mischaracterizes.
Go ahead.
THE DEPONENT: Could you repeat that question?
**Q. (By Atty Balint) You felt you had enough information for evaluation; correct?**
A. Correct.
**Q. And you knew there was a surgery that had taken place.**
A. Correct.
**Q. Did you care what the -- what the surgeon -- what the records of the surgery had to say?**
ATTY LEID: Object to the form.
Go ahead.



THE DEPONENT: Yeah. We -- we absolutely reviewed the records from the surgery.
**Q. (By Atty Balint) Why did you ask for the records from the surgery if you had already made up your mind that you had sufficient information to give a valuation of $5,000?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: The $5,000 offer was a compromise. We believe, like I said before, that your client was fully compensated by the underlying settlement waiver of PIP.
**Q. (By Atty Balint) Okay. So I'm asking you the question: If you -- if you felt that you had enough information, why did you personally, Thomas Grundy, ask for the surgery records?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Well, I would want to review those records to see if there was any additional information in there.
**Q. (By Atty Balint) Why? What would it matter if there was additional information if you'd already -- if you already, as you've repeatedly testified, had enough information?**



ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Sorry. Could you repeat that one?
ATTY BALINT: Can the Court Reporter read that back, please?
(Record read back as requested.)
**Q. (By Atty Balint) Why would the surgery records matter under that circumstance?**
A. I think you provided a new demand at that point, and we'd want to review all the records because you were stating that it was related to the accident.
**Q. I know, but you've repeatedly testified, and I know we're repeating ourselves, but I'd like a clear answer if you can provide one, that the -- if you felt you had enough information to not care about a surgeon's sworn declaration, why would you ask -- why would you, personally, ask for the surgery records?**
ATTY LEID: Object to the form. Mischaracterizes. Asked and answered.
Go ahead.
THE DEPONENT: Because the assertion was that you were relating the surgery as a result of the accident so we wanted to review those records.
**Q. (By Atty Balint) That was always the case,**



**wasn't it, that the ongoing treatment -- that the position of the claimant was that they were all related to the crash? What's new about that?**
A. Well, there was multiple different demands over the course of the file, and the surgery records weren't initially provided because you provided the medical billing for the surgery but you hadn't provided the records, so we were continuing to follow up on those.
(Pause in the proceedings.)
ATTY BALINT: Reno, could you pull up Exhibit 9, please?
**Q. (By Atty Balint) Okay. This is the cover note to you, email, dated with AMICA 1914 at the bottom, that I've submitted an updated UIM demand along with a disk of exhibits to follow in regular mail. "If you have any questions or concerns, just let us know."**
**Do you see that language?**
A. Yeah. It looks like it was submitted by Reno. I don't -- actually, I don't see you cc'ed on it.
ATTY BALINT: I want to find Exhibit 24, which we talked about before. Hold on.
(Pause in the proceedings.)
ATTY BALINT: Would you pull up Exhibit 24, Reno? I just want to make sure I have the

Page 73

exhibits right.
**Q. (By Atty Balint) Okay. Exhibit 24 is back on the screen. It has Amica numbers of 1783 to 1786.**
**So in this -- in this letter, I included the medical bills, and did you see the reference there on that page right below the summary of the bills? Do you see the page where the records are also submitted?**
A. I don't see which portion you're referring to.
**Q. Okay. On the --**
A. It's really small on my screen.
**Q. Yeah, it is on mine too. Sorry.**
**Right below the summary of the medical bills, it says: "The total medical bills arising from this crash now total $155,732.44. All of the medical records and bills listed are submitted herewith on disk. This should facilitate a crosscheck by Amica of the information listed in the chronology."**
A. Sure, yup.
**Q. Do you see that language?**
A. I do.
**Q. So by the time -- by the time we were talking about the surgeon's declaration, you also had a copy of the surgery records, did you not?**
ATTY LEID: Object to the form.
Go ahead.

Page 74

THE DEPONENT: Could you state that again, please?
**Q. (By Atty Balint) Was there anything else missing that was referenced in this letter, Exhibit 24? Was there anything else missing that you weren't able to see from the documentation that was provided with it besides the declaration of Dr. Goldman?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I don't recall specifically. I do know, at one point, there was -- you had provided the medical bills for the surgery and that you were waiting on the records.
**Q. (By Atty Balint) Okay. And --**
A. And I believe you had indicated Reno may have been on vacation and that you would be providing me the full set of the documents once they arrived.
**Q. Okay. And did you get the -- did you get the records along with this -- along with this letter of June 3, '22, Exhibit 24?**
A. We got the records that you provided.
(Pause in the proceedings.)
ATTY BALINT: Okay. Can we take just a 30-second break?
ATTY LEID: Sure. We can go off the

Page 75

record. We won't go anywhere.
(Pause in the proceedings.)
**Q. (By Atty Balint) Do you agree, Mr. Grundy, that as far as the size of the various medical bills that were submitted to you, including the surgery bills, would you agree that the amount of these bills was reasonable and necessary for the treatment of his left knee?**
ATTY LEID: Object to the form. Beyond the scope.
Go ahead.
THE DEPONENT: I don't know. I mean, that would be in the claims file if we had that opinion.
**Q. (By Atty Balint) Do you have any disagreement with the size of any of the medical bills that, by the time of this demand letter, totaled -- what was it?**
**By the time of this June 30 demand letter, the total bills were $155,732.44, and I'm asking you the question: Do you agree that the amounts charged for the various services in the medical records were reasonable and necessary?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: It looks like the bulk of the -- the charges, the 83,000 and the 26,000, it

Page 76

appears they may have been related to the surgery. I just don't have them up in front of me.
**Q. (By Atty Balint) Okay. I'm -- I'm not asking for the -- you've already said that -- you've already said repeatedly that your opinion was they were not related to the crash; right?**
A. Correct.
**Q. I'm asking a different question. As to the amounts of these bills, the -- for example, the bill for the surgery at Morristown Memorial Hospital, 83,153.91, is that bill reasonable for the services that were -- that were rendered?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I don't know. I'm not sure offhand.
**Q. (By Atty Balint) Okay. Did you ever express -- did Amica ever express any disagreement with the amount of those bills by saying there was overcharging or any other reason to criticize the charges that were made?**
A. I don't think there was a specific disagreement on it, just that we didn't believe it was related.
**Q. Okay.**
A. I think there was a -- there was one of my

notes in the file that made reference to possible Medicare adjustments.
**Q. Okay. And -- and I -- I see that letter. I don't know where I can find it real quick.**
**But the Medicare adjustments -- what relationship did that have to your evaluation of the case that Medicare had some adjustments that he was entitled to?**
A. That didn't have anything to do with the evaluation of the case.
**Q. So would you agree that in your training in Washington law, that it's the amount of bills charged, not how much was paid by any insurance provider such as Medicare?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Could you restate that one, please?
**Q. (By Atty Balint) Yeah. The question is: When you're evaluating a claim, do you look at the amounts charged or do you reduce it by the amount of Medicare or any other medical insurance company, what they actually paid?**
A. We're looking at the amounts charged. But we also want to make sure if there's a Medicare lien out



there, because it's typically a super lien, that it's protected, you know, for reimbursement.
**Q. Okay.**
A. And I don't recall if there was an actual Medicare lien here or not.
ATTY BALINT: Okay. Reno, let's just tie this down with going to Page 2064 of Exhibit 1.
**Q. (By Atty Balint) Do you agree, Mr. Grundy, that when you're reviewing records to come up with an evaluation of the case to a first-party claimant, do you agree that the -- that what should be done is to review all of the available information?**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.
THE DEPONENT: Yeah. We'll definitely review all of the information that's provided.
**Q. (By Atty Balint) Okay. And would you feel free -- in responding to a first-party claim, would you feel free to cherrypick information that was favorable to Amica as opposed to information that was unfavorable to Amica in terms of the evaluation of the case?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: We would not cherrypick



information.
**Q. (By Atty Balint) On the bottom of Page 2063, and to put it in context, maybe we should look at your note of -- on Page 2060, start there, of Exhibit 1.**
**Okay. So 2060, I just wanted to understand this entry by you on 7/11/22. Does it start on Page 2060 and continue through 2065? You can take your time to look at that. I just want to make sure that this -- that you are the author of this several-page summary.**
A. You can go to the next.
(Deponent reviews exhibit.)
Okay.
**Q. All right. Is that all yours?**
A. It appears to be my note, yeah.
**Q. Okay.**
A. Yeah, that appears to be my note.
**Q. So on Page 2057, there's a note -- an additional note from July 18, 2022, by you.**
A. Yeah.
**Q. And it's a -- you summarize a note -- a letter from me or an email saying: "I received your letter of July 12th repeating Amica's offer of $5,000. I'm disappointed that the updated medical information, photo, and surgeon's sworn declaration and analysis did**



**not change Amica's offer."**
**Do you see that language?**
A. Yes.
**Q. Did you -- at this point in time when you looked at that letter and acknowledged the existence of a sworn declaration, did you ever tell anybody on the plaintiff's side that you did not receive that declaration?**
ATTY LEID: I'm going to object to the form and any testimony or comments past the date of the IFCA, which is July 25, 2022.
With that instruction, Mr. Grundy can answer.
THE DEPONENT: Can you just repeat the question for me?
**Q. (By Atty Balint) Yeah. With the note we just looked at where you summarized a letter from me, you -- the letter of July 12 repeated the offer of $5,000. We're on Page 2057.**
A. Right.
**Q. Okay. And then I expressed the -- my disappointment that the updated medical information, photo, and surgeon's sworn declaration and analysis did not change Amica's offer. Do you see that language?**
A. Yes.

**Q. And now I want to ask you, during your involvement in the case, did you ever ask for the surgeon's declaration again? Strike that.**

**Did you ever ask for the surgeon's declaration that was referenced in the July 12th letter?**

A. I don't recall asking for a declaration.

(Pause in the proceedings.)

ATTY BALINT: Reno, could you pull up Exhibit 6, please?

**Q. (By Atty Balint) Exhibit 6 is from the Amica training manual, confidential records. The Bates Stamp is obscured in that black at the bottom of the page, but it's Page 21 that was provided to us.**

**Would you agree with the statement that insurance claims are not adversarial? The insurance company cooperates with the insured to find what coverage is available and get their claims paid expeditiously. Would you agree with that?**

A. What is this?

**Q. This is from the training manual of Amica that you said you repeatedly looked at.**

A. This is --

ATTY LEID: Object to the form.

Go ahead.

THE DEPONENT: It doesn't appear to be an



Amica PowerPoint slide. I'm just wondering what it is.

**Q. (By Atty Balint) Okay. So let's just ask you the question then.**

**Do you agree with the statement that insurance claims are not adversarial? Insurance company cooperates with the insured to find what coverage is available and get their claims -- get claims paid expeditiously. Do you agree with that standard or not?**

A. I don't know in terms of what coverage this is referring to.

**Q. Okay. At the top of the page is -- the question on this slide is: "What is good faith?" Do you see that?**

A. I do see that.

**Q. Okay. Let's confine it to -- if you needed clarification, let's say it's first-party. Would you agree that first-party underinsured motorist claims are not adversarial?**

A. Okay. So --

ATTY LEID: Wait. Stop.

Object to the form.

Go ahead.

THE DEPONENT: So we're bracketing it to underinsured motorist claims? I would say that they actually are adversarial. I don't agree with this



statement here.

**Q. (By Atty Balint) Okay.**

A. As a -- as a first-party UIM claim, we step into the shoes of the tortfeasor so I just don't agree with the statement in this slide.

**Q. Which means you can be adversarial in your adjusting practice?**

A. It's -- it's adversarial.

**Q. Okay. Let's go to -- to Exhibit 7 for a moment. Again, this is from the confidential information. I can't tell the Bates -- the confidential Bates number, but it's Page No. 25 of the training materials that was provided.**

**At the bottom -- oh, sorry, you don't have it yet, Exhibit 7.**

**Would you agree that first-party claims are not, quote, unquote, "negotiated" like a third-party claim? Well, first, do you agree with that?**

ATTY LEID: Object to the form.

Go ahead.

THE DEPONENT: I don't agree with that.

**Q. (By Atty Balint) You do not? I'm sorry. I didn't hear you.**

A. I don't agree with that.

**Q. Okay. I hope you would agree that all offers**



**to first-party claimants must be based upon reasonable valuation and diligent investigation.**

A. I would say that all offers to any claimants must be based upon a reasonable evaluation and investigation.

**Q. And --**

A. It's a standard.

**Q. And do you agree that low-ball offers to, quote, "change the midpoint," end quote, which force the insured into litigation can be the, quote, unquote, "denial" that supports a claim for bad faith?**

**Do you agree with that standard of Amica's?**

A. I think bad faith is a question for a judge or a jury.

**Q. Well, do you agree that lowball offers to change the midpoint of any negotiations is something that Amica encourages?**

A. Amica specifically discourages lowball offers.

**Q. Okay. And you -- and to repeat yourself, I think you agree that that $5,000 offer was an -- the hope for was that you would continue negotiations; correct?**

A. It was a -- like I said before, it was a compromise offer. Typically, negotiations would continue, in my experience. Like I said, I handle

Page 85

thousands of cases.
**Q. All right. So the -- so you agree that the $5,000 offer was not a lowball offer to encourage negotiations?**
A. It was absolutely not a lowball offer.
**Q. Was it -- was it made to encourage further negotiations?**
A. It was a compromise offer.
**Q. So you didn't care if there was any further negotiations? Is that your testimony, sir?**
ATTY LEID: Object to the form.
ATTY BALINT: Okay.
ATTY LEID: Go ahead.
**Q. (By Atty Balint) Go ahead.**
A. I encourage negotiation. I even offered to mediate the case.
**Q. Okay. Do you think the $5,000 offer was meant to encourage more negotiations --**
ATTY LEID: Object to the form.
Go ahead.
**Q. (By Atty Balint) -- including mediation?**
A. I'm just not understanding your question. Sorry.
**Q. Let me -- let me rephrase it. The $5,000 offer combined with a -- a suggestion of mediation, was**

Page 86

**that not an attempt to further negotiations?**
A. It was -- it was a compromise offer. Typically, negotiations would continue beyond that point. It's atypical that an attorney or claimant would accept the first offer, but in no way was it a lowball offer.
(Pause in the proceedings.)
ATTY BALINT: Let's go to AMICA 2960.
ATTY LEID: Would this be -- sorry. We've been going about another hour. Would this be a good time to take a break?
ATTY BALINT: Yeah. Let me finish this question, then we can take a break.
ATTY LEID: Sure.
ATTY BALINT: Please go to AMICA 2960.
**Q. (By Atty Balint) 2960, this was provided as a supplemental information for the claims file.**
**We've seen this entry before near the top of that page where Macdonald-Conill, Kim, reassigned the case from Brittany Am to you; correct?**
A. Correct.
**Q. Okay. And the next entry was from Alex Rottler. He reviewed it, and the offer of $1,000, he says: "New money was rejected. Per plaintiff's counsel, client moving forward with surgery. Increase**

Page 87

**the reserves to $95,000."**
**Do you see that language?**
A. Yes.
**Q. Was this part of the claims file that you were looking at?**
A. I haven't seen that note before.
**Q. Okay. It's part of the claims file. Was it not provided to you?**
A. What do you mean "provided to me"?
**Q. Well, it was part of the claims file. As part of the claims file, I thought you said you had access to the claims file. Did you?**
A. I have access to the claims file. I do not have access to hidden notes from home office. If you look at the highlighted portion that says "yes," this is what we were referring to earlier, the home office. That might mean that it was a hidden note. So I have access to the claims file, but I don't have access to hidden confidential notes.
**Q. Okay. So you're -- it's your testimony that this entry from Mr. Rottler was not part of any information that you had at any time?**
A. Absolutely not.
**Q. Okay.**
ATTY LEID: Good time for a break?

Page 88

ATTY BALINT: Yeah. Okay.
ATTY LEID: Perfect. Let's go off the record.
(A break was taken from 10:10 a.m. to 10:21 a.m.)
ATTY BALINT: Reno, why don't you pull up Exhibit 26?
**Q. (By Atty Balint) Did you receive the report of Dr. Kearney on June 8, 2021?**
A. I don't recall the exact date we received it.
ATTY BALINT: Okay. If we can go to Exhibit 1, again. Page 2076.
Reno, are you there? Hello?
Okay. Scroll down a little bit to give Mr. Grundy a chance to review that whole page.
**Q. (By Atty Balint) Let's start out with this question, Mr. Grundy. Do you agree that, at all times, in handling first-party claims, Amica should never put its interest above those of the claimant?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Can you define, like, "interest" for me?
**Q. (By Atty Balint) Monetary interest. Saving money.**

Page 89

ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: Can you repeat that question for me?
**Q. (By Atty Balint) Do you agree that in handling a first-party claim, Amica should never put its interest above those of the claimant?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I mean, we evaluate cases, third-party or first-party cases, based on the information at hand in our evaluation and our investigation.
**Q. (By Atty Balint) Now, why don't you answer the question?**
A. That's my answer to the question.
**Q. The question is: Do you agree that Amica should never put its interest above those of the claimant in a first-party context?**
ATTY LEID: Same objection. Go ahead.
THE DEPONENT: I mean, it's hard to say. Every case is so different. I mean, no case is a 50/50, so we're evaluating the case based on the information available in the investigation.
**Q. (By Atty Balint) I understand that, but in**

Page 90

**trying to resolve a first-party claim, is it okay to put the interest of Amica above those of the -- of the insured, the claimant?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: Well, in regard to a first-party claim, like I said previously, we step into the shoes of the tortfeasor.
**Q. (By Atty Balint) Okay. So it's okay to try to minimize the claim, in your view?**
A. I did not say that.
**Q. What are you saying then when you're saying that you step into the shoes? What does that mean?**
A. We're evaluating the case as we would evaluate any other case based on the information at hand. We're not evaluating it differently.
**Q. So you disagree with the standard that the insurance company in a first-party context should never put its financial interest ahead of those of the claimant?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I think I just answered that question.
**Q. (By Atty Balint) Well, answer it again in terms**

Page 91

**of a yes or no perhaps.**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: It's not a yes or no. Like I said, every case is specifically different.
**Q. (By Atty Balint) So it's --**
A. We're reviewing the information at hand.
**Q. So it's okay, in some cases, to put the interest of Amica ahead of the claimant?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I did not say that. I said that we're evaluating the information given the scenario and the claim. Every claim's different.
**Q. (By Atty Balint) Okay. But do you agree with the standard that the insurance company should never put its interest above those of the claimant?**
ATTY LEID: Same objection. Go ahead.
THE DEPONENT: I do not say that.
**Q. (By Atty Balint) I'm not asking if you say that. I'm saying that.**
**Did you -- do you agree with that standard?**
ATTY LEID: Same objection.
THE DEPONENT: I'm telling you that we review the information that's provided because every

Page 92

claim is completely different. There's no claim that's exactly the same.
**Q. (By Atty Balint) Are there any circumstances where you, as an adjuster operating in Washington, in Washington cases, could put the financial interest of Amica above those of a first-party claimant?**
ATTY LEID: Same objection.
Go ahead.
**Q. (By Atty Balint) Are there any circumstances where that would be the proper thing to do?**
A. Can you state that again, please?
**Q. Let's confine ourselves to Washington standard. Do you agree that it's -- do you -- is there -- let me say it. Are there any circumstances where Amica could put its interest above those of a first-party claimant in resolving a claim?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: In the context of a UIM claim, like I said before, you're stepping into the shoes of the tortfeasor, and we're evaluating based on documentation and information.
**Q. (By Atty Balint) So it is -- it is okay to put the information of -- the interest of the insured -- is it okay then, under your standards, in some**

**circumstances to put the interest of the -- Amica over those of its first-party claimant?**
A. I didn't say that.
**Q. What are you saying then? Is it okay to do that ever?**
ATTY LEID: Object to the form. Answered -- asked and answered.
Go ahead.
THE DEPONENT: Are you asking me if it's okay to put the insurance company's interests above somebody else?
**Q. (By Atty Balint) Above the claimant's interest.**
A. In terms of what context of interests?
**Q. Okay. I'm going to work at this until I get an answer or until your counsel tells me not to ask any more questions.**
**There's -- I'm asking you to agree with the standard that the insurance company should never put its interest, financial interest, above those of the -- of the claimant.**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.
THE DEPONENT: I'm stating that basically we're reviewing every case. No case is 50/50. There's



nuances of each case. And every case is different, and we're evaluating it as such.
**Q. (By Atty Balint) So there are some cases where it's okay to put the interest of the insurance company above those of the -- of a claimant. Is that what you're saying?**
ATTY LEID: Same objection.
THE DEPONENT: I did not say that.
**Q. (By Atty Balint) What are you -- you're -- do you think there's ever a circumstance where that could happen?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I think it's a hypothetical question.
**Q. (By Atty Balint) It is a hypothetical, so please answer it.**
ATTY LEID: Same objection. Improper hypothetical.
Go ahead.
THE DEPONENT: Yeah. It's a hypothetical question. I mean, I don't know what to tell you.
**Q. (By Atty Balint) Are you refusing to answer that question?**
ATTY LEID: Object to the form.



Go ahead.
THE DEPONENT: I believe I just answered your question. I believe it's a hypothetical question. We review every case based on its own merits. No case is exactly the same.
**Q. (By Atty Balint) Okay. So you do that in all your cases, and I'm asking you the question: Is it -- in any of the cases you've handled, first-party cases in Washington, is it okay to -- to put the interest of -- financial interest of Amica in minimizing a claim over those of the claimant?**
ATTY LEID: Same objection.
Go ahead.
THE DEPONENT: I didn't say that. Like I said, we step into the shoes of the tortfeasor.
**Q. (By Atty Balint) Which means to you what? That it's adversarial and you can take an adversarial interest?**
A. I didn't say that, but I -- it is an adversarial situation.
**Q. Let me ask a more basic question then. Do you ever think it's okay for Amica to not operate in good faith in trying to resolve a first-party claim?**
A. At Amica, we constantly operate in good faith. We're trying to reach fair and prompt settlement



agreements first- or third-party.
**Q. In this -- in this page, we're talking about your entry of 6/23/21, you say: "We have received the MRR." Do you see that?**
A. I don't see it on this page.
**Q. It's on Page 2076.**
A. Oh, yeah. Right at the top, I do.
**Q. Okay. What did you mean by a "favorable MRR"?**
A. Where is that?
**Q. We have received -- and you refer to a document number.**
A. Right.
**Q. What'd you mean by receiving a favorable MRR, sir?**
A. I believe it was basically in support of our initial determination that the injury wasn't related to the surgery.
**Q. You agree that it was -- that your characterization of it, it was favorable to Amica's position?**
A. It was favorable in the sense that the -- Dr. Kearney indicated that it was not related to the accident, yes.
**Q. Okay. Do you think that in getting an MRR and you're trying to resolve the claim in good faith, do you**

**think it's okay to say, "Oh, we got a favorable MRR report in"?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: I mean, that's the word that was used. Yeah.
**Q. (By Atty Balint) Okay. The date is 6/23/21. Do you see that?**
A. Yes.
**Q. That's when you received the Kearney report. When did you provide it to the plaintiff or plaintiff's counsel?**
A. I'm not sure of the exact date. I know me and you had set some conference calls, and I had followed up with you to discuss, but I don't know the exact date.
**Q. Why did it take until December of 2021 to provide the Dr. Kearney report to claimant's attorney?**
A. That's not true.
**Q. Oh, okay. When did you provide it?**
A. I believe it was provided to you via email in September at some point. We were trying to set up conference calls. We actually had a conference call scheduled, and I contacted your office and no one was available. At least, this is what's, you know, in the notes and to my recollection.



ATTY BALINT: Reno, go to Page 2074, please.
THE DEPONENT: Yeah. If you look at my note on September 27th, it shows that I emailed it over to you in September, not in December.
**Q. (By Atty Balint) Okay. Why did it take from the February receipt of this until September and until I asked for it?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: First of all, it wasn't in December. I'm not really sure where the December date came from.
**Q. (By Atty Balint) Okay. Let's stick with the September date. September 27, 2021: "Spoke with plaintiff's counsel. He requested a copy of the MRR for their review. I see no issues with forwarding it to them. I have emailed as requested."**
**Do you see that language?**
A. Yeah. I emailed it over to you.
**Q. Okay. So why did it take from February 13 till September 27 to provide that report?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: February 13? What



happened on February 13th? I think you might have some of the dates confused.
ATTY BALINT: I might.
(Pause in the proceedings.)
**Q. (By Atty Balint) Yeah, you're right. It's -- your reference to the previous page we looked at, 2076, says: "Received the favorable MRR."**
A. Yeah. That's not in February, though.
**Q. Okay. June, why did it take until June until September to provide that report?**
A. Well, me and you had a call set up, and I was continuing to follow up with you to discuss it. And then once you requested it, I provided it to you immediately.
**Q. Did it take a request from me to -- for you to have to provide that MRR report?**
A. Yeah. I had no issue with providing it to you at all.
**Q. Why didn't you provide it automatically when you got it?**
A. That's not typical that we always provide it. I just felt like there was really nothing to hold back, so as soon as you asked for it, I gave it to you.
**Q. Okay. So it required a request from me before you were -- before you provided it. That's certainly**



**true, is it not?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: In writing, yeah. I mean, the plan was for me and you to discuss it over the phone. I think there was some other instances where either you or Reno may have been out of the office. And correct me if I'm wrong, but the medical leave.
**Q. (By Atty Balint) What does that -- okay.**
A. So there was some -- like, there were some delays in that regard, but I had no issue with discussing the report and forwarding it over to you as soon as you needed it.
**Q. But you felt -- you felt no need to report -- to provide it automatically?**
A. Well, my plan was to discuss it with you over the phone and provide you a copy.
ATTY BALINT: Okay. Let's -- let's go back to the standards in Exhibit 7, please.
(Pause in the proceedings.)
MR. ETIENNE: I'm sorry. Did you want me to pull up an exhibit? I missed that exhibit number.
ATTY BALINT: Exhibit 7. Yes, please.
**Q. (By Atty Balint) Do you agree with the standard that despite what a plaintiff's attorney may say, you do**

Page 101

**not have to give up your limits at the drop of a hat? The insurer is permitted to fully investigate claims. However, you must keep first-party insureds informed about the investigation (every 30 days).**
ATTY LEID: Object to the form.
Go ahead.
**Q. (By Atty Balint) Do you see that language, sir?**
A. Yeah, I'm reading off that slide.
**Q. Do you agree with that, that you should provide first-party insureds, and you must keep us -- first-party insureds informed about the investigation every 30 days?**
A. Yeah. Is there a Washington statute in that regard? Would you mind pulling that up for me?
**Q. I don't -- I'm asking the questions. This is an Amica standard. Do you agree with that standard or not?**
ATTY LEID: Object -- object to the form. I think the witness has testified this is not an Amica document, but go ahead.
THE DEPONENT: Yeah. That's not an Amica document.
**Q. (By Atty Balint) It's part of the Amica training manual, is it not?**
A. I don't recognize this slide.

Page 102

**Q. Okay. Do you -- let me ask you the question. Forget about the slide. Do you agree that you must keep a first-party insured informed about the investigation at least every 30 days, yes or no?**
A. That would be typical, yeah.
**Q. Okay. So the question is: You had a document that you withheld until it was requested. Is that keeping -- is that keeping the first-party claimant informed about your status of your investigation?**
ATTY LEID: Object to the form.
Go ahead.
**Q. (By Atty Balint) Does that comply with that standard?**
ATTY LEID: Same.
Go ahead.
THE DEPONENT: Well, we informed you that we were getting the medical record review, and then I attempted to contact you to discuss it. We weren't -- we weren't holding it back. It's not like you weren't informed about the record review that was taking place.
**Q. (By Atty Balint) Well, was I informed about the contents of that record review?**
A. As soon as you asked for it, I provided it to you.
**Q. Okay. But did you -- was that compliance of**

Page 103

**the standard to keep first-party claimant informed about your investigation?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Yes. We informed you of what our investigations were.
**Q. (By Atty Balint) The contents of the investigation or just that you had -- you had received an MRR report?**
A. Well, as you can see, within the -- the claim file, I was attempting to contact you to discuss the MRR report.
**Q. Well, why didn't you provide it? I understand that, and I'm not questioning you about that. I'm questioning you about: The MRR report was part of your investigation, yes?**
A. It's -- it's a part of it, yeah. It's not the whole thing.
**Q. Okay. And did you keep the -- the first-party claimant informed about that part of the investigation in terms of the contents of that -- of your investigation?**
ATTY LEID: Object to the form. Asked and answered.
Go ahead.

Page 104

THE DEPONENT: Yeah. I mean, we -- I was -- I was wanting to basically discuss it with you, and then I was going to forward it over. I forwarded it exactly when you requested it. That same day, I believe.
**Q. (By Atty Balint) You agree with the proposition that Amica had and continues to have -- or continued while you were -- let me rephrase it.**
**While you were involved in the file, do you agree that Amica had the duty to not refuse to pay claims without conducting a reasonable investigation?**
A. You -- can you rephrase that, please?
**Q. Do you agree that while you were handling the claim, the standard at Amica was not to refuse to pay claims without conducting a reasonable investigation?**
A. We conduct a reasonable investigation and determine the value.
**Q. Okay. So you agree with that standard that you -- that you -- that Amica had the duty not to refuse to pay claims without conducting a reasonable investigation? I'm not asking if you did or not. I'm asking if that's the standard at Amica while you were handling this claim.**
A. Yeah. The standard at Amica is to conduct a thorough and fair and prompt investigation. And like I

said before, we pay what we owe when we know that we owe it.
**Q. Okay. Do you agree that Amica, during your time, had the duty to attempt in good faith to effectuate prompt, fair, and equitable settlements in claims in which liability has become clear?**
A. Yes.
**Q. As part of settling a bodily injury claim, what sort of -- what sort of effects on the insured do you review?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: What do you mean by "effects on the insured"?
**Q. (By Atty Balint) Okay. In this -- in this case, what was the -- you never talked to the insured; correct?**
A. No. I mean, he was represented. I didn't speak with him directly.
**Q. And you didn't ask for permission to speak to him directly via his represented counsel, did you?**
A. No.
**Q. Did you ever investigate Mr. Gaekwar's pre-crash life like: Educational background; employment background; activities he engaged in, including**



**exercises and athletics; hobbies? Did you ever investigate his background?**
A. No, we didn't investigate background.
**Q. Okay. And did you investigate how the injuries -- how he claims the injuries of January 25, 2020, changed his life and activities?**
A. We reviewed the medical records that were provided.
**Q. Okay. Would you agree that in valuing a claim arising in Washington, a first-party claim, that you should evaluate his pain and suffering up to the -- up to the present time?**
ATTY LEID: Object to the form. Go ahead.
THE DEPONENT: For all cases, first- or third-party, we're evaluating the medical specials, pain and suffering, among other things.
**Q. (By Atty Balint) Okay. And how did -- how did Mr. Gaekwar -- what was his pain level and suffering as far as your involvement in the claim was concerned?**
A. Like I said previously, I believe that he was fairly compensated by the underlying settlement.
**Q. Okay. But did he have -- did he have any pain in regard to this knee injury?**
A. Yeah. We're not disputing that he didn't have



pain. I mean, it's documented in the medical records that he sustained a strain of the knee following the accident and he had pain in the knee.
**Q. And how did this affect -- how did this affect his -- this injury affect his enjoyment of life?**
ATTY LEID: Object to the form.
Go ahead.
THE DEPONENT: Like I said before, you know, we reviewed the medical records. It indicated that he was progressively getting better. He actually was going on hikes after the accident. I think it was about two months after.
**Q. (By Atty Balint) Did you actually review his deposition transcript, sir?**
A. I don't recall reviewing the transcript of his.
**Q. Was it provided to you?**
A. I don't recall it being provided.
**Q. Okay. Did you try to evaluate his loss of income capacity?**
A. I don't believe there was a claim for loss of income capacity --
**Q. Okay.**
A. -- to my recollection.
**Q. As part of this preparation, were you provided**



**with Dr. Kearney's report?**
A. His record review?
**Q. Yes.**
A. It's within the claims file. I've seen it.
**Q. Okay. You don't have access to that claims file as you sit there now?**
A. No. Not right now, unfortunately.
ATTY BALINT: I don't think it's part of the exhibits, but let me -- give me a couple minutes to pull that and we'll ask about it. Okay? I'll provide it.
ATTY LEID: Sure. Should we take a quick break and then -- off the record. Sorry.
(Atty Wilhelm joined the proceedings.)
(A break was taken from 10:49 a.m. to 10:52 a.m.)
ATTY BALINT: Reno, if you can pull up Exhibit 25, please?
Okay. If you can scroll down and give the witness a chance to look at Exhibit 25. He's never seen this before, I take it.
**Q. (By Atty Balint) It's a request from defense counsel to permit the providers, Mr. Gaekwar's medical providers, to produce records.**
**I'm asking you the question: During a**

Page 109

**pre-litigation setting, do you, as the adjuster, ask for -- do you have the power to ask the claimant, via an attorney or directly, to provide authorization for medical records?**
A. Yes.
**Q. In fact, you do it all the time, don't you?**
ATTY WILHELM: Object to the form.
THE DEPONENT: We do it when we believe that we need prior medical records.
**Q. (By Atty Balint) Well, any medical records. This is -- this is --**
A. Oh, yeah. Yeah.
ATTY WILHELM: Same objection.
Sorry, Mr. Grundy.
**Q. (By Atty Balint) Is there any reason why you did not ask for permission via our authorization to produce medical records from all the providers?**
ATTY WILHELM: Object to the form.
You can answer.
THE DEPONENT: I mean, as I stated before, I believe that we had enough information based on the medical documentation that you provided. You indicated that you had provided all of the medical records.
**Q. (By Atty Balint) Okay. Did you have any**

Page 110

**communications at any time with anybody from Nationwide?**
A. Not that I recall, at least with respect to this claim. I may have contacted them on another case.
**Q. All right. We're talking about this claim, so thank you for that clarification.**
**Okay. In terms of the records that you relied on to make your evaluation determination, except for asking for an MRR report from Dr. Kearney, did you ever initiate any investigation or did you rely solely on what was provided to you by plaintiff's counsel?**
A. Investigation into the accident itself or the -- the injuries?
**Q. Either one. Did you ever ask for any information? Did you ever investigate and get any information outside of what was provided by plaintiff's counsel?**
A. The -- like I said, the first thing we did was I ordered the medical record review, and then you said that you had provided all of his records. There was certain points where I had to follow up with you, I think, on the surgery records because they came later on --
**Q. Okay.**
A. -- but that would be the extent of it.
**Q. Okay. In looking back at the claims file that**

Page 111

**you reviewed and all the other materials that were provided to you in preparation for this deposition, is there anything you think you could've done better in terms of your investigation?**
ATTY WILHELM: Object to the form.
THE DEPONENT: I don't believe so. I'm a pretty seasoned adjuster. I handle, like I said, thousands of cases. I don't see anything that I could've done better here.
**Q. (By Atty Balint) Okay. Did you ever receive any formal or informal reprimands from a superior about the handling of the Gaekwar claim?**
A. I have never received any type of reprimands whatsoever, on this claim or any other claim.
**Q. Did you ever speak directly with Dr. Kearney?**
A. Not to my recollection.
**Q. And that would've been in the file had you actually spoken to him, wouldn't it? In the claims file.**
ATTY WILHELM: Object to the form.
THE DEPONENT: It could have been.
**Q. (By Atty Balint) Who selected the records to send to MES that was the broker for Dr. Kearney?**
A. That likely would've been me through like a secure share or like a print form.

Page 112

**Q. Do you know why Dr. Kearney was selected to be the records reviewer?**
A. He was the doctor that MES had assigned.
**Q. Okay. Had you had any prior dealings with Dr. Kearney that you're aware of?**
A. I have not.
**Q. Okay. When a -- when a records reviewer is assigned, do you have any method within the -- within the confines of Amica to check out -- to investigate the -- the objectivity of the examiner?**
A. Well, typically -- sometimes, they provide a CV. But for the most part, we use a company like MES because, you know, they vet these doctors, they vet the surgeons, and we're kind of relying on them to, you know, provide a doctor that's experienced.
**Q. Okay. I may be at the end. Give me a couple minutes, give me five, ten minutes to check out my notes and then we'll conclude this hopefully.**
A. Sure. No problem.
THE STENOGRAPHER: Off the record.
(Deposition concluded at 11:03 a.m.)
(Reading and signing was requested pursuant to FRCP Rule 30(e).)
--o0o--

C E R T I F I C A T E

STATE OF ARIZONA )
)
COUNTY OF MARICOPA )

I, Nicole A. Bulldis, RPR, a Certified Court Reporter, do hereby certify under the laws of the State of Washington:

That the foregoing deposition upon oral examination of Thomas Grundy was taken stenographically by me on July 28, 2023, and transcribed under my direction;

That the witness was duly sworn by me to testify truthfully, and that the transcript of the deposition is full, true, and correct to the best of my ability;

That I am not a relative, employee, or counsel of any party to this action or relative or employee of such counsel, and that I am not financially interested in the said action or the outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of August 2023.

Nicole A. Bulldis, RPR
WA CCR. No. 3384