# Exhibit 11

MES SOLUTIONS
SINCE 1978

505 S. 336TH STREET
SUITE 150
FEDERAL WAY, WA 98003
(253) 765-2980

AMICA MUTUAL
PO BOX 9690
PROVIDENCE, RI 02940

Fax: (866) 934-5967

| | |
|---|---|
| Injury Date: | 01/25/2020 |
| Birth Date: | 09/22/1945 |
| Jurisdiction: | WA |
| Appointment Date: | 06/08/2021 |
| Location: | 505 S. 336TH STREET SUITE 150, FEDERAL WAY ,WA 98003 |

Dear TOM GRUNDY:

Enclosed is a record review report regarding CHANDRASI GAEKWAR (claim # 60003757148) by SEAN KEARNEY, M.D.,Orthopaedic Surgery.

Thank you for the opportunity to be of service. If you have any questions or concerns regarding this report, or if we can be of any further assistance, please do not hesitate to contact us at the above number. We look forward to the opportunity of serving you again in the future.

Sincerely,

BOBBIE LOPARDI
MES Solutions

Enc.
File # 21721008864

This communication, along with any documents, files or attachments is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing, or saving in any manner. This communication does not form any contractual obligation on behalf of the sender or, the sender's employer, or the employer's parent company, affiliates or subsidiaries.

**Sean Kearney, M.D.**
**Orthopaedic Surgeon**

**Date:** June 8, 2021

| | | | |
|---|---|---|---|
| **Claimant:** | Chandrasi Gaekwar | **Client:** | Amica Mutual |
| **Date of Incident:** | January 25, 2020 | **Referred by:** | Tom Grundy |
| **MES File #:** | 21721008864 | **Claim #:** | 60003757148 |
| **Date of Birth:** | September 22, 1945 | | |

At your request, I reviewed the submitted records regarding Chandrasi Gaekwar. I did not examine Mr. Gaekwar.

This is a record review only. The claimant is not available for interview or physical examination. All opinion and conclusions are based solely on review of the available medical records.

## History of Present Injury

At the time of the motor vehicle accident on January 25, 2020, the claimant was a 75-year-old male. According to the medical records, he was rear-ended while going 5 miles per hour and struck his left knee and scalp on the dashboard. *[Examiner's Note: There are no further descriptions of the motor vehicle accident in the medical records.]*

The claimant presented six days after the motor vehicle accident for evaluation on January 31, 2020. At that time, he noted ongoing right shoulder pain, cervical pain, lumbar pain, and left knee pain since the motor vehicle accident of January 25, 2020. He was noted to have a previous history of a right knee replacement. Diagnoses included left knee pain, left knee injury, left knee effusion, neck strain, and lumbar strain. He was referred to physical therapy and advised to use ongoing anti-inflammatories and activity modification. The claimant underwent left knee x-rays on January 31, 2020, which showed moderate-to-severe tricompartmental osteoarthritis, particularly noted in the medial compartment.

The claimant then followed up for reevaluation on March 26, 2020. At that office visit, he was noted to be better after attending physical therapy. He was also noted to have undergone an injection with Synvisc to the left knee by Dr. Mandt on March 24, 2020, which had helped as well. *[Examiner's Note: The note by Dr. Mandt is not available in the medical records.]* He was advised to continue physical therapy and continue to observe the benefits of the injection.

The claimant completed 28 sessions of physical therapy from February 19, 2020, through May 21, 2020. By May 21, 2020, the right shoulder strain, cervical strain, and lumbar strain had resolved. The claimant continued with ongoing left knee pain with notable severe tricompartmental osteoarthritic changes. Further physical therapy was performed from May 25, 2020, through September 30, 2020, for a total of an additional 33 visits of physical therapy for the left knee. On May 30, 2020, the claimant was discharged to a home exercise program as he had completed over 60 visits of physical therapy.

Reevaluation on December 24, 2020, noted some ongoing left medial knee pain. Repeat x-rays at this visit showed continued left knee tricompartmental osteoarthritis with varus malalignment. Given his previous benefit from Synvisc in the past, a repeat Synvisc injection was recommended. *[Examiner's Note: It is unclear if the claimant received a repeat Synvisc injection to the left knee.]* There is also a discussion of possible left total knee arthroplasty if he continued with symptoms despite nonoperative management.

**Review of Records**

There are a series of photographs for review.

Photograph #1 dated March 10, 2020. This depicts a taillight fixture which appears to be the right rear taillight of an unidentifiable vehicle. No apparent damage.

Photograph #2, March 10, 2020, showing the right rear taillight of a vehicle with the trunk open. There is no damage to the taillight; however, there appears to be some damage to the trim about the right rear quarter panel.

Photograph #3, March 10, 2020, showing what appears to be the left rear taillight of an unidentifiable vehicle with the trunk open. The taillight is intact; however, there is either removal or some damage to the left rear bumper assembly.

Photograph #4, a removed portion of a bumper assembly of a Ford vehicle with a Washington license plate that is not fully visible. Date is March 10, 2020. There is some cracking and damage to the bumper cover assembly.

Photograph #5 is an unidentifiable close-up of a part of a vehicle. There are some scratches with some markups noted. Date is March 10, 2020.

Photograph #6, the rear of an unidentifiable vehicle with the trunk open. The rear bumper cover has been removed completely exposing the bumper cushion and the trailer hitch assembly. The taillights have also been removed. There does not appear to be any gross damage. Date is March 10, 2020.

Photograph #7 of the left rear taillight assembly of an unidentifiable vehicle with the trunk open. Date is March 10, 2020. There is some debris within the gutter, but no identifiable damage.

Photograph #8 of the rear of an unidentifiable vehicle with the bumper cover assembly and taillights removed. The trunk is open. The bumper cushion and the trailer hitch are identified and appear intact. There appears to be no gross damage. Date is March 10, 2020.

Photograph #9 identifying the close-up of an unidentifiable portion of a vehicle. Date is March 10, 2020. There is a metal flange that is dented. This is unidentifiable.

Photograph #10 of an unidentifiable close-up of a portion of a vehicle with a date of March 10, 2020. There is some scratching and scuffing of this. This appears to be a part of the bumper cover assembly.

Photograph #11 of the close-up of a front of a vehicle. The radiator cooling screen is identified in this photograph with a date of March 10, 2020. There is a dent in a structural bar traversing the radiator cooling assembly.

Photograph #12 of a close-up of an unidentifiable portion of a vehicle. There are some markups, but no significant damage noted. This is dated March 10, 2020.

Photograph #13 identifying the close-up of an unidentifiable portion of a vehicle. Again there are some markups with the date of March 10, 2020. No significant damage is noted.

Photograph #14 of the close-up of an unidentifiable portion of a vehicle. This is a structural bar that traverses what appears to be a radiator cooling assembly. There is a markup with a dent noted. Date is March 10, 2020.

Photograph #15 of an unidentifiable part of a vehicle dated March 10, 2020. There are markups on this part of the vehicle with no apparent damage.

Photograph #16 of a close-up of a structural bar overlying a radiator assembly. There is a dent noted. Date is March 10, 2020.

Photograph #17 of a close-up of an unidentifiable portion of a vehicle with some markups dated March 10, 2020. No apparent damage.

X-ray report of a left knee dated January 31, 2020. Findings include diffuse demineralization. No fractures. Moderate joint effusion. Moderate-to-advanced tricompartmental osteoarthritis most advanced in the medial compartment. This report notes that included in the contralateral knee (the right knee) there is a revision total knee arthroplasty with intact femoral and tibial components which are incompletely imaged. Overall impression is:
1. Moderate-to-advanced tricompartmental osteoarthritis.
2. Diffuse demineralization.
This is read by Erin Moran, M.D.

Office visit with Sadia Habib, M.D., on January 31, 2020. Chief complaint is back, shoulder, and knee pain. The claimant presents for evaluation after a motor vehicle accident seven days prior to presentation, on January 25, 2020. The claimant was rear-ended going about 5 miles per hour. He notes a small laceration on his forehead. He also has back pain, shoulder pain, and left knee pain since the motor vehicle accident. He was seen at this office four days prior to this

visit. Supportive measures were recommended. He was prescribed muscle relaxants and Voltaren. He has been using an ACE bandage on the left knee. Swelling has improved a little. He notes pain about the medial left knee when walking. Physical exam shows pain with left knee flexion and localized tenderness over the left medial joint line of the knee. Positive knee effusion. Normal right knee. Nontender lumbar region and neck. Full range of motion of the neck. Straight leg raise is normal bilaterally. Assessment:
1. Left medial knee pain.
2. Left knee injury.
3. Left knee effusion.
4. Neck strain.
5. Lumbar strain.

Plan is for imaging of the left knee as well as referral to physical therapy for the left knee, neck, and back pain. Continue to wear the knee brace as needed. He is prescribed methocarbamol.

Office visit with James Kriseman, D.O., on March 26, 2020. The claimant follows up after a motor vehicle accident. He is now two months after the motor vehicle accident. He has had an injection performed to the left knee and is doing much better. He continues with physical therapy. The physical therapy is helping to improve his strength and stability of the knee. He has a history of a previous right knee replacement. There are no physical complaints at this visit. His gait is strong and good. Physical exam shows normal cervical range of motion. There is a pacemaker noted in the left subclavicular region. There is evidence of degenerative joint disease seen in both knees, on the right more so than the left. Evidence of a previous right knee surgery is noted. Good strength of the quadriceps and hamstrings bilaterally. No effusion of the left knee. Assessment is:
1. Motor vehicle accident sequela.
2. Left medial knee pain.
3. Left knee primary osteoarthritis with exacerbation status post motor vehicle accident.
4. Moderate persistent asthma without complication.

There is discussion of general health maintenance. No specific orders were placed at this encounter. Plan is for follow-up in about six months for annual physical examination. Continue physical therapy for the knee. Strength appears to be quite good. Continue to follow-up with physical therapy and orthopaedic surgeon. The claimant also is noted to have underlying asthma and preventative recommendations are discussed.

Office visit on December 24, 2020, with Trevor Pearson Scott, M.D. This is for left knee pain. The claimant presents with several month history of left knee pain. The claimant was involved in a motor vehicle accident on January 25, 2020, where he describes striking his knee on the dashboard. He has had left knee pain since. He previously has seen Dr. Mandt and had a Synvisc injection with good relief on March 4, 2020. He has also been doing physical therapy, which helps. He has had a previous right total knee arthroplasty in 2018 in New Jersey and is satisfied with the outcome. He is very active and enjoys cycling. He notes pain throughout the left knee, which is worse with twisting and pivoting activities. He is able to walk several blocks. No use of assistive devices. Exam of the left knee shows swelling and effusion. There is tenderness over the medial and lateral joint lines. Stable ligamentous exam. Range of motion is

0 to 120 degrees. Mild patellofemoral crepitus. X-rays of the left knee are reviewed from February 18, 2020, and a new standing lower extremity series was ordered at this office visit. These show severe tricompartmental osteoarthritis with marked varus alignment of the left knee. There is "bone-on-bone osteoarthritis" of the medial compartment of the left knee. There is well-aligned total knee arthroplasty on the right knee. Impression is left knee osteoarthritis. The claimant is not ready for operative treatment. There has been good relief from a Synvisc injection previously and he would like to try that again. There is a discussion that his arthritis is severe enough that at some point he may want to proceed with total knee arthroplasty.

There are series of physical therapy notes at Innova Physical Therapy spanning February 4, 2020, through September 30, 2020.

The initial examination on February 4, 2020, indicates diagnoses of:

1. Pain in the right shoulder.
2. Pain in the left knee.
3. Unspecified injury of the left lower leg.
4. Effusion of the left knee.
5. Strain of the neck.
6. Strain of the low back.

The note indicates that the claimant was involved in a motor vehicle accident on January 25, 2020. He was rear-ended at a slow speed and reported that he hit his left knee and scalp on the dashboard. There is a history of a previous right total knee arthroplasty. The claimant presents with left knee pain, low back pain, cervicalgia, and right shoulder pain. The left knee pain is worsened by walking. The low back pain is worsened by prolonged sitting and lifting. The cervical and shoulder pain is exacerbated by range of motion, especially extension. Physical exam shows some decreased cervical and lumbar range of motion. Knee range of motion shows normal extension bilaterally with flexion to 90 degrees in the left and normal on the right. There is pain at the end range of right shoulder flexion. Plan is for physical therapy formal treatment one to two times per week for eight weeks. This is signed by Kevin Bonilla, P.T.

The claimant completes 28 visits of physical therapy through May 21, 2020. At the reevaluation on May 21, 2020, the claimant is walking and doing home exercise program. He has started to get medial knee pain again after the walk and took the day off. He talked to his physician and was advised to continue physical therapy. Assessment is remaining dysfunction in the left knee. Whole body is otherwise holding good function. Plan is for continued physical therapy and a home exercise program for knee strengthening. This is signed by Bret Swigard, physical therapist.

The claimant undergoes an additional 33 physical therapy visits through September 30, 2020. At this visit, the claimant continues with left knee pain and is now using orthotics. He is doing a home exercise program. He thinks the physical therapy is helping. The physical therapist notes that "we have opted to discharge the patient as he has been in physical therapy for quite some time and can do the home exercise program at home." His left knee has good range of motion,

no effusion, better tolerance to loading, but it remains varus deformed secondary to degenerative joint disease. Plan is for discharge from physical therapy.

## Conclusions

### Diagnoses

1. Left knee strain/contusion, related to the motor vehicle accident of January 25, 2020, resolved by May 21, 2020.
2. Cervical strain, related to the motor vehicle accident of January 25, 2020, resolved by May 21, 2020.
3. Right shoulder strain, related to the January 25, 2020, motor vehicle accident, resolved by May 21, 2020.
4. Lumbar strain, related to the January 25, 2020, motor vehicle accident, resolved by May 21, 2020.
5. Scalp laceration, related to the January 25, 2020, motor vehicle accident, resolved shortly after the motor vehicle accident.
6. Left knee moderate-to-severe tricompartmental osteoarthritis with noted varus malalignment, pre-existing and neither caused by nor permanently aggravated by the motor vehicle accident of January 25, 2020.

## Response to Questions Posed

**1. Is the diagnosis properly stated and supported by objective and subjective findings?**

The diagnoses as stated above in the *Diagnoses* section are properly stated and supported by objective and subjective findings in the medical records.

**2. Does medical documentation support a causal relationship between the accident and/or injury and the diagnoses assigned to the claimant? Please explain.**

It is the examiner's opinion that the medical records support documentation of causal relationship between the motor vehicle accident of January 25, 2020, and the following diagnoses:

1. Left knee strain/contusion.
2. Cervical strain.
3. Right shoulder strain.
4. Lumbar strain.
5. Scalp laceration.

The medical records document strains to these regions immediately after the motor vehicle accident of January 25, 2020.

**3. Are the claimant's current complaints related to the original injury? List objective findings to support your opinion.**

This is a records review only and the claimant's current symptoms are unknown. It is the examiner's opinion that the diagnoses specifically related to the motor vehicle accident of January 25, 2020, have resolved. These would include diagnoses of left knee strain/ contusion, cervical strain, right shoulder strain, lumbar strain, and scalp laceration. Physical therapy notes dated May 21, 2020, support resolution of these diagnoses. It is the examiner's opinion that any ongoing symptoms would be related to the pre-existing left knee moderate-to-severe tricompartmental osteoarthritis.

**4. Explain the history of prior injuries and/or pre-existing conditions, if applicable. Were these aggravated and/or do they impact the current injury? If so, explain.**

It is the examiner's opinion that the claimant had pre-existing moderate-to-severe left knee tricompartmental osteoarthritis with associated varus malalignment prior to the motor vehicle accident of January 25, 2020. This diagnosis was neither caused by nor permanently aggravated by the motor vehicle accident. The natural history of this condition is that symptoms will arise and will continue to worsen over time. It is the examiner's opinion that these symptoms would have arisen regardless of the motor vehicle accident of January 25, 2020.

**5. Is the claimant continuing to experience symptoms that are a result of the injury?**

This is a records review only and the claimant's current symptoms are unknown. If the claimant were to be experiencing any current symptoms, it is the examiner's opinion that these symptoms are not related to the injury of January 25, 2020, but rather to the pre-existing left knee tricompartmental osteoarthritis.

**6. Was past treatment appropriate and related? Explain and cite source documentation for your rationale.**

It is the examiner's opinion that treatment for the claimant's condition to include the left knee strain/contusion, cervical strain, right shoulder strain, lumbar strain, and scalp laceration would be considered appropriate and related from the time of the injury of January 25, 2020, through the claimant completing 28 visits of physical therapy on May 21, 2020. Specifically, the four months that the claimant underwent treatment for the above-mentioned conditions would be considered an appropriate amount of time for physical therapy modalities to allow for resolution of the conditions caused by the motor vehicle accident. Any treatment beyond May 21, 2020, would be considered unrelated to the motor vehicle accident of January 25, 2020. It would be considered related to the pre-existing left knee tricompartmental osteoarthritis.

7. **Is current treatment appropriate and still related to the original injury? Please explain.**

It is the examiner's opinion that any ongoing treatment would be considered unrelated to the original accident of January 25, 2020. The four months of treatment from the time of the injury through May 21, 2020, for the above-related diagnoses would be considered adequate for resolution of these diagnoses.

8. **What further medical care would be reasonable, medically necessary, and related to the original injury? If further care is indicated, outline a treatment plan and indicate a date after which further care would be considered unnecessary. If not, note a specific date after which documentation no longer supports reasonable and necessary care. Cite source documentation for your rationale.**

It is the examiner's opinion that no further medical care would be considered reasonable, medically necessary, and related to the injury of January 25, 2020. It is the examiner's opinion that any treatment rendered after May 21, 2020, would be considered unsupported and no longer reasonable and necessary as related to the motor vehicle accident.

9. **What further durable medical equipment and/or diagnostic testing would be considered medically necessary for this claimant? Please explain.**

No further durable medical equipment and/or diagnostic testing would be considered medically necessary.

10. **What is the natural history of the injury or injuries sustained by the claimant? Please explain.**

The natural history of the related conditions of left knee strain/contusion, cervical strain, right shoulder strain, lumbar strain, and scalp laceration are that they would resolve with four months of nonsurgical treatment as the claimant underwent, to include physical therapy, activity modification, anti-inflammatories, and rest. The natural history of the unrelated tricompartmental osteoarthritis of the left knee would be that this condition would continue to worsen over time, especially given the moderate-to-severe changes noted on imaging.

11. **Is continued use of medications reasonable and necessary and still related to the original injury? Please explain your rationale.**

The continued use of medications would be considered unreasonable, unnecessary, and unrelated to the original injury of January 25, 2020. Medication use for up to four months after the motor vehicle accident to include anti-inflammatories and acetaminophen would be considered reasonable and related to the motor vehicle accident

of January 25, 2020. Any use of medications after May 21, 2020, would be considered unreasonable and unrelated to the claim.

**12. What medications to date have been reasonable and necessary and related to the original injury? Please explain your rationale.**

It is the examiner's opinion that the initial medications used by the claimant to include the Voltaren, methocarbamol, Flexeril, and any other nonsteroidal anti-inflammatory prescribed would be considered reasonable and necessary and related to the original injury of January 25, 2020. These are typical medications prescribed for the diagnoses related to the claim.

**13. Based on the medical documentation provided, is the claimant a surgical candidate? Explain your answer and cite source documentation for your rationale. If surgery is required, please state the name of the proposed procedure and expected outcomes, with your treatment and recovery plan.**

Specifically in relation to the claim of January 25, 2020, all related conditions have resolved in the examiner's opinion. It should be noted that the claimant does have moderate-to-severe left knee tricompartmental osteoarthritis with associated varus malalignment which can result in elective total knee arthroplasty if symptoms continue to cause significant dysfunction. It is the examiner's opinion that this condition was pre-existing and neither caused by nor permanently aggravated by the motor vehicle accident and therefore any surgery proposed for this condition would be considered unrelated to the motor vehicle accident of January 25, 2020. If the claimant were to proceed with left total knee arthroplasty, this would be considered outside of the claim. Expected outcomes are good with this procedure and recovery from this surgery typically takes four to six months of formal postoperative physical therapy. Again, this would be considered unrelated to the claim.

**14. Does the claimant's current condition prevent him/her from returning to work? If so, what date would you anticipate that the claimant could return to work? On a temporary basis? On a permanent basis?**

No, the claimant can return to work with no restrictions.

**15. Is the claimant restricted from work? If so, what are the specific restrictions? Are they temporary or permanent? If they are temporary, please state how long the restrictions will be necessary.**

No, the conditions as related to the claim of January 25, 2020, have resolved and the claimant would not be restricted from work.

**16. Has the claimant reached pre-accident status?**

It is the examiner's opinion that all of the conditions related to the claim of January 25, 2020, have resolved and the claimant has reached pre-accident status.

Thank you for the opportunity to assist you in the evaluation of this case. If you have any questions or concerns, please feel free to contact MES.

Sincerely,

Sean Kearney, M.D.
Orthopaedic Surgeon

Dictated, reviewed, and opinion verified.

SK:ANL/rng/bl

# LTC Sean P. Kearney, MD, MPH

**CONTACT INFORMATION**

1035 Seagull Drive, Vass, NC 28394
Cell Phone (253) 651-2043
Work Email: sean.p.kearney8.mil@mail.mil
Personal Email: spkearney1@gmail.com

**EDUCATION**

**Pediatric Orthopaedic Surgery Fellowship**
Children's Hospital of Philadelphia, University of Pennsylvania, Philadelphia, PA
August 2012-January 2013

**Orthopaedic Surgery Residency**
PGY 1: Madigan Army Medical Center, Tacoma, WA, June 2006-June 2007
PGY 2-5: Madigan Army Medical Center, Tacoma, WA, July 2007-June 2011

**MD, MPH**, University of Connecticut School of Medicine, Farmington, CT
August 2001-May 2006
**MPH Thesis:** "Perceptions of emergency preparedness: A focus group study of suburban Atlanta homeowners."

BS, Furman University, Greenville, SC, March 1998-June 2000
Major: Biology, ***summa cum laude***

Clarkson University, Potsdam, NY, August 1996-December 1997

**CURRENT POSITION**

**Staff Orthopaedic Surgeon**
Womack Army Medical Center, Fort Bragg, NC
November 2018 - present
Duties: General orthopaedic surgical care; teaching residents, PA students, and USU students

**PROFESSIONAL EXPERIENCE**

**Chief Orthopaedic Surgeon (Combat Deployment)**
HKIA Role 2E Trauma Hospital, Kabul, Afghanistan
June 2018-November 2018

**Chief, Orthopaedic Surgery**
Womack Army Medical Center, Fort Bragg, NC
October 2015 – October 2017

**Staff Orthopaedic Surgeon**
Womack Army Medical Center, Fort Bragg, NC
February 2013-September 2015

**Chief US Orthopaedic Surgeon (Combat Deployment)**
Bastion Role 3 Trauma Hospital, Camp Bastion, Afghanistan
April 2014-October 2014

**Fellow, Pediatric Orthopaedic Surgery**
Children's Hospital of Philadelphia**,** Philadelphia, PA
August 2012-January 2013

**Chief of Orthopaedic Surgery; Chief of Surgery**
Munson Army Health Center, Fort Leavenworth, KS
July 2011-July 2012

**ACADEMIC APPOINTMENTS**

**Assistant Professor of Surgery**
Department of Surgery
Uniformed Services University of the Health Sciences
Bethesda, MD
October 2017 – present

**RESEARCH FELLOWSHIP**

**CDC Experience Fellow**
Centers for Disease Control and Prevention, Atlanta, GA
National Center for Injury Prevention and Control
Division of Unintentional Injury Prevention
September 2004-June 2005

**MILITARY SERVICE**

Lieutenant Colonel, Medical Corps, United States Army
June 2018-present
**Combat Deployment: Kabul, Afghanistan June-November 2018**

Major, Medical Corps, United States Army
June 2011-June 2018
**Combat Deployment: Camp Bastion, Afghanistan April-October 2014**

Captain, Medical Corps, United States Army
June 2006-June 2011

Second Lieutenant, Medical Service Corps, United States Army Reserve
June 2000-May 2006

Cadet, Reserve Officers Training Corps (ROTC), United States Army Reserve
September 1996-June 2000

**ORTHOPAEDIC COURSES**

AO Basic Principles of Fracture Management, Mar 2007
Orthotics and Prosthetics Course, Oct 2007
Enneking Seminar in Musculoskeletal Pathology, Oct 2009
AO Spine Principles and Treatment of Spinal Disorders, Jan 2010
AO Advanced Principles of Fracture Management, Jun 2010
Surgical Approaches for Internal Fixation, Aug 2010
AANA Masters Experience in Shoulder Arthroscopy, Oct 2010
International Pediatric Orthopaedic Symposium, Dec 2008-2012
Combat Extremity Surgery Course, Dec 2010
Advanced Surgical Skills for Exposure in Trauma Course (ASSET), Oct 2013
Advanced Trauma Operative Management Course (ATOM), Oct 2013
Emergency War Surgery Course, Oct 2013
Stryker Advanced Hip Arthroscopy Course, Oct 2016
Musculoskeletal Ultrasound Imaging Workshop, Dec 2016

**CERTIFICATION/ LICENSURE**

**Diplomate, American Board of Orthopaedic Surgery**
**Medical Licenses**: Nebraska, North Carolina, Washington
**Advanced Trauma Life Support**, May 2018

**PROFESSIONAL MEMBERSHIPS**

American Academy of Orthopaedic Surgeons
Arthroscopy Association of North America
Society of Military Orthopaedic Surgeons

**HONORS/AWARDS**

**Scholastic**

-**Phi Beta Kappa**, Furman University, May 2000
-**First Team Academic All-American**, Clarkson University Ski Team, 1997
-**Eagle Scout**, Boy Scouts of America, 1996

**Military**

-**2 Army Commendation Medals**
-**5 Army Achievement Medals**
-Graduate, Captain's Career Course, Ft. Sam Houston, TX, December 2013
-**Distinguished Honor Graduate**, Officer Basic Course, Ft. Sam Houston, TX, July 2002
-**Distinguished Military Graduate**, Furman University, May 2000
-**Cadet Battalion Commander**, Furman University ROTC, 1999-2000
-**Superior Cadet Award**, Furman University ROTC, 1998, 2000
-**United States Airborne Course**, June 1998

**PUBLICATIONS**

1. Bankamp B, **Kearney SP**, Liu X, Bellini WJ, and Rota PA. Activity of polymerase proteins of vaccine and wild-type measles virus strains in a minigenome replication assay. *Journal of Virology*, vol 76 (14), 7073-81, 2002.

2. Diekman ST, **Kearney SP**, O'Neil ME, and Mack KA. Qualitative study of homeowners' emergency preparedness: Experiences, perceptions, and practices. *Prehospital and Disaster Medicine*, vol 22 (6), 494-501, 2007.

3. **Kearney SP**, Bluman EM, Lonergan KT, Arrington ED, Ficke JR. Preparedness of orthopaedic surgeons for modern battlefield surgery. *Military Medicine*, vol 177(9), 1058-64, 2012.

4. Dormans JP, **Kearney SP**. Expert's comment concerning Grand Rounds case entitled "Solid variant of aneurysmal bone cyst on the cervical spine of a child: case report, differential diagnosis, and treatment rationale", *European Spine Journal*, vol 22, 532, 2013.

5. **Kearney SP**, Dormans JP. Orthopedic diseases: Non-sports-related pathologies in young athletes. In: Guzzanti V (ed) *Pediatric and Adolescent Sports Traumatology*. Springer-Verlag Italia 2014, pp 237-245.

6. **Kearney SP**, Mosca VS. Selective hemiepiphyseodesis for patellar instability with associated genu valgum. *Journal of Orthopedics*, vol 12, 17-22, 2015.

**PRESENTATIONS**

1. **Kearney SP**. Emergency preparedness among metro Atlanta homeowners. National Injury Prevention and Control Conference, Denver, CO, May 9, 2005

2. **Kearney SP**, Bluman EM, Lonergan KT, Arrington ED, Ficke JR. Preparedness of orthopaedic surgeons for modern battlefield surgery.
-- North Pacific Orthopaedic Society, Sun River, OR, Oct 1-3, 2009
-- Society of Military Orthopaedic Surgeons, Honolulu, HI, Dec 15-19, 2009
-- American Academy of Orthopaedic Surgeons, New Orleans, LA, Mar 9-13, 2010

3. **Kearney SP**, Benfanti PL. Parental attendance during pediatric reductions.
-- Western Orthopaedic Association, Maui, HI, Jul 23-26, 2008
-- International Pediatric Orthopaedic Symposium, Orlando, FL, Dec 3-7, 2008
-- Society of Military Orthopaedic Surgeons, Las Vegas, NV, Dec 8-12, 2008
-- North Pacific Orthopaedic Society, Sun River, OR, Oct 1-3, 2009. **Winner of Resident Research Award**.
-- Washington State Orthopaedic Association, Seattle, WA, Nov 13-14, 2009. **Winner of Resident Research Award.**

4. **Kearney SP**, Tompkins BJ, Baird GO, Caskey PM. Effectiveness of a single incision percutaneous epiphysiodesis technique for treating leg length discrepancy.
-- International Pediatric Orthopaedic Symposium, Orlando, FL, Dec 1-5, 2009
-- Society of Military Orthopaedic Surgeons, Honolulu, HI, Dec 15-19, 2009
-- Pediatric Orthopaedic Society of North America, Waikoloa, HI, May 4-7, 2010
--American Orthopaedic Association, San Diego, CA, Jun 9-12, 2010
--Western Orthopaedic Association, Monterrey, CA, Aug 4-7, 2010. **Winner of Resident Research Award.**
--American Academy of Orthopaedic Surgeons, San Diego, CA, Feb 15-19, 2011.

5. **Kearney SP**, Mosca VS. Selective hemiepiphyseodesis for patellar instability with associated genu valgum.
-- International Pediatric Orthopaedic Symposium, Orlando, FL, Dec 1-4, 2010.
-- Society of Military Orthopaedic Surgeons, Vail, CO, Dec 13-17, 2010.
-- Pediatric Orthopaedic Society of North America, Montreal, Quebec, Canada, May 11-14, 2011.

6. **Kearney SP**. Low return to active duty after hip arthroscopy: A prospective cohort study. Society of Military Orthopaedic Surgeons, Scottsdale, AZ, Dec 12-15, 2017.

# Exhibit 12

# Deposition of Thomas Van Kooten

# Gaekwar v. Amica Mutual Insurance Company

# July 25, 2023

BUELL REALTIME REPORTING
COURT REPORTING AND LEGAL VIDEO

**206.287.9066 I 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com

Certified WBENC Women's Business Enterprise

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANDRASI GAEKWAR, )
)
Plaintiff, )
)
vs. ) No. 2:22-cv-01551-BJR
)
AMICA MUTUAL INSURANCE )
COMPANY, a foreign )
corporation, )
)
Defendant. )

Videoconference Deposition Upon Oral Examination
of
THOMAS VAN KOOTEN

8:55 a.m. PST
July 25, 2023

Witness Location: Chicago, Illinois
(All participants appeared via videoconference.)

REPORTED BY: Karmen Knudson, RPR, CRR, CCR #1935



APPEARANCES

FOR THE PLAINTIFF:

DAVID J. BALINT
BALINT & ASSOCIATES
5950 Sixth Avenue South
Suite 200
Seattle, WA 98108
dbalint@balintlaw.com

FOR THE DEFENDANT:

LUCY WILHELM
COLE WATHEN LEID HALL P.C.
222 Etruia Street
Seattle, WA 98109
lwilhelm@cwlhlaw.com

COURT REPORTER:
KARMEN KNUDSON, RPR, CCR
BUELL REALTIME REPORTING
1325 Fourth Avenue
Suite 1840
Seattle, Washington 98101

ALSO PRESENT: RENO ETTIENNE



I N D E X


| EXAMINATION BY: | PAGE |
| --- | --- |
| Mr. Balint | 4 |
| Ms. Wilhelm | 76 |


EXHIBIT INDEX


| EXHIBIT | MARKED | PAGE |
| --- | --- | --- |
| 1 | Claim file<br>AMICA 2038 to 2129 | 21 |
| 2 | Letter to Am from Balint dated<br>February 9, 2021<br>AMICA 0084 to 0086 | 26 |
| 3 | Letter to Witter from Balint dated<br>November 4, 2020<br>AMICA 0059 to 0064 | 28 |




THOMAS VAN KOOTEN, witness herein, having been
duly sworn by the Certified
Court Reporter, testified
under oath as follows:

EXAMINATION

BY MR. BALINT:
**Q. Could you please state your full name and residence address for the record.**
A. Thomas Van Kooten. 3032 North Racine Avenue, Apartment 3, Chicago, Illinois 60657.
**Q. And your phone number, please, sir?**
A. 630-253-8206.
**Q. And email address?**
A. Tnvk23@gmail.com.
**Q. I want to start out with just asking some general background information.**
**Tell us, in thumbnail sketch, what your educational history has been since graduating high school. And when you're doing that, please try to give us some approximate dates.**
A. Sure.
So graduated high school 2012. Graduated from College of Dupage with my associate's degree in 2014 and then graduated from Illinois State University

Page 5

with my bachelor's in 2016.
**Q. Okay. And anything since that time? Any seminars, any sort of online courses? Anything?**
A. Yeah. So there's a website called The Institutes that I've gotten a few insurance designations from. Most recently was the CPCU designation, which was in about 2018, I think.
Actually, I take that back. That was about 2020 that I achieved that designation.
Other designations through The Institutes would be AIC and AINS, which I can look up the acronyms if you'd like, but general insurance stuff. That's where I was told to go to for insurance continuing education.
**Q. Okay. And if you can give us the same sort of thumbnail sketch of your educational history since -- I mean your occupational history since graduating high school, including dates, please.**
A. Sure.
Graduated high school in 2012, worked detailing cars throughout college, till 2015, wherein late 2015 through 2016, I had an internship at a subrogation law firm.
After I graduated from -- or after I graduated from college, I worked with Amica as a claims

Page 6

rep from 2016 through 2018/2019-ish. And then for about a year or two, 2018 through 2020, I was a claims supervisor.
In 2021 -- sorry. So claims supervisor would be more 2019 to 2021.
In 2021, I left Amica to move to Chicago and I became a claims rep for CNA Insurance. And then starting last July, 2022, I transitioned into a data analytics role for CNA Insurance. And that's where I currently am.
**Q. Okay. So just to summarize, you were with Amica from 2016 through sometime in 2021?**
A. Yes.
**Q. And as a -- let me ask one other thing. Do you have any medical background?**
A. No.
**Q. Do you have any legal background? And you might have to tell us what you did for the law firm you worked for.**
A. Like I said, I worked for -- no, I don't have legal background.
I did work for a subrogation law firm as an internship, and it was more of obtaining information, calling insurance carriers, asking for information on claims, calling anyone that might be involved, if they

Page 7

had additional information, but no actual legal work.
**Q. Okay. Was that law firm in Chicago?**
A. It was in Normal, Illinois.
**Q. Where is that?**
A. Kind of middle of the state. It's Bloomington/Normal is kind of the area it's known as. It's down the street from where State Farm is headquartered.
**Q. You said you were no longer with Amica, and I think you started to give us a separation background. Tell us a little bit about how that separation occurred and why.**
A. So my personal relationship with my girlfriend, we decided to move out of California to -- sorry -- Southern California to Chicago. Notified Amica that I would be relocated to Chicago.
Based on requirements to report to an office at a certain frequency, where I was moving, I wasn't able to meet those requirements. So I left Amica during my move to Chicago and just found a role with a different insurance carrier.
**Q. So you were physically located in California during the time you were with Amica?**
A. Yes.
**Q. Working remotely?**

Page 8

A. Yes.
Yeah. So obviously I would go to the office before the pandemic. Once the pandemic hit, we were working remotely.
By the time I left, there was still no plan -- no solid plan of return to office or what that might look like.
**Q. Okay. Tell us a little bit about the training you had to be an adjuster at Amica when you first started.**
A. Sure.
So I was hired with a class of similar claim trainees. We went through -- I think it was a six-week sort of boot camp style training in the home office, where there was a lot of kind of classroom style training but also a lot of technical style training of learning the policy in and out, you know, gaining the hard skills on what it's like to reach out to people, maintain the claim, desktop, document file.
So, you know, the technical understanding of what needs to be done, and there's also some practical training.
**Q. As the claims representative, what were your duties and what was the geographic area you were responsible for?**

Page 9

A. Yeah. So once I -- after I completed training, I was given a spot in the Southern California office, handling homeowners and auto insurance PI claims and -- you know, amongst other things. But generally, you know, claims that arise from home and auto policies.
The area was Los Angeles County. Sometimes some stuff in Orange County, but generally speaking, it was Los Angeles County when I first started, but as I progressed, it became a little bit more just beyond the physical locations I was able to get to and more of a region of the west in general.
I can get more specific if you'd like.
**Q. I would just like to know, as you were ending that particular role before you became a claims supervisor, what experience you had in adjusting Washington underinsured motorist claims.**
A. Sure.
So since my career is predominantly Southern California claims, we -- I remember we went through kind of an alignment change. And along the time I was transitioning to be a supervisor, I had also taken on a role of just handling specifically auto claims. And, you know, just based on my desktop, I did have some UM, underinsured motorist, stuff. And slowly as we were realigning, we would get claims from each state, until

Page 10

we got to a point where, when I was the supervisor, it was kind of, you know, wherever -- whatever region you're assigned to, which was the west, which included claims like this, just the nature of whatever you got on your desktop, depending on the volume that's had and whoever's in line to handle that next claim.
So I had some exposure. Can't say that predominantly my desktop was these UIM claims, but they weren't -- no, I don't think there was any specific person that got these claims. It was kind of just along with whatever else was in your desktop.
**Q. The geographic area, before you transitioned into claims supervisor, what were the geographic areas that you were covering?**
A. I really don't remember specifically. I mean, I think it just kind of grew over time as things were changing. I really don't remember a specific point where it went from one thing to another.
**Q. Okay. By the time you finished, is what I'm asking, what areas were you covering all together?**
A. Sure. I can give you a list of some of the ones I remember.
I mean, California, Washington, Oregon, Colorado, Nevada, Arizona, North Dakota. I would say those are the ones that I recall coming up the most

Page 11

frequently. And obviously only if you had the appropriate licensing for those states.
**Q. And I assume you had licensing for Washington.**
A. Yeah.
**Q. How many people were on your team that covered that same geographic area?**
A. It fluctuated. It was -- I want to say it was five, but it might have been four or six depending on the time. But it was usually around five, plus or minus one, depending on what sort of structural changes were going on, what sort of alignment needed to be shifted, any new people, anyone leaving, stuff like that.
**Q. So from 2019 to 2020, you were in the position of a claims supervisor? Do I have the dates right?**
A. I'm trying to think exactly.
Is it all right if I reference my LinkedIn real quick, or --
**Q. That's fine.**
A. Just for accuracy?
I can tell you whatever's on LinkedIn is, you know, certainly what it is.
All right. So I was a claims adjuster from

Page 12

December -- so I was hired June 2016. I was an associate adjuster until December 2016. From December 2016 through January 2019, I was a claims adjuster. From January 2019 through when I left in May of 2021, I was a claims supervisor.
**Q. As a claims supervisor at Amica, did you also adjust claims or were you just supervising other adjusters?**
A. During the transition from being an adjuster to a supervisor, since I was making that transition within one region, there was a period where I did have sort of -- claims were left on my desk that I handled during the beginning of my tenure as supervisor, but once those ones were completed, I did not have any adjusting duties on any desktop.
**Q. So tell us what your duties were, what they encompassed, as a claims supervisor.**
A. Sure.
You know, establishing relationships with those people that reported to me; making sure that I'm available for them to ask any questions regarding their work or their career, regarding the office; making sure that they are set up with the resources they need to do their job as claims rep; overseeing their desktops; monitoring what claims they might have come in;

Page 13

monitoring the work that they do; giving touch points, advice, on files as needed, you know; and just interacting with them daily on how things are going and what sort of stuff they're working on.
I'm sure there's other things, but generally speaking that's what it consisted of.
**Q. How many people were you supervising at any given time?**
A. Yeah. So, like I said, it was usually around five, plus or minus one.
It changed just based on headcount movement, you know, people joining the company, people leaving the company, whether someone's capacity was one thing or another, but I remember it being somewhere around five.
**Q. Did you choose the people that were in your team that you were supervising or were they assigned to you?**
A. They were assigned.
**Q. All right. And who did you report to while you were a claims supervisor?**
A. So for a while, I reported to Todd Crozier. And then at the end of my career there, I reported to Sam Glazier.
**Q. And if you can remember what their titles were for Crozier and Glazier.**

Page 14

A. Crozier was, I believe, a branch manager for the Southern California branch.
And I don't remember exactly what Sam's title would have been. I don't recall what his exact title was, but I remember -- because Todd had been that branch manager for a while when I was reporting to the office, that's who I had seen every day, but when I started reporting to Sam, it was kind of during that pandemic period where my interaction with him was mostly virtual.
Actually, I think it was all virtual. I don't think I've ever actually met him.
**Q. What did you do -- what did you do document-wise to prepare for the deposition today?**
A. I skimmed through -- well, I looked through the claim notes specifically from the start of the file until the point of the initial demand from your office, and I looked at that demand itself but probably read it once over.
**Q. You mentioned you had certifications. What certifications did you have in Washington?**
A. I don't remember specifically, but if it was a state that I was working in, I would have been licensed for handling claims in that state, whether it be through my carrier itself or through any sort of reciprocal licensing that would have applied.

Page 15

But no specific designations for Washington outside of that licensing, if it was even required for that state. It's hard to keep track of which states require what type of licensing, so that we had -- we did have some internal people help out with that.
**Q. At the time you were just handling claims, what's the maximum settlement authority you had? And let's confine it to personal injury type claims.**
A. Yeah. I believe it was $30,000 with sort of a hierarchy of anything beyond that would go through whoever my supervisor was at that time; and beyond their authority, it would go to the manager; and beyond that, possibly going to home office for approval on authority.
**Q. While you were at Amica, did you have any say-so, including any recommendation responsibility, for Amica setting reserves for any bodily injury claim?**
A. No. Any reserve setting was established outside of my purview.
**Q. And you never made recommendations for increasing reserves?**
A. No.
**Q. Okay. Was the information on whatever the reserves were at a particular time while you were adjusting claims or as a claims supervisor, were those levels of reserve in the claims file of any particular individual, such as Mr. Gaekwar?**

Page 16

A. No. I believe there might be reserve information on the files attached to them, but based on permission settings, people at my level at any point in my career were not privy to any of that information and couldn't get access to it.
**Q. So do you have any idea what information whoever was setting the reserves had in order to help them set the reserves?**
A. The reserves would have been set, I'm assuming, based on the information that was developed, through the file notes that were posted in the file by whoever the handler was.
**Q. While you were a supervisor, did you have access to the claims files of all the people that worked under you?**
A. Yes.
**Q. And if you logged in to a file to review it, would that login be noted in the claims file in all circumstances?**
A. Yes. If someone -- yes, if I viewed the file, there was a tab you can go to check with a timestamp showing when I had reviewed the file.
**Q. And is that true for the people in the home office as well if they were setting reserves?**

Page 17

A. I don't know. I know it's the case for myself and the people that I was supervising, but I don't recall if it was the same for those home office people.
**Q. Can you give us the names and job titles of anybody that you believe was responsible for setting reserves for a bodily injury claim.**
A. I honestly don't remember who it would have been.
**Q. What level were they?**
A. It would be the claim examiner role, is what they were called at Amica. Claim examiner.
**Q. As far as settlement authority is concerned, what settlement authority did the people that you were supervising have when you were claims supervisor?**
A. It would have -- it depended on the person. Newer people will obviously have lower, but the people I'm supervising, the max that they would have, I believe, would be 30,000.
I believe the maximum would be 30,000.
**Q. For the adjusters that you were supervising, how did they get assigned any particular settlement authority? How did that happen?**
A. So they have their inherent authority to whatever level was, and then if they required additional

Page 18

authority, you know, they would post a summarized report -- well, doesn't have to be summarized. They post a report on file establishing whatever factors they believe drive the claim to be higher than whatever range it should be, and they'll request authority. And depending on how much authority is being requested, it would go up the chain of command.
So if it was authority above what they have but below my maximum authority, you know, I would review and approve if it seems appropriate.
If it was authority beyond me, they would put in an authority request, I would approve it on my end, put it up to whoever is next in line to approve that level depending on where the authority request is coming in at.
**Q. And if you had adjusters with 30,000 authority during the time that you were a supervisor, was your authority also limited to 30?**
A. I believe it was at 50. I think -- it was something along the lines of like an adjuster that had received kind of the expected level of authority would be at 30, the supervisor would be at 50, and I think like the branch manager would be at around 100.
Now, that might have changed when I stopped reporting from Todd and went to Sam, but it was

Page 19

something along those lines.
**Q. The adjusters that worked under you and that you were supervising, how were they assigned particular claims for bodily injury?**
A. It's mostly random where, you know, your name is in a queue. There's claims that match your criteria, your level of whatever it is.
You know, first would be jurisdiction, which states, and if you're available and you're next in queue for a claim, you would get a claim assigned to you based on, you know, whatever you're able to handle.
**Q. So what was the caseload for people at various levels that you were supervising, number of cases that they were responsible for?**
A. Depends -- obviously it depends.
It's a wide range, but somewhere between 100 and 200. If you're at 200, that's quite a lot, in my opinion. But it's also difficult to classify something as a case because there might be a claim with multiple injuries on it and you can count all those injuries as one or you can count just the claim as one.
So, I mean, between a hundred and two hundred. And if you're someone that's relied on to handle more complex claims, your load would be a little bit lower due to the nature of the claims on your

Page 20

desktop and a little bit higher if you're handling more of the -- I don't know -- for lack of a better term, easier claims.
**Q. I just want to ask about particular individuals here.**
**What was your relationship to Tom Grundy, if any?**
A. I had worked with Tom here and there both as a claims rep and as a supervisor. Any sort of work that we did that kind of overlapped would have been limited to occasions of covering someone else's desk or kind of -- kind of less typical work. It was just times where either I was covering someone's desk and would run into his files or it would be something helping out, or maybe he had a case that I had similar things with and I would reach out to him for details in how he handled it. Stuff like that.
He was always in kind of an adjacent vertical alignment to me, where we did things very similarly but he just reported to different individuals than I did. So I know of him but no direct work with him, I'd say.
**Q. And can you answer the same question for Barkley Finsterbush, if you know who he is?**
A. Yeah. So I knew Barkley from doing some trainings back at home office as a supervisor, you know,

Page 21

kind of trainings to get the most out of your direct reports, kind of. HR empowerment kind of training.
So I had -- I've met him a few times and know him more on a personal level than I do on a work level. He was always East Coast and I was always West Coast, so our work didn't really overlap much other than those high-level trainings of kind of networking stuff.
MR. BALINT: Reno, could you pull up Exhibit 1 and we'll go through part of the claims file.
(Exhibit No. 1 introduced.)
MR. BALINT: Could we start with page Bates stamp 2097.
**Q (By Mr. Balint) What I want to do here is I want to bracket your involvement in the case that we're talking about.**
A. All right.
**Q. As far as looking at page 2097, can you see it on your screen?**
A. Yes.
**Q. Is that time frame the -- it's August 4, 2020. Is that the first time that you were aware of this case?**
A. I don't know if I was aware before that date. I would have documented it in the claim file if there is any other involvement I had.

Page 22

I can't recall exactly if I knew this case before August 4th.
**Q. Okay. In the material you reviewed prior to the start of this deposition, did you see any other indications that you had anything to do with the Gaekwar claim before this date of August 4, 2020?**
A. I mean, to answer that, I'm just going to pull up the exhibit myself and --
**Q. Okay.**
A. -- if there's notes before that date, it would be yes. If there's no notes with my name before that date, it would be -- it would be no.
**Q. How would you search what you have available to see if that's the case?**
A. I would just open up this exhibit with the file notes.
MS. WILHELM: Can I jump in and clarify real quick?
Mr. Van Kooten, are you looking at one of the exhibits that my office forwarded you or do you have access to the claim file?
THE WITNESS: No. I'm looking at what was forwarded to me.
MS. WILHELM: Thank you.
A. I mean, judging by -- okay. So also just

Page 23

using some logic here, judging by the context of this note and what I had put there, and it doesn't appear there would be any notes before then, that looks to be my first involvement of this case. My first acknowledgment would be that August 4th, 2020.
**Q (By Mr. Balint) The assignment to Brittany Am, was she one of your team members that you were supervising?**
A. Yes, she was.
**Q. And at this time, in August 4, 2020, how much experience do you remember she had, if you were able to review that, just approximately?**
A. That's tough.
I can't recall exactly. She -- I don't remember exactly.
Approximately, if I had to guess, it would probably be like a year, somewhere around there. So I can rule out like an extensive amount of time, you know. My best guess would be about a year.
**Q. And on this page, 2097 --**
A. Yes.
**Q. -- there's some notations in the left-hand side: related to, home office by topic. Those items.**
A. Yeah.
**Q. At what point in time or what would be the**

Page 24

**circumstances where the home office designation would be yes?**
A. Just speculating on my knowledge of the analytics -- and the company I work for now uses the same claims system -- I imagine the permission I have in my role, if it was set to "yes," I wouldn't be able to view a file like that -- a note like that.
I do remember for Amica, home office could put notes in a file, but they wouldn't appear for someone at my or Brittany's level.
It was kind of that same thing I was mentioning before, where they might have stuff on the file, but if it was from home office, it would just not be for me. So I imagine there's some view you could look at for this that would include home office notes if they're there, but I wasn't able to see them.
**Q. Was there some points in a claims file that the home office would be -- you would refer a file to the home office?**
A. The only time I can recall getting input, direct input, from home office would be if authority on a file goes beyond that of myself and whoever was above me, so Todd or Sam, then the authority request would go to home office. But other than that, no, I don't know that -- oh, I take that back.

Page 25

Every once in a while, you get a note from someone in home office asking you to develop more information on a file if -- I assume if they need it for purposes of setting their reserve. So that's kind of the interactions I would have with home office. Yeah.

**Q. Would those interactions to or from the home office be in this claims file or would they be somewhere else?**

MS. WILHELM: Object to the form.

Sorry. Mr. Van Kooten, you can answer.

THE WITNESS: Oh, okay.

A. It would be in this claims file. I don't know where else they would be.

**Q (By Mr. Balint) All right. On page 2083, which I think is a continuation of -- well, let's see. We start out here at 2082.**

**2083 looks like it's a continuation of 2082. Would you agree?**

A. Can I see 2082?

And now 2083?

Yeah, it looks right.

**Q. It says here under this that the demand -- on 2083, demand reviewed.**

**To what extent did you review the demand in this Gaekwar claim?**

Page 26

A. So when a demand comes in, I would review it and establish what was being requested, any time lines, and just make sure the claims professional, Brittany Am, was aware of those time -- you know, those time constraints and what was being requested and if any conditions were attached to those demands. Just outline any high-level important points, and then it would be up to her to review that claim to kind of get some more specific case information.

Obviously if there's any questions along the way, we would converse back and forth, but for a demand like this, it would just be reading the demand that was sent in, establishing what the timelines are, establishing if there's any other conditions on it, and noting anything that's high-level importance, which -- depends on the case.

**Q. In preparation for the deposition today, did you review the demand that you're referring to?**

A. I read through it once, yes.

MR. BALINT: And, Reno, if you could put that up and we'll mark it as another exhibit, February 9, 2021.

(Exhibit No. 2 introduced.)

**Q (By Mr. Balint) Is this the demand you're referring to? And if necessary, I'll just have Reno scroll down.**

THE WITNESS: Yeah, please scroll down for me.

A. Oh, I see it there.

Yes, I believe I reviewed possibly two of them. I think another one was the initial one that was sent to -- well, I believe there might have been another one, but, yes, I know which one this is.

**Q (By Mr. Balint) Is this the one you're referring to that you reviewed as it came in or was there more material than this that you reviewed when the claim came to your attention?**

A. So with the way this claim works, I definitely would have reviewed a claim addressed to the tortfeasor's insurance carrier requesting limits for permission for the Hamilton buyout, something along those lines I remember reading, which rings a bell. Basically the permission to settle with that tortfeasor carrier before this demand came in that was directly addressed to Ms. Am.

MR. BALINT: Okay. Can we mark this, Ms. Court Reporter, as Exhibit 2 just to keep our...

(Reporter clarification.)

MR. BALINT: Then, Reno, if you can pull up and we'll mark, as Exhibit 3, the November 4, 2020

Page 27 (continued as Page 28)

exhibit, which has an Amica Bates stamp numbers on it.

(Exhibit No. 3 introduced.)

**Q (By Mr. Balint) Okay. We're showing you Exhibit 3, which at the bottom of the page should have Amica numbers on it.**

MR. BALINT: Scroll down a little bit, Reno.

Yeah, starting with number 0059.

**Q (By Mr. Balint) Is this the one you were referring to, sir?**

A. Yes. This is the other one I was mentioning.

MR. BALINT: If you'll scroll down to 0060, the next page.

Yeah, thank you.

**Q. (By Mr. Balint) There's a list of documents that were supposedly attached to this claim, to Nationwide.**

MR. BALINT: And if you go to the very bottom, Reno, please.

**Q. (By Mr. Balint) This shows that a copy, including enclosures, was sent to Brittany Am.**

**As far as your recollection is concerned after your review of the files, did this actually get addressed to Brittany Am before your involvement?**

MS. WILHELM: Object to the form.

You can answer, Mr. Van Kooten.

A. I read the file notes this morning, and I believe I read something that said we got the -- okay, here it is.
Yeah, from what I see it, I note on November 5th that we got a copy of this letter, but it didn't have any of the documents mentioned within the letter. It was just -- it was just the letter itself.
**Q (By Mr. Balint) Did any of the documents arrive later, that you were able to see?**
A. I mean, eventually I believe they were provided by your office. I can't say that they were with this letter that was sent or if they were recent. I'm not sure.
MR. BALINT: On 0059, Reno, please.
**Q (By Mr. Balint) You see the language in that first paragraph that in order to aid its independent evaluation for settlement and for a Hamilton buyout decision, a copy of this case analysis is also directed to Amica along with the documents referenced?**
**Do you see that language?**
A. This first paragraph?
**Q. Yes. The last line of the --**
A. Yeah, I see it.
**Q. And then the next paragraph says: "The enclosed disc contains the following documents." And**



**that's what we just looked at a moment ago on the next page?**
A. Right.
**Q. So what is the -- or at the time, in November of 2020, what is the procedure at -- what was the procedure at Amica when a document came in referencing other documents that were supposedly enclosed in seeking clarification of those records?**
MS. WILHELM: Object to the form.
You can answer.
THE WITNESS: Okay.
A. There was a mail processing center that would have scanned this into our file. You can see actually the scan date on the top left of the letter. And if they received a CD with information attached to it, they would either have attempted to get the documents from there into the claim file or would have forwarded the CD to the office where the claims adjuster was at.
**Q (By Mr. Balint) Were there any -- while you were at Amica, any failures of the document center to have loaded discs into the file?**
A. There were some cases, yes. But I believe it was due to problems with the formatting of the documents on there or if there was a password along with the CD that wasn't with the cover letter attached to it, things



of that nature.
**Q. As far as your memory is concerned, did you ever review, at the time that you were assigning this to -- let me start over.**
**At the time you assigned this to Brittany Am -- and it says in the document we looked at before that demand reviewed, quote/unquote, by you -- did you actually review any of the underlying records at that time?**
A. I can't remember.
**Q. How would we recreate that, Mr. Van Kooten, when it says -- how would we find out what you did when the entry says demand reviewed?**
MS. WILHELM: Object to the form.
A. There are usually notes attached to -- can you tell me which note exactly it is that says demand reviewed so I can look at that one?
**Q (By Mr. Balint) Oh, yeah. It's page 2083.**
A. Okay. 2083.
So it looks like this note was me acknowledging that the demand -- the Exhibit 2 demand was responded to. And I might have put that demand reviewed subject line to satisfy a condition to complete an activity named "something" demand along those lines, because when a demand comes in -- I'm trying my best to



remember exactly how it worked. And I worked with a different carrier that did it slightly different.
But more or less when a demand comes in, there's these urgent activities that have to be completed. And for Amica, I would review the demand and establish the due date activities, which would then require another demand reviewed activity to complete them. Something along those lines.
So demand reviewed could mean a few different things. Sometimes it's just the subject line that's required to satisfy an activity. And it depends on which point in time -- it depends on the content of my note, really, what I was doing at that point in time.
And from the one you referenced, it looks like I was just acknowledging that the demand had been responded to. There might be one before that where I acknowledged some other factors of the details of the claim.
(Crosstalk)
A. It looks like on --
**Q. Sorry.**
A. It looks like on February 11th, 2021, on AMICA 2086, that I saw some -- it looks like I might have seen the documents at that point.
Yeah, but more or less the demand reviewed

could mean a few different things.
**Q. On 2086 --**
MR. BALINT: Reno, if you could scroll down to that.
**Q (By Mr. Balint) You're probably looking at a better copy than we have. But on 2086, there's another entry from you dated February 11, 2021.**
A. Yeah.
**Q. Demand reviewed. And there's various entries.**
**Did those entries come from you or did they come from a summary sent to you by Brittany Am?**
A. You know, it's probably -- she wouldn't have sent me anything for me to post under the file. What I wrote there would probably be -- depending upon whatever notes are before there, you know, if she had reviewed the file, I would review her notes and review the documents attached, but I would have come up with that note by myself, you know, a combination of what she had written and also -- I don't just -- I wouldn't have just relied on what she wrote. I would definitely look at it as well, "that" meaning the contents of what was sent.
**Q. Is there any way of knowing if you relied on Brittany Am for the summary or if you reviewed it yourself and repeated the most pertinent points**



**necessary for your evaluation?**
A. I mean, I don't suppose there's any way of knowing that.
I mean, I can tell you the way I conducted things, that wouldn't have been the case of me just rewriting what she had written. I would definitely go in there myself. I feel like I had a pretty good ability to go in and look at these things.
You know, I certainly wouldn't have spent -- well, I can't speculate on that. I might not have spent as much time reading through the files and the medical bills and records that she had, but I definitely wouldn't have just relied on her synopsis of what was presented to create my note.
**Q. The original demand directed to Nationwide we've looked at as Exhibit 3 references in page 0060 the various records that were attached or supposedly attached to the claim.**
A. Mm-hmm.
**Q. Remember that?**
**In that set of records, there were at least two sets of records that preexisted the injury-causing event that was the basis for the UIM claim. There was records from Overlake Primary Care Clinics dated from July 28, 2015.**



**(Crosstalk)**
**Q. You got it?**
**From July 2015 to March 26, 2020, and then there was Proliance Orthopaedics records from June 14, 2017 to March 4, 2020.**
A. Yeah, I see that.
**Q. In coming up with a value of a claim, would you agree that it would be important to know what relevant preexisting conditions the claimant had so that you can evaluate that claim in that way?**
MS. WILHELM: Object to the form.
A. Yeah.
**Q (By Mr. Balint) You would --**
**(Crosstalk)**
A. That's certainly one factor, yes.
**Q. Okay. Would there be any reason why the actual records that are referenced there from 2015 to 2017 are not anywhere found in any of the Amica claims files?**
MS. WILHELM: Object to the form.
A. I'm not sure why they wouldn't be there.
**Q (By Mr. Balint) If they're not there because they weren't -- either they weren't delivered in that disc or the disc wasn't properly transcribed, would you agree that the duty of the adjuster assigned would be to**



**ask for those records from the attorney for the plaintiff?**
MS. WILHELM: Object to the form.
A. Yeah. I mean, I don't think that's unreasonable.
I think also, you know, there should be conversations between the two parties that could eventually lead to that.
**Q (By Mr. Balint) And was --**
**(Crosstalk)**
**Q. Go ahead. Sorry.**
A. No, that's all right.
**Q. In your review of Exhibit 3, did anybody note any inaccuracies of this attorney letter to Nationwide, a copy to Amica?**
MS. WILHELM: Object to the form.
A. I feel like the only inaccuracy would be that the contents weren't available to us as the claims handlers. Not that there was any misrepresentation of them being actually sent, but just that objectively we did not have them when this was sent to us initially.
**Q (By Mr. Balint) Okay. And --**
A. And I can't speculate on whether there's, you know, something wrong with the mailing center, but me and Brittany looking at this file, I can say based on my

Page 37

notes, we looked for documents on this claim, what was referenced in here was not available to us when we saw this file -- or when we saw this Exhibit 3 for the first time.

**Q. Was there, at any time -- well, let me ask a background question.**

**A letter comes in and you don't yet have the attachments.**

A. Sure.

**Q. Okay?**

**To what extent does -- when the attachments do come in, is there any reference between the demand letter and the actual records?**

**And let me rephrase that in a different way. Sorry.**

**In Amica getting a claim like this, UIM claim, do you rely on what the records say and ignore the attorney letter or are they both together?**

MS. WILHELM: Object to the form.

A. They're definitely both together. You know, the records have the objective information from the medical facilities that treat someone, but the letter also contains really good information on the attorney's position on their client's injuries, just to get an understanding.

Page 38

**Q (By Mr. Balint) Okay. Going back to that, is there ever an occasion, that you're aware of, in the file after your review prior to this deposition that there was any difference between the medical records themselves and what's represented in this letter of November 4, 2020, Exhibit 3?**

MS. WILHELM: Object to the form.

A. I don't remember.

**Q (By Mr. Balint) If there were any inaccuracies, would that have been noted in the claims file?**

MS. WILHELM: Object to the form.

A. If there was a noticeable inaccuracy that had impact on the evaluation or handling of the claim, then yes. But, you know, there could be an inaccuracy of a date being a day off or something like that. It's hard to tell. It depends on the level of the inaccuracy, which is really subjective.

MR. BALINT: Okay. Reno, if you just scroll down to, in Exhibit 3, the bottom of page 0062 and the top of 0063.

Go up a little bit to 62.

**Q (By Mr. Balint) In this letter on the bottom of page 0062, there's a reference to Mr. Gaekwar's pre-crash condition of his health. And it says, among other things, he did have preexisting congenital defects in both knees, making him more susceptible to injury in the event of trauma. However -- then it goes on to say he had right knee replacement. "However, any remotely relevant historical conditions were dormant at the time of this crash."**

**Do you see that representation?**

A. Yes.

**Q. Well, the next page goes on to say what Washington law is, the difference between an active preexisting condition at the time of a crash and one that had been dormant.**

**Do you see that language describing the jury instructions?**

A. Yes.

**Q. As a background information, was there any training in Washington law that would have incorporated this difference between a previous interim condition and an aggravation of a preexisting condition?**

MS. WILHELM: Object to the form.

A. I can't say that there would have been a specific training on this pattern jury instruction, no.

**Q (By Mr. Balint) Okay. And if a representation was made like this to Amica, as it was in this letter, to what extent would there have been any**

Page 39 / Page 40

**consultations with somebody that would know if this is the applicable law to this claim?**

MS. WILHELM: Object to the form.

A. Certainly.

You know, I'm sure you know, there's a lot of attorneys that include a lot of language. And I would say if I were coaching someone on my team, it would definitely be, you know, try to get this case resolved based on the content of the demand and its contents. And if this particular aspect of the claim did become contentious, I would definitely consult with counsel in Washington to pull up the origin of this -- I don't know what you would call it -- Washington Pattern Jury Instructions and make sure that what's being referenced in here is applicable to the circumstances that are related to this event.

I mean, unfortunately, there are a lot of times where there is case law that's referenced that -- well, it's subjective. You know, sometimes it doesn't exactly fit the circumstances.

So, you know, we certainly did reference counsel in the areas that we were working in if there was -- you know, if this was a point of contention that was brought up during negotiation discussions, but that wouldn't be something I would focus necessarily a lot of

Page 41

effort on in getting the ball rolling and getting dialogue open with counsel that was for the insured.
**Q (By Mr. Balint) Well, you were involved in the case. Was there any effort to reach out to somebody that would have the legal knowledge to interpret this?**
A. I can speak that my involvement, that discussion was not had, no.
**Q. Would you agree that it's important for an adjuster evaluating the claim for the dollar value of the claim to know if a condition that was at issue was active at the time of the crash or it was dormant?**
A. Yes.
**Q. And in this case, is there any indication that anybody at any time while you were involved in the case reviewed any preexisting, pre-crash medical records?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) What's your answer? I'm sorry.**
A. I recall reading through the notes that we were aware of some possible preexisting conditions. I can't speculate specifically if any document -- if any medical records had specifically been reviewed, but I think it was clear from this letter that some underlying things were made aware of.

Page 42

**Q. Okay. But I'm really asking a more particular question.**
**Did anybody ever review the preexisting medical records to see if the condition that was the basis for the claim was active or was dormant at the time of the injury-causing event?**
MS. WILHELM: Object to the form. Asked and answered.
But you can answer to the best of your ability, Mr. Van Kooten.
A. I can't say that this particular part of -- this particular aspect of this case was given, you know, extra attention, but I don't know that there was warrant for it, based on the initial conversations -- I don't know.
**Q (By Mr. Balint) As you were supervising Brittany Am, did you ever suggest or require her to review the pre-crash medical records or to even ask for them?**
A. Yeah. I think -- let's see. I have to rely on the notes I have, so I'll go back through there.
**Q. Okay.**
A. I can tell you that, you know, one of the first steps is making sure that you have all -- the information that's available. And we spend a lot of

Page 43

time asking plaintiffs' counsels for preexisting injury information. But like I said, I have to rely on the notes here to tell you exactly what I said.
**Q. Take your time.**
A. Okay.
It doesn't appear that I ever wrote to request additional records. However, I think it could be insinuated that -- well, I mentioned that none were received on the initial demand, that they should have been requested.
**Q. Prior to the letter, Exhibit 3, November 4, 2020, Amica had paid for medical bills out of its personal injury protection coverage; correct?**
A. Based on what I see in the file notes, that appears correct.
**Q. All right. Hold on. I have a dog in the office. Sorry.**
A. Jealous.
**Q. It's a good dog too, except it has too much fur.**
**To what extent, while you were at Amica, did an adjuster, a bodily injury adjuster, have access to the records and bills in the PIP file?**
A. I believe they should have been accessible. There might be some extenuating cases where they have

Page 44

been separated by request, but I don't think it should be difficult to obtain those records for an adjuster.
**Q. Are you thinking, or waiting for the next question?**
A. No, I'm waiting.
**Q. Okay. If an adjuster did access the PIP file, would that be noted somewhere in the Amica record?**
A. Yeah. So there is a history tab within claims center that you could -- you can see when people view a file. I believe it's called history.
There is a tab that you can go into that shows you each time someone viewed a file.
Actually, I think it just shows you the first time they view it that day. But in essence, yes, you can see when someone views a file.
**Q. Would that be within the claims file we have in front of us, Exhibit 1?**
A. Yeah. It should be in every claim file.
**Q. Okay. Did you personally get involved in the decision to waive Hamilton rights?**
A. It looks from the notes that I might have been out of office or something during that time, that someone had to step in for me at some point during the process. But, yes, I was involved in that.
And when the first demand from Nationwide was

sent to us, I said that we need to, you know, run the proper background checks on the tortfeasor to make sure we know what decision we want to make for the Hamilton buyout.
MR. BALINT: Reno, if you could go down in Exhibit 1 to 2090.
**Q (By Mr. Balint) In the middle of that page, Brittany Am asks whether -- or I guess Lanesheia White, who was doing the PIP materials, would we be waiving our PIP subro?**
**And then an entry from Brittany Am dated November 18, 2020, and the reference there is not involving the home office, but then there's an entry by an Alex J. Rottler dated 11/12/20.**
**Who is he?**
A. I forget what his involvement was. I guess he might have been someone in home office. He might have been an examiner on this file, is my best guess.
**Q. Then why would it --**
**(Crosstalk)**
**Q. I'm sorry. Go ahead.**
A. Yeah, I assume you're going to ask why would his not be labeled as home office?
**Q. Yes.**
A. I believe -- I believe that's more for the



confidential home office notes.
If I remember correctly, they have the ability to toggle that on to yes or no. It would be yes for times that they're discussing things like reserving. It would be no for things that they actually have to communicate something with someone in the file, like such as now the approval for the waiving the subro rights would come from home office.
**Q. On page 2091 --**
MR. BALINT: You're going to have to go back, I'm sorry, to the bottom of 2090.
**Q (By Mr. Balint) The Todd Crozier entry.**
A. Yeah.
**Q. And he was, at that time, the one you reported to?**
A. I don't remember who I was reporting to at that time.
**Q. And the topic is labeled as subrogation.**
A. Mm-hmm.
**Q. And it looks like on 2091, a note to Alex, which I assume is Rottler?**
A. I would assume that as well, yeah.
**Q. And it's saying see the notes in support of the current request. It references the underlying dec page for the tortfeasor at Nationwide. And then it**



**says: I agree with request to allow 5 UDBI to settle with adverse carrier, declining the Hamilton buyout. Do you agree?**
**And it looks like Rottler, Alex Rottler, agreed on 2090.**
**Is that correct? Am I reading that right?**
A. Yeah.
**Q. Okay. I apologize. It's a little bit confusing because the numbers are in reverse day order.**
A. Yeah.
**Q. Okay. Who made the request to allow the $5,000 -- 5 UDBI -- I assume that refers to $5,000 -- to settle the underinsured motorist claim?**
MS. WILHELM: Object to the form.
A. The 5 UDBI -- so there's a single claim file, whatever this claim number is, 600037- -- whatever.
**Q (By Mr. Balint) Okay.**
A. Within that, there's different lines for each -- I forget what they call them there -- exposure within the file. So if there was four occupants in that vehicle and they all had UDBI claims, Joe would be 1, John would be 2, Tom would be 3, David would be 4.
So the 5 UDBI just refers to what number exposure was open within that claim file.
**Q. I'm not quite understanding, because in this**



**case, as far as we know, there were only the tortfeasor and Mr. Gaekwar.**
A. It could be something like vehicle damage -- or property damage claim. There could be a rental exposure, which is subject to its own separate limits. There could have been a suffix -- or sorry. I refer to them as a "suffix," so if you hear me say that.
There could have been an exposure that was opened in error, like it could have been opened as an underinsured motorist BI claim and need to be closed and changed to an underinsured motorist BI claim.
I can't speculate exactly what's open on this file, but it could be a multitude of things like that.
But I can definitely tell you that the 5 means that was the fifth exposure open on the file, for whatever reason.
**Q. It had nothing to do with $5,000 settlement authority?**
A. No.
**Q. On 2088, page 2088 of Exhibit 1 -- let's wait tell me get there. Sorry. I keep forgetting you have your own file there.**
**On 2088, Brittany Am makes an entry dated December 9, 2020. The topic is "Investigation." And she has an auto status update, claim pending. Again,**

Page 49

**that 5 UDBI.**
A. Mm-hmm.
**Q. Do you know what that stands for?**
A. Underinsured motorist bodily injury.
**Q. Bodily injury? Okay.**
A. Yeah. So UM would be uninsured motorist bodily injury claim. UD would be underinsured motorist bodily injury claim.
**Q. In the entire time that you were involved in this file with Ms. Am handling the actual file, is there any time where you or Brittany Am actually did an investigation by outreaching to get medical records or to talk to witnesses?**
**I just want to know what active investigation Amica initiated during the time you were on the file as opposed to passively interpreting information that was being sent to you by the attorney.**
MS. WILHELM: Object to the form.
A. It looks like from the file notes, that the police report was the extent of the investigation, for the most part.
MR. BALINT: Let's go to, please -- let's go to page 2082 of Exhibit 1.
Okay.
**Q (By Mr. Balint) Correct me if I'm wrong, but**

Page 50

**this looks like the last date, 3/5/21, that you were actively involved in the file. Is that correct?**
A. That's what it appears like, yes.
**Q. And for what reason -- because it looks like from your employment, that you were there longer.**
**For what reason would you not be involved in the file anymore, if you know?**
MS. WILHELM: Object to the form.
A. I would have been involved in the file as long as it was on one of -- on Brittany's desk, while I was still there.
(Crosstalk)
A. Just because -- just because there's no notes doesn't mean I wasn't still, you know, related to this file or under my purview.
**Q. Okay. But for that, you would rely on your memory?**
A. Yeah.
**Q. Okay. Do you have any such memory?**
A. No, I don't.
**Q. It looks like on that date, 3/5/09, that the claims handling was referred to somebody other than Brittany Am. Is that correct?**
A. On which date?
**Q. 3/5/21.**

Page 51

A. Looking at the file notes, it looks like Brittany put in a note on 3/19/21 to monitor contact from plaintiff's counsel. So it looks like she might have been on it longer than that.
**Q. Okay. In your entry on page 2086, it again says the demand was reviewed.**
A. Mm-hmm.
**Q. And you note that the -- Mr. Gaekwar has $300,000 of underinsured motorist limit. And then it says again this 5 UDBI is this only pending claim.**
A. Mm-hmm.
**Q. You note that: The insured has received $50,000 from the tortfeasor on his bodily injury claim and $10,000 from Amica on PIP that's been waived and that we are able to count these payments as an offset. As such, any offer would be new money in addition to the $60,000 that the insured has received.**
**Then you note the demand request, $140,000 new money, claimed medical specials total $20,925.38, and a response to the demand is requested by 3/8/21.**
**Do you see those?**
A. Mm-hmm.
MR. BALINT: Can we take a brief five-minute break here and then come back, or ten minutes?
MS. WILHELM: Sure.

Page 52

MR. BALINT: Is that okay, Lucy?
MS. WILHELM: Sure.
MR. BALINT: So we'll go off the record for a few minutes. Ten minutes.
(Recess 10:18 to 10:25 a.m.)
**Q (By Mr. Balint) In this particular claim by Mr. Gaekwar, a thousand dollars new money was offered; correct?**
A. I'm not sure.
MR. BALINT: Reno, would it be too much trouble to find that reply to this 140?
It would be after February 9.
**Q (By Mr. Balint) I don't know if you have page 2081 available to you. Do you see -- do you have that available to you or just relying on the screen?**
A. I do.
**Q. Okay. This is a note from Brittany Am, 4/21/21, and it just says that: I sent a letter rejecting the $1,000 settlement offer.**
A. Okay.
**Q. So my question to you is: How did Amica, including you and whoever else was involved, how did you come up with a $61,000 evaluation of the case?**
MS. WILHELM: Object to the form.
A. Yeah. I mean, I can't specifically remember,

but it would have just been evaluating the documentation we had on file for your client's claim, whether it be the demand letter or medical bills and records.

**Q (By Mr. Balint) At any time, did anybody under your supervision or you attempt to have a conversation, recorded or not, with the claimant, Mr. Gaekwar?**

A. To my knowledge, no. I don't see why anyone would have intentionally contacted him knowing that he had an attorney.

**Q. Well, even before he had an attorney or even during the time of the attorney, did anyone ask for permission to speak with Mr. Gaekwar about how his injuries were progressing and how they were affecting his life?**

A. I don't know.

**Q. If there was such a conversation, that would be recorded in the file, would it not?**

MS. WILHELM: Object to the form.

A. I mean, I would hope that any conversation with the insured on a file would be documented.

**Q (By Mr. Balint) Okay. So is it a frequent occurrence -- or let's say: Does the adjuster have the power to ask a represented person to interview the claimant, either recorded statement or unrecorded**



**statement? Did Amica have -- the adjusters have that power to ask for that?**

MS. WILHELM: Object to the form.

A. I mean, you could certainly do it. No one would ever tell you to do it. But, I mean, it's not going to stop anyone from picking up the phone and doing something. But that would not be protocol.

**Q (By Mr. Balint) It would not be protocol for Amica to talk at any time with the claimant to see how it's affecting his life?**

A. Not with the representative of the claimant. Before representation, yes.

**Q. Well, you could always -- so it never happened that a represented person -- you didn't talk to the lawyer and say, "Listen, we want to talk to your client. Can we record it? You can stay on the line if you want."**

**(Crosstalk)**

MS. WILHELM: Object to the form.

**Q (By Mr. Balint) Doesn't that happen fairly frequently?**

MS. WILHELM: Object to the form.

A. I can't say how frequently it happens, but, yeah, I mean, it's been asked.

**Q (By Mr. Balint) Okay. And in this case,**



**there's no indication that a direct contact with Mr. Gaekwar even via or with the attorney was ever requested. Right?**

MS. WILHELM: Object to the form. Asked and answered.

You can answer.

A. From what I see, there's no indication of that.

**Q (By Mr. Balint) Okay.**

A. But that's just with the exhibits that have been given to me.

**Q. So then in adjusting a claim, did an adjuster have the power to ask for an examination under oath?**

MS. WILHELM: Object to the form.

A. Yes, they do. It's not something that typically happens at the onset of negotiation discussions.

**Q (By Mr. Balint) Okay. Would that request for an examination under oath, would that require going higher than you to get permission for the adjuster to do that?**

A. Yes.

**Q. While you were involved in the file, did Amica ever submit a request or consent -- request to directly get medical records from providers?**



A. I'm not sure.

**Q. And to your information, that was never done in this case with Mr. Gaekwar, was it?**

MS. WILHELM: Object to the form.

**Q (By Mr. Balint) During the time you were involved, I mean.**

A. Based on what I can tell in the file notes, it's not mentioned, but that doesn't mean it wasn't sent, there was no sort of letter sent.

From what I can see, it doesn't appear that way.

**Q. Okay. You indicated that the -- did Brittany Am or you have access to a medically trained person of any kind to interpret medical records that were provided?**

A. Yeah. We have a few -- we had a few vendors we would work with that if -- like I said, you know, first step is trying to communicate with the plaintiff's counsel and reach a resolution, but if things reached a point where there was more contention, we would definitely submit to -- we had some third parties that would read and review bills and records.

**Q. Was there anybody in-house at Amica that would be consulted for interpretation of medical records that were provided?**

A. To my recollection, no, there wouldn't be anyone in-house like that.

**Q. While you were involved in the file, did you or Brittany Am or anybody else consult with any medical professionals?**

MS. WILHELM: Object to the form.

A. Based on the notes, doesn't appear that way.

**Q (By Mr. Balint) Is there any record at Amica for how much time any of these entries that we're looking at -- so in other words, whether it's a review of records, is there any way of reconstructing how much time was taken by you or an adjuster under you to review records?**

A. No. There's no -- there's no allocation of time like that. There's a lot of in and out, especially because if you're working on it and you get a phone call from someone, you answer the phone call. You move around a lot.

I can't -- I can't even think of a way that would be good to estimate that.

**Q. What was the metric or metrics at Amica when you were involved in this file for monitoring the efficiency of an adjuster?**

A. There were some data programs we used that would show you, you know, total number of claims in and



total number of claims out to get an understanding of how many claims you would close in a certain time period or just how many you were getting in relative to someone else.

But then, you know, only having four or five, six people on my desktop, you can also tell just by going into files when someone is touching on a frequency that's appropriate.

So there were some objective measures, just counting claim volume taken in versus closed, and then also some more subjective of I'm in your files every day, I can see -- I've asked you for attention on this one X number of times and it has gone unresponded to. So things like that.

**Q. Is there anything in the file or in your memory that you can point to that Brittany Am could have done better in evaluating this claim?**

MS. WILHELM: Object to the form.

A. Yeah, that's tough.

I mean, ultimately I do feel like you could analyze every claim even further, but you have to balance a point of overanalysis with just getting an initial offer out there.

You know, having done research to understand the claim, it's very subjective. So it's hard to say



yes or no, but I think every claim could be handled slightly better just by saying one thing differently or just presenting something, just communicating in a different manner.

But specifically, it's hard to say.

**Q (By Mr. Balint) Okay. In this particular claim, while Brittany Am was handling the claim and you were her superior, did you ever tell her to do something better; for example, to ask for any other medical records, to ask for an EUO, to ask for any discussion about what Mr. Gaekwar was going through in his recovery? Anything?**

A. Based on the records, no direction specific to that was given, but I can see from her -- sorry -- based on the notes.

Based on her notes, I can also see she was trying to establish contact with your office, which, I mean, just the communication is most important to anything else.

**Q. Would you agree that Amica had the duty to reasonably investigate this claim before rejecting an offer?**

MS. WILHELM: Object to the form.

A. Yeah. I think there's a duty to always reasonably investigate a claim before rejecting an



offer.

**Q (By Mr. Balint) In this case, why offer -- why was the authority given and the direction given and the approval given to offer any money at all new money?**

**I mean, by way of background, doesn't seem like there's much difference between $1,000 and zero. So I'm asking why anything was offered.**

A. Well, that's --

MS. WILHELM: Object to the form.

A. I think the difference between zero and a thousand is significant, but that's all relative.

It's tough because where do you draw the line? Where do you say that's a meaningful amount of money? That's really speculative.

Yeah, I mean, the evaluation at that point in time seemed to be in that range and was a reasonable offer and trying to get dialect started, because there were more layers to this claim than some have just based on your client's history.

So I don't see any single offer as being -- especially early on, being, you know, final evaluation. I see it being as at least trying to get discussion started.

**Q (By Mr. Balint) Okay. So you said based on the client's history. Can you explain that, please.**

**What history are you referring to?**
A. Yeah, I'm sorry. I'm referring to the fact that your office was up-front about preexisting injuries, where a lot of times the cases we handle, there's no indication of preexisting injuries for the injured party.
**Q. Okay. And in this case, what preexisting injuries are you talking about that's relevant to the left knee?**
A. I'm just referencing the dialogue that was outlined in your demand letter.
**Q. Okay. Which basically said that he had arthritis in the knee; right?**
A. Mm-hmm.
Well, sorry. If that's what it said, then yes.
**Q. Okay. So we've already talked about this, but wouldn't it be important for evaluating the case under Washington law to know if that condition was active or not at the time of the crash?**
MS. WILHELM: Object to the form.
A. Yeah, certainly. But with the way these demands come in, it's paramount for us to respond within the timeline. You know, it's just important to get a response out there, and there's more dialogue that can



be had during phone conversation, or however you want to discuss these things, that can develop some of that information, that back and forth.
It would be impossible -- well, it would be difficult to respond to every case that's alluded to by plaintiffs' firms due to the frequency that they are mentioned. And like I said, if it would be a point of contention, then, yes, I do think there's additional investigation that does need to go into it. But just based on the progression of this claim, it didn't seem as an urgent matter at the point in time that I was overseeing the file.
**Q (By Mr. Balint) You indicated that there was a -- or that the letter, the demand letter for the $140,000, which is Exhibit 2, February 9, 2021, did set a time limit for response. Correct?**
A. I can't --
(Crosstalk)
A. I can take a look.
**Q. Page 086 of Exhibit 2.**
A. Sure. Let me pull it up.
Right. Please respond to this demand by March 8th, 2021. This is what I see on 0086 from --
**Q. And you indicated -- I'm sorry. You indicated there was a time limit --**



**(Crosstalk)**
A. Go ahead. Sorry. I don't mean cut you off.
**Q. The letter says please respond to this demand by March 8, 2021, at which point the offer is withdrawn.**
**And you indicated a moment ago that you thought, given these time constraints, a thousand-dollar new money offer was appropriate. Correct?**
MS. WILHELM: Object to the form.
A. I believe it would have been within Brittany's authority at that point. But, yeah, I mean, there's autonomy to evaluate these claims and make offers based on your best understanding of the facts that you have present to you.
**Q (By Mr. Balint) So I'm trying to respond -- I'm trying to ask about a particular answer you gave that the thousand-dollar offer was meant to initiate discussion.**
**Is that the purpose of it?**
A. No. The purpose of it is to give an offer based on what we are aware of and what we have available to us at the time.
**Q. Okay.**
A. I can say that statement was made with the understanding that a lot of times there is more information to be developed.



And, you know, ultimately the first offer doesn't settle a lot of times. So just based on my experience as a claims rep, you're making a fair offer, but more often than not, that initial offer is what gets the discussions going because, you know, you've given us your perspective in the demand, you've given us our perspective of the evaluation and the offer, and then typically there is some ground in between.
**Q. You indicated that there could be more information that could be sought. Is there any indication while you were involved in the file that you or Brittany Am ever asked for any more information?**
MS. WILHELM: Object to the form.
A. I just think that she did send this initial offer and she did follow up, based on the notes that she was trying to investigate further.
If we were firm that this offer was our full and final, best offer, we wouldn't -- and we're not interested in getting more information, there would be no reason for her to follow up.
**Q (By Mr. Balint) Okay.**
A. So her -- you know, my understanding is that she continued to follow up and keep having discussions, because the more you communicate, the easier it becomes to settle claims or understand your differences. Right?

**Q. I guess my question was more particular.**
**Yes, she was still involved in the claim, but I'm wondering if you have any indication that at any time while she was involved and you were involved in this Gaekwar claim, that any more information or documentation was ever requested.**
MS. WILHELM: Object to the form. Asked and answered.
A. I don't have a specific item to reference to confirm that.
**Q (By Mr. Balint) Well, based on the file that you were provided, is there any indication that you or Brittany Am ever asked for any more information or documentation?**
MS. WILHELM: Object to the form.
And I want to note that Mr. Van Kooten has not been provided the whole file. He's been provided the exhibits your office sent.
MR. BALINT: Okay.
**Q (By Mr. Balint) Based on those exhibits.**
A. Yeah. So like I mentioned, there's no specific wording that she asked for additional information, but I can tell you, like I said, anecdotally, you know, you continue to reach out to an office to get more information to reach settlement.



So we're kind of going around in a circle. But essentially, yeah, there's no specific thing I can point to that says she asked for more information. There's more of my perception that her actions in the file suggest she was reaching out for more information.
**Q. What are you looking at, if you can be more specific --**
A. Certainly.
**Q. It's fairly time limited in terms of the $140,000 demand letter coming in and the termination that you and Brittany had involved in the file. So in that interim period of time, is there any indication that she sought more -- or you sought more information of any kind, documentation --**
**(Crosstalk)**
A. Yeah, so --
MS. WILHELM: Object to the form.
A. So like I was alluding to, initial offer was sent in response to the demand.
And let me give you the timeline.
**Q (By Mr. Balint) Okay.**
A. So referring to the notes, AMICA 2082, it looks like I acknowledged the demand was responded to, meaning response was sent before the timeline mentioned at the bottom of Exhibit 2. And then that was on



March 5th, 2021, that I make that note.
Then on March 19th, 2021, contact -- okay.
Oh, yeah. April 21st, 2021, looks like Brittany placed a call to Reno and requested a call back to discuss.
So like I said, there's -- I get your point, no specific reference to any other questions being asked, but I do see that there was intentions of following up to get more information, open dialogue.
**Q. Okay. Let's say that March 8, the deadline in this Exhibit 2 --**
A. Sure.
**Q. -- was not sufficient time to evaluate the case. Is there any indication that you or Brittany Am asked for more time to evaluate the case?**
MS. WILHELM: Object to the form.
A. There's no indication requesting more time to evaluate the case, but I also -- you know, we're also told -- or expected to evaluate based on what we have. You're always able to evaluate based on what you have. Where do you draw the line of -- it's hard to draw a line of if that wasn't enough, should we have requested it and not made a response.
It's tough. I mean, you always want to err on the side of making an offer based on what you have.



**Q (By Mr. Balint) And based on what we have is what we've been talking about now. There's no other documentation of any involvement by you or Brittany Am; correct?**
MS. WILHELM: Object to the form.
A. What do you mean by that?
**Q (By Mr. Balint) Well, you keep saying "it's based on the information we had." I'm wondering if there's any more information --**
A. Oh.
**Q. -- that was available that we haven't talked about or referenced in some of these letters.**
MS. WILHELM: Object to the form.
A. It's tough. I can't remember anything specifically, but like I mentioned, you know, she reported to me. Part of my role -- my duty is, you know, have dialogue with her about whatever she may want to talk about.
I can't specifically remember this file but, you know, I did speak with her frequently. Outside of -- outside of placing notes back and forth, we did have dialogue, you know, off the record on things.
**Q (By Mr. Balint) But you have no memory of that; correct?**
A. (Witness shakes head.)

Page 69

**Q. Okay. Is that correct?**
A. That's correct. Yeah.
**Q. At the time that this $1,000 offer response to the $140,000 new money demand was made, what was Brittany Am's autonomous settlement authority?**
A. I can't -- I can't specifically recall.
**Q. Was it only a thousand dollars?**
A. I can't recall. That would be very unlikely. It wouldn't -- it would be unlikely that someone just has a single thousand dollars in their authority.
**Q. And do you have any idea what that authority was at the time, her maximum authority?**
MS. WILHELM: Object to the form.
A. It's tough. Like I said, I can't remember specifically.
My best guess, it would be somewhere $10,000 to $30,000, but I don't remember.
**Q (By Mr. Balint) Would it be fair to say that in the $140,000 demand that we've talked about, Exhibit 2, that that figure and the explanations in the two letters and the documentation that was provided was evaluated as being way outside the range of reasonable value?**
MS. WILHELM: Object to the form.
A. That's tough. I mean, we evaluate based on

Page 70

what we have, and there's always the understanding that there could be something missing.
You know, it's tough. I wouldn't say anything is unreasonable, but we evaluate based on what we know.
**Q (By Mr. Balint) Okay. So how would you explain, then, $140,000 new money offer with a $1,000 response?**
A. Yeah. I think it goes back to -- I mean, like you said, the difference between zero and a thousand is nothing. It's perspective. It's subjective how you feel about some of these things.
There's obviously the objective bills and records to back things up, but there's a lot of interpretation otherwise that makes it different.
I can't -- I don't know how you came to $140,000, but based on our understanding, you know, Brittany's understanding, she must have evaluated this around $61,000.
**Q. Why not $65,000?**
MS. WILHELM: Object to the form.
A. I don't know. Why didn't you guys ask for $65,000?
You know, it's her interpretation, her understanding and application of her knowledge to the

Page 71

information she had. That's where her value of this claim came to.
**Q. (By Mr. Balint) And you as a claims supervisor at the time, you agreed with that $1,000 new money offer, did you not?**
MS. WILHELM: Object to the form.
A. I don't recall exactly how it worked at that point, if that authority was autonomous for her and then she just was able to respond or if I had to give input. But I believe she might have just been able to respond by herself.
So, yes, I would have agreed with her evaluation because I trusted her and have worked with her and enjoyed working with her.
**Q (By Mr. Balint) Whatever her settlement authority was in consultation with you, is $1,000 new money offer the highest that Amica was willing to go while you were adjusting the claim?**
MS. WILHELM: Object to the form.
A. No. I mean, it's always open to additional information and additional discussions and nothing is ever final, honestly, unless there's some sort of actual policy limit that prohibits -- which we're assuming there's not for this case.
But, no, I mean, I have never coached anyone

Page 72

to make a final offer and stick to it on the grounds of something like that.
**Q (By Mr. Balint) If $1,000 new money offer was not the maximum that Amica was willing to go to resolve this claim, what was the maximum?**
MS. WILHELM: Object to the form.
A. I don't know.
**Q (By Mr. Balint) And in a UIM context, would you agree that under Washington law, if the settlement evaluation is more, it should be tendered?**
MS. WILHELM: Object to the form.
A. It's been a while since I worked under Washington law. Honestly, I'm not -- I don't remember.
**Q (By Mr. Balint) Was any money -- as far as your awareness of the file, was any money ever tendered to the claimant?**
A. It doesn't appear that way.
Well, outside of PIP, but I'm assuming we're talking about the UM exposure.
**Q. Yes.**
**Is there any indications you had in your review of the file that Mr. Gaekwar or his attorney refused to cooperate with you?**
**Amica, I mean. I keep saying "you," but I really mean Amica.**

A. No, I understand. I keep -- yeah, I do the same thing.
MS. WILHELM: Object to the form on that one too.
A. No, I don't -- I didn't see that at all.
**Q (By Mr. Balint) Okay. Were you aware in the medical records that you had of Mr. Gaekwar's pre-crash level of functioning in terms of his body, his knees, any part of his functioning?**
MS. WILHELM: Object to the form.
A. I don't recall.
I mean, I can speculate based on what's been provided in those demand letters that it summarizes, but I can't remember the records themselves.
**Q (By Mr. Balint) Do you think it would be important for this question of whether a condition was dormant and then lit up, do you think it would be important for Amica to know that your claimant had hiked the Himalayas mountains, up to 17,000 feet, months before the crash without any problems?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Would that be important for you to know as far as pre-level functioning is concerned?**
MS. WILHELM: Same objection.



A. Yes.
**Q (By Mr. Balint) And would you also want to be aware that he had done a world tour a few months before this crash, also without any problem?**
MS. WILHELM: Object to the form.
A. Yeah, I'm sure a world tour is along the same difficulty. But yeah. So sure. Yeah.
**Q (By Mr. Balint) And I think you pointed out a flaw in my question.**
**Would you want to know what was involved in the Himalayas hike up to 17,000 feet or a world tour in terms of knee functioning?**
MS. WILHELM: Object to the form.
A. Yes.
**Q (By Mr. Balint) Was there anything in the file, that you're aware of, as far as Mr. Gaekwar's occupational history?**
A. None that I recall.
**Q. Just in terms of standards that existed at Amica while you were there, do you agree that Amica had the duty to act in good faith in the handling of UIM claims?**
MS. WILHELM: Object to the form.
**Q (By Mr. Balint) Under Washington law.**
A. Yes.



**Q. Okay. And would you agree that there was a continuing duty to give equal consideration to the insured's interest as compared to Amica's own interest?**
MS. WILHELM: Object to the form.
A. Yes.
**Q (By Mr. Balint) Would you agree that Amica had the duty, while you were involved in the claim, not to refuse to pay claims without conducting a reasonable investigation?**
MS. WILHELM: Object to the form.
A. I think in my answer, yes, they should have done a reasonable investigation.
**Q (By Mr. Balint) Are you aware of any communications between you and/or Brittany Am and Thomas Grundy in the transition between Brittany Am's handling of the file and Mr. Grundy's?**
A. I'm not aware of any communications.
**Q. If there were, would that be documented in the claims file?**
A. Could be.
There's also the chance that they could talk as colleagues about a claim file informally. You know, it's possible there would be notes in there, but if they were talking one person to another about the file, it's probably more likely that that wouldn't be something you



would mention in there.
**Q. I think you've already answered this, so I apologize, but at the time the $1,000 new money offer was made, was there any reference -- was there any knowledge that you or Brittany Am had expressly about the reserves that were set at that time?**
MS. WILHELM: Object to the form.
A. No knowledge of the reserves.
MR. BALINT: All right. I have no further questions. Thank you. I appreciate it.

EXAMINATION
BY MS. WILHELM:
**Q. Mr. Van Kooten, before we go off the record, can you just walk us through the documents that you were provided for deposition today, what they're titled as they were sent to you and how many pages they are?**
A. Certainly.
**Q. Sorry.**
A. That's all right.
I've got -- I was given four PDF documents. One's titled Claim File Excerpts, Van Kooten 2814, Gaekwar.
One is titled 11/4/20 Demand with Bates stamps 2814 Gaekwar.

**Q. And sorry --**
**(Crosstalk)**
**Q. -- how many pages was that?**
A. I'm sorry. That was six pages. The first one that I mentioned was 16 pages for the claim file excerpts.
The third document called Doc 29.2 Claim File 2814 Gaekwar is 92 pages.
And the last one, 2/9/21 UIM demand with Bates stamps 2814 Gaekwar was three pages.
**Q. And is that the entirety of what you reviewed for today's deposition?**
A. Yes.
**Q. And so your answers today were based on your independent recollection as well as those documents?**
A. Correct.
MS. WILHELM: Great. Thank you so much, Mr. Van Kooten.
I think I'm ready to go off the record.
(Reading and signing was requested pursuant to FRCP Rule 30(e).)
(Deposition concluded at 11:04 a.m.)
(Reporter officially marked exhibits at conclusion of deposition.)



REPORTER'S CERTIFICATE

I, KARMEN M. KNUDSON, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify that the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was reserved; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND and DIGITAL SIGNATURE this 3rd day of August, 2023.

Karmen Knudson

Karmen M. Knudson, CCR, RPR, CRR
Certified Court Reporter No. 1935.

# Exhibit 13

**DECLARATION OF DR. ROBERT T. GOLDMAN, MD**

I declare that:

My name is Robert T. Goldman. I am a medical doctor licensed and practicing in New Jersey and New York. A copy of my CV is attached hereto as Exhibit A. I am a board-certified orthopedic surgeon.

The statements and opinions expressed herein are on a more probable than not basis.

I began treating Mr. Chandrasi Gaekwar in September 2014 for various bilateral knee problems. His right knee was consistently worse than the left. These symptoms were treated conservatively with a series of Synvisc injections in both knees, and physical therapy which continued through May 2017. At the start of these treatments, both knees responded well. Over time these methods of conservative care stopped having a substantial effect on his right knee. Active symptomology of his left knee resolved by May 2017. I performed a right knee replacement on May 30, 2018.

From May 2017 and through the date which the collision occurred, January 25, 2020, Mr. Gaekwar had no complaints or active symptoms in his left knee. Immediately following the crash, there was pain and visible swelling with his left knee, stiffness and reduced range of motion. In addition, his left knee was locking. The right knee continued to remain symptom free. Mr. Gaekwar's injury care consisted of physical therapy and other conservative treatments, such as more injections. When his pain and symptoms in his left knee no longer responded to conservative treatments, Mr. Gaekwar agreed with my recommendation for left knee replacement surgery, which I performed on December 13, 2021.

In my opinion, the left knee treatments and replacement surgery of December 13, 2021, and the resulting follow up care, including a stay at an inpatient rehabilitation center and physical therapy, were all reasonable and necessary, and related to the crash of January 25, 2020.

Mr. Gaekwar had some pre-existing degenerative changes in his left knee, which included: osteoarthritis, subchondral sclerosis, joint space narrowing, cystic degeneration and osteophyte formation. These conditions had been dormant since May 2017, two and half years before the collision of January 25, 2020. Immediately after the crash, these dormant left knee conditions were greatly aggravated. The only treatments from the date of the collision to the present have been for Mr. Gaekwar's left knee problems.

Mr. Gaekwar has been a cooperative patient, diligently seeking to recover as much as possible from the injuries he received as a result of the January 25, 2020 collision. The left knee surgery of December 13, 2021 and the follow up therapies have enabled him to be more active and functional. He still has some residual pain and disability so, going forward, I prescribed physical therapy for him as needed.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed in Cedar Knolls, New Jersey this 10th day of May, 2022.

Robert T. Goldman, MD

# Exhibit 13.1

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM

***BALINT & ASSOCIATES, PLLC***
***ATTORNEYS AT LAW***
***5950 Sixth Avenue South, Suite 200***
***Seattle, Washington 98108***
***Telephone: (206) 728-7799 // Facsimile: (206) 728-2729 // Cell: (206) 947-7988***
***Email: dbalint@balintlaw.com***

*David J. Balint*
*Donald J Horowitz, Of Counsel (Dec.)*

June 30, 2022

Thomas Grundy
AMICA – UIM Dept.
PO Box 9690
Providence, RI 02940-9690

**Sent via Email &**
**Regular Mail:**
tgrundy@amica.com

| | |
|---|---|
| Client: | Chandrasi Gaekwar |
| Our File No.: | 2814 (P-17) |
| Case No: | 60003757148 |
| Date of Incident: | 01/25/2020 |

Dear Mr. Grundy,

Over a year ago Mr. Gaekwar's offer to settle with AMICA Insurance for $140,000 new money expired. For background, see the demand letter dated February 9, 2021. That offer was based on the uncertainty that Mr. Gaekwar would need further surgical intervention on his injured left knee. After much effort to treat his knee conservatively, it became clear surgery was the best option. Said surgery took place on December 13, 2021. My client has now completed an extensive course of pre and post-surgical physical therapy, much of which required inpatient care.

Included with the demand letter of February 2021, the known medical charges were $19,255.38. See the summary below.

| **PROVIDERS** | | **TOTAL CHARGES** |
|---|---|---|
| | | |
| Overlake Medical Clinic - Redmond | | $1,156.28 |
| Proliance Orthopedics & Sports Medicine | | $1,650.00 |
| Innova Physical Therapy | | $15,974.50 |
| Radia | | $117.60 |
| Evergreen Hospital | | $357.00 |
| **TOTAL TREATMENT CHARGES** | | **$19,255.38** |

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM



Since then, Mr. Gaekwar continued with conservative care, which eventually plateaued, leading to the left knee surgery of December 13, 2021. The following is a summary of these updated providers, their dates of service and the amounts billed.

| **PROVIDERS – UPDATED & SURGERY RELATED** | | **TOTAL CHARGES** |
|---|---|---|
| | | |
| 05/24/21 - 11/22/21 Advantage Physical Therapy | | $8,351.00 |
| 10/21/21 - 01/25/22 Tri-County Orthopedics | | $9,520.00 |
| 11/29/21 - 12/15/21 Morristown Memorial Hospital | | $83,153.91 |
| 12/01/21 - 3/31/22 Professional PT & Training | | $9,109.13 |
| 12/15/21 - 12/24/21 Atlantic Rehab Institute | | $26,342.02 |
| **TOTAL UPDATED & SURGERY RELATED CHARGES** | | **$136,476.06** |

The total medical bills arising from this crash now total $155,732.44. All of the medical records and bills listed are submitted herewith on a disk. This should facilitate a crosscheck by AMICA of the information listed in my chronology. The surgeon, Dr. Robert T. Goldman, MD, submitted a sworn declaration delineating the cause of the surgery, the need for surgery and the reasonableness of the medical care provided. A copy of his declaration, along with his curriculum vitae, is also enclosed on the disk. Dr. Goldman notes in his conclusion that "[Mr. Gaekwar] still has some residual pain and disability so, going forward, I prescribed physical therapy for him as needed." A careful review of the medical records will support the fact that prior to this crash with the underinsured driver, Mr. Gaekwar had no active conditions with his left knee. Since you may not be familiar with Washington law, when a dormant condition is lit up and made active, the tortfeasor is liable for all of the effects of the incident. The jury instruction summarizing the law that would be given to a jury after trial is as follows:

> "WPI 30.18 Previous Infirm Condition:
> If you find that:
>
> (1) before this occurrence the plaintiff had a bodily condition that was not causing pain or disability; and
>
> (2) because of this occurrence the pre-existing condition was lighted up or made active,
>
> then you should consider the lighting up and any other injuries that were proximately caused by the occurrence, even though those injuries, due to the pre-existing condition, may have been greater than those that would have been incurred under the same circumstances by a person without that condition."



In order to assist you, included on the provided disk is a photograph of Mr. Gaekwar's left knee taken shortly after the crash. As you can see, there is a distinct open wound and scar from the suffered abrasion, a direct result of the force of the impact from hitting the dash.

I remind you that prior to the collisionMr. Gaekwar, at age 75, was in excellent physical condition and led a very active lifestyle. Just months before, my client had completed a multiple day hiking vacation in the Himalayan mountains, able to easily reach an elevation of over 17,000 feet. The photos from his vacation are included on the provided disk. Mr. Gaekwar was an avid cyclist, able to complete a multiple mile circuit with ease. This was one of his favorite pastimes, one that brought him great pleasure and allowed him to enjoy the great outdoors while helping to reduce his stress levels. Since the collision, despite all his efforts, he has not been able to return to this hobby. Although Mr. Gaekwar has made improvements from his accident-related injuries, he is far from pre-accident condition.

In order to help facilitate the best and fastest recovery possible, on recommendation of his doctors, Mr. Gaekwar completed an intense round of physical therapy before the surgery. The purpose of these treatments was to strengthen the muscles around his knee to prepare for the trauma and lack of use during his recovery. This would put him in the best possible position to begin aggressive physical therapy as soon as possible, not to mention shorten his recovery time. This was important to Mr. Gaekwar as he was proud of his physical condition prior to the collision. He was very active for his age, able to travel, hike, cycle and maintain an intense workout routine at the gym. Since the collision, he has been doing his best to reach that same pre-collision status. As a result, after the surgery, Mr. Gaekwar was placed in an in-house rehab facility, Atlantic Rehabilitation Institute. This was a necessity due to past surgical recovery problems such as anemia and the risk of blood clots. This was also the only way Mr. Gaekwar could receive his aggressive physical therapy, which consisted of 1.5-hour sessions, twice a day. This in-house rehab care was prescribed by his surgeon and was paid in full by Medicare. It was related and necessary.

My client has suffered through an intense surgery and extensive medical care causing him a great deal of pain, suffering and disability. It has been more than two years

BatchID: 6981 DateScanned: 07/07/2022 11:47:11 AM

since the crash. He has at least 9.82 years to endure the continuing problems according to the life expectancy tables utilized by our courts.

The report provided by the opinion witness hired by AMICA, Dr. Sean Kearney, will not suffice over the personal knowledge and expertise of the surgeon, Dr. Robert T. Goldman, MD, who has been following Mr. Gaekwar's knee condition since 2014. The opinion of Dr. Kearney is deficient in several particulars, including the fact that he did not physically exam Mr. Gaekwar, nor did he talk with him about the present left knee condition.

As a Under Insured Motorist carrier, AMICA owes a duty of good faith in resolving a claim brought by its insureds. A part of this good faith includes the duty to investigate thoroughly the documentation provided. If, after reading the materials enclosed on the disk, AMICA requests other information or documentation, please do not hesitate to ask.

Given that the uncertainties presented with the offer of February 2021 no longer exist, the opportunity is hereby extended to AMICA to resolve the claim of Mr. Gaekwar for $275,000 new money (including waiver of PIP) which is within available limits. This offer will expire, unless AMICA reasonably requests more information, by the close of business on Friday, July 24, 2022. Checks should be made to the order of the trust account of Balint & Associates, PLLC only. Out of the proceeds all outstanding subrogation interests, including Medicare and Medigap, will be resolved.

Very truly yours,
BALINT & ASSOCIATES, PLLC

David Balint
Attorney at Law

Cc: Client

# Exhibit 13.2

Claims Processing - Amica Scan Center
PO Box 9690
Providence, RI 02940-9690

Toll Free: 1-866-97-AMICA
(1-866-972-6422)
Fax: 1-888-818-2386

July 12, 2022

Balint & Associate, PLLC
5950 Sixth Ave S
Ste 200
Seattle, WA 98108

Our File Number: 60003757148
Our Insured: Chandrasi M. Gaekwar
Your Client(s): Chandrasi M. Gaekwar
Date of Loss: January 25, 2020

Dear Mr. Balint:

Please allow this letter to serve as our response to your demand letter dated June 30, 2022. We had the opportunity to review the demand and enclosures provided. We must respectfully reject your demand for settlement at this time.

It is evident from a review of the records that the need for the left knee surgery was in relation to localized osteoarthritis.

Our offer of $5,000 new money to settle your client's underinsured motorist bodily injury claim remains. Please present our offer to your client at this time. Please also advise if your client is interested in mediating this case in an attempt to work toward a fair resolution.

Sincerely,

Thomas W. Grundy

Thomas W. Grundy
Claims Department
866-972-6422 x21542
TGRUNDY@AMICA.COM



Amica Mutual Insurance Company Amica Life Insurance Company Amica Property and Casualty Insurance Company
Amica General Agency, LLC Amica General Insurance Agency, LLC

# Exhibit 13.3

Gmail

**David Balint <dbalint@balintlaw.com>**

---

## Gaekwar - Claim No. 60003757148/file 2814 (P-17.1) Geakwar v AMICA

---

**David Balint** <dbalint@balintlaw.com> Mon, Jul 18, 2022 at 11:24 AM
To: "GRUNDY, THOMAS W. (Tom)" <TGRUNDY@amica.com>
Cc: Reno Ettienne <rettienne@balintlaw.com>
Bcc: Chandrasi Gaekwar <cgaekwar@rocketmail.com>

Tom, I received your letter of July 12 repeating Amica's offer of $5000. I am disappointed that the updated medical information, photo, and surgeon's sworn declaration and analysis did not change Amica's offer. Unfortunately, this forces Mr. Gaekwar to file suit so that a jury can decide fair compensation. An IFCA letter will be drafted and sent as a required prelude to filing a lawsuit. Your concluding line about mediation is evidence of bad faith when no amount of damages material provided to you changes the pre-surgery offer. My client is anxious to settle and remains willing to negotiate but Amica displays little effort to be fair to its insured. David

[Quoted text hidden]

[Quoted text hidden]

Eagle2017BadgeSmall

[Quoted text hidden]

---

**image001.gif**
5K

# Exhibit 14

Balint & Associates, PLLC
5950 Sixth Ave South, Suite 200
Seattle, WA 98108

June 11, 2023

Re : Chandrasi Gaekwar v Amica Mutual Insurance Company
Case No. 2 :22-cv-01551-BJR
File No. 2814.02 (D-9)

My name is Robert T. Goldman. I am a medical doctor licensed and practicing in the state of New Jersey. A copy of my CV is attached hereto as Exhibit A. I am a board-certified orthopedic surgeon. A copy of my compensation agreement is attached as Exhibit B.

I do not have, nor do I maintain a testimonial list. I cannot recall any courtroom testimony. I have testified as a treating doctor on rare occasions, but I cannot recall anything specific, nor do I have a database that specifies or tracks deposition testimony.

The statements and opinions expressed herein are on a more probable than not basis.

I am basing this report on my treatment records of Mr. Chandrasi Gaekwar, both in my clinic at Tri-County Orthopedics and at Morristown Medical Center. I was also provided with a chronology of Mr. Gaekwar's treatments by various providers beginning in 2014. A copy of this chronology, which was supplied by Mr. Gaekwar's attorney, is attached as Exhibit C. One entry I reviewed specifically was the clinic note of February 13, 2020 from Overlake Medical Center and Clinics in Redmond, Washington (Dr. James D. Kriseman, DO). It is attached as Exhibit D.

I first treated Chandrasi Gaekwar on September 30, 2014, at which time he reported having problems in both knees, his right worse than his left historically. My records reflect that he had a prior right knee arthroscopy in the past, along with prior conservative care consisting of Orthovisc (hyaluronic acid) injections to both knees. X-rays revealed osteoarthritis in both knees. Since prior Orthovisc injections provided significant relief from his symptoms, I recommended Synvisc (hyaluronic acid) injections for both knees. At this time, I informed Mr. Gaekwar that he would possibly need a knee replacement in the future. He was next seen by me on September 24, 2015, nearly a year later, for a follow up visit. His symptoms had returned. Since the Synvisc injections provided substantial relief the previous year, I provided the same care, injecting both knees with Synvisc. Mr. Gaekwar returned to my office once more on May 17, 2018 due to increasing pain in his right knee, which was quite severe. His right knee had not improved with recent injections, physical therapy, and non-steroidal anti-inflammatory medication. I recommended that Mr. Gaekwar undergo a right total knee replacement.

On May 30, 2018 Mr. Gaekwar underwent a right total knee replacement at Morristown Medical Center as I had recommended. I was the surgeon. The procedure was performed without

difficulty, however he developed symptomatic anemia post-operatively, which was successfully treated. He also participated in physical therapy to assist in his recovery from the surgery.

I next saw Mr. Gaekwar on July 17, 2018 for a postoperative visit for his right knee. He was doing well with knee range of motion from 0 to 125 degrees. I recommended that he continue with his physical therapy. At this time, in order to treat the arthritis in his left knee, I provided him with a cortisone injection, which was performed without difficulty. He was asked to return as needed in the future.

Mr. Gaekwar returned to my office on October 21, 2021, over three years later, for evaluation of left knee pain. He informed me that since our last visit he had been involved in a motor vehicle accident in January 2020, at which time his left knee became very painful. Since the accident, he had reasonably tried conservative treatment, including physical therapy and Synvisc injections, which did not provide lasting relief. As a result of this accident, Mr. Gaekwar's left knee pain dramatically worsened and progressively deteriorated until conservative care was no longer effective. He returned to see me due to the pain and resulting disability in his left knee, which had become severe enough for him to consider a left total knee replacement. This surgery took place on December 13, 2021 at Morristown Medical Center. The surgery went well without complications. Afterwards, I recommended an intensive course of both inpatient and outpatient physical therapy in an attempt to return to his pre-injury status.

Based on a the review of my own records, along with the documentation provided to me, in the time period between his visit with me on July 17, 2018 and the collision of January 25, 2020, Mr. Gaekwar's left knee was asymptomatic. The clinic note of February 13, 2020 from Overlake Primary Care with Dr. James D. Kriseman, DO (Exhibit D) reports that in October 2019, Mr. Gaekwar spent several days climbing in the Himalayas, hiking up to 17,000 feet without any difficulties. This supports my opinion that he recovered well from his right knee surgery and was asymptomatic in his left knee until the trauma of his motor vehicle accident on January 25, 2020.

It is documented by radiographs that Mr. Gaekwar had pre-existing degenerative changes in his left knee, which included: osteoarthritis, subchondral sclerosis, joint space narrowing, cystic degeneration, and osteophyte formation, all of which are visible on the radiographs. These radiographic findings do not necessarily cause pain or disability, but they make the joint more susceptible to deterioration in the event of trauma. It is my opinion this is what happened to Mr. Gaekwar. Immediately after the motor vehicle accident of January 25, 2020, he became symptomatic due to the collision.

Mr. Gaekwar has been a cooperative patient, diligently seeking to recover as much as possible from the injuries he received as a result of the January 25, 2020 accident. The left knee surgery of December 13, 2021 and the follow up physical therapy have enabled him to be more active and functional, however he still has not returned to his pre-accident condition and continues to suffer from residual pain and disability.

In conclusion:

It is of my opinion that the left knee non-operative treatments, left total knee replacement surgery of December 13, 2021, and the resulting follow up care, including a stay at an inpatient rehabilitation center and physical therapy, were all reasonable and necessary, and related to the motor vehicle accident of January 25, 2020.

It is also my opinion that after the amount of time that has passed, Mr. Gaekwar's present condition is, on a more probable than not basis, permanent.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed in Cedar Knolls, New Jersey this 11th day of June, 2023.

Robert T. Goldman, MD

# Exhibit 15

ORTHOPEDIC CONSULTING SERVICES · LLC

June 8, 2023

David J. Balint
Balint & Associates, PLLC
5950 6th Ave, S. Suite 200
Seattle, WA 98104

Re: Gaekwar v. Amica

I, Brian P. Wicks, MD, completed my undergraduate education at Dartmouth College and proceeded with my medical training at Upstate Medical University in Syracuse, NY. At this same institution I completed my internship and orthopedic surgery residency training. I followed this with a fellowship training year in hand and upper extremity training with the Tufts Program in Boston, MA. A copy of my CV is attached as Exhibit A. A copy of my fee structure is attached as Exhibit B. I am the founder of Orthopedic Consulting Services, LLC which is a continuing concern providing expert witness services for defense and plaintiff counsel for personal injury cases and Medical Professional Liability Insurance. At this time, I do not have a Deposition Testimony List, however I am working to compile one. It will be supplemented upon completion.

I was a staff orthopedic surgeon for over 32 years with The Doctors Clinic in Kitsap County. I retired from clinical practice 12/31/22. I have extensive non-operative and operative experience in the full range of orthopedics, including knee arthritic conditions and total knee replacement. I have diagnosed and treated thousands of patients for a wide range of musculoskeletal issues, including congenital deformities, traumatic injuries, and age-related bone and joint conditions. I served as a commissioned officer in the US Naval Reserve as a Hand Surgery Consultant, Naval Hospital Bremerton, and completed my military service at the rank of Lieutenant Commander.

You have asked my opinions in this case regarding causation and damages. I have based my opinions on my education, training, and experience as an orthopedic surgeon. I express my opinions stated herein on a more probable than not basis to a reasonable degree of medical certainty.

In forming my opinions, I have reviewed the following records:

1. Deposition Transcript of Chandrasi Gaekwar
2. Plaintiff's Answers to Amica Mutual Insurance Company's Pattern Interrogatories and Requests for Production to Plaintiff Chandrasi Gaekwar
3. Injury Photos of Chandrasi Gaekwar
4. Overlake Primary Care from 7/28/15 to 3/26/20
5. Innova Physical Therapy from 2/4/20 to 9/30/20
6. Proliance Orthopedic from 6/14/17 to 3/4/20
7. MRI Imaging from Proliance Orthopedic
8. Evergreen Health X-ray of 1/31/20
9. Kessler Institute of Rehabilitation from 6/1/18 to 6/21/18
10. Tri-County Orthopedic from 9/30/14 to 1/25/22
11. Morristown Memorial Hospital from 6/9/18 to 12/15/22
12. Professional Physical Therapy and Training from 10/13/17 to 6/1/23

13. North Warren Medical Associates from 10/21/15 to 9/23/19
14. Advantage Physical Therapy from 5/25/21 to 11/22/21
15. Atlantic Rehabilitation Institute from 12/15/21 to 12/24/21
16. P-31 Medical Chronology as prepared by Plaintiff's Counsel

In the collision of January 25, 2020, Chandrasi Gaekwar sustained a contusion of the LEFT knee that lit up the previously asymptomatic osteoarthritis of that knee. The lighting up of that arthritic condition caused him disabling pain. He also suffered strain and strains of his neck and low back. His left knee was treated initially with extensive non-operative interventions, including injections and extensive physical therapy. This conservative treatment was reasonable and necessary to avoid surgical intervention. When conservative care failed to alleviate the symptoms, Mr. Gaekwar underwent a left total knee replacement, which occurred on December 13, 2021. All of this care was reasonable and necessary as well as caused by the collision of January 25, 2020.

According to the records, the neck injury has resolved, but Mr. Gaekwar continues to experience flare ups of pain in his low back, even after physical therapy and despite continuing a home exercise program. The neck and back injuries were caused by the underlying traumatic event, and once again, the care given was reasonable and necessary.

In my opinion it is often better to try non-operative care as a means to get better, if the pain can be tolerated, as there are some patients who will improve with non-operative interventions, even in clinical situations similar to Chandrasi Gaekwar's. The surgery for a total knee replacement involves serious, although rare, risks that are best avoided if at all possible. An additional argument for trying non-operative means of care is that there is no point at which a total knee replacement cannot be performed if symptoms require.

In a review of Chandrasi Gaekwar's records, there is radiographic evidence of osteoarthritis of the left knee prior to the collision. However, we in orthopedic practice know that there is no direct correlation between the degree of osteoarthritis and the severity of a given patient's symptoms. In some cases, an injured knee can be returned to pre-injury status with non-operative interventions, but with arthritic joints, such as the knee, it is common to elicit a specific injury that causes a joint to become painful and unresponsive to non-operative intervention, requiring surgical intervention. In my opinion, this is what happened to Mr. Gaekwar.

Chandrasi Gaekwar's history of frequent and, occasionally, stressful levels of physical activity prior to the trauma, supports my opinion that his left knee was asymptomatic for a substantial period of time before the car accident. Before the trauma, the last time there was any treatment to the left knee was an injection on July 17, 2018. According to the record from Overlake Medical Center dated February 13, 2020, Mr. Gaekwar. reported that in October 2019, "...he climbed the Himalayas with a guide and went up to over 17,000 feet. He states he had no problems whatsoever." In other words, the period of dormancy was at least 18 months before the accident.

It is possible, not probable, that Chandrasi Gaekwar would have needed left total knee arthroplasty in the future, but the trauma he sustained during the collision, and his subsequent inability to control the

symptoms lit up by the collision, are what made the performance of the left total knee replacement necessary.

In orthopedics, we do not know why an arthritic joint will progress to being so symptomatic as to require joint replacement surgery, but we do know that trauma can be a clearly inciting incident, even in the absence of radiographic changes caused by the trauma. Such trauma, in Chandrasi Gaekwar's case, was the probable reason for his having to undergo left total knee replacement.

Given Chandrasi Gaekwar's pre-collision dedication to maintaining optimal physical conditioning, and his conscientious attendance at post-injury physical training in an attempt to return himself to preinjury condition, there is no evidence that Chandrasi Gaekwar was exaggerating his knee symptoms for secondary gain. Mr. Gaekwar's sincere professions of frustration at the loss of physical capabilities following the motor vehicle collision also supports his sincerity in trying to regain his physical capabilities following the collision and following the knee replacement surgery. In my opinion, Mr. Gaekwar's present condition and disabilities are permanent.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed in Silverdale, Washington this 9th day of June, 2023.

BP Wicks, MD

Brian P. Wicks, MD

# Exhibit A

# CURRICULUM VITAE
# BRIAN P. WICKS, M.D.

## BUSINESS ADDRESS

Orthopedic Consulting Services, LLC
12784 Silverdale Way NW
Silverdale, Washington 98383
(360) 360.990.1509
Email- Bonelogic55@gmail.com

## EDUCATION AND TRAINING

UNDERGRADUATE
Dartmouth College 1976-1980
A.B. Degree in Biology

MEDICAL SCHOOL
State University of New York, Upstate Medical University, Syracuse, NY
1980-1984 Medical Degree

RESIDENCY TRAINING
State University of New York, Upstate Medical University, Syracuse, NY
1984-1985 General Surgery Internship
1985-1989 Orthopedic Surgery Residency

FELLOWSHIP TRAINING
Tufts University Combined Hand Surgery Fellowship, Boston MA
1989-1990 Hand Surgery Fellowship

## BOARD CERTIFICATION

1992- American Board of Orthopedic Surgery
2012-2022 Re-certified American Board of Orthopedic Surgery
2023- Board Eligible Status- American Board of Orthopedic Surgery

## ACADEMY MEMBERSHIP

Fellow American Academy of Orthopedic Surgeons – 1996- present

## WORK HISTORY- Through 12/31/22

The Doctors Clinic, Staff Orthopedic Surgeon, 1990 thru 12/31/22

The Doctors Clinic, President, 1999-December 2012

## ORTHOPEDIC SURGERY PRACTICE EXPERIENCE

32 years of General Orthopedic Surgery including lumbar spine surgery
Specialty emphasis on Hand/Wrist and Foot/Ankle Surgery
Effective 12/31/22- Retired from clinical practice

## CURRENT WORK HISTORY

Orthopedic Consulting Services, LLC, Founder- April 2015-present

-Expert witness services for defense and plaintiff counsel for MPL and personal Injury cases.

Senior Consultant, MPL Business Line, Gradient AI- Boston, MA

-Focus on deployment of predictive analytics, machine learning, and augmented intelligence for improvement of MPL business operations and patient safety initiatives.

Independent Consultant, The Expert Institute- 2021-present

-Focus on evaluation of potential MPL cases for the plaintiff bar to determine if there is sufficient merit to proceed with case development

## MILITARY SERVICE

United States Naval Reserve, Medical Corps 1987-2003
Rank- Lieutenant Commander

## BOARD POSITIONS

PHYSICIANS INSURANCE, A MUTUAL COMPANY- Seattle, WA

Director- 4/2009- 2019
Chairman, Finance and Audit Committee- 5/2010-5/2012
Member, Executive Committee- 1/2011-7/2019
Chairman of the Board of Directors- 5/2012- 5/2015
Member, Claims Committee- 5/2011 – 7/2019
Member, Investment Committee- 5/2013- 7/2019

KITSAP REGIONAL LIBRARY FOUNDATION

Director- 2016-present
Chair Governance Committee- 1/2022-present
President, Board of Directors- 1/2019-1/2022

## LEADERSHIP POSITIONS HELD

Kitsap County Medical Association – President 1999-2000

Washington State Medical Association- - President 2007-2008

Washington State Orthopedic Association—Secretary-Treasurer- 2009-2011

## HOSPITAL APPOINTMENTS

St Michael Medical Center, Silverdale, WA; Active Staff, 1990-12/31/22

## OTHER APPOINTMENTS-

Washington State Healthcare Authority Advanced Imaging Management Group-2009-2010

## Recent Presentations-

PIAA Annual Meeting May 2012- Co-presented- “The Role of the Physician in the Finance and Audit Committee

PIAA- meeting in Seattle (October 2111)- Medicine and Liability- The Physician Perspective

Harrison Memorial Hospital- Presentation to Pre and Post-op Nurses. (June 2016)- Risk Management in the Perioperative Setting

CV Updated 1/2023

# Exhibit B

# *Professional Fee Schedule for Orthopedic Consultation Case Work*

Brian P. Wicks, MD

Orthopedic Consulting Services, LLC

12784 Silverdale Way NW

Silverdale, WA 98383

---

Hourly Rate- $700

Minimum Billing Period- 15 minutes

Invoices will be submitted monthly with payment due upon receipt

Rate effective 1/2022

# Exhibit 16

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CHANDRASI GAEKWAR, a single individual,<br><br>Plaintiff,<br>v.<br><br>AMICA MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | No. 2:22-cv-1551-BJR<br><br>**PLAINTIFF'S ANSWERS TO AMICA MUTUAL INSURANCE COMPANY'S PATTERN INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF CHANDRASI GAEKWAR** |

TO: CHANDRASI GAEKWAR, Plaintiff

AND TO: All Parties and Counsel of Record

## DEFINITIONS AND INSTRUCTIONS

### A. INTERROGATORIES

These Interrogatories are served upon you in accordance with rules 26, 33, 34 and 37 of the Federal Rules of Civil Procedure. YOUR ATTENTION IS DIRECTED TO RULE 26(e).

Please answer the Interrogatories under oath, within thirty days of service. Type the answers in the space provided, adding pages if additional space is required.

The Interrogatories herein apply to all information and items within the knowledge of you, your attorneys, agents, representatives, or persons acting in your behalf.

Said Interrogatories are also intended to impose a continuing duty upon you to furnish the information requested if said information is acquired after answering the Interrogatories.



WATHEN | LEID | HALL | RIDER, P.C.
222 ETRURIA STREET
SEATTLE, WASHINGTON 98109-1659
(206) 622-0494/FAX (206) 587-2476

**INTERROGATORY NO. 22**: Are you claiming any physical, mental or emotional injuries, disability, or disfigurement due to the **INCIDENT**? If so, please

(a) Describe your understanding of each injury, disability or disfigurement, and for each, identify the area of your body affected;

(b) State those from which you have recovered and the approximate date of your recovery; and

(c) For all continuing complaints, state whether the complaint is subsiding, remaining the same or becoming worse: and state the frequency and duration of the complaint.

**ANSWER:**

See the medical records previously provided to Amica and the set of duplicate documents submitted in response to the Requests for Production. Also see all versions of the demands.

Prior to the collision, I led a very active lifestyle, which involved regular gym visits with a rigorous routine. This included biking from Sammamish to Woodinville and back every Saturday and Sunday. I took pride in being physically active and exercising every day. During my initial recovery, I could not continue to perform my normal workout so I had to put a hold on my YMCA gym membership. In order to do this, Dr. Kriseman provided me with a letter confirming the effect of my injury. See Doc 8 showing my regular activity at the YMCA prior to the collision and Doc 10 which is the note provided by Dr. Kriseman to suspend my membership due to injury. I am still unable to resume my normal workout activities causing a recent push by the YMCA to resume paying my dues. I have asked for an extension as I still cannot workout. This is very upsetting for me as just months before the underlying crash I had completed a multiple day hiking trip in the Himalayan Mountains, able to easily reach an elevation of over 17,000 feet. I was an avid cyclist, able to complete a multiple mile circuit with ease. Getting out and enjoying the outdoors was one of my favorite pastimes, one that brought me great pleasure and kept me in great shape. To this day, I am still unable to enjoy these activites as I once did.

Wanting to avoid surgery, I attempted to heal my injury with aggressive physical therapy, but eventually nothing improved the situation causing me to hit a plateau. Eventually surgery became the only option. After scheduling the surgery for December, 2021, in an attempt to give myself the best chance of recovery, I prepared by attending more physical therapy to help strengthen my knee as much as possible beforehand. Despite my efforts, the recovery from the surgery was still very painful. In fact, because of the challenging recovery, I got approval from the surgeon, Dr. Goldman, to be placed in a rehabilitation recovery center post-surgery. Even with their help my recovery was slow, but I remained diligent in my goal to reach my pre-crash level of functioning. In my efforts I attended formal physical therapy and diligently followed the provided home exercise program. The surgery also left a scar.



WATHEN | LEID | HALL | RIDER, P.C.
222 ETRURIA STREET
SEATTLE, WASHINGTON 98109-1659
(206) 622-0494/FAX (206) 587-2476

Despite my efforts, I still have not regained my pre collision condition of my left knee. I wake up most mornings with a stiff and sore left leg. When it is cold and damp, which happens often in the Seattle area, it is even worse. When I get out of bed, I have to take it slow, needing to take a few steps forward and back, bending my knee slowly to regain movement before I can walk confidently. To help maintain my mobility and manage my lingering aches and pains, most mornings I do a series of exercises provided to me during my various courses of physical therapy. At times, I also have to massage the leg to help ease the pain. I have one spot in the left knee joint that is especially painful. Since the collision I now must walk slowly and carefully up and down stairs, making sure to hold on to the railing. This was something I never did before the incident. Despite all my efforts, I have been unable to return to my more vigorous exercise routine, as well as other activities such as biking and hiking. When I go for walks I have to make sure I stay mostly on flat ground. When conduction my normal activities throughout the day I must pay close attention to the position of my left leg. If I do not remain hyperaware, I find I tend to over stress my knee, causing me more pain. For example, when driving I try to stop every hour or so because that leg stiffens up and becomes painful. Also, as previously stated, I have been unable to restart my gym membership at the YMCA. These are disabilities I never had before the crash.

To help manage my pain and maintain my mobility I may need periodic physical therapy in the future, which would help reduce pain and knee stiffness, as well as improve balance and maintain my range of motion. Currently I am only 70% back to my pre-collision status. This plateau has been established since the conclusion of my post-surgery care in May 2022.

Emotionally, my inability to return to full function has troubled me greatly. I am 78 years old and prior to the collision I had no limitations with my physical activity and hobbies. I was in great health and was still able to experience the world and all it offered. I was proud of my ability to still participate in vigorous activities such as biking and hiking, which is demonstrated by my trip to the Himalayas just months before my injury. Since the collision I have not been able to get on a bicycle nor go hiking, I even struggle to get up and down stairs. For the first time, I am actually starting to feel my age. This is very upsetting for me. I am not the kind of person to give up, yet even after surgery, I feel defeated. It feels as if I am stuck with my current limitations and I will no longer be able to freely enjoy what the world has left for me to see. I am not ready to sit back and watch life pass by, I still want to experience as much as I can for myself.

I am also upset with Amica. I have been with Amica for 38 years and have demonstrated great loyalty. So much in fact that I have 2 car insurance policies, as well as homeowners' insurance with Amica. Throughout these 38 years I have faithfully paid my premiums without question. Now that I have a serious claim, Amica has chosen to not only fight the claim, but also has done so in a way to question my honesty.



WATHEN | LEID | HALL | RIDER, P.C.
222 ETRURIA STREET
SEATTLE, WASHINGTON 98109-1659
(206) 622-0494/FAX (206) 587-2476

**ATTORNEY SIGNATURE**

The undersigned attorney for Plaintiff in this action, has read the foregoing Interrogatories and Requests for Production of Documents, and the answers and responses thereto, and believes that the answers and responses are in compliance with Rule 26.

DATED this 13th day of March, 2023.

BALINT & ASSOCIATES, PLLC

By____________________

David J. Balint (WSBA #5881)
Of Attorneys for Chandrasi Gaekwar
Balint & Associates, PLLC
5950 Sixth Ave South, Suite 200
Seattle, WA 98108
Tel: (206) 728-7799
dbalint@balintlaw.com

**DECLARATION OF RESPONDING PARTY**

I declare under the penalty of perjury under the laws of the State of Washington that I am the plaintiff in this action. I declare that I have read, or have had read to me through an interpreter, the foregoing answers, know the contents thereof, and believe them to be true and correct.

DATED this 13th day of March, 2023.

____________________
Chandrasinh Gaekwar, Plaintiff

**CERTIFICATE OF SERVICE**

# Exhibit 17

FRIEDMAN | RUBIN
Trial Lawyers PLLP

RICHARD DYKSTRA
Attorney at Law... Admitted in WA & AK
SEATTLE OFFICE
1109 1ST AVENUE, SUITE 501 | SEATTLE, WASHINGTON 98101 | P: 206.501.4446 | F: 206.623.0794 | WWW.FRIEDMANRUBIN.COM
EMAIL: rdykstra@friedmanrubin.com

June 12, 2023

***Via Email and First Class Mail***
***dbalint@balintlaw.com***

Mr. David Balint
Balint & Associates, PLLC
5950 6th Ave S.
Suite 200
Seattle, WA 98108

Re: Chandrasi Gaekwar v. Amica Mut. Ins. Co.,
USDC WD WA # 2:22-cv-01551-BJR
Your file No. 2814.02

Dear David:

This letter is submitted at your request and is intended to comply with the requirements set forth in Fed. R. Civ. P. 26(1)(2)(B).

## I. Background, Qualifications and Prior Testimony

I am an attorney and was admitted to practice law in Washington State in 1973, and my bar number is 5114. I was admitted to practice law in Alaska in 1987, and my bar number is 870606. My Curriculum Vitae is attached as Exhibit A. It contains a list of all publications that I have authored in the previous 10 years.

From March of 1975 until May 2011 I worked as an attorney for the Seattle based law firm known as Stafford Frey Cooper, ("SFC"), though it had different names in earlier years. I started as an associate, became a partner in 1979, and remained a partner until December 31, 2010. On January 1, 2011 I became "of counsel" at SFC firm but on May 1, 2011 I left that firm and joined Friedman | Rubin PLLP as an of counsel, where I continue to practice law.

Very early in my legal career at SFC I began handling insurance coverage matters for the firm's insurance company clients. This commonly involved providing legal opinions on issues of insurance coverage. By the mid 1980's my law practice was almost entirely involved with insurance related matters, including coverage opinions, insurance coverage litigation, and the defense of insurance bad faith claims. By the late 1980's I also began to represent clients who were policyholders, generally under commercial liability or property policies, but also under personal lines policies like auto and homeowners, as well as maritime, excess and umbrella, errors and omissions, and directors and officer's policies.

FRIEDMAN | RUBIN PLLP



From about 1990 until I left SFC in 2011, I always represented a mix of clients, including insurers, policyholders, municipal risk pools and occasionally insurance brokers. My representation of both insurance companies and policyholders very frequently involved advice and representation related to an insurer's obligations to handle claims in good faith, and to comply with applicable statutory, regulatory, and common law obligations in the handling of claims. In many instances I was asked to advise insurance company clients on whether they had a duty to defend an insured under liability insurance, and to advise whether the insurer had conducted a proper investigation before making any decision on its obligations to defend or indemnify its insured, or to pay a claim.

I am also asked frequently by attorneys to provide advice and opinions on a wide variety of issues that their clients have related to insurance, either for their clients, or for their opposing parties. I have been retained by counsel on approximately 30 cases in the last ten years to provide opinions as an expert witness, usually on issues of insurance coverage and insurance claims handling. Not all those retentions resulted in the disclosure of my expert opinions, but attached as Exhibit B is a list of all cases in which I have testified as an expert witness, either in deposition, or at trial, since 2004, or provided expert reports that were disclosed to my client's adversaries.

Since joining Friedman Rubin, I no longer represent clients who are insurance companies or municipal risk pools, but I continue to represent policyholders, or parties with claims that can be satisfied out of insurance policies, and to provide advice and expert opinions to attorneys on insurance related matters.

## II. Evidence Considered

Attached as Exhibit C is a list of all documents that I have considered in the formation of my opinions reflected in this report. I understand that discovery is not closed in this matter, and that it is possible that I will be provided with additional documents and perhaps deposition transcripts. While I am comfortable that the materials I have reviewed are sufficient for me to express the opinions stated herein, I will certainly consider any additional materials provided, and reserve the right to supplement my opinions expressed herein.

## III. Discussion

You have asked me to provide you with a report explaining my opinions with respect to the claims handling of Mr. Gaekwar's claim for underinsured motorist's ("UIM") benefits to his insurer, Amica Mut. Ins. Co. ("Amica") arising out of his January 25, 2020 auto accident.[1]

---

[1] I have not been asked to provide any *legal opinions* in connection with this engagement and I do not intend to do so. While I have legal training and experience, I fully understand and agree that legal questions are

**OPINIONS**

**Summary Opinion No. 1:** Based upon my education, training and experience, and my review of insurance industry texts concerning the handling of insurance claims, in my opinion there are a number of well recognized and generally accepted customs and practices in the insurance claims adjustment industry. The customs and practices related to an insurer's decision to accept or deny a claim made by an insured for policy benefits include the following:

- An insurer should always act in good faith towards its insured, including dealing fairly and honestly towards its insured, and being open and honest in all of its dealings with its insured[2].

- An insurer should give equal consideration to the interests of its insured as it gives to its own financial interests – an insurer should not treat an insured as its adversary.[3]

- An insurer should conduct a prompt, full and fair investigation[4], at the insurer's expense, *before* it makes any decision on whether to accept or deny a claim, or to make an offer to compromise a disputed claim. The insured is not obligated to investigate his claim, but only to respond to reasonable requests for information from the insurer.

- What is necessary to complete a full and fair investigation in a claim depends on the particular circumstances of each individual claim, and what is

---

not the province of expert witness testimony, and that all legal questions are reserved to the Court, to the parties and to their attorneys, and not the subject of expert witness testimony. Further, the opinions expressed herein are my personal opinions, and do not reflect the positions of my law firm, or any of its clients.

[2] Amica's "Code of Ethics" includes "Be open and honest - Your interactions with policyholders, claimants and their representatives, vendors and the public at large must be conducted openly, honestly and according to the highest standards of business conduct" Confidential Amica # 00060. Further, Amica's claims training materials titled "First Party Bad Faith in Washington" presented a slide titled "To whom do I owe "good faith" and includes "First-party Insureds (YES!!!) Named Insureds . . . UIM claimants. (See Confidential Amica #000674)

[3] Amica's claims training materials titled "First Party Bad Faith in Washington" presented a slide titled "What is "good faith" states that it is "Not putting the interests of the insurer above that of the insured." And "Insurance claims are NOT adversarial. The insurance company cooperates with the insured TO FIND what coverage is available and get claims paid expeditiously." (See Confidential Amica #000675)

[4] Amica's claims training materials state that an "essential" element of good faith is to "complete a timely and thorough investigation." (See Confidential Amica # 000413).

FRIEDMAN | RUBIN PLLP

Mr. David Balint
Page 4
June 12, 2023

necessary to constitute a full and fair investigation may change during the course of an insurer's investigation as it learns information about the claim.

- A full and fair investigation should include investigation into all facts that would support the payment of benefits and not just an investigation of facts that might support the denial of payment of benefits or the offer of a compromise of a disputed claim. An insurer should objectively evaluate all claims based on all available evidence and not just the evidence that it believes supports its own financial interests in paying less than a reasonable amount.[5]

- An insurer should complete its investigation of a claim within thirty days, unless the investigation cannot reasonably be completed within such time, in which case the insurer should notify the insured what investigation remains to be completed, and the reasons additional time is needed for investigation.[6]

- An insurer may deny a claim for benefits or make an offer to compromise a disputed claim only if it has a reasonable basis to do so. Any denial of payment of benefits or offer of compromise of a disputed claim should not be based on either assumptions that can be verified by potentially available information, or on speculation about any material facts. Instead, to conduct a full and fair investigation an insurer should make reasonable efforts under the circumstances to obtain any reliable information that is reasonably available related to the material facts of a claim before making decisions to accept to deny a claim or make an offer of compromise on a disputed claim.

- An insurer should attempt in good faith to effect prompt, fair and equitable settlement of claims in which liability has become reasonably clear.

- An insurance company should pay a claim within a reasonable time after it has received reasonable loss documentation supporting the policyholder's entitlement to policy benefits.

---

[5] Amica's "Good Faith Handling Workshop" includes a slide headed "good faith essentials" that states "reasonable offers when warranted." (See Confidential Amica # 000413)
[6] Amica's claims training materials titled "First Party Bad Faith in Washington" presented a slide titled "When am I exposed?" which includes "Investigation Permitted" which states "Despite what a plaintiff's attorney may say, you do NOT have to give up your limits at the drop of a hat. The insurer is permitted to fully investigate claims. However, you must keep first-party insureds informed about the investigation (every thirty days)." (See Confidential Amica # 000679)

FRIEDMAN | RUBIN PLLP



- An insurer should document all pertinent developments in the handling of the claim in its claim file, in such detail as to allow the events and dates of events to be reconstructed.[7]

In my opinion, these principles apply to Amica's obligations to Mr. Gaekwar in connection with his claims for Underinsured Motorists benefits arising out of the January 25, 2020 auto accident.

**Supporting Facts and Reasons:** In the insurance claims handling industry the principles listed above are fundamental to the relationship between a policyholder and its insurance company and apply whenever a policyholder presents a claim to its insurance company. Indeed, these principles are discussed in insurance industry educational courses and publications of "The Institutes" (formerly known as "The Insurance Institute of America"), leading to such well known certifications as "AIC" (Associate in Insurance) and "CPCU" (Chartered Property Casualty Underwriter). In this regard, under the custom and practice in the insurance claims handling industry, the relationship between an insurance company and its policyholder is not just the ordinary relationship between two parties to a contract, where each party is permitted to treat the other party as its adversary, and to contest any claim unless there are no reasonable grounds to do so. Instead, the custom and practice in the insurance claims handling industry recognizes that the insurance company has a duty to act in good faith towards its insured which is more than just acting with honesty and lawfulness of purpose. This standard applies to claims for Underinsured Motorists benefits, even though the UIM insurer is "standing in the shoes" of a tortfeasor. An insurer's obligation to act in good faith is a broad obligation of fair dealing, and a responsibility to give equal consideration to the policyholder's interests as the insurer gives to its own financial interests.

For example, in Markham, James, *et. al.*, <u>The Claims Environment</u> (Insurance Institute of America, 1st ed, 1993) the authors' state:

> [T]he claims representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims (pg. 13).
>
> An investigation must often be undertaken to develop fully the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely. (pg. 29)

---

[7] Amica's "Good Faith Handling Workshop" includes a slide headed "good faith essentials" that states "watch your file notes. Document everything, but be objective." (See Confidential Amica # 000413)

FRIEDMAN | RUBIN PLLP



**Summary Opinion No. 2:**

Based upon my education, training and experience, in my opinion Amica failed to follow customary claims handling practices in its handling of Mr. Gaekwar's UIM claims in the period leading up to its March 6, 2021 rejection of the $140,000 "new money" offer and responding with its first $1,000 offer, including:

(a) failing to conduct a prompt, full and fair investigation before rejecting the $140,000 offer,

(b) failing to give equal consideration to the interests of Mr. Gaekwar as it gave to its own financial interests in valuing his claim at only $61,000, resulting in a $1,000 "new money" offer,

(c) failing to attempt to effectuate a prompt, fair and equitable settlements of claims in which liability is reasonably clear, and

(d) failing to document pertinent events in its claims file.

**Supporting facts and reasons:**

A. Chronology of significant claims handling events.

As it relates to my opinions expressed above, my review of the Amica claim file and correspondence establishes the following chronology of significant events related to its handling of the claim up to March 6, 2021.[8]

- 1/25/20 – Auto Accident
- 1/28/20 – Gaekwar notice to Amica, (Amica # 2128)
- 2/18/20 – Amica receives Balint LoR on PIP and UIM claims (Amica # 2119)
- 8/3/20 – Amica receives notice of UIM claim (Amica # 2099)
- 8/4/20 – Amica acknowledges that UIM and not UM is triggered. (Amica #2097)
- 9/9/20 – Amica's investigation confirms that UIM limits are $300K, awaiting evidence of tortfeasor limits exhausted. Sets 60 day diary (Amica # 2096)
- 10/30/20 – Called attorney who stated "insured still treating and they have not set a demand yet, but when they do, they will try to negotiate." (Amica #2094)
- 11/5/20 – Amica receives copy of Balint 11/4/20 letter to Nationwide requesting its limits of $50K. (Amica # 57-64)

[8] I have reviewed all of the materials provided to me and listed on Exhibit C, attached, and created this chronology which is not intended to be an exhaustive list of all claims activities, but I feel it is helpful to set out pertinent dates to understand my opinions.

FRIEDMAN | RUBIN PLLP



- The letter sets forth information about liability and damages, and states that prior to the accident Mr. Gaekwar "had no active pre-existing back, neck or left knee symptomology whatsoever" though he had "preexisting congenital defects in both knees making him more susceptible for injury in the event of trauma. . . . any remotely relevant historical conditions were dormant by the time of this crash." Letter cites WPI 30.18 that pre-existing conditions that were not causing pain or disability but are "lighted up or made active" can be caused by the accident, "even though those injuries . . . may have been greater than those that would have been incurred under the same circumstances by a person without that condition."
- Letter says that it encloses disk with copies of numerous categories of documents including "Policy report, photos," and significantly, as related to Mr. Gaekwar's pre-accident condition "Doc. 14.1 -- 7/28/15-3/26/20 Overlake Primary Care Clinic Records" and "Doc. 17.1 – 6/14/17–3/4/20 Proliance Orthopedics Records." But Amica's claims file produced in discovery only contains medical records from after the accident.
- The disk also contained various records and invoices for his post-accident medical treatment totaling $19,255.38.

- 11/5/20 – Acknowledges that "Letter serves as Hamilton buyout request. Submitted asset check for TF so we can properly respond." (Amica #2093)
- 11/5/20 – $10,000 "Automatic System Reserve" upon claim opening (Amica response to Int. # 24)
- 11/12/20 –Agree with waiving and signing off on underlying settlement (#2090)
- 11/12/20 - $40,000 reserve – "based on $50,000 collected from tortfeasor, $19,255.38 in medical expenses. PCP, PT, Underlying osteoarthritis, Injection" (Amica response to Int. # 24)
- 12/9/20 – Amica advised that Gaekwar is settling with tortfeasor, and creating settlement demand on UIM (Amica #2088)
- 2/9/21 – Balint demand for $140,000 new money. References November 5, 2020 letter and enclosures and summarizes care since November demand to Nationwide. (Amica # 85-86)
    - Under "Additional/Future Treatment" letter states that in December 2020 Mr. Gaekwar's doctor "noted that the left knee injury is severe enough that at some point the injections will no longer be an effective method to control pain and that Mr. Gaekwar would benefit from a left total knee replacement." Under "Damages" letter states that prior to accident Mr. Gaekwar led active lifestyle, including gym and bicycling long distances, but despite exercise program, he continues with knee pain and stiffness.

- 2/11/21 – Amica acknowledges "Demand Reviewed. Primary Injury Claimed: Left knee Osteoarthritis." . . . "Demand requests $140,000 in new money. Claimed medical specials total $20,925.38. (Amica #2086)
- 3/4/21 – Review of medical records. Lists records reviewed but does not list any pre-accident medical records. Notes that as of 12/24/20 "left knee injection. – Patients arthritis is severe enough that at some point the injections may no longer be effective." (Amica #2083-85)
- 3/4/21 – Amica responds stating "there can be room for disagreement as to the amount of damages, we are willing to review and consider any additional information you wish to provide." Makes a "good faith attempt to resolve this claim" by offering waiver of Medical Payment reimbursement and $1,000 "new Money" to resolve UIM. (Amica #93-94)

B. <u>Amica failed to conduct a prompt, full and fair investigation before rejecting Mr. Gaekwar's $140,000 "new money" offer and responding with a $1,000 "new money" offer on March 4, 2021</u>.

As explained above in Opinion No. 1, customary insurance claims handling practices require an insurer to conduct a "full and fair" investigation *before* making any decision on accepting or rejecting a claim, or making a compromise offer on a disputed claim. Also, it is the insurer's obligation to conduct this investigation -- and not the insured's obligation to investigate his own claim. The insured is only obligated to cooperate with the insurer's reasonable requests for information. And the investigation should be objective and reasonable and not limited to looking for evidence to deny payment of benefits. In my opinion Amica failed to conduct a sufficient investigation before it rejected Mr. Gaekwar's February 9, 2021 $140,000 offer and in responding on March 4, 2021 with a $1,000 "new money" offer.

As of February 9, 2021 Amica had received from Mr. Gaekwar's attorney substantial information and supporting documentation from both Mr. Gaekwar's November 12, 2020 demand to Nationwide, (with its exhibits) and his February 9, 2021 UIM demand to Amica (with exhibits) regarding the adverse driver's liability, the nature of Mr Gaekwar's injuries, his claim that his left knee osteoarthritis was symptom free before the accident, the amounts of his already incurred medical expenses, his projected future medical expenses and the legal proposition (with cited legal authority) that a tortfeasor is liable for any non-symptomatic pre-existing condition that "lights up" because of the accident. But, despite extensive discussion in both letters that Mr. Gaekwar's left knee was symptom free pre-accident, there is nothing in the claim file to show that the adjuster did any investigation, let alone a "prompt, full and fair" investigation into Mr. Gaekwar's left knee condition before the accident. I note that November 12, 2020 cover letter specifically references that the enclosed disk includes "14.1 - 7/28/25 – 3/26/20 Overlake Primary Care Records" and "17.1 - 6/14/17 – 3/4/20 - Proliance Orthopedics Records." However, the adjuster's claim notes for March 4, 2021 (Amica #2083-85)

FRIEDMAN | RUBIN PLLP



specifically lists various records that the adjuster reviewed, but there is no reference to any review of any medical record predating the accident. Also, while many of the records listed as being included on the disk are found in Amica's claims file, including *post-accident* records from Overlake Primary Care and Proliance Orthopedics, no copy of the pre-accident records from either provider are found in the claim file. I do not know the explanation for this discrepancy.

But in my opinion, even if the pre-accident medical treatment records were not included on the disk that accompanied the November 12, 2020 letter, Amica had an obligation to note that absence, and promptly request copies of those records. As stated above, it is the insurer's obligation to complete a prompt, full and fair investigation, not the insured's obligation. Thus, under customary claims handling practices, as well as Amica's own internal training, it is the insurer's obligation to obtain and review all reasonably available information before it makes any decision on a claim. Amica itself acknowledges the importance of a "thorough" review of medical records, especially regarding any pre-existing conditions.[9]

As of March 4, 2021, if Amica had any question about whether Mr. Gaekwar's was experiencing left knee osteoarthritis symptoms before the accident, then in my opinion it was obligated, as part of its duty to conduct a prompt, full and fair investigation, to conduct a thorough investigation into his pre-accident condition *before* it rejected his $140,000 offer and *before* it decided to make its $1,000 "new money" offer. For example such a reasonable investigation into his pre-accident condition and symptoms could have included such things as:

1. If the pre-accident medical records from Overlake and Proliance were not contained on the disk provided, then Amica should have "thoroughly" reviewed the records on the disk, noted that the referenced pre-accident records were missing, and made reasonable efforts to obtain such records, either by requesting them from Mr. Gaekwar, or obtaining them directly from his providers.
2. asking to take a recorded statement of Mr. Gaekwar to verify his claims about his left knee being symptom free prior to the accident, or
3. if it wanted the Gaekwar's statements to be sworn, taking an examination under oath, or
4. obtaining a records review of *all* the medical records related to Mr. Gaekwar's pre-accident and post accident conditions[10], or
5. asking for an IME to verify (a) whether the left knee arthritic condition was asymptomatic pre-accident, or (b) whether the claimed knee trauma could "light

[9] See Confidential Amica # 000123 and Confidential Amica # 000126.

[10] While Amica was not obligated to uncritically accept Mr. Gaekwar's assertion about his pre-accident condition without investigation, it was required to "fully investigate" this claim, and "keep [him] informed about the investigation (every thirty days.) See Confidential Amica # 000679.

FRIEDMAN | RUBIN PLLP



up" a pre-existing arthritic condition, or (c) find out what would be the likelihood of future left knee surgery, and the amount of future medical specials for future treatment.

6. Also, if Amica had questions about how Washington law would treat a tortfeasor's responsibility for pre-existing asymptomatic conditions that were "lit up" by an accident, it could have conducted its own research, or requested an legal opinion.

Instead, Amica did none of these things, *or anything else*, to fully and fairly investigate the pre accident condition of left knee, and the causation and extent of Mr. Gaekwar's injuries and damages before it reject his offer of $140,000 and make its $1,000 "new money" offer. This was not in compliance with customary claims handling practices, and Amica's own standards which emphasize completion of a timely and thorough investigation.[11]

C. <u>Amica failed to make a reasonable effort to effectuate a prompt, fair and equitable settlement before summarily rejecting Mr. Gaekwar's $140,000 "new money" offer and responding with a $1,000 "new money" offer on March 4, 2021.</u>

As explained above in Opinion No. 1, customary insurance claims handling practices require an insurer to be open an honest with its insured, to give its insured equal consideration with its own financial interests, to not to treat Mr Gaekwar as its adversary, and to attempt to effectuate prompt, fair and equitable settlements of claims in which liability is reasonably clear. In my opinion, based upon my education, training and experience, Amica's conduct leading up to its March 4, 2021 $1,000 offer was contrary to customary insurance claims handling practices and Amica's own training to adjusters as follows.

There is no indication that Amica gave any consideration, let alone "equal consideration," to Mr. Gaekwar's contention that his left knee osteoarthritis was not symptomatic before the accident, or that his continuing left knee symptoms were caused by the accident, and would likely require future surgery. This is especially dismaying given that both the November 4, 2020 and February 9, 2021 letters make clear that though Mr. Gaekwar had pre-existing left knee osteoarthritis, he claimed to be symptom free before the accident. It is also clear from the records that Amica did review that as of December, 2020, when the records of his treatment ended, Mr. Gaekwar's physicians believed he would continue to suffer serious left knee symptoms, that conservative treatment would not resolve the issues, and that future surgery was likely.

---

[11] Amica's Good Faith Handling Workshop, slide titled "Good Faith Essentials" says "complete a timely and thorough investigation." Confidential Amica # 000413.

FRIEDMAN | RUBIN PLLP



Thus, whether Mr. Gaekwar was symptom free pre-accident and whether his continuing condition and future treatment were caused by the accident was a central issue in his claim. But Amica does not appear to have given any consideration to the "symptom free pre-accident" claim. Regardless of whether it had received any pre-accident records, it should have obtained sufficient records and made a "fair and equitable" determination as to whether he was experiencing any left knee symptoms before the accident. But instead of conducting any investigation into his pre-accident condition, Amica apparently decided that it would simply reject his $140,000 offer and make its $1,000 offer without giving any consideration to Mr. Gaekwar's pre-accident condition. In my opinion, at the time of Amica's March 4, 2021 decisions to reject the $140,000 and make a $1,000 offer, Amica's ignoring of the evidence in its file of his pre-accident condition and deciding that it did not need to conduct any further investigation into his pre-accident condition fell far below customary claims handling standards.

The $61,000 March 4, 2021 valuation appears to be a "low-ball" offer to justify Amica starting negotiations at the lowest point possible in order to force Mr. Gaekwar to dramatically reduce his claim to prompt any kind of reasonable offer from Amica.[12] The claims file provides no explanation for how the $1,000 "new money" valuation was arrived at. But it is notable that several months earlier, on November 12, 2020, Amica had set a claim reserve of $40,000, considering the $50,000 that he recovered from the adverse driver and the $19,000+ in medical specials.[13] Based on this reserve, Amica appears to be valuing the claim in the range of $90,000, (or more since its PIP had only paid $10,000 of the nearly $20,000 in specials). Following the November 12, 2020 reserve Amica received the February 9, 2021 demand letter with its updated information about Mr. Gaekwar's claim including information about likely knee surgery and costs. But even with this new information Amica did not adjust its reserve. This suggests that *internally* Amica had placed a much higher value on Mr. Gaekwar's claim than $61,000. But instead of extending an offer commensurate with the valuation represented by its reserve, and considering the supplemental information received, Amica simply told Mr. Gaekwar that it valued his claim at a total of $61,000, and offered him $1,000 "new money."

Even if Amica's $40,000 reserve is ignored, at a minimum its claim file should explain what evidence and reasons it had for its stated $61,000 valuation leading to a $1,000 "new money" offer. But there is simply no explanation for any valuation anywhere in the claim file. Nor does Amica's March 4, 2021 letter contain any explanation of how it arrived at its $1,000 "new money" offer. The failure to provide any articulated basis for the $61,000 valuation contravenes the customary claims handling practice that an insurer

---

[12] Amica's claims training materials titled "First Party Bad Faith in Washington" presented a slide titled "When am I exposed?" which includes "Not a Negotiation" "First-party claims are not "negotiated" like a third party claim. All offers to first party claimants must be based upon reasonable valuation and diligent investigation. Low ball offers to "change the midpoint", which force the insured into litigation, can be the "denial that supports a claim for bad faith." (See Confidential Amica # 000679).

[13] See Amica response to Int. # 24)

FRIEDMAN | RUBIN PLLP



should not make an offer of a compromise of a disputed claim until after it has a reasonable basis to do so, based upon a full and fair investigation, and giving equal consideration to the interests of Mr. Gaekwar as it gives to its own financial interests, and not to treat Mr. Gaekwar as an adversary. Finally, in failing to have and articulate a reasonable basis for rejecting Mr. Gaekwar's offer, and countering with a $1,000 "new money" offer, was a failure to make an attempt in good faith to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear[14].

Instead of making a reasonable attempt to value Mr. Gaekwar's claim before responding to his $140,000 "new money" offer, giving equal consideration to his interests, based upon a full and fair investigation, and actual evidence, rather than assumptions and speculation, Amica made no effort to comply with the above customary claims handling standards.

D. <u>Amica failed to document in its claims file its evaluation of Mr. Gaekwar's UIM claim the evidence and reasons it rejected Mr. Gaekwar original $140,000 "new money" claim and its offer of $1,000 "new money"</u>

As expressed above in Opinion No. 1, customary claims handling practices include an insurer's obligation to document in its claims file all pertinent events in such detail that the event and date can be reconstructed. In addition to the absence of any explanation for its $61,000 valuation, there is no suggestion in the claim file that, as of March 4, 2021, Amica had any evidence that the nearly $21,000 in invoices for medical specials and 11 months of medical and physical therapy treatment that Mr. Gaekwar submitted should be discounted because all or any part were unreasonable or unnecessary. Nor was there any evidence to justify the position that Mr. Gaekwar's injuries were not caused by the accident and were the result of pre-existing condition. Further, as of March 4, 2021 the claim file has no documentation of any evidence or reasons to justify discounting his $140,000 claim for any reason at all. This was contrary to customary claims handling practices of documenting in the claims file all pertinent events.

**<u>Summary Opinion No. 3</u>:**

Based upon my education, training and experience, in my opinion Amica failed to follow customary claims handling practices in its handling of Mr Gaekwar's UIM claims between its March 4, 2021 offer and December 6, 2021 in the following respects:

(a) failing to conduct a full and fair investigation before refusing to reconsider the $140,000 offer and making a $5,000 "new money offer, including an unexplained delay of many months in its investigation,

---

[14] Indeed, Amica's "First Party Bad Faith in Washington" training emphasis that "all offers to first party claimants must be based upon reasonable valuation and diligent investigation." (See Confidential Amica # 000679)

(b) failing to give equal consideration to the interests of Mr. Gaekwar as it gave to its own financial interests in valuing his claim at only $65,000, resulting in a $5,000 "new money" offer,

(c) failing to attempt to effectuate a prompt, fair and equitable settlements of claims in which liability is reasonably clear, and

(d) failing to document pertinent events in its claims file.

**Supporting facts and reasons**:

A. Chronology of significant claims handling events.

As it relates to my opinions expressed above, my review of the Amica claim file and correspondence establishes the following chronology of significant events related to its handling of the claim up to December 6, 2021.

- 3/22/21 – Balint letter responding to Amica offer. Offer rejected, explains that surgery is inevitable and is a direct result of the motor vehicle collision. Ask to reconsider off to take into account the inevitable need for left knee surgery. (Amica #1704)
- 4/21/21 – Claims note reviewing 3/22/21 letter. Called Balint and left voice mail requesting "call back to discuss insd possible knee surgery and to discuss claim value." (Amica #2081)
- 5/4/21 – Reserve adjusted to "$95,000 – Additional injection noted, Arthritis increased to point injections may n longer be effective. Now $20,925.38 in medical specials. Verbal information from Plaintiff's Counsel that knee surgery is inevitable." (Amica response to Int. # 24)
- 5/5/21 – Claim reassigned to Grundy. "We may want to consider an MRR/IME at this point." (Amica # 2080)
- 6/1/21 – Grundy review of new assignment. "Send email to local DC for ortho referral for an MRR." (Amica #2080)
- 6/1/21 – Grundy email to Balint – setting up MRR, and upon receipt of that report I will be in touch so we can continue settlement discussions." (Amica # 2079)
- 6/8/21 – Dr. Kearney's Record Review "This is a records review only and the claimant's current symptoms are unknown." (Amica # 69-83)
    - Report summarizes the records reviewed, (Amica #71-75) but notably this detailed list does not include any reference to any medical records prior to the accident. He does not appear to have received any medical records of Mr. Gaekwar's pre-accident treatment and condition from 2015 to the date of the accident, which had been provided to Amica with the November 4, 2020 demand.

- Dr. Kearney states that the "diagnoses" in the reviewed records are that all of Mr. Gaekwar's injuries related to the motor vehicle accident have resolved by May 21, 2020, (Amica #75), though the specific source of this summary is unclear.
- Also, he states "it is the examiner's opinion that any ongoing symptoms would be related to the pre-existing left knee moderate-to-severe tricompartmental osteoarthritis with associated varus malalignment prior to the motor vehicle accident. This diagnosis was neither caused by nor permanently aggravated by the motor vehicle accident. The natural history of this condition is that symptoms will arise and will continued to worsen over time. It is the examiner's opinion that these symptoms would have arisen regardless of the motor vehicle accident of January 25, 2020." (Amica #76).

- 6/23/21 – Reviews Dr. Kearney MRR. "I believe our current eval is fair." (Amica #2077)
- 9/13/21 – Email to Balint to set time to discuss. (Amica #2074)
- 9/27/21 – T/c Balint. Requested copy of MRR – which will forward (Amica #2074)
- 10/25/21 – Email to Balint – Have you reviewed MRR yet? (Amica #2073)
- 11/29/21 – Email to Balint – follow up re review of MRR (Amica #2071)
- 12/3/21 – Email from Balint – Gaekwar is going to have surgery. "I have read the paper review of doctor Sean Kearney which does not change the case valuation." (Amica # 1911-13)
- 12/6/21 – Email to Balint Dr. Kearney's opinion that knee condition is unrelated and any ongoing treatment would not be related to the accident. (Amica # 1911)
- 12/6/21 – email from Balint "Amica number was not a real offer nor a realistic assessment of Amica's exposure." (Amica # 1910)
- 12/6/21 – email to Balint – The $1,000 took into consideration prior compensation of $60K, but "I can increase our offer to $5,000 new money." (Amica #1909)

B. <u>Amica failed to conduct a prompt, full and fair investigation before making its $5,000 "new money" offer on December 6, 2021.</u>

As explained above in Opinion No. 1, customary insurance claims handling practices require an insurer to conduct a "full and fair" investigation *before* making any decision on accepting or rejecting a claim, or making a compromise offer on a disputed claim. In my opinion Amica also failed to conduct a sufficient investigation before it responded to Mr. Gaekwar's request to reconsider its $1,000 "new money" offer on December 6, 2021 by making its $5,000 "new money" offer. By May of 2021 the claim file was reassigned, the reserve raised to $95,000, and the decision was made to have a medical records review done before making any further offer. Amica provided Dr. Kearney

with some of the accident and medical records received from Mr. Gaekwar's attorney, but apparently did not provide him with a copy of the February 9, 2021 letter with information about his claim that his left knee was symptom free before the accident, and his extensive activities (Himalayan hiking and long bikes) before the accident. As discussed in Opinion 2, C above, failing to review or obtain reasonably available evidence related to Mr. Gaekwar's pre-accident condition is inconsistent with customary claims handling practices.

The deficiencies with Amica's investigation prior to its December 6, 2021 offer are not limited to the failure to investigate Mr. Gaekwar's pre-accident condition. Another concerning aspect of Amica's claims handling between March 4, 2021 and December 6, 2021 is the delay in any activity to investigate the current status of Mr. Gaekwar's injuries. It took two months between the March 4th offer and the reassignment and setting of a new $95,000 reserve, and during this period there was no attempt to obtain any information about Mr. Gaekwar's current condition, or whether he was symptom free before the accident from him or any of his providers. After reassignment, it took a month to obtain Dr. Kearney's report. When Dr. Kearney's June 8, 2021 report was received, Amica apparently decided to contest the value of Mr. Gaekwar's claim based on at least the following issues: (a) whether Mr. Gaekwar's pre-accident left knee condition was asymptomatic, (b) whether he continued to experience left knee symptoms as of its December 6, 2021 $5,000 offer, (c) what was his current condition as of the time of Amica's offer, and (d) whether under Washington law any pre-existing but asymptomatic conditions would be part of recoverable damages if the accident "lit up" or made symptomatic that condition. But to reasonably contest any of these issues, Amica's was obligated to conduct a prompt, full and fair investigation of those issues *before* making any decision on what the reasonable value of Mr. Gaekwar's claim required that it investigate these issues.

Instead of promptly completing a thorough investigation into these issues, Amica did nothing to obtain information of any of these issues. It waited three months between receipt of Dr. Kearney's report and contacting Mr. Gaekwar's counsel, which is contrary to its obligation to promptly investigate, and to complete its investigation within 30 days, or if it could not complete its investigation, notifying Mr. Gaekwar what in its investigation remained to be completed, and the reasons additional time was required[15]. The claim file contains no documentation of why it took eight months between March, 2021 and December 2021 to complete its investigation, and why no explanation was given to Mr. Gaekwar for the delay.

In my opinion, based upon my education, training and experience, a full and fair investigation *before* the December 6, 2021 offer should have included, at a minimum, reasonable attempts to obtain all readily available information on these issues including both his pre-accident condition and his current condition, as of the date of its offer, which

---

[15] Amica's adjusters are trained to keep insureds informed about developments in its investigation at least every thirty days. See Confidential Amica # 000679.

was over a year after the last records of medical treatment. Thus, Amica's investigation should have included whether, as of the time of its response (December 2021) Mr. Gaekwar's "moderate-to-severe tricompartmental osteoarthritis" was asymptomatic before the accident by:

(1) if it questioned the completeness of the records provided, it could have requested all his prior medical records, and his post December 2020 medical records, from Mr. Gaekwar, or directly from the providers, or

(2) taking a recorded statement or alternatively an EUO from Mr. Gaekwar as to his past and current condition, or

(3) investigating further his claim that he was healthy enough in the few months preceding the accident to hike at the 17,000 foot level of the Himalayas, or engage in long distance bike rides.

Similarly, before making any decision on the valuation of Mr. Gaekwar's claim in December 2021, Amica should also have further investigated:

(1) his current condition, by requesting an IME, or

(2) whether he was asymptomatic prior to the accident, and the osteoarthritis was "lit up" by the accident, by requesting a report or interview with Mr. Gaekwar's treating physician, or

(3) whether Washington law made the adverse driver responsible for pre-existing but asymptomatic conditions that "lit up" because of the accident, by conducting in house legal research or requested an opinion from one of its attorneys.

However, instead of making any attempt to investigate any of these critical issues, Amica decided to proceed with its evaluation and offer based upon a six month old report from Dr. Kearny based itself upon out dated records of his treatment. In my opinion, as of December 6, 2021 when it made its $5,000 offer, Amica had failed to conduct a "full and fair" investigation, and therefore did not comply with customary claims handling practices.

C. Amica failed to make a reasonable effort to effectuate a prompt, fair and equitable settlement before refusing to reconsider its rejection of Mr. Gaekwar's $140,000 "new money" offer and responding with a $5,000 "new money" offer on December 6, 2021.

As discussed above in connection with Opinion No.1, customary claims practices include:

- dealing fairly and honestly towards its insured,
- giving equal consideration to the interests of its insured as it gives to its own financial interests, and not treating the insured as an adversary,
- conducting a prompt full and fair investigation, at the insurer's expense, *before* it makes any decision on whether to accept or deny a claim,

FRIEDMAN | RUBIN PLLP



- including an investigation into all facts that would support the payment of benefits and not just an investigation of facts that might support the denial of payment of benefits,
- objectively evaluating the claim based on all available evidence and not just the evidence that it believes supports its own financial interests in paying less than a reasonable amount,
- making reasonable efforts under the circumstances to obtain any reliable information that is reasonably available related to the material facts of a claim *before* making decisions to accept to deny a claim,
- completing an investigation promptly, and within 30 days, unless not reasonably possible, and if so, then advising the insured of the reasons the investigation will take longer, and
- attempting in good faith to effect prompt, fair and equitable settlement of claims in which liability has become reasonably clear.

In my opinion, Amica's decision to offer only $5,000 "new money" in December, 2021 failed to comply with these practices, as follows:

1. Relying upon Dr. Kearney's opinion that the left knee osteoarthritis condition was pre-existing and not caused by the accident without realizing that it was flawed because it was not based upon all of the available information related to Mr. Gaekwar's pre-accident condition, and only based upon records of his condition as of December, 2020. This was a failure to give equal consideration to the interests of Mr. Gaekwar, since it failed to include any investigation of any facts that would support a claim, it failed to be objective, and it failed to attempt to find reasonably available evidence before making a decision on the role of any pre-existing conditions.

2. By arriving at an unexplained (and undocumented) valuation of $5,000 "new money", while its file reserve was at $95,000, Amica failed to make an offer of a compromise of a disputed claim only after it had a reasonable basis to do so giving equal consideration to the interests of Mr. Gaekwar as it gives to its own financial interests, and not simply treating Mr. Gaekwar as its adversary.

3. The absence of any documentation in the claim file for $5,000 "new money" valuation did not comply with Amica's obligations to (a) document all pertinent events in the claim file to permit the events and dates to be reconstructed, (b) be open an honest with its insured, (c) to give its insured equal consideration with its own financial interests, (d) to not to treat Mr Gaekwar as its adversary, (e) to attempt to effectuate prompt, fair and equitable settlements of claims in which liability is reasonably clear.

All of the above show that Amica failed to make an attempt in good faith to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear.

FRIEDMAN | RUBIN PLLP



**Summary Opinion No. 4**:

Based upon my education, training and experience, in my opinion Amica failed to follow customary claims handling practices in its handling of Mr Gaekwar's UIM claims between December 2021 and its July 12, 2022 rejection of Mr. Gaekwar's June 30, 2022 demand for $275,000 "new money."

**Supporting facts and reasons**:

A. Chronology of significant claims handling events.

As it relates to my opinions expressed above, my review of the Amica claim file and correspondence establishes the following chronology of significant events related to its handling of the claim between its December 6, 2021 offer until its July 12, 2022 rejection of the June 30, 2022 demand for $275,000.

- 1/31/22 – Email to Balint – "have you presented counter offer to client?" (Amica # 1910)
- 1/31/22 – Email from Balint $5k is not really an offer and is rejected. "Once Mr. Gaekwar recovers a bit more from his surgery, and we know if there will be any residuals, then we will proceed to suit." (Amica # 1909)
- 1/31/22 – email to Balint – disagrees that $5K new money is not a real offer, based upon prior money, review of records and expert's review. Asks for surgery records and encourages a counter offer. (Amica # 1908)
- 2/1/22 – Balint email with invoices from hospital and rehab of approximate $107K (Amica # 1907)
- 4/4/22 – Email to Balint asking for surgery records.
- 5/31/22 – Email to Balint – following up on request for surgery records. (Amica #1946)
- 5/31/22 – Balint email – we are in final stages of gathering all updated medical information and bills – hope to present all records to Amica for analysis within the next few weeks. (Amica #1945)
- 6/30/22 Balint Updated Demand letter (Amica #1783-1990). Goes thru history, updates treatment for surgery and costs:
    - "The surgeon, Dr. Robert T. Goldman, MD, submitted a sworn declaration delineating the cause of the surgery, the need for surgery and the reasonableness of the medical care provided. A copy of his declaration, along with his curriculum vitae, is also enclosed on the disk." (Amica # 1784)

- “A careful review of the medical records will support the fact that prior to this crash . . . Mr. Gaekwar had no active conditions with his left knee.” (Amica # 1784)
- “Since you may not be familiar with Washington law, when a dormant condition is lit up and made active, the tortfeasor is liable for all of the effects of the incident.” (Amica # 1784)
- Discusses Mr. Gaekwar’s pre accident physical condition, including hiking in Himalayan mountains to at 17,000 feet.
- Discusses need for aggressive in house rehab prescribed by surgeon and paid in full by Medicare.” (Amica # 1785)
- Dr. Kearney’s report “will not suffice over the personal knowledge and expertise of the surgeon, Dr. Robert T. Goldman, MD, who has been following Mr. Gaekwar’s knee condition since 2014. The opinion of Dr. Kearney is deficient in several particulars, including the fact that he did not physically exam Mr. Gaekwar, nor did he talk with him about the present left knee condition.” (Amica #1786)
- Amica owes a duty of good faith, “which includes the duty to investigate thoroughly the documentation provided. If, after reading the materials enclosed on the disk, AMICA requests other information or documentation, please do not hesitate to ask.” (Amica # 1786)
- New money demand of $275,000. (Amica # 1786)

• 6/30/22 -- Email to Amica with copy of letter- “a hard drive copy, along with a disk of the exhibits, are to follow via regular mail.” (Amica # 1787)

Dr. Goldman’s May 10, 2022 Declaration (not found in Amica file):

- Started treating Mr. Gaekwar in September 2014 for bilateral knee problems.
- Treated conservatively with injections and physical therapy through May 2017. “Active symptomology of his left knee resolved by May 2017.”
- “From May 2017 and through the date which the collision occurred, January 25, 2020, Mr. Gaekwar had no complaints or active symptoms in his left knee.”
- “Immediately following the crash, there was pain and visible swelling with his left knee, stiffness and reduced range of motion. In addition, his left knee was locking.”
- Left knee replacement surgery on December 13, 2021.
- “In my opinion, the left knee treatments and replacement surgery of December 13, 2021 and the resulting follow up care, including a stay at an

FRIEDMAN | RUBIN PLLP



inpatient rehabilitation center and physical therapy, were all reasonable and necessary, and related to the crash of January 25, 2020."

  - "Mr. Gaekwar had some pre-existing degenerative changes in his left knee which included: osteoarthritis . . ." "These conditions had been dormant since May 2017, two and half years before the collision of January 25, 2020. Immediately after the crash, these dormant left knee conditions were greatly aggravated."

- 7/6/22 -- Reviews demand, waiting on disk. (Amica #2066)
- 7/11/22 -- Review of demand. "New review of Meds. After review of new records this does not change evaluation. PC is claiming bills at $155K. POA shows $145K Significant Medicare adjustments. Left knee issues stemmed from severe osteoarthritic changes. Feels claim has value of $5k new money offer. "If negotiations stall, we should look to send the new records to MRR expert in preparation for an updated report/litigation." (Amica #2060)
- 7/12/22 – Rejects the offer. "We had the opportunity to review the demand and enclosures provided. . . . It is evident from a review of the records that the need for the left knee surgery was in relation to localized osteoarthritis." Offer of $5K remains. Suggests meditation. (Amica # 12)

B. <u>Amica failed to conduct a prompt, full and fair investigation *before* rejection of the June 30, 2022 $275,000 demand on July 12, 2022.</u>

As explained above, customary claims handling practices require an insurer to conduct a prompt "full and fair" investigation *before* offering a compromise of a disputed claim. It is the insurance company's obligation to do this investigation, at it's own expense, and the insured is not obligated to investigate his own claim, only to cooperate with reasonable requests from the insurance company for information. In my opinion Amica again failed to conduct a sufficient investigation before it responded to Mr. Gaekwar's June 30, 2022 demand. Prior to July 12, 2022 rejection of the June 30, 2022 demand the only evidence that Amica's had obtained in its investigation of Mr. Gaekwar's condition came from his attorney, and from a flawed medical records review based upon medical records that did not cover any treatment after December 24, 2020. The February 9, 2021 and June 30, 2022 demands provided Amica with much more evidence related to Mr. Gaekwar's condition as of those dates. This included information about his surgery, post-surgery treatment, and medical invoices of over $135,000, as well as a declaration from Dr. Goldman, his treating physician, establishing that his condition, including surgery, were caused by the accident trauma, and that the charges for his surgery and follow-up treatment were reasonable and necessary. But instead of investigating this new information from Mr Gaekwar's attorney or obtaining information on his condition from any other source, Amica decided that it did not need to make any further effort to investigate his current

condition. Instead Amica simply decided to rely upon a year old records review that did not include any records of the last eighteen months of his treatment.

In addition to medical records and invoices, Dr. Goldman's declaration provided Amica with the opinions of Mr. Gaekwar's treating physician on causation and the reasonableness and necessity of the surgery and follow on treatment. By contrast, Dr. Kearney never met or examined Mr. Gaekwar, let alone at any time near the June 30, 2022 demand. Other than the references in the claim file to reviewing the supplemental materials submitted with the June 30, 2022 demand, Amica does not document any attempt to do anything further to investigate Mr. Gaekwar's current condition, including the issues of (a) whether Mr. Gaekwar's pre-existing osteoarthritis was dormant for a period of time before the accident, or (b) whether the accident "lit up" the pre-existing left knee condition, or (c) whether the left knee replacement surgery and in house rehabilitation was caused by the accident, and whether the treatments were reasonable and necessary, or (d) whether under Washington law the Medicare adjustments to the surgery and rehabilitation charges would be admissible to reduce the amount of special damages claimed.

In my opinion, before Amica responded to the June 30, 2022 demand, it had an obligation under customary claims handling practices to conduct a prompt, full and fair investigation into each of these issues at a minimum. Under the circumstances a reasonable investigation could have included such things as:

1. Obtaining a current physician's opinion on the above issues, by having Mr. Gaekwar examined by a physician or at least obtaining and providing the physician with *all* of Mr. Gaekwar's records and information about his pre-accident and current condition, and requesting an opinion, (note this was mentioned in the July 11, 2022 claims note as something that could be done), or

2. Interviewing Mr. Gaekwar about his left knee condition and his level of activity in the period before the accident, or

3. Conducting research or requesting a legal opinion on whether the Medicare adjustment of the charges would be admissible to reduce the amount of special damages owed.

But, as with its investigations done before its $1,000 and $5,000 offers, Amica did none of these things, nor anything else before it rejected his $275,000 "new money" demand on July 12, 2022. As expressed in my opinions No. 2 (B) and No. 3 (B) above, in my opinion Amica did not comply with customary claims handling practices.

I am advised that Amica contends in the lawsuit that it never received Dr. Goldman's declaration on the disk that was provided with the June 30, 2022 demand. There is nothing in the claim file to document whether it did or did not receive the declaration, which would certainly be a "pertinent event" that should have been documented under customary claims handling practices. In my opinion, even if Amica did

not receive Dr. Goldman's declaration, it nevertheless failed to conduct a full and fair investigation before responding to that demand. I note that the June 30, 2022 cover letter specifically states "A copy of his declaration, along with his curriculum vitae, is also enclosed on the disk." (Amica # 1784). Further the July 11, 2022 claim note (Amica #2060) specifically states "New review of Meds." and there is no mention in that entry that anything listed in the cover letter was missing from the disk. In my opinion, when the disk was reviewed, Amica should have confirmed whether the disk included all of the materials referenced in the cover letter, including the declaration of Dr. Goldman, which is prominently discussed. If the disk did not include a copy of Dr. Goldman's declaration, then under customary claims handling practices Amica should have promptly requested a copy from Mr. Gaekwar's counsel. But Amica did not ever document in its claims file or in any communications with Mr. Gaekwar's counsel that it did not have Doctor Goldman's declaration. Customary claims handling practices require the insurer to conduct the investigation, not the insured. Thus, if relevant information is missing, it is the insurer's duty to obtain it. Thus, whether or not Dr. Goldman's declaration was contained on the disk, in my opinion Amica failed to conduct a full and fair investigation of Mr. Gaekwar's condition post surgery before making a response to his $275,000 demand.

C. <u>Amica failed to make a reasonable effort to effectuate a prompt, fair and equitable settlement before summarily rejecting Mr. Gaekwar's $275,000 "new money" offer on July 11, 2022.</u>

In my opinion, in addition to my opinion above, Amica's conduct between its receipt of the June 30, 2022 demand and its July 12, 2022 response was also contrary to customary insurance claims handling practices in other respects, including:

1. Its obligation to document in its claims file all reasons and evidence it relied upon to document its evaluation of Mr. Gaekwar's claim at $65,000, resulting in the $5,000 "new money" offer.

2. Its obligation to investigate *all* facts that would support the payment of benefits and not simply rejecting the newly supplied evidence and relying upon self-serving assumptions and speculation to justify offering only $5,000 "new money." This includes an obligation to thoroughly investigate the information provided with the February 9, 2021 and June 30, 2022 demands.

3. Its obligation to make an offer of a compromise of a disputed claim only after it had a reasonable basis to do so giving equal consideration to the interests of Mr. Gaekwar as it gives to its own financial interests, and not simply treating Mr. Gaekwar as its adversary. In this regard, even as of July 12, 2022, Amica had a claim reserve of $95,000, which had not been updated since the receipt of the June 30, 2022 demand and its records of the surgery, follow up treatment and an additional $135,000+ in medical expenses. But even with these documented developments, Amica persisted with its $5,000 offer.

4. Its obligation to make an attempt in good faith to effect prompt, fair and equitable settlement of a claim in which liability has become reasonably clear.

Again, as with its conduct discussed in Opinion No. 3 above concerning its claim handling leading up to its December 6, 2021 offer of $5,000, Amica continued to fail to comply with customary claims handling practices in the period between receipt of the June 30, 2022 $275,000 "new money" offer and its July 12, 2022 rejection. It gave no consideration to the additional medical records and invoices documenting the knee surgery, nor even attempted to seek an updated opinion from Dr. Kearney, or some other physician, as to Mr. Gaekwar's current condition. Instead, it ignored Mr. Gaekwar's condition in the year and a half since the last treatment records it had sought to be reviewed. Nor does Amica appear to have attempted to give any consideration, much less equal consideration to Mr. Gaekwar's interests, and instead seems only interested in treating him as its adversary, and to only protect its own financial interests.

The claim file contains only conclusory statements that the new records do not change the prior evaluation, relying only upon the adjuster's opinion, and makes no attempt to obtain another view from anyone else. Tellingly, the July 11, 2022 claims note states: "If negotiations stall, we should look to send the new records to MRR expert in preparation for an updated report/litigation." (Amica #2060). This demonstrates that the adjuster knew that an "updated report" might be helpful to evaluate the claim. But instead of obtaining such an update, *before rejecting the $275,000 demand*, Amica simply elected to ignore an obvious reasonable source of information and simply decided to continue to rely upon the outdated report of Dr. Kearney, based upon outdated records, that disputed all causation of injuries after May, 21, 2020. This was a serious failure to comply with customary claims handling practices and demonstrates that Amica made no attempt to effectuate a prompt, fair and equitable settlement.

**Summary Opinion No. 5**:

Based upon my education, training and experience, in my opinion Amica failed to follow customary claims handling practices in its handling before refusing to resolve the claim in response to Mr. Gaekwar's July 25, 2022 IFCA notice.

**Supporting facts and reasons**:

A. Chronology of significant claims handling events.

As it relates to my opinions expressed above, my review of the Amica claim file and correspondence establishes the following chronology of significant events related to its handling of the claim in response to the July 25, 2022 IFCA notice.

- 7/18/22 – Balint email. "I am disappointed that the updated medication information, photo, and surgeon's sworn declaration and analysis did not change Amica's offer." Mr. Gaekwar will file suit and send an IFCA letter. Rejects mediation offer as "evidence of bad faith when no amount of damages material provided to you changes the pre-surgery offer." (Amica # 1990)
- 7/18/22 – Amica email – disagrees that offering to mediate is evidence of bad faith. "As you are aware, the MRR expert opined that the surgery would be unrelated to the accident and related to a degenerative condition." (Amica # 1990)
- 7/25/22 – Balint IFCA Notice and letter
  - Notice history of claim including that on June 30, 2022 a large amount of updated information and documentation provided "as well as the sworn declaration of the surgeon establishing proximate cause." Amica did not ask for any further information. No new offer was made. (Amica # 127)
  - Quotes IFCA statute and various WAC regs. Including 284-30-330 (3), (4), (6) and (7), as well as 284-30-370 (Amica # 128-29)
  - "Amica had access to my client's medical records and bills from almost the beginning of this case, . . . There was no effort by Amica (or you opinion witness) to interview or examine its insured even though it had a right to do so under its insurance policy." (Amica # 129)
  - Amica has 20 days to make an effort to treat its insured fairly. (Amica # 130)
- 8/4/22 – Letter from Mr Leid to Balint acknowledging IFCA notice, but Amica disagrees. Asks for any additional documents, but no mention of anything that it requests (like Dr. Goldman's Declaration). No counter offer. (Amica # 67-68)

B. <u>Amica failed to make a reasonable effort to effectuate a prompt, fair and equitable settlement during the 20 day IFCA Notice period to resolve the claim in a prompt, fair and equitable manner.</u>

The July 25, 2022 letter gave AMICA a period of 20 days in which to resolve his claims before he filed suit. The letter summarized the history of the claim, and the documentation provided, including another reference to Dr. Goldman's declaration. It also summarized the negotiations over more than a year to resolve the claim, as well as applicable insurance law and regulations. It invited Amica to request any further information that it might need (and if Amica indeed had not received Dr. Goldman's declaration, Amica could have easily asked for it at that time). But instead of taking advantage of the opportunity to attempt to resolve the claim in a prompt, fair and equitable manner, Amica's counsel responded on August 4, 2022 that Amica disagreed with the allegations without any further explanation. It made no offer to resolve the claim. As a result Mr. Gaekwar was forced to file suit to obtain his insurance policy benefits.

FRIEDMAN | RUBIN PLLP



In my opinion, based upon my education, training and experience, Amica's failed to comply with customary insurance claims practices by (a) not using the 20 day period to make sure its investigation was full and fair, (b) not making sure that it completed such investigation *before* it made decisions on the value of Mr. Gaekwar's claim, and the $1,000 and later $5,000 "new money" offers that it had extended, (c) not giving equal consideration to the interests of Mr. Gaekwar as it gave to its own interests, (d) relying upon assumption and speculation instead of a thorough investigation, and (e) not attempting to effectuate a prompt, fair and equitable settlement of a claim in which liability has become reasonably clear before Mr. Gaekwar filed suit.

## IV. Conclusion

In summary, at each of the four timeframes discussed above, in my opinion Amica completely failed to comply with customary claims handling practices in the handling of Mr. Gaekwar's UIM claim.

## V. Compensation

I am being paid at the hourly rate of $575 for my work on this matter, which is my customary rate for matters handling in 2022, when I accepted this engagement (my current hourly rate for expert engagements effective January 1, 2023 is $595).

Very truly yours,

[signature]

Richard Dykstra

Enclosures

# EXHIBIT A

# *CURRICULUM VITAE*

**Richard Dykstra**

1109 1st Ave., Suite 501
Seattle WA 98101
Telephone: (206) 501 4446
Direct: (206) 578 5963
Facsimile: (206) 623 0794
Email: rdykstra@friedmanrubin.com

## *Admitted to Practice*

Washington State Bar Association (1973)
Federal District Court, Western District of Washington (1975)
Ninth Circuit Court of Appeals (1975)
Alaska Bar Association (1987)
Federal District Court for District of Alaska (1987)

## *Employment*

May 2011 to present: Of Counsel, Friedman | Rubin PLLP
Jan 2011 to April 2011: Of Counsel, Stafford Frey Cooper
1979-2011: Shareholder, Stafford Frey Cooper
1975-1979: Associate, Stafford Frey & Mertel
1973-1975: Law Clerk, Judge Frank James, Washington State Court of Appeals

## *Nature of Practice*

For nearly forty years, Richard's practice has focused on issues of insurance coverage and insurance company good faith claims handling. He has been involved in many of the noteworthy Washington cases that establish the standards for insurance company conduct. Since 2011 he generally represents policy holders and serves as "personal counsel" for large and small businesses, law firms and medical professionals to establish and protect their interests whenever insurance is at issue. He has achieved a number of confidential settlements involving payment of many millions of dollars for injured persons and businesses. He also assists attorneys, both in Washington and around the country, to help them evaluate the insurance coverage available to satisfy their clients' claims, and to help strategize and negotiate to accomplish the clients' goals. Richard also has served as an expert witness on several occasions.

## *Publications and Speaking*

- *Ethical Issues in Covenant Judgment Cases*, The 19th Annual WSBA Law of Lawyering: The Must vs. Mustn't Edition, WSBA, (Dec. 16, 2022)
- *Liability Insurer's Bad Faith: Know it When You See It,* The Beating Heart of Bad Faith & IFCA: Unreasonableness, Damages & Talking with Your Jurors, WSAJ Spring Conference 2018 (May 11, 2018)

- *A Policyholder's View of Defense Counsel's Ethical Duties*, Insurance in the Construction Industry, The Seminar Group (October 5, 2017)
- *Recovering Attorney Fees in Insurance Litigation,* WSAJ's 39th Annual Insurance Law Seminar, (January 19, 2017)
- *Common Insurance Issues in Worksite Accident Claims,* Worksite Accident Claims, The Seminar Group, (Nov. 17, 2015)
- *When to Covenant and When not to Covenant?* Covenants Not to Execute, WSAJ, Nov. 2014)
- *Gathering Information on the Enemy: How Broad is the Scope of Discovery in a Bad Faith Case? What is the Outer Limit of Cedell v Farmers Insurance*, WSAJ's 36th Annual Insurance Seminar (Jan. 2014)
- *A Policyholder's View of Defense Counsel's Ethical Duties*, Insurance Law: The Litigation Process, (WSBA Dec. 2013)
- *Discovery of Insurance Materials*, Annual Insurance Law Seminar (WDTL, April 2012)
- *Developments in Enforceability of Arbitration Provisions*, 34th Annual Ins. Seminar (WSAJ, Jan. 2012)
- *Overview of Liability, Property and Builders' Risk Issues for the Construction Professional*, Annual Conference on Construction Law (The Seminar Group Sept. 2000-Sept. 2010)
- *Ten Tips for Claims Handling*, Reed McClure Eleventh Insurance Law Seminar (May 2010)
- *TGINE (Thank Gawd Its NOT ERISA),* 31 Annual Ins. Seminar (WSTLA, Jan 2009)
- *Managing Litigation Against the Corporate Executive,* Liability of the Corporate Executive (The Seminar Group, 2009).
- *A Policyholder's View of Defense Counsel's Ethical Duties*, Insurance Coverage From A to Z (National Business Institute, February 29, 2008), and (Insurance Coverage Litigation, August 11, 2006).
- *Settlement Strategies When Liability Insurance Involved,* The Essentials of Civil Settlement Strategies (Washington State Bar Association, Sept 21, 2006).
- *Overview of Liability and Builder's Risk Insurance Issues for the Construction Professional, Analyzing, Pursuing and Resolving Construction Claims in Washington* (Professional Educations Systems Institute LLC, December 16, 2005).
- *Twelve Myths and Realities of Insurance Coverage for Construction Defect Claims* (Co-Author with Ron Dinning) (Washington Defense Trial Lawyers, February 11, 2005).
- *Reading the Policy – How to Get It and How to Read the Declarations Page, Insurance Law Basics: Covering the Basics* (Washington State Trial Lawyers Association, September 22, 2004).
- Speaker, Bad Faith Litigation in Washington (NBI, Inc. August 13, 2002).
- *A Policyholder's View of Defense Counsel's Ethical Duties*, Annual Ethics Seminar (Washington Defense Trial Lawyers, December 2002).
- *Common Insurance Coverage Issues in Professional Liability Claims*, Insurance Coverage – An Analysis of the Critical Issues (Washington State Bar Association, April 1999); and in Suing & Defending Professionals in Washington (Washington State Bar Association, March 1998).

- *Staying out of Court and in Business*, Co-Author (Archipelago Publishing, 1997).
- *Litigating with Insurance Companies,* Eighth Annual Nuts and Bolts of Insurance Coverage Seminar, Part I (King County Bar Association, May 1996); and 18th Annual Insurance Law Seminar (Washington State Trial Lawyers Association, January 1996).
- *Liability Insurance and the Contractual Allocation of Risk,* Nuts & Bolts of Insurance Coverage, Part 2A (King County Bar Association, May 1995).
- *Insurance Coverage for Derivative Liabilities of Successor Corporations*, Litigating the Coverage Claim II: Pretrial Procedures and Strategies,(American Bar Association -TIPS Section, 1993).
- *Notice and the Right to be Heard: the Significance of Old Friends,* Harvard Civil Rights Civil Liberties Law Review (May 1974) (Co-author with Professor Steven N. Subrin).

### *Education*

1973 –Juris Doctor, Northeastern University School of Law, Boston MA
1970 – Bachelor of Arts, *cum laude*, University of Washington, Seattle WA

### *Professional Associations*

- American Bar Association, and the following ABA Committees
  - Insurance Coverage Committee of the Tort and Insurance Practice Section,
  - Insurance Coverage Litigation Committee of the Litigation Section, and
  - Ethics Committee of the Center for Professional Responsibility
- Washington State Association for Justice
- American Association for Justice
- Fellow, American College of Coverage Counsel

### *Other*

- “AV” rated (“preeminent”) via Martindale Hubbell, by peer attorneys and judges.
- Selected for inclusion in *Washington Law & Politics* “Super Lawyer” list (top 5% of lawyers statewide) in area of insurance law in 2000, 2003-22, based upon its readers’ poll.
- Selected for inclusion in *Best Lawyers in America* © list in field of Insurance Law for 2009-2023.
- League of Justice, Washington’s Most Amazing Attorneys, Washington CEO magazine, March 2006.

# EXHIBIT B

**Expert Testimony**

*Strategic Wealth Management v. First Specialty Ins.* AAA Arbitration 75 Y 195 00435 JISI (deposed Dec. 29, 2004)

*Lexington Ins. Co. v. Issaquah Care Center, LLC* USDC WD WA #CV5-1614P (deposed, July 18, 2007)

*Holiday Resales Inc. v. Hartford Casualty Ins. Co.*, USDC WD WA # CV-07-1321 JLR (deposed, May 23, 2008)

*Gosney v. Firemen's Fund*, King Co. Sup Ct. #09-2-32462-0 (deposed 12/11/2014), (trial testimony, April 13, 14, and 21, 2015).

*Connors v United Services Automobile Assoc.*. Pierce Co. Sup Ct. # 15-2-12064-1 (deposed Dec. 12, 2016)

*Cypress Insurance Company v. SK Hynix America, Inc.*, USDC WD WA # CV-00467-RAJ (deposed October 17, 2018) (trial testimony March 13, 2019)

*In Re Fraser's Boiler Service, Inc, Debtor*, WSBC WD WA # 18-41245-BDL (deposed December 20, 2018)

*Solomon A. Agere v. Meseret Shiferaw*, Spokane Co. Sup. Ct. # 19-2-03579-32 (deposed October 6, 2020, trial testimony January 27, 2023)

*Phillip Traulsen, et. al. v. Ephrata Trucking LLC, et. al.*, King Co. Sup Ct. #19-2-20293-9 SEA (deposed January 26, 2021)

*Derek and Megan Watson v. Schwabe, Williamson & Wyatt, P.C., et. al.*, King Co. Sup. Ct. # 21-2-03478-7 SEA (Declaration filed Nov. 1, 2021, and deposed December 15, 2021)

**Expert Reports filed since 2014**

*Jones v. Ryan, Swanson & Cleveland*, King Co. Sup Ct. # 13-2-35395-4 (Declaration filed Aug 8, 2014)

*City of Bothell v. Berkley Regional Specialty Ins.*, USDC WD WA 2-14-cv 00791 (RSL) (Declaration filed Nov. 5, 2014)

*Igielski v Riversource Life Ins. Co.*, USDC WD WA 2:15-cv 00313 RAJ (Declaration filed May 26, 2015)

*Adam Factor v YRC, Inc. et. al.*, Dist. Ct. Oklahoma County, OK, # CJ-2013-4486 (Affidavit Filed Oct. 15, 2015)

*Connors v United Services Automobile Assoc.*. Pierce Co. Sup Ct. # 15-2-12064-1 (Declaration Filed March 9, 2017)

**Expert Witness Disclosure of Opinions**

*Premier Harvest LLC, et. al. v. Axis Ins. Co. et. al.*, USDC Western Dist. WA # 17-cv-0784-JCC, (Report dated June 15, 2018 and rebuttal report dated July 16, 2018)

*Gillies & Oil Family Cyclery, LLC, et. al. v Ohio Security Ins. Co.*, King Co. Sup Ct. # 18-2-18585-8 SEA (Plaintiffs' Disclosure of Possible Primary Witnesses, July 1, 2019)

*Alison L. Yearsley v. Steven Fogg, et. al.*, King Co. Sup Ct. # 18-2-27074-0 SEA, (Plaintiff's CR 26 Expert Opinions, July 30, 2019)

# EXHIBIT C

2814.02 – Gaekwar v AMICA
D-3 Expert Richard Dykstra
List of Documents Sent to Dykstra
6/9/2023

**LIST OF INDEXED DOCUMENTS:**

| | |
|---|---|
| 11.1 | AMICA Automobile Accident Report Filled Out by Chandu (Bate No. 254-255 - From Defense Initial Disclosures) |
| 25 | DME Paper Review by Dr Sean Kearney (& his CV) |
| 27 | Dr Robert T. Goldman CV |
| 27.1 | Declaration Robert T. Goldman |
| 27.2 | Demand Letter to Grundy Including Declaration of Dr Goldman |
| 27.3 | Grundy Letter acknowledging reading of Demand Letter of 6/3/22 |
| 27.4 | Email to Grundy expressing disappointment that he didn't change offer despite new info, including the declaration of Dr Goldman |
| 27.5 | IFCA Notice to Amica including reference to Dr Goldman declaration |
| 27.6 | Complaint (Paragraphs 11 &22 referencing the Goldman declaration and new documentation) |
| 27.7 | Amica Answers admitting Paragraph 11 of the Complaint regarding Dr. Goldman declaration |
| 27.7A | P's Initial Disclosures (pg 8) |
| 27.8 | P's Answer to Amica Is/RPs including reference to Dr. Goldman declaration in answer to I-25 |
| 29 | Amica Claims Log (1/27/20--7/25/22 (printed by Grundy 7-25-22) |
| 29.2 | [Final] Amica Claims Log (1/27/20--7/25/22 (printed by Christine Hall 1/4/23) Duplicate of 29.1 |
| 29.2A | Amica Claims Log Excerpts – Review of Claim by Claims Supervisor |
| 31.1 | Chronology of Communication with AMICA |
| 31.2 | Communication Emails for Chronology of Communication with AMICA |
| 36.3 | AMICA Supplemental Confidential Material (Confidential Bates 121-826) |
| 36.3A | Index of Received Training Modules in Confidential Bates 121 – 826 |
| 36.4 | AMICA Confidential Supplemental Production [DUPLICATES] - Duplicates (Confidential Amica 319 - 409) |
| 40.1 | Initial Demand to Nationwide |
| 40.2 | UIM Supplemental Demand |
| 40.8 | Updated UIM Demand with Surgery Information |

**DEMAND SPECIFIC EXHIBITS NOT INCLUDED IN "LIST OF INDEXED DOCUMENTS" ABOVE:**

| | |
|---|---|
| 1 | Police Report |
| 5 | PD Photos Provided by Client (Might be from Ins Appraiser) |
| 5.1 | Amica PD Photos for Clients Vehicle |
| 5.3 | Revised PD Estimate for Amica--$5,292.02 |
| 6 | Injury Photos of Client from Client |
| 7 | Proof of Medicare Form - Signed by Client |
| 10 | Letter from Dr. Kriseman to Suspend Gym Membership |
| 14.1 | 7/28/15 - 3/26/20 Overlake Primary Care Clinic Records |

| | |
|---|---|
| 14.2 | 1/27/20 - 3/26/20 Overlake Primary Care Clinic Bills |
| 15 | 1/31/20 Radia Bill |
| 16.1 | 2/4/20 - 9/30/20 Innova PT Records |
| 16.2 | 2/4/20 - 9/30/20 Innova PT Bills |
| 17.1 | 6/14/17 - 3/4/20 Proliance Orthopedics Records |
| 17.2 | 2/18/20 - 3/4/20 Proliance Orthopedics Bills |
| 17.3 | MRI Image from Proliance Orthopedics |
| 18.1 | 1/31/20 Evergreen Health X-Ray Record |
| 18.2 | 1/31/20 Evergreen Health X-Ray Bill |
| 20.1 | 10/21/21 - 1/25/22 Tri County Orthopedic Records - SURGERY |
| 20.2 | 10/21/21 - 1/25/22 Tri County Orthopedic Bills - SURGERY |
| 21.1 | 11/29/21 - 12/15/2022 Morristown Hospital Records - SURGERY |
| 21.2 | 11/29/21 - 12/13/21 Morristown Memorial Hospital Bills - Surgery |
| 22.1 | 12/1/21 - 5/4/22 Pro Physical Therapy and Training - Post Surgery Records |
| 22.2 | 12/1/21 - 5/11/22 Pro Physical Therapy and Training - Post Surgery Bills |
| 26.1 | 12/15/21 - 12/24/21 Atlantic Rehab Institute Records |
| 26.2 | 12/15/21 Admin date Atlantic Rehab Institute Bill |
| 28 | Himalaya Hike Photos |

**LOOSE DOCUMENTS PROVIDED BUT NOT INDEXED:**

- Updated Rules of the Road
- Copy of the Protective Order regarding Training Manuals
- D’s Answers to 1st Rog/2nd RPs
- 12.1.20 Def No Added Coverage Form
- 12.1.20 Release – Nationwide – Signed
- 12.24.20 Dr. Trevor Scott Visit Notes
- Nationwide Dec Page for E. Garcia
- 12.24.20 Proliance Ortho Bill
- Index of Defense Initial Disclosures

# Exhibit 18

MOBURG REPORTING
SINCE 1928
COURT REPORTERS & LEGAL VIDEO

**Moburg Reporting**
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

---

| | |
|---|---|
| CHANDRASI GAEKWAR, a single individual,<br><br>Plaintiff,<br><br>vs.<br><br>AMICA MUTUAL INSURANCE COMPANY, a foreign corporation,<br><br>Defendant. | No. 2:22-cv-1551-BJR |

COPY

---

Videoconference Deposition Upon Oral Examination

of

RICHARD DYKSTRA

---

9:54 a.m.

August 7, 2023

Seattle, Washington

Sarah K. Webb, RSR, CCR #21035567

APPEARANCES

FOR THE PLAINTIFF:

DAVID BALINT
Attorney at Law
BALINT AND ASSOCIATES PLLC
5950 - 6th Avenue South
Suite 200
Seattle, Washington 98108
dbalint@balintlaw.com

FOR THE DEFENDANT:
LUCY WILHELM
Attorney at Law
WATHEN LEID HALL RIDER, P.C.
222 Etruria Street
Seattle, Washington 98109
lwilhelm@cwlhlaw.com

COURT REPORTER:
SARAH K. WEBB, RSR, CCR
MOBURG REPORTING
33400 - 9th Avenue South
Suite 207
Federal Way, Washington 98003
info@moburgreporting.com

* * * * *



EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Ms. Wilhelm | 4 |


EXHIBIT INDEX

(No exhibits marked for identification.)

* * * * *



RICHARD DYKSTRA, witness herein, having been duly sworn by the Certified Court Reporter, testified under oath as follows:

EXAMINATION

BY MS. WILHELM:

**Q. Mr. Dykstra, my name is Lucy. I represent Amica in this lawsuit, I think as you're probably aware.**
**Before we jump into this, I wanted to kind of go over some basics about Zoom depositions that I'm sure you're familiar with, but I like to just reiterate. When we are on Zoom, it gets really easy to talk over each other, so please make sure you're giving me a couple seconds to make sure I'm done with my questions, because sometimes I'm a little slow. I will extend the same courtesy to you so that we're not talking over each other and making Ms. Webb's life hard, okay?**
A. Certainly.
**Q. All right. Have you been deposed before, sir?**
A. Yes.
**Q. A time or two, right?**
A. Quite a few.
**Q. Okay. So you're aware that you're under oath. Do you have any questions about that process today? What that means?**



A. No questions.
MR. BALINT: If you can turn up your volume a little bit. I can't hear you and I have my hearing aids in. Pretend you're talking to your wife.
THE WITNESS: All right. I'm trying to find where I can adjust the volume and I don't see it. Is this better?
MR. BALINT: That's good.
THE WITNESS: I was leaning back. That's not good.
**Q. (BY MS. WILHELM) All right. Let's start off kind of with a get to know you. Mr. Dykstra, can you tell me about your kind of career?**
A. After graduating law school, I had an appellate court clerkship with Washington State Division 1 for a year and a half. And then I was hired as an associate at Seattle law firm, Thompson Schofield and Stafford. It was an insurance defense firm that I was hired to be an assistant for Jack Schofield. That was in March of 1975. And then after being an associate for a couple -- three years, I became a partner at that firm. It changed its name over time to Schofield and Stafford. And when Schofield became a judge, it became Stafford Frey Pertel. And when Pertel became a judge, it became Stafford Frey Cooper. Anyway, it was a variety of

different variations. So I was a partner there for 33 years. Managing partner for a couple of years.

I had a practice that evolved to insurance-related matters. I started out representing insurance companies. I did litigation and opinion letters and trainings and so on, and eventually, I started doing some work for policyholders, so I did both. In the '90s and early 2000s, I started work for municipal risk pools, like the Washington Cities Insurance Authority and the Washington Counties Risk Pool and so on. In 2011, I became of counsel. Shortly after that, I joined Friedman Rubin, where I've been of counsel for close to 12 years now, I guess.

**Q. Thank you for that. In all that time, have you been -- since 1975, working more or less in capacity as an attorney?**

A. Yes.

**Q. Okay. Have you ever worked directly for an insurance company, either as in-house counsel or an adjuster -- in that capacity?**

A. No. I served as general counsel, but as an outside counsel, not an internal employee at the insurance company.

**Q. Gotcha. And, again, that was on the litigation side, post -- kind of the claims handling, right?**



A. I actually -- as counsel for my insurance company clients, I provided a variety of roles including advice in connection with the handling of the claim, the valuation of claims, the -- often participating in attempts to settle claims as well as when claims turned to litigation, I was generally hired to be their litigation counsel. Yes.

**Q. Gotcha. On a note kind of about the valuation of claims, what's your understanding of the kind of common practices in insurance about how insurance companies should value claims?**

A. Well, all -- because insurance is regulated by the state and has a public policy component, all insurances are obligated to handle claims in a fair way. There is a demarcation between claims where your adversary -- the adversary is not insured and is for liability purposes making a claim against an insured. And in those instances, you don't owe the adversary of your insured heightened duties. You still have duties of honesty and fairness and so on, but not a duty to the adversary of your insured where the person you're dealing with is an insured or stands in the shoes of an insured.

The only standard of good faith and fair dealing that can be broken into instances where -- like



a homeowners claim, medical, auto, UIM -- where you have a variety of duties -- that, I think we'll talk about here -- and those instances where your insured is being sued and you have obligations to handle the claim against your insured. And in Washington, that's referred to as the enhanced obligation of good faith. And so there's a difference in standard between defending liability insureds and in those instances where you're handling the claims of the company's own insureds.

**Q. Okay. So to kind of clarify -- I asked kind of about valuation. So what I'm understanding is that valuation of all claims should be done fairly, but there's a distinction between, I'll call it first party, where the insured is the claimant, and third party where the insured is not the claimant, maybe somebody that the insurance is defending. Does that make sense?**

A. Well, the claim is usually against somebody the insurance is defending. So you value the claim of a nonparty to the contract, so yes. And you're right. The bases for my distinctions were in the duties owed to valued claims.

And when you value the claims of those who are your own insureds -- who stand in the shoes of your own insureds, you have a different than -- higher standard



than if you are evaluating the claims of people against your insurer.

**Q. Gotcha. Okay. Let's -- actually, can you elaborate a little bit more for me where exactly those heightened duties in your opinion apply? And what I mean by that, for example, is that in investigating coverage, investigating causation, investigating damages, where do those duties kind of come up in first-party claims?**

A. Okay. So we'll set aside, for now, the liability against your insured claims. In the first-party claims, you have a contract that's viewed with public policy implications. And according to both the law and the customary training and standards of the insurance industry, you owe a duty of good faith and fair dealing with respect to all of those claims brought by your own insured.

So there are a number of standards that apply to those, including the obligation to properly respond when you receive a claim -- to keep the insured promptly notified of developments in the claim; to thoroughly, fully and fairly investigate the claim and all of the elements. It's an insurance company's duty to investigate, not the insured's duty to investigate or develop his claim. The insured's duty is to cooperate

Page 10

with requests.

Once you have obtained full and fair material to investigate the claim, then you should valuate the claim giving equal consideration to the interest of the insured and the insurance company. And if in the valuation of the claim you have determined that a sum is -- the claim has value that is given equal consideration, then you have an obligation to make offers that are reasonable based upon the equal consideration standard of interest in both. You have to have a reasonable basis for any offer or the rejection of any offer, and you have to have that reasonable basis before you reject an offer or make an offer. And if the offer is not accepted, you have a continuing duty to investigate and attempt to determine whether there's further information, which would assist in determining the value of the claim -- whether there's coverage, those kinds of issues -- and it's a continuing duty to attempt to promptly and fairly resolve the claim without treating your insured as an adversary.

**Q. And, I apologize, I'm just taking some notes. If you see me looking down, I'm not ignoring you. I'm making sure I'm tracking my thoughts.**

**So let's turn now to kind of what work you did in this case. It's my understanding that Plaintiff's**

Page 11

**counsel sent you probably a whole lot of materials to review. Can you go over kind of what your primary -- the primary basis of information that you relied on in creating your opinions?**

A. There is an appendix to my report, which lists, hopefully completely, all of the materials that were provided to me by Mr. Balint. Within those materials, I paid special attention to the claims notes, which are the company's internal notations of how it's handling the claim as well as communications that the companies received and sent in connection with the claim.

So the file I got had a lot of duplication of those materials. And the claim notes had a variety of redactions that -- subsequent iterations of the claim notes that were provided had a different set and so on. It was a bit confusing pinning down the single set that represented the universe of the claim notes. And similarly, pinning down the communications that were received by the company and the communications that it made. But those were the things that I attempted to go through and make sure I had in mind as I approached questions of whether I felt the claim was handled properly.

**Q. Gotcha. So based upon kind of what you said there, I take it that -- one thing that's important when**

Page 12

**evaluating claims handling is what documents were received and sent when; is that accurate?**

A. Very, yes.

**Q. Okay. When -- at kind of the conception of a claim, what would ideal claims handling look like in your opinion? For example, in Mr. Gaekwar's case -- an underinsured motorist case, we know this kind of started with the presentation of a demand letter that was sent to Nationwide.**

A. Yes. And that demand letter included enclosures, references to materials that document the circumstances of the accident. I believe there was a police report. I believe there was information related to medical expenses that were incurred. There was reference to enclosed medical records, and those records included both pre- and post-accident time frames.

You know, the letter speaks for itself. But there was an explanation -- several-page explanation of what impacts the accident had. I believe there was an analysis of the fact that this was a clear liability case; Mr. Gaekwar was not thought to be at fault in any way, so the tortfeasor was at fault. It's been six months -- three months since I looked at that. That's sort of what I recall off the top of my head.

**Q. On receiving that kind of letter with the**

Page 13

**support, I think there was also a request for waiver of PIP subrogation.**

A. That's correct.

**Q. What investigative steps would you have expected Amica to take kind of in an ideal claims handling world? Does that make sense?**

A. Yes. I don't know that it's in the ideal world. It's in the practical world. Insurance adjusters are trained throughout to promptly and thoroughly investigate the claims. So the initial presentation raised a variety of issues, for example, liability. I do believe that somebody looked at the materials and made -- early on concluded that this was a case of liability of the underinsured motorist.

There would be the question of reasonableness and necessity of medical payments. Somebody was looking into the -- they either had or could look at the PIP file and the medical files they were referred to and make the conclusion as to whether the medical that had been incurred to date was reasonable and necessary. And then the description of Mr. Gaekwar's current condition and whether that was caused by the accident should have been a -- well, what is the main subject of the investigation? So they should both focus on: How do we determine what his current condition is? What do we

need to know? Does that require further information? Do we need to obtain the services of investigators or medical professionals or that sort of thing to determine his current condition?

And since Amica quickly concluded that it wanted to investigate his prior condition because it wanted to raise the issue of his -- whether he had ongoing injuries which were not caused by the accident and were, therefore, not the responsibility of the tortfeasor. Well, it should have, at that point, done a full, fair investigation of his prior condition to determine what evidence there was about his prior condition and how that bore on his condition at the time of the accident.

So all of that -- ideally the insurance industry would like to see that done within 30 days of the submission of the claim. It does recognize that if certain issues take longer than 30 days -- it can't reasonably be accomplished in 30 days -- the adjuster should inform the insured of what else needs to be done, why it can't be completed within the 30-day period, and proceed ahead to -- for the plan to obtain whatever remains that's needed before the claim can be valuated and a decision made on how to handle it.

**Q. So would you say that Washington law -- and I**



**assume that's what we're referencing -- talking about kind of that 30-day rule -- would you say that it puts kind of time-is-of-the-essence pressure on adjusters to diligently and fairly valuate claims?**

A. Before I answer that -- while I certainly have legal training, I don't expect to be asked questions based on my legal training in this deposition. I have been deposed enough and testified enough that I understand fully that it is the role of the court to decide what the law is, not usually the basis for expert testimony. So I'd like to answer these questions based upon my understanding of what the common and prevailing practices of the insurance adjustment industry, which I have a great deal of familiarity with as well.

So in connection with -- from the perspective of the insurance claims handling industry, I don't know that time is of the essence is that they have to move promptly, reasonably in order to complete their investigation within 30 days. If the investigation takes longer, they have to have a reason for that. Simply being busy, as adjusters generally are, is probably not a sufficient reason to take longer than the 30-day period to complete the investigation.

But reasons like we need to obtain records from another source and we can't get them quickly from an



insured -- for example, because we want to obtain them directly from the medical providers -- those might be reasons why it might take longer than 30 days for an adjuster to obtain all of the reasonable, necessary, available information before making decisions, so it certainly needs to be promptly. And that the adjuster is busy is not considered an excuse to the duty to do it promptly.

**Q. Okay. So if an insured is still treating for a condition that they are attributing to the underlying accident at issue, for example, in Mr. Gaekwar's claim, does that change kind of the timeline that we've been discussing at all in your opinion and your experience as someone knowledgeable about claims handling?**

A. I wouldn't say that it particularly changes the obligations. It does mean that you may not be able to complete your investigation. In your investigation, it needs to know the conclusion of the treatment.

So in the insurance claims handling industry, there are many instances where the claims clearly exceed the limits of the coverage that's available, so it's not necessary in those particular instances to know what the conclusion of the treatment is in order to be able to make decisions and start paying benefits and that kind of thing. On the other hand, if the -- when it's



concluded and how it's concluded is necessary to value a claim. For example, where the policy limits are high enough that it will matter to the valuation of the claim, whether it's within or in excess of it, then yes. The waiting for the conclusion of the treatment is important, but that doesn't mean that the insurance company -- the insurance adjusters have nothing to do until it's completed.

In my mind, they need to get busy and obtain the information that is already available and resolve any issues that can be resolved based upon that, like reasonableness and necessity of the medical costs that have been incurred and, you know, issues like that, while they await the final development of the medical diagnosis.

**Q. In your opinion, if an insured is attributing an injury or ongoing injury to a collision, does Amica have a duty to continue considering that injury even if there may be evidence that it's unrelated?**

A. Absolutely. The fact that there is evidence that it's unrelated doesn't mean that Amica is entitled to conclude that it's unrelated. It has to consider all of the evidence that it has and can reasonably obtain. And if there is evidence on both sides that it's -- some evidence that it's unrelated and other evidence that

it's related, then Amica is not excused from its obligation to fully and fairly investigate, nor its other obligations.

Merely because it has found some evidence that would support a reduction and a benefit of ode or whatever, it certainly has to continue to investigate and consider all of the evidence, not just the evidence that is supportive of not paying the claimed value.

**Q. Gotcha. So when Plaintiff's counsel, in this case, told Amica that there was an upcoming knee surgery attributed to the underlying accident, Amica's obligations would be to continue investigating until that had concluded; is that accurate?**

A. Yes. And it doesn't mean that it can do nothing until that's obtained. It has obligations to -- for example, past medical records would not have likely changed. So they should have proceeded to retain past medical records while it awaited the development of the surgery to determine his current condition.

**Q. Okay. I would like to turn to your report, unless there's anything else kind of that you want to add to that -- to that little conversation that we've had.**

A. No.

**Q. Okay. So you have -- let's see. I want to say**



**it's six -- five opinions for this case. Big, kind of overarching...**

A. Yes. I believe I broke it into five categories. One is a general category and four relate to segments of time.

**Q. Okay. So in your first one, what you're referring to as "general," I don't necessarily see a kind of conclusion that's based on kind of tying facts to these standards. Would you say that's more of an overarching statement of standards that Amica should be abiding by?**

MR. BALINT: I'm going to object to the form. Maybe you can rephrase that and just ask a question rather than your observations or your opinions about what it says. I'm not disagreeing with asking the question, but just the form of it.

MS. WILHELM: Okay.

**Q. (MS. WILHELM) Mr. Dykstra, do you understand my question?**

A. Could you rephrase it?

**Q. Yes. I can rephrase it.**

**What is kind of your ultimate conclusion for Opinion No. 1?**

A. My opinion -- conclusion for Opinion No. 1 is that insurance companies, especially those handling UIM



claims in the state of Washington, have a variety of well-recognized standards that insurance adjusters are trained on. Not just Amica, but both within Amica and outside to comply within the proper handling of claims.

And I went through what I thought were the relevant ones for purposes of Mr. Gaekwar's claims. There are other principles that would apply to different kinds of claims. For example, the whole set of liability claims where somebody is making a claim against the insured, I didn't feel those needed to be set forth. So I tried to go through what I feel is the relevant standards that adjusters are trained on and summarize them so that -- mainly for the benefit of evaluating the claims handling by what Amica did throughout.

**Q. Understood. Okay. Let's move on to Opinion 2. What is your ultimate conclusion there?**

A. In Opinion 2, I concluded that -- in respect to at least four of the standards that were referenced in No. 1, Amica failed to comply with customary claims handling practices. And I can get into the details of each of the four, but I wanted to highlight four that seemed to be important for that period of time, which was the period of time from its receipt of notice of the accident through the time that it rejected the initial



request for -- I'm sorry. I think it was 125,000 -- and counter-offered with its $1,000 new-money offer. So that was a time frame that I wanted to say that I felt there were four principle ways in which Amica failed to comply.

**Q. Gotcha. As a kind of overarching question, just to lay some foundation for bad-faith claims generally and first-party claims, what is an insurance -- sorry. There's -- I don't know if you can hear that there's some noise going on outside my door -- what is an insurer's role in a first-party case -- I know that's kind of a big question -- a first-party underinsured motorist case?**

A. Your question is what is an insurer's role?

**Q. Yes. How would you characterize it?**

A. It's an obligation to give equal consideration to the interest of the insured with its own interests. So it's obligated to make sure that it fully investigated the claim by taking all of that information that's reasonably available; that it considers the information, both in its favor and that would favor the insured's interest; that it develops a reasonable basis for its decisions on the claim. And then throughout that process, it fully documents its handling in the claim file.

**Q. Can you sort of give me a concrete example of Amica putting the insured's interests at the same level as its own? I'm just -- I don't know how you would -- what facts would show you that. Does that make sense?**

A. Well, you said examples where you put insured's interests equal to its own. And right now, I don't recall -- well, I guess, it evaluated liability and reasonably quickly determined that it thought the insured, Mr. Gaekwar, was not liable, that the tortfeasor was liable.

So in a similar context, it evaluated the offer to settle the underlying claim for the limits of the Nationwide policy and allow Mr. Gaekwar to proceed to obtain that settlement and not object to it, so on and so forth. In both instances, they reasonably, promptly evaluated the interest of both the insurance company and Mr. Gaekwar and made what I consider to be proper decisions. So if you're asking for instances where I thought they did right, those were two.

**Q. Okay. I guess my kind of question, then, is -- I mean, is there a situation where that would ever not result in payment to the insured? Does that make sense? Because the two examples you gave were, I would assume, kind of a balancing between investigation cost versus the cost of forgoing subrogation of PIP.**



A. Well, certainly there are instances where an insurance company finds that there is no evidence to support the interests of an insured on a particular issue. And at that point, having it fully investigated and being unable to find anything, I think the company is proper to result in -- you know, give a result and decision that may be dictated by those -- the evidence that it has obtained. But if it hasn't obtained all of the available evidence, is not in any position. It's simply not ready yet to make any decisions. So it's sort of a precondition to making any decisions. Whether to accept or reject the claim is to conduct a full investigation and evaluate the interests.

So here, as you know from reviewing the opinion, I don't think they ever got to the position where they had conducted a full investigation for a variety of reasons. So I don't think they were ever in a position to deny any part of Mr. Gaekwar's claim.

If they had conducted the full investigation and you looked at the evidence they obtained, they might very well have had -- depending on what this investigation would have obtained -- they might have been in a position to not accept Mr. Gaekwar's claim, but they never went down that road. They decided instead to take a shortcut and simply seize upon



information that they thought was beneficial and simply refused to pay his claim.

**Q. I want to show you -- well, first, I want to ask you -- so is it your opinion Amica did deny Mr. Gaekwar coverage?**

A. Well, it actually denied him a benefit. The technical proposition of coverage -- they always considered he was an insured. That he was -- had a -- he met the qualifications for an underinsured motorist claim by being injured in an auto accident, so they didn't deny those issues.

It was always a question of the valuation of his claim and whether they valued his claim at or above the amount of offsets that were credited to his claim. So denial is not probably the right word. It's offering a sum which is less than the claim is reasonably worth.

**Q. Okay. So the issue, then, isn't a denial. It's a valuation dispute?**

A. Well, I think that their failure to do the rudimentary steps necessary constitutes a denial. They didn't articulate there was a denial. They didn't send him a letter and say, "You have no claim under the policy, and, therefore, we are terminating your claim." None of that.

So certainly the valuation was an element of



the claim. But in order to have a reasonable dispute about valuation is a threshold necessity that the company had honored its obligations to reasonably investigate it and give it equal consideration. Amica never got to the point of just disputing valuation. They quit the process long before they could get to a position of having a reasonable dispute about valuation.

**Q. Okay. At one point in your report, you talk about the legal principles that Mr. Balint supplied Amica to consider the claim with. One being that the tortfeasor would be liable for preexisting conditions being lit up by an accident. Does that sound familiar?**

A. That is one of the propositions that was outlined in his letters, yes.

**Q. Okay. In kind of your experience with claims handling, how does that consideration play into what adjusters should be seeking out as far as information and how they should be valuing the claim?**

A. So it's very common that legal principles implicate issues of how -- what the claim is worth. And that's especially true in the UIM context where the consideration is: What is the claim against the tortfeasor -- the negligent motorist's worth? This is a fairly common proposition. What is the law about this kind of a claim?

And in my experience, insurance adjusters are thought that if there is, in their mind, any question about what the law is, they have resources that the insurance company provides for them to get an answer. So the law on a particular issue certainly can vary by jurisdiction. It can vary in terms of whether it's, you know, current or under dispute or whatever else.

It's simply because Mr. Balint or any other lawyer would say, "I believe that the applicable law to his claim against this negligent motorist is that if his condition was not symptomatic but was lit up by the accident, that the tortfeasor is obligated to pay for that condition even though there was a preexisting nonsymptomatic component." That certainly is a proposition of law. And Mr. Balint provided his version of it. And if the insurance company didn't want to accept it, they're by no means obligated to accept Mr. Balint's statement of the law. But if they didn't want to accept it, they would need to consult with authorities that would answer that question.

So in my experience, that's when they pick up the phone and they call either in-house legal authorities, lawyers, who are familiar with the law in the state of -- for example, here in Washington -- and ask them, "What's the law on this?" "Is he right?" "Is



he wrong?" "Do we have an answer?"

And then secondly, if the in-house procedures aren't right, then Amica has, like many others, what's called panel counsel. Law firms that are hired on a very frequent basis to answer legal questions as well as to represent them. They could have easily picked up the phone or sent an email and said, "Hey. I have a question about Washington law and how it treats preexisting nonsymptomatic conditions." And obtain information from a knowledgeable source, a lawyer, with legal training on the basis to add into its file.

Here, I didn't see any evidence that at any point in the handling of the case from the start to finish that Amica made any effort to determine the validity of the legal propositions that Mr. Balint stated. So it's the absence of any effort to do that, that I am very critical of. I don't know what they would have been told if they'd picked up the phone and called, you know, one of their attorneys. That would be speculation on my part, and I don't need to be doing that. I'm just saying that you don't get the benefit of having that be debatable if you haven't done the basic work of obtaining something that would support contesting his proposition.

**Q. So the obligation -- would you agree that the**



**obligation, then, to consult legal counsel comes when Amica doesn't buy a legal theory that's presented by counsel?**

A. Yes. If they're willing to accept it, then they're not obligated to continue because that's, in essence, giving the interest of its insured consideration. It's only when they don't want to accept it that they have an obligation to come up with a reasonable basis to contest it. And even then, that only gets them to the point of having to give both interests consideration. It doesn't mean that they get to value their own interest because they found some source that was supportive of it.

**Q. So where Amica buys that the tortfeasor would be responsible for the exacerbation of a previous asymptomatic condition, when the condition returns to being asymptomatic, would you expect Amica to continue investigating if there were subsequent returns to symptom -- subsequent treatment for a potentially related condition? Let's word it like that.**

A. I think that it has an obligation to continue to investigate his condition until it has resolved his claim. So the fact that there may be evidence that the condition resolved, the fact -- that does not mean that the insurance can say, "Then nothing can ever happen."



And at that point -- I think in each of these instances, instead of turning around and saying, "Is this truly his current condition" -- for example, there are instances, in essence, that devalued his claim based upon medical records that were a year and a half old. And I don't consider that re- -- and when they knew that there was contentions that there had been a lot of treatment in the interim, I don't think they can turn around and say -- even if the year-and-a-half-old treatment was conclusive, I don't think you can turn around and say, "I get to ignore all of the subsequent information I have about his condition."

So again, like the law proposition, you have an obligation to investigate what's happened to him in the intervening year and a half because you haven't resolved his claim. You have an obligation to continue to find out what his condition is until the claim can be closed because it has been fully resolved. And I didn't see that that's how they handled it. They had very little interest in continuing to investigate his current conditions, both presurgery when he was saying, "I expect to have to undergo surgery" and then postsurgery.

And when they hadn't adequately investigated his, you know, condition in December of -- I think it's 20- -- I'm sorry. The years get -- the records that

they obtained in the March of '21 letter -- which the records went through December of '20, I believe -- you can't just continue to rely on those when the rest of the information they have was that he's continuing to treat. So I don't think it's proper for them to say, "Well, as of December of '20, he was obviously fine. So thereafter, we don't have to do anything." That's not a reasonable investigation. Not reasonably handling the interest of the insured.

**Q. So if Mr. Gaekwar's neck pain -- which I think everyone's in agreement resolved pretty quickly after the accident -- if that had recurred, for example, in December of 2021, more than a year after the accident, but the claim is still open, is Amica under an obligation to continue investigating into that neck pain despite it having resolved?**

A. I think it is. Now, it depends upon does he claim that the neck -- the subsequent neck issue is causally related to the accident? If he claims that it is, then Amica has an obligation to investigate it.

In insurance adjustments, there are lots of instances where people discover that they have conditions which were causally related to the accident but weren't known to them immediately -- didn't know until time passed by. So that's the point where you



consult the medical record and the medical providers and make a determination: Is it true that this is unrelated to the accident? In which case, if they have that to rely upon, then it doesn't need to be further considered.

But if it's a disagreement as to whether or not a condition is related to an accident, then they have to do more than just say, "Well, we disagree, so we can ignore the claim that it was causally connected." No. You've got to go and obtain the available evidence and make a reasonable determination based on that evidence. You can't just close your eyes and say, "I see nothing further."

**Q. How about a tortfeasor? Would the underlying tortfeasor have to reopen their claim if it's resolved? For example, if Mr. Gaekwar experienced a recurrence of neck pain?**

A. Well, the underlying tort litigation goes a slightly different route. The underlying tort litigation -- he filed suit -- well, he made a claim. I'm not sure he filed suit -- he made a claim, and the underlying tortfeasor's insurance company said, "All right. We're willing to pay you the limits of our insurance in exchange for a release of our insured." And Mr. Gaekwar's attorney then presented that to Amica



and said, "Is this all right with you that we let him go?"

Well, if the limits have been paid and a release has been obtained, then certainly the underlying -- Nationwide has no further obligation to go and investigate Mr. Gaekwar's later claims because A, his claim has been settled with a release and they have paid their limits. So there's two sort of independent reasons why Nationwide would not have any further obligation. But in the UIM context, Amica had neither settled the claim nor paid its limits. So as long as it's done neither, it has an obligation to continue to investigate the things that are raised to see whether or not they may be causally related to the accident.

**Q. Even if the underlying tortfeasor wouldn't consider those -- or doesn't have to?**

A. Well, the underlying tortfeasor doesn't have to because he's holding a release, which says he's no longer liable regardless of what later is determined. So that's a completely different situation than Amica who has no release of its obligations to pay on behalf of the tortfeasor what was owed, so there's a difference there. Amica hasn't settled its claim, so it is obligated to continue even though Nationwide has paid its limits and settled.



**Q. Okay. Would you agree that, to an extent, Amica is stepping into the shoes of the tortfeasor in a context like Mr. Gaekwar's claim?**

A. Is that your question? That they are stepping in?

**Q. Would you agree?**

A. They are stepping into his shoes for purposes of the tortfeasor's liability. They are not stepping into his shoes in terms of duties that it owes to its insured. Standing in his shoes -- so if the tortfeasor was not negligent, then Amica does not have an obligation to pay claims that -- for which he -- you know, if he was negligent.

But since it conceded he was negligent, it had an obligation to continue to pay his claims even though the tortfeasor was released because, of course, the release was given with Amica's approval, and, therefore, that doesn't prevent Amica from being obligated to pay amounts above what was paid to settle -- to resolve Mr. Gaekwar's claims. So its obligation to pay money above what Mr. -- the tortfeasor's insurer paid, that creates its duty to continue to treat Mr. Gaekwar as its insured fairly, with equal consideration of its interest.

**Q. When you say that Amica can adopt the**

**tortfeasor defenses as to liability, are you referencing, like, comparative fault? Or does that also include the amount and relatedness of damages?**

A. I think that to the extent that the tortfeasor has defenses about the relatedness of damages -- you know, Amica has those defenses, but it only has those defenses until such time as the valuation of the case depends upon it. So it can't turn around and say that just because the tortfeasor -- the auto driver can dispute whether medical expenses were necessary, that Amica can continue to dispute them.

The moment the tortfeasor's insurance is paid and he's gotten a release, Amica doesn't obtain the release. Amica gets a credit for what's paid, but Amica hasn't paid any of that. So it's obligated to consider the reasonableness and necessity on its own because that bears to its reasons it is accepting or rejecting the demand of its own insured.

**Q. Gotcha. Okay. Let's talk about kind of how these claims -- how claims are being kind of defended here.**

**So what is, in your opinion and experience, the insured's burden with a third-party claim where they're saying, "Hey. The other insurance company" -- in this case, Nationwide -- "your insured caused an accident.**



**I'm injured. Pay money." What's the burden of kind of proof there, if any?**

A. The burden of the person who sustained the injury? Is that what you're asking about?

**Q. Yes.**

A. The burden of proof of the person who sustained the injury against the person whom they have no enhanced relationship with, is a burden to -- usually to prove beyond -- or more -- more probably than not. The elements of their claim, including causation, damages, negligence, that sort of thing, so that's the arm's length. And they're not obligated -- the tortfeasor is not obligated to consider the insured's interest -- the claimant's interests in that scenario.

**Q. And does that change in the first-party context?**

A. Yes.

**Q. Can you tell me a little bit about how that adjusts in the first-party context from your experience and training?**

A. In the first-party context, the -- Mr. Gaekwar has a policy with Amica. And that policy with various statutory, regulatory and contractual revisions requires Amica to give equal consideration to the interests of Mr. Gaekwar. They are not entitled to treat him as an



adversary. They are obligated to consider and come up with what's reasonable from both their and Mr. Gaekwar's considerations.

They are not permitted to reject things for which they have no basis to reject simply because he's their adversary, because he's not their adversary. He is their own insured, and they have an obligation to treat him fairly in all regards. Both in issues of trying to decide, you know, does he have a claim? What's it valued? Paying his claim promptly? How is it handled? As well as its own obligations to conduct the investigation and have a reasonable basis for its decisions. So it has a whole panoply of responsibilities to its own insured, even though that -- it involves a claim that its own insured has against the automobile driver.

**Q. So I think that goes to Amica's obligations. How about the insured's? Does the insured have any obligations under the UIM policy contract?**

A. Yes. The insured has a variety of obligations. They have to give prompt notice of the claim. They have to reasonably cooperate with requests for information. If the insurance company requests, they need to submit to an examination under oath. They have an obligation to bring their claim within the time that's authorized



by the law. So yes. They have a variety of obligations as set forth in the policy.

And certainly, they have an obligation, as I said, to reasonably cooperate with the insurance company's investigation by responding to requests for information with -- providing what it has or if it doesn't have the information -- the insured doesn't have the information, letting the insurance company know so that it can proceed ahead to obtain the information in another matter.

Lots of times, for example, the insured doesn't have his medical records. His doctor has his medical records. So if the insurance company wants his medical records, the insured may be obligated to provide a consent so that the insurance company can then go and obtain the medical records to further its investigation.

**Q. I want to drill down on what you said by the insured has to present their claim -- or make their claim.**

**What kind of -- what are we referencing by that? What does that mean to you?**

A. I didn't say "present." I said give notice of the accident. So the insurance policy has a variety of specific obligations. And typically in auto instances, there is an obligation to promptly notify the insurance

company of an accident. And here, Mr. Gaekwar did within a couple -- three days.

He then later presented information -- I didn't study this aspect -- but he had both collision coverage benefits under his policy. I think he was aware of them or was informed of them. He provided information with the company and eventually it extended a proposal or offer to resolve this collision. Again, it's not something I studied because it was promptly resolved.

Similarly with requests to personal injury protection, or PIP coverage, he is aware of it. I think he was advised that he had that benefit. He provided medical records, I think at the request of the insurance company, and reviewed them and paid up to its limits of the amount of money owed.

So there's a process of give notice, the insurance company then advises what benefits are owed, he indicates what benefits he wants to seek to his advantage, and they tell him what he needs to do to do it. He has an obligation to provide the information they are asking for, and having done that, they have an obligation to consider it and determine whether the benefits are owed under the policy, and if so, make prompt payment of it. So that was done with respect to, I believe, the collision benefit and the personal injury



protection benefit.

**Q. Okay. So is it your opinion, then, that whenever an insured who has an underinsured -- or uninsured motorist policy, whenever they notify their insurer that there's been an accident, at that point, the insurer should open an investigation, create a claim file for an underinsured claim as well?**

A. No. I think that in this instance, no one knew -- not even Mr. Gaekwar knew, the moment the accident occurred, whether or not he had an underinsured motorist claim. That depends, among other things, on what the limits are of the insurance that are available for the driver who hit him, and so until the parties know more about it -- but certainly at the time that Amica had got notice from Mr. Gaekwar's attorney that he wanted to present a UIM -- which was a few months after the accident -- absolutely at that time, it had an obligation to open up a UIM claim file and begin its investigation and request the information that it would need in order to go do it.

As far as I recall while it opened the file, it did nothing until it received the demand letter to Nationwide for Nationwide's policy limits. And even then, while it got a variety of materials, it really didn't do anything further other than just note them.



It didn't attempt to investigate what was being involved there until months later, it finally obtained a letter from Mr. Gaekwar's attorney saying, "Here's my UIM demand package." Its obligation to investigate certainly predated the receipt of that letter making the UIM demand. And I believe that it had that obligation back from the time that it received notice from his attorney that he wanted to preserve -- pursue a UIM claim.

**Q. I want to push back with you a little bit there. In this case, I believe at the time that Nationwide made the underlying settlement, medical specials were somewhere in the realm of $19- to $20,000.**

**How would you expect -- how do you expect Amica to evaluate the underinsured motorist claim when special damages are below the tortfeasor's limits, if there's been no kind of information from Plaintiff's counsel?**

A. Well, the fact that Plaintiff's counsel hasn't provided a road map doesn't excuse the insurance company from its fundamental obligation to conduct a full and fair investigation. So the premise, I believe, is flawed. That it has to see damages -- concrete out-of-pocket damages exceeding the tortfeasor's limits before it has any obligations.

I believe the customary industry practice is



that it has an obligation to conduct an investigation of the claim without regard to what the underlying limits are, and they've not determined them. It's certainly by a medical specialist. Now, that gets into the question of does he have any claim of any residual injury? If this is a claim with only medical specials and no claim of residual injury, then they have an obligation to evaluate the elements of his claim before it's been -- his treatment is concluded and his condition returned to preaccident level and all of that, so they still don't get to stop.

But they have an obligation to turn around and say, "From the date of the accident until the conclusion of the medical treatments, what was the course of his treatment? How much discomfort and pain and suffering did he sustain? Did he sustain any wage loss? Were there any extenuating damages that he may have sustained during this period?" All of that needs to be done. An evaluation is made to determine how that will depend on what the available tortfeasor's limits are.

So I don't think that they can just -- their obligation to investigate doesn't start until they know that the medical specials exceed the tortfeasor's limits. I think that's wrong. They have an obligation to investigate his full claim, not just the amount of

his specials. And that starts as soon as they're aware that he wants to pursue a claim.

MS. WILHELM: Okay. I think that this would be a good spot to take a five- to ten-minute break, if we're all amendable to that.

THE WITNESS: I'm fine with that. I need something for my throat. I talked too much.

MS. WILHELM: 11:10. Is that okay with everyone?

MR. BALINT: Yes. That's fine.

(Break taken 11:01 a.m. to 11:18 a.m.)

**Q. (BY MS. WILHELM) So, Mr. Dykstra, I want to kind of ask you -- before we walk through specific things in the claim file, do we even get to consideration of specific items that Amica reviewed and considered? Or are we just at bad faith because Amica didn't start an investigation independently and seek out records independently? Does that make sense?**

MR. BALINT: I object. That does not make sense to me.

**Q. (BY MS. WILHELM) Mr. Dykstra, do you understand my question? Or was it confusing?**

A. My report emphasizes that beyond the failure to investigate, there were many other failures of the company in handling the claim. So I don't think that



this is only an insurer failure to investigate.

**Q. Okay. Let's talk about -- we kind of mentioned obtaining prior medical records. I know that generally, the testimony that's come forward in this case has been that as a represented party, Amica doesn't send them medical record releases, relying instead on counsel. What is your take on that?**

A. Well, Amica may have a nationwide practice how it handles, for example, underinsured motorist claims. That does not answer the question of how it should handle claims presented under Washington policies, Washington principles, and so on.

So I don't -- I mean, I'm familiar with how insurance companies operate in other jurisdictions, but I'm not here to testify about that or whatever. But in the state of Washington, not only Amica, but I think all insurance companies acknowledge that they have a duty to investigate. And it is not upon the insured to produce to them all of the information for their consideration in first-party claims and especially, for example, the UIM claim.

MR. BALINT: Lucy, does that answer your question? Or were you asking: Can the insurance company go directly to the insured to get a consent to get medical records?



MS. WILHELM: That was not my question.

MR. BALINT: Okay.

MS. WILHELM: But I appreciate that.

**Q. (BY MS. WILHELM) Obviously, Amica can't communicate directly to the insured when there's been a letter of representation, right? Do we agree on that?**

A. As soon as they had a letter of representation, all communications should go through Mr. Balint's office.

**Q. Okay. Basically, I'm going to kind of summarize what I understand your testimony about the burden of proof or persuasion on first-party claims to be. I anticipate that you will disagree, and I'm hoping you kind of explain where I've gone wrong, if that makes sense.**

A. Okay.

**Q. So my understanding, then, is that in your opinion and in your experience, Amica is obligated to prove Mr. Gaekwar's injuries and seek out information that would support those injuries to kind of prove up his claim for itself.**

A. Actually, no. I don't believe they have an obligation to prove his claim. I believe they have an obligation, under Washington claims-handling principles, to fully investigate his claim, including looking for --



as hard for information that would support his claim as it looks for information that doesn't support his claim. So it's not an obligation of proving claims. It's an obligation of looking for information on either side. And once it has obtained information -- the fully available information, it has an obligation to make a reasonable decision giving interest consideration to both.

It can't just simply sit back and say, "Well, since we have found one piece of evidence that we think supports us, we can simply say, Mr. Gaekwar, you're entitled to nothing or you're entitled to $1,000 and that's it." No. It has far more obligations to consider. If they had done a full investigation and come up with lots of information on both sides, we don't know what, it's a valuation of would have or should have done because it didn't do that. So I'm not going to speculate on what it would have discovered if it would have done a prompt, full and fair investigation.

But I think that, you know, it had an obligation to do that. And then when it got the information, not just simply seized upon the information that supports giving it a value of 61,000, for example, with a $1,000 payment. It had an obligation to do both -- consider both sides and come up with a

reasonable basis for that.

**Q. So is the issue, then, whether information was appropriately considered? Or is the issue that an investigation shouldn't encompass seeking out records outside of what the insured presents?**

A. I think both. But certainly, the threshold question is -- and you say outside of what the insured presents -- I see evidence in the file that the insured presented substantial records preaccident of his condition, which was one of the main issues that Amica had with his claim.

There is apparently some concern or question about whether or not Amica received them. There's clearly no indication that Amica ever considered them. But what is clear is that Amica knew that those records were there. It knew it had no records about his preexisting condition, and yet it wanted to take the position that all of his injuries were caused by the preexisting condition.

Well, to do that, it's got to go and get those records and review them and give them a reasonable evaluation. They just can't simply say, "Well, we know there are records out there, but we're not going to go and look for them."

**Q. Then, is it that a first-party -- or an insurer**



**has to go seeking records where they disagree with the insured?**

A. If they -- if -- I did not say where -- let's go back to the proposition. You know, the claim doesn't start out with the presumption of denial or the presumption of no pain. The claim starts out as an open claim and it has an obligation to obtain information before it makes any decisions about the valuation. So it's not where it disagrees. It first has to get the information and then decide does it disagree.

**Q. So I suppose I'm still a little bit confused. Amica doesn't have to seek out additional information unless it feels that there's something the insured hasn't presented?**

A. No. It has an obligation to seek out additional information unless it's willing to accept its insured's claim for a particular benefit. So if it gets auto -- an estimate of auto repair, it can decide whether it wants to accept that estimate that the insured says, "Yeah. This is what I'll accept." If it doesn't want to, then it has an obligation to go and find further information but give it a basis to say no.

So yes, it has an obligation to consider. If it chooses to say, "No. We'll accept what you have presented and we will pay you the benefits you are



asking for," it's entitled to do that. That's not failing to treat its insured fairly. It's not obligated to accept whatever the insured presents, but it cannot refuse to accept what its insured presents and just say, "We just don't think we owe that." It's got an obligation whenever it doesn't want to accept the insured's presentation to go forward and develop evidence to find out what the actual, you know, full factual basis of the claim might be.

**Q. Okay. So where -- like in this case, Mr. Gaekwar presented $20,000 of medical specials to Ms. Am early on. She accepted those, evaluated the payment from the underlying tortfeasor, and made an offer without requesting any kind of releases of information. After making that offer, she said, "Call me and let's discuss further this claim."**

**At that point -- is that the point at which Amica should have gotten additional records when that initial offer was denied?**

A. Before the initial offer was denied. They've got records, which included substantial discussion of the impacts on Mr. Gaekwar besides his medical specials and an offer to settle his claim, I believe, for 125,000 new money.

So if it wanted to accept that proposition, it



could have said, "We will accept your offer and here's a settlement for 125,000" and sign the policy -- or the release of the claim and proceed ahead. But when they say, "No. We're not sure we want to accept 125,000," they can't turn around and say, "Here's $1,000. Talk to us if you care." No. It has an obligation before it rejects the 125,000 to go ahead and perform its investigation.

And if it doesn't credit his claim of the injuries sustained and so on, then it has an obligation to get the records and the information that would bear on that, both pre- and postaccident, and then evaluate them giving equal consideration to both. So it can't just turn around and say, "We reject your 125,000 and here's 1,000 and call me if you have any questions. Call us to discuss." That's -- it stopped completely its obligations when it said, "No. You're not -- we're not going to pay you 125."

**Q. Okay. So understanding that standard, then, if Amica -- once Amica had its valuation of 1,000 new money, which is obviously not the same as the demand, rather than extending an offer for the amount of that valuation, Amica should have commenced an additional investigation; is that accurate?**

A. Well, I don't -- candidly, I don't accept the

proposition that Amica's valuation was $1,000 new money. I accept that was the offer. There's nothing in the claims file to demonstrate how that is a reasonable offer. There is nothing in the records that it obtained that would demonstrate that kind of extreme discount from Mr. Gaekwar's valuation of the claim.

So I understand that Amica claims and witnesses had testified that they did a valuation. And in the insurance claims handling industry, if it does a valuation, it's got to explain it in its claims file how it arrives. And this claims file is just utterly lacking any kind of explanation as to how it came to the conclusions, first, that 125,000 wasn't a reasonable valuation and how $1,000 was a reasonable valuation.

So to close the loop, I don't see anything in the claims file that explains it had a basis to valuate the claim at $1,000. And without -- had they performed an investigation and obtained records that it may claim it didn't have or whatever or reviewed the records and sought out information about how these conditions were, they can't just simply say, "Well, he admittedly had osteoarthritis earlier in his life. We automatically conclude that this is osteoarthritis and it is not a new condition and not caused by the accident." It can't do that. It didn't even obtain medical opinions when it



took that position.

It just simply said -- this adjuster, I'm not sure of what her training and experience in valuating medical claims and claims in the state of Washington -- but she simply said she valued it at $61,000. Not 60, not 59, not 70, you know, she just plucked a number, which sounds suspiciously like no valuation, just simply making a counter-offer.

**Q. What steps should a first-party insurer take to evaluate general damages?**

MR. BALINT: The insured or the insurer?

MS. WILHELM: The insurer.

A. Well, they need to consider what's presented as the impact of the claimed injury on the insured. So generally, this kind of thing is, you -- if the insured is unrepresented, you take a statement from the insured and you ask what impact has this had and what have you done and all of those kinds of facts.

When they are represented, you need to go through what is presented by the represented party and ask the questions about -- so here, Mr. Balint had provided two letters of explanation of the impact of this accident on Mr. Gaekwar, both the November Nationwide demand with its supporting records and, I think, its February UIM demand for this further



explanation of the impact. So Nationwide needs to study that and evaluate it.

There's no formula for evaluating the impact. That has to do with considering that here because it's a question of valuation of the claim. In the tort context, that has to consider whether a jury or a judge would evaluate Mr. Gaekwar's claims of being substantially, seriously impacted by this injury and having a continuing injury. So I didn't see evidence of any of that stuff.

**Q. (BY MS. WILHELM) Okay. But there is evidence that -- well, I won't fight with you about what the records say.**

**So your report is dated June 12, 2023. I think it was filed with the court sometime around maybe June 18. Since then, have you reviewed any additional records and materials?**

A. I received and reviewed the deposition transcripts of two witnesses -- just a moment -- a Brittany Am and a Barkley Finsterbush -- I apologize. I probably mispronounced his name -- so I received and reviewed both depositions. There was another sent late Friday that I did not have a chance to review, so I haven't reviewed that.

And in terms of records, I did review a couple



of supplemental record productions from Amica's claim notes. They dealt with the period of time when reserves were being set within the Amica file. And I believe they were the set of reserves that come from -- the set of claim notes that come from the interaction of the home office examiner on the file, which previously had not been included in the claim notes. So those are the only additional materials that I had reviewed.

**Q. Okay. Well, that's a great segueway into my next topic. Let's talk about reserves.**

**In your training and experience, what are reserves based on? What do they include?**

A. Well, the insurance industry has a generalized standard for reserving, and then each insurance company has their own particular take on what reserving is to accomplish. So within the industry as a whole, reserves are designed to be a reasonable valuation of the company's exposure for a known claim.

And in this regard, the insurance industry is regulated to both pay attention -- study what its known claims are as well as an actuarial determination for unknown but expected claims. So your -- incurred but not reported, IBNR, is a different reserve calculation than your reserve calculation for purposes of known claims.

And the generality is that the regulators for insurance companies want to make sure that the insurance company is financially prudent and solvent. And so therefore, with respect to known claims, it has set aside and placed in secure investments a sufficient sum of money to represent its aggregate exposure on known claims.

**Q. In your report, you sort of use those as a way to suggest that Amica valued Mr. Gaekwar's claim higher than their offers to resolve. Can you explain how you relate the two?**

A. Well, I am not aware of any of Amica's internal policies with respect to what its reserves are supposed to detail. I don't know whether that has been disclosed in discovery and answered. But in my experience representing insurance companies, the adjusters are typically told to set reserves that represent the best current known valuation based on the information that they have of the value of the claim, generally including potential loss-adjustment expense, meaning the expense of -- to the company of claims resources as well as if a claim is being reserved because it's going into litigation. Then at this point, potential litigation expense might be included.

In this case, the two reserves that were being



set were not -- I don't think were denied to the claim going into litigation, and so I don't think those were the consideration, but there was really no explanation specifically. There is -- in the claim note that was recently received, there is a slight explanation of what the considerations were from raising the reserve from the $40,000 -- or 45–. I don't remember -- to the 95–. But those considerations suggested, since the claim was not -- did not appear to be involving a significant expenditure of adjustment -- or a legal -- excuse me -- claims expense, they represented some valuation of what was it likely going to be -- the total payment that would need to be made on the claim.

And the fact they were adjusted as new developments occurred suggested to me that somebody is looking at this particular claim and saying, "Our original estimation of the claim has changed and we need to change our reserve," which is a completely proper circumstance. Claims should be evaluated and adjusted where appropriate as information comes available. So the information that they obtained at the time suggested, for example, that the claim valuation should have went from 45,000 to 95,000. That would seem, to me, to reflect a recognition that there was substantially more at stake for the company to try and



resolve the claim than they had before.

Well, when you line that up with the offers being made, there's a discount. Because instead of recognizing that there is a substantially -- internally recognizing there is a substantially greater amount that's going to be necessary on average to resolve this claim, they make only a de minimis to go from $1,000 to a $5,000 change in position of the offer.

So that disconnect between recognizing internally whatever reasons Amica has changed its valuation with respect to this claim, but not reflecting any change in its offers -- to any significant change in its offers to Mr. Gaekwar, is an unusual fact that doesn't seem, to me, to be consistent with effort to make a fair, reasonable and equitable resolution of a claim in which liability has become clear, which is the company's overriding obligation.

**Q. Gotcha. And you're aware now that the adjusters on the file do not have information about what reserves are set at, right?**

A. I saw testimony to that effect from -- I don't remember. One or both -- but I do know that those claim reserves are not set by a computer. They are set by a home-office personnel who is basing, presumably, the change in the reserves on information that is available.



So while the individual adjuster may not know it, the home-office claims examiner -- who is apparently the one setting the reserves -- is aware of the information in the claims file in making that change. That's my understanding.

By the way, I find that -- it's an unusual situation that the line adjusters aren't aware of the reserves. Most companies that I've represented and dealt with and handled internally, the line adjusters were aware of the reserves even if they weren't the ones setting the reserves.

**Q. I'm curious about that, but I'll keep with my questioning.**

**One of the purposes of reserves is to maintain Amica's solvency; is that accurate?**

A. That is a regulatory purpose of a reserve, yes.

**Q. Okay. Would you expect Amica to -- obviously try to be accurate with their reserving. But in the event that accuracy is difficult, for example, in contested claims, would you anticipate they would err on the side of overreserving or underreserving?**

A. The insurance regulators frown on both overreserving and underreserving -- and the reason being that both misstate the financial condition of the company. Secondly, there's a great deal of literature

about using reserves to misrepresent the financial profitability of insurance companies, which is a subject -- separate subject matter. But valuations of insurance companies are oftentimes impacted by either overvaluation or undervaluation across the board of reserves, so that's considered manipulation and has a lot of consequences.

Within the company, I would expect that Amica's goal is for reserves to be neither overreserves nor underreserves, but to be based upon the quality of the information they have, a reasonably accurate estimate of the expectations.

**Q. Okay. I want to talk about communication with the insured real quick. In your report, you point out a couple of time periods where there is -- some time passes without contact between Amica and Mr. Balint. Is there a rule of thumb or a time frame that flags to you improper claim handling?**

A. Certainly, customary claim handling practices require that the insurance company keep the insured advised of developments on the claim with frequency. Now, whether that's every 30 days -- it may depend upon, in individual states, different criteria.

But in my experience, proper claims handling means that the insured is kept promptly advised of



developments. So it may be that they need to be told what's happening more often than every 30 days, but certainly at a minimum. If not a lot is happening, they should be told what has happened, and then more importantly, told what is the next expected steps necessary so that the insured knows where its claim is headed and how and when it's likely to have something resolved. So left open-ended or continuing to evaluate is not an adequate communication, according to customary claims handling practices. They need to be told concretely what is needed to be done, what's being done to accomplish those steps. And once things are accomplished, they need to be told this has happened.

An example, a records review was obtained. I don't think -- it's many months before the insured was even advised that there was a records review. Then, he wasn't even provided with a records review for another several months. To me, that's not proper communication in any regard. You're not trying to hide information from the insured that your investigation has obtained. You're trying to be open and honest with your insured about what you have obtained so that the insured knows what's -- how his claim is proceeding.

So the great deal of time between when the records review was requested and obtained and providing



that information to the insured, was simply -- to my mind, there's no excuse for it. There can be no reason why the insured isn't told what the company is doing and provided with that information.

**Q. So I see that's putting Amica in a weird position. When Amica is not allowed to communicate directly with the insured, but Amica has called or emailed or left a voicemail for counsel, is the expectation that Amica continue to leave voicemails for counsel even when they're not responded to? Even if the only action is, "We're waiting for a response from your counsel"? I'm unclear.**

A. Well, in my mind, the insurance company has the obligation to say, "We're still waiting for this information, and as soon as we get that, this is what we can do." And I don't think it's a situation where the moment the insured is -- the insurance company has fired off an email, that it can simply ignore the file and its progression until such time it receives a response. So the obligation to complete the investigation and promptly do it is, to my mind, the obligation of the insurance company.

Now, whether the insured doesn't respond, that may be a period of time when that's all the insurance company needs, then maybe the insured has reasons.



There are a lot of times where an insured says, "I'm waiting to have my surgery. No. I'm not going to decide anything until I have my surgery." So in that period of time, the insured isn't obligated to write the insurance company every 30 days saying, "I'm still waiting for my surgery." But when the insurance company obtains information, it's obligated to share that information promptly.

So I think my main criticisms was that the insurance company didn't move the thing along even if Mr. Gaekwar was delayed sometimes responding because of conditions. That's a separate situation, I believe, under customary claims handling.

**Q. Does Amica have any obligations to protect their insured's personal health information, in your mind, that would go towards the claims handling? I understand you're probably not an expert in health privacy law.**

A. I have attempted not to become an expert in health privacy law. And certainly Amica should not be ignoring health privacy law in its handling of the claim, so I would not expect it. But I think that's a common consideration that insurance companies have. So I would expect that Amica has in place standards how to handle the insured's health privacy information in

compliance with applicable standards.

**Q. In your mind, would that include not just sending a compilation of records, or in this case, records reviews out without acknowledgement from the insured or their counsel?**

A. I don't know -- when you say "send out," send out to whom?

**Q. To counsel.**

A. If Amica -- I think Amica is entitled to send to its -- the insured's attorney anything that it has relating to the insured's conditions. As long as he is represented, the insured's attorney is entitled to all the information about his client that Amica has.

**Q. Do you see any distinction between Plaintiff's counsel sending Amica records or Amica receiving records pursuant to a release versus Amica sending those records to an individual that's not a licensed health care provider? Does that make sense?**

A. Well, I certainly recognize that there would be a very substantial difference if Amica sent health care records to someone that is not a health care provider and is not somehow protected within the HIPAA regulations as a recipient. I don't know what particularly you have in mind, but certainly Amica should not be sending Mr. Gaekwar's health care records



to someone who is not obligated to keep them confidential and doesn't have sufficient interest under the statute to obtain that information.

MS. WILHELM: Let me look through my notes here really quick. I think I'm about done. Do we want to take five? Does anybody need a break?

THE WITNESS: Fine with me. I will promise to be here.

(Break taken 11:57 a.m. to 12:02 p.m.)

**Q. (BY MS. WILHELM) So, Mr. Dykstra, I just want to confirm a couple of things with you before we wrap up.**

**I'm still a little unclear about when Amica should have taken affirmative investigation steps. We talked about the investigation begins effectively when the insured reports there was an accident, and then I'm unclear. Do they also have to put Amica on notice of the underinsured claim?**

A. Well, I think you misunderstood. The policy requires a variety of benefits, not just UIM. The insured should give the insurance notice of the accident. That allows the insurance company to do whatever it wants to do.

And in this instance, it provided Mr. Gaekwar information about some of its benefits, including the



collision and the PIP. Until it knows more, I don't -- other than making him aware that he has a UIM benefit under his policy, I'm not sure that it has an obligation to investigate at that point, other than it does -- if there's information it wants to obtain right away. If it wants to find out -- you know, send an accident reconstructionist or whatever, it at least has a chance to do something that's time sensitive.

Here, Amica got notice, as I understand it, of Mr. Balint's representation and that he was intending to pursue a UIM claim a few months later. And at that point, they had an obligation, knowing that he intends to pursue such a claim, to commence its investigation. I don't think it did anything other than -- I believe there was an opening of a claim for UIM as distinguished from the PIP in the fall -- I think it was in August or September -- but it waited until it received the November demand package to Nationwide.

So I would say that its duty to investigate, certainly because they opened a UIM claim subfile, started when they did that in August or September, and certainly continued on through the time that it obtained -- or it received the demand letter to Nationwide, which to that mind, would make it clear to them that a UIM claim was going to be presented. It



provided the documentation. It provided the requests for Amica to make a decision on whether to exercise its subrogation rights or waive the subrogation rights and allow Mr. Gaekwar to proceed with his settlement with Nationwide. It knew from that point on, it was going to get a UIM claim. It had every reason to begin its investigation, by then at least.

As far as I understand it, it really didn't do anything other than receive documents, records and put them in the file until the following February when Mr. Balint provided the formal UIM demand package. And at that point, it continued to have an obligation to investigate from there. The notice of accident is an obligation under the policy, but it is not the same as an obligation to investigate the claims that they trigger related to different obligations of the company.

**Q. Gotcha. So the trigger for the obligation to investigate, particularly the UIM claim, is when the insurance company's on notice that there will be such a claim?**

A. Yes. Not that it has been made, but that it's intended to be pursued.

**Q. Gotcha. And that should go beyond just opening a file? There should be affirmative investigation?**

A. Yes.

**Q. Okay. And by investigation, that's not simply reviewing records that are presented. There should be other affirmative action; is that...**

A. It should do everything that's going to be necessary for it to handle the potential UIM claim. So the UIM claim involves elements which didn't eventually get disputed here, but it had an obligation, if it wanted, to investigate liability. It had an obligation to, you know, investigate subrogation aspects, all of those things. And if they weren't done, started at that time.

**Q. And then we also talked about once an insured has presented their demand -- their damages, Amica should be looking to provide and compensate the insured. If they disagree with the insured's injuries or the value of their injuries or their damages, at that point, Amica is obligated to undergo further investigation; is that accurate?**

A. Yeah. It's obligated to do a complete investigation if it has any reason to disagree with anything that is being presented and requested.

**Q. Okay. And by "investigation," again, we're not talking about reviewing and analyzing documents in the claims file. It's other things, right?**

A. It has to be both. It has to review what it



has and decide whether it's sufficient and whether -- if it needs anything else. And if it needs anything else, it needs to obtain that.

**Q. Okay. In Mr. Gaekwar's case, one of the big issues is whether Amica's determination about what was necessary for their investigation is at issue.**

A. Certainly seems to have been. They felt that a large component of the claim was resolved of preexisting injuries that were not caused by the accident. So it had an obligation to fully investigate that, if they wanted to contest its liability because of preexisting conditions.

**Q. Okay. And your conclusions about the sufficiency of the record -- I just want to be clear, is that based on your knowledge of claims handling generally in your experience?**

A. Yes. This is based upon my familiarity with insurance adjustments and how adjusters are trained. I participated in adjuster trainings for most of my professional career until the last few years when I no longer represent insurance companies.

I give seminars. I participate in explaining to insurance adjusters, not lawyers. I want to make it clear, I'm not trying to testify to what I tell lawyers. I do that, but that's not what I'm going to be asked



about in this case. It's what I tell insurance companies and adjusters about how they handle their claims.

And the source materials that I have relate to training adjusters and not legal manuals. Lawyers don't go and consult the institute's publications on how insurance adjusters are trained. But I have familiarity with them. I have copies in my office. I have been dealing with them for many, many years. And that's the kind of thing that I am basing my opinion on.

**Q. Gotcha. And that's not medical training or experiences, for example, records review, correct?**

A. I wouldn't claim to have, any longer, any experience in records review because it's been too long a time since that's what I was doing on a daily basis.

**Q. Gotcha. Do you have any other medical background besides just...**

A. Only as a patient.

**Q. Me too, unfortunately.**

A. Actually, today, my youngest daughter sent me a text she is now fully enrolled in med school. So I will probably learn a little bit more about medical conditions as a dad instead of as a patient.

MR. BALINT: Congratulations. Who is going to pay for it?



THE WITNESS: Well, the school has so far been generous, but we will have to figure it out.

MS. WILHELM: Well, if we go to trial, you know...

THE WITNESS: Yeah.

**Q. (BY MS. WILHELM) Let's see. Would you anticipate Amica adjusters who do consult experts to rely on the opinions of those experts?**

A. I would expect them to provide the experts with all the information that is necessary to make a decision and then listen carefully to the recommendation of the experts. But you don't -- you can't rely on an expert if you haven't provided that expert with the necessary information. So you've got to do both: Provide them with the information and then reasonably rely upon what the expert has said.

**Q. Would you expect -- based on your experience with medical record reviews and IMEs and the like, would you expect an examining physician to communicate if they didn't have sufficient records to opine?**

A. I would hope they would, certainly. But I don't think that it's just a question of asking -- in this case, there -- as I said, there's clear indications that there were records related to preexisting conditions. But they aren't mentioned in the medical

records exam as anything that was reviewed. They aren't mentioned in the Amica adjuster's summary of information that was reviewed, but they are clearly known and being discussed. So I can't account for why they weren't provided to the expert, but it would appear at this point that they weren't or the experts simply ignored it. Neither of those is a proper outcome.

**Q. Okay. Which brings me to my next topic here. It's my understanding, based on your report and your testimony today, the fact that those prior records as well as the affidavit of Dr. Goldman weren't sent to Amica doesn't excuse Amica from their obligation to seek out those records; is that accurate?**

A. I don't know whether they were or not. But even if they weren't sent, then Amica had an obligation to request them specifically and obtain them before proceeding ahead with any kind of valuation. So largely what you said is correct.

**Q. Okay. And then as far as evaluating general damages, is it your position that the most appropriate way to do that would likely be speaking with the insured?**

A. Yes. Or at least gathering correct information about the impact of the accident on the insured. You know, either speak with them or ask for narratives or



submit questionnaires or any of -- there's a variety of ways that you can find out what the insured experienced because you would need to know, if there was ever going to be a trial, what the insured would be saying.

I don't think you just turn around and say, "Well, the medical specials are at almost 20,000, so that's all we need to know to valuate the impact of the claim on the insured."

**Q. Okay. In your experience with these claims and claims handling, would you expect to see the insurer reach out to the insured's friends or family to discuss general damages?**

A. Well, when representing an insured, they would need to at most deal with the insured's attorney. And I guess the question would be: After I interviewed the insured, are there questions which I want to obtain information from friends and family? I don't know that you would start the interview with friends and family.

I think you would start with an interview of the insured, a recorded statement or, you know, explanations. And then if you have questions, want to make sure that there's corroboration, you deal with the insured's attorney with what others might say: Interview a spouse, children or whatever. So it depends a little bit on how much you want to contest the



insured's valuation.

If you say -- if the insured says, "This has had a major impact on my life," you need to investigate what the insured says. And if you want to contest it, what other witnesses would say.

**Q. Okay. And I just want to clarify, do you hold any -- oh. Gosh. I want to call them certifications -- I think it's titles -- from the institute?**

A. I have not completed any of the institute's designations, no.

**Q. Designations was the word. Sorry.**

A. I have not.

**Q. And then you have not worked as a claims handler?**

A. I have not been an employee of a company as a claims handler. I have always functioned as an attorney in connection with insurance claims. But in connection with insurance claims, there has certainly been many instances where my role was -- the handling of the claim was distinguished from advocate in court. But never have I ever received a W-2 from an insurance company for one minute's work in my entire career.

**Q. Okay. Can you give me an estimate of how many hours you spent preparing for today's deposition?**

A. Are you talking about the prep as distinguished



from writing the report?

**Q. Correct.**

A. Three or four hours.

**Q. Okay. And could you remind me of your hourly rate?**

A. 595 -- sorry. This one is 575.

**Q. And is that the same for prep and for testimony?**

A. Yes.

**Q. Okay. And have you worked with Mr. Balint before?**

A. I've never been a witness for him. There have been a couple of instances over 20, 30 years where his office has consulted with me on insurance issues, asked my opinion about, you know, claims they had and so on. But never in the context of a potential witness and more in the context of did I have legal judgment and advice that his clients might benefit from.

I'm thinking. There have been maybe two or three that I recall -- one of the early instances -- actually, Mr. Balint's client was insured in an accident and had a claim against one of my clients and had brief dealings with Mr. Balint in connection with that case, because I was personal counsel for the defendant in the case. That he was -- so we had occasions over the

years, but never as an expert witness, but more as advising on legal insurance condition issues.

**Q. Gotcha. And I think I did review the list of all your testimony. But have you testified in federal court before?**

A. Yes.

**Q. Okay. And then have you ever been involved as a party in a lawsuit related to or arising out of kind of your role as of counsel or in-house counsel on an insurance claim like the one we're here about?**

A. I'm not quite sure as a party. I was long ago sued by a former client on a claim of malpractice that was tried -- a defense verdict affirmed on appeal. That's the only professional litigation I've ever been involved in. And that wasn't in any way in terms of -- as a witness.

MS. WILHELM: Okay. I think that's it from me.

Mr. Balint, did you want to ask any questions?

MR. BALINT: No. I think that's enough for me.

MS. WILHELM: Shoot. I have one more. I'm sorry.

**Q. (BY MS. WILHELM) Mr. Dykstra, are there any opinions outside of what you testified to today and in**



**your report that you anticipate giving at trial?**

A. I don't have any in mind. I recognize that there is a fluid process. And as I am provided with information, I may have further opinions, and then Mr. Balint or whoever may ask me about them. But I haven't come across anything since I wrote in my report that is different or not somehow summarized in the materials in the report.

**Q. Okay. Thank you.**

MS. WILHELM: That's it this time, I promise.

MR. BALINT: Signature?

THE WITNESS: I want to reserve.

(Deposition concluded at 12:22 p.m.)

(Signature reserved.)



C E R T I F I C A T E

STATE OF WASHINGTON )
) SS.
COUNTY OF KING )

I, the undersigned Washington Certified Court Reporter, pursuant to RCW 5.28.010 authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify:

That the annexed and foregoing deposition consisting of pages 1 through 75 of the testimony of each witness named herein was taken stenographically before me and reduced to typed format under my direction;

I further certify that according to CR 30(e) the witness was given the opportunity to examine, read and sign the deposition after the same was transcribed, unless indicated in the record that the review was waived;

I further certify that all objections made at the time of said examination to my qualifications or the manner of taking the deposition or to the conduct of any part have been noted by me upon each said deposition;

I further certify that I am not a relative or employee of any such attorney or counsel, and that I am not financially interested in the said action or the outcome thereof;

I further certify that each witness before examination was by me duly sworn to testify the truth, the whole truth and nothing but the truth.

I further certify that the deposition, as transcribed, is a full, true and correct transcript of the testimony, including questions and answers, and all objections, motions, and exceptions of counsel made and taken at the time of the foregoing examination and was prepared pursuant to Washington Administrative Code 308-14-135, the transcript preparation format guidelines;

I further certify that I am sealing the deposition in an envelope with the title of the above cause and name of the witness visible, and I am



delivering the same to the appropriate authority;

I further advise you that as a matter of firm policy, the Stenographic notes of this transcript will be destroyed three years from the date appearing on this Certificate unless notice is received otherwise from any party or counsel thereto on or before said date;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 17th day of August, 2023.

______________________________
SARAH K. WEBB, RSR, CCR
Washington State Certified Court Reporter
License No. 21035567

D E C L A R A T I O N

I declare under penalty of perjury that I have read my within deposition, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the Correction Sheet.

Dated this ______ day of _____________, 2023,

at ________________________________(city/state).

_______________________________________

RICHARD DYKSTRA

SARAH K. WEBB, RSR, CCR
COURT REPORTER



MOBURG REPORTING
COURT REPORTERS
33400 9TH AVENUE SOUTH
SUITE 207
FEDERAL WAY, WA 98003
(206) 622-3110

________________________________________

PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET, SHOWING PAGE, LINE, AND REASON, IF ANY. SIGN THIS SHEET AND SIGN THE ACCOMPANYING SIGNATURE PAGE (DECLARATION).

________________________________________

PAGE LINE CORRECTION AND REASON

__________________________
RICHARD DYKSTRA
Date taken: August 7, 2023

REPORTER: SARAH K. WEBB, RSR, CCR



MOBURG REPORTING
COURT REPORTERS
33400 9th AVENUE SOUTH
SUITE 207
Federal Way, WA 98003
(206) 622-3110

TO: DAVID BALINT
Balint and Associates PLLC
5950 - 6th Avenue South
Suite 200
Seattle, Washington 98108

August 17, 2023

IN RE: CHANDRASI GAEKWAR, a single individual vs. AMICA MUTUAL INSURANCE COMPANY, a foreign corporation
DEPOSITION OF: RICHARD DYKSTRA

A copy of the deposition transcript of the above-named deponent is provided via E-transcript. Please have the deponent review the transcript and sign the Correction Sheet and Declaration. The signed Correction Sheet and Declaration should then, within 30 days, be forwarded to:

SARAH K. WEBB, RSR, CCR
MOBURG REPORTING
COURT REPORTERS
33400 9th Avenue South
Suite 207
Federal Way, WA 98003

who will then enclose them in the original transcript, seal it, and forward it to LUCY WILHELM for retention until the time of trial.

If you have any questions, feel free to contact me at the number listed above.

Sincerely,

________________________________
SARAH K. WEBB, RSR, CCR

cc: L. Wilhelm, D. Balint



Certification of Court Rule and WAC Compliance

GAEKWAR V AMICA Case No. 2:22-cv-1551-BJR

I, VALERIE SEATON, am an authorized representative of MOBURG REPORTING and do hereby, under penalty of perjury, certify that Moburg Reporting and all court reporters providing services in the above-captioned case on MOBURG REPORTING'S behalf will fully comply with all applicable rules and regulations governing the provision of court reporting services, including, where applicable, Washington Superior Court Rule 28(c)-(e) and WAC 308-14-130(1). *

___________________________ 8-17-2023
Valerie L. Seaton Date
President
Moburg Reporting

*28(c) Disqualification for Interest. No deposition shall be taken before a person who is a relative or employee or attorney or counsel of any of the parties, or is a relative or employee of such attorney or counsel, or is financially interested in the action.

28(d) Equal Terms Required. Any arrangement concerning court reporting services or fees in a case shall be offered to all parties on equal terms. This rule applies to any arrangement or agreement between the person before whom a deposition is taken or a court reporting firm, consortium or other organization providing a court reporter, and any party or any person arranging or paying for court reporting services in the case, including any attorney, law firm, person or entity with a financial interest in the outcome of the litigation, or person or entity paying for court reporting services in the case.

28(e) Final Certification of the Transcript. The court reporter reporting a deposition shall not certify the deposition transcript until after he or she has reviewed the final version of the formatted transcript. A court reporting firm, consortium, or other organization transmitting a court reporter's certified transcript shall not alter the format, layout, or the content of the transcript after it has been certified.

308-14-130(1) Offer arrangements on a case concerning court reporting services or fees to all parties on equal terms.

# Exhibit 19

# Deposition of Barkley E. Finsterbush

# Gaekwar v. Amica Mutual Insurance Company

# July 20, 2023

BUELL
REALTIME REPORTING
COURT REPORTING AND LEGAL VIDEO

**206.287.9066 I 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com

Certified WBENC Women's Business Enterprise

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANDRASI GAEKWAR,
Plaintiff,
v. No. 2:22-cv-01551-BJR
AMICA MUTUAL INSURANCE COMPANY, a foreign corporation,
Defendant.

* VIDEOCONFERENCE *

DEPOSITION UPON ORAL EXAMINATION OF

BARKLEY E. FINSTERBUSH

* Witness located in Tampa, Florida *
* All times noted are Eastern Standard Time *

DATE TAKEN: July 20, 2023
REPORTED BY: Ryan Ziegler, RPR, CRR, CCR #20107870



A P P E A R A N C E S
* All parties participating via Zoom *

FOR PLAINTIFF:

David J. Balint
BALINT & ASSOCIATES, PLLC
5950 Sixth Avenue South
Suite 200
Seattle, Washington 98108
206.728.7799
dbalint@balintlaw.com

FOR DEFENDANT:
Rory W. Leid, III
Lucy B. Wilhelm
WATHEN|LEID|HALL|RIDER, PC
222 Etruria Street
Seattle, Washington 98109
206.622.0494
rleid@cwlhlaw.com
lwilhelm@cwlhlaw.com

ALSO PRESENT:
Reno Ettienne

* * * * *



VIDEOCONFERENCE DEPOSITION OF BARKLEY E. FINSTERBUSH

EXAMINATION INDEX

| EXAMINATION BY | PAGE |
|---|---|
| Mr. Balint . . . . . . . . . . . . . . . . . . . . . | 4 |

* * * * *

EXHIBIT INDEX

| EXHIBITS FOR IDENTIFICATION | PAGE |
|---|---|
| 1 5/5/2021 - 7/25/2022 Claim File Notes, AMICA 2056, 2059-2060, 2065, 2067-2068, 2080 | 13 |
| 2 11/4/2020 Letter from D. Balint to J. Witter | 21 |

* * * * *



TAMPA, FLORIDA; JULY 20, 2023
12:00 P.M.

BARKLEY E. FINSTERBUSH, witness herein, having been first duly sworn on oath, was examined and testified as follows:

E X A M I N A T I O N

BY MR. BALINT:

**Q. Could you please state your full name and residence address for the record, Mr. Finsterbush?**

A. Barkley Earle Finsterbush, and I live at 4790 Tramanto Lane in Wesley Chapel, Florida 33543.

**Q. Telephone number?**

A. (706)992-4552.

**Q. And email address, please?**

A. BFinsterbush@Amica.com.

**Q. Are you still with Amica?**

A. Yes.

**Q. Could you give us a little bit of biographical information on you starting with educational history starting with high school graduation?**

A. I graduated from Bay High School in Panama City, Florida, in 2005. I went to the University of Central

Florida in Orlando, Florida, and I graduated there in 2009. I went to Johnson & Wales University, the online campus or online university. I started when I lived in Rhode Island. I completed that degree when I lived in Phoenix, Arizona, and I believe I finished that in 2022.

**Q. What was your undergraduate degree in?**

A. It's a Bachelor of Fine Arts degree in theater.

**Q. And your graduate degree?**

A. I have a master's in business administration with a specialization in organizational management.

**Q. Give us a little thumbnail sketch of your educational history also starting from graduation with high school, and include -- and please include when you're going through your job history the date -- the inclusive dates, please.**

A. You said educational history or job history?

**Q. Job history. You already -- you already --**

A. Job history.

**Q. -- covered the educational, I hope.**

A. Yeah. I did. All right.

So do you want me to start after college?

**Q. Well, start with -- start with high school just to get a full picture of places you've worked.**

A. Okay. In 2003, the summer of 2003, I worked at Shipwreck Island Waterpark and Miracle Strip Amusement



Park. I was a lifeguard by day and a games employee by night. In high school, I also worked at Shipwreck Ltd., which is a retail shop on Panama City Beach, and Miracle Strip and Shipwreck Island are also on Panama City Beach. I don't know the dates that I worked there.

I worked at Blue Island, which is also a retail shop on Panama City Beach. I returned to Miracle Strip Amusement Park in the summer of 2004 for the games role. I worked with my girlfriend-at-the-time's dad doing odd jobs for him throughout my senior year of college, and then when I moved to Orlando, I got a job as a sales associate at Bed Bath & Beyond in 2005, July of 2005.

I worked there until approximately March or April of 2006, and I got a job as a server at Buffalo Wild Wings in Orlando, and I worked there until June or May of 2006. And then I went to Trinidad, Colorado, and did a summer internship at the Colorado Repertory Theatre as a sound engineer. Then when I came back to Orlando in the fall of 2006, I went back to Bed -- to Buffalo Wild Wings and continued working at Buffalo Wild Wings.

And then in the summer of 2007, I did an internship at FX Design Group as a carpenter, and meanwhile still working at Buffalo Wild Wings through that whole summer and FX. That ended in August. I worked at Buffalo Wild Wings until March of 2008, and at that time I went



back to Bed Bath & Beyond, and I was a server/front-of-house trainer at Buffalo Wild Wings the whole time I was there.

I went back to Bed Bath & Beyond as a sales associate. At some point I was promoted to full-time. I don't know the exact date, and then in, I think, May of 2010, I was promoted to a department manager. In November of 2010, I was promoted to a merchandise manager, and I moved to Columbus, Georgia, at that time.

I was in Georgia working in the soft lines as the merchandise manager until February of 2012 when I moved back to Orlando and was still a merchandise manager in Orlando. At some point -- I don't know the exact date -- I was transitioned to operations manager, and I jumped around stores often, so I don't have the dates. I worked in Apopka. I worked in Orlando. I worked in Casselberry.

I also did overnight work in other stores across the multiple districts that I worked in, including Land -- or Lady Lake and Brandon and Wesley Chapel. So I was in that operation manager role until November of 2014, and at that time I went to Pottery Barn as an associate store manager, and I was in that role in Orlando until January of 2016, and at that time I was hired by Amica as an associate adjuster.

I went to Rhode Island for seven weeks, and then



upon completion of the onboarding, I moved to Rochester, New York. That was January 2016 to March of 2016. I moved to Rochester in March of 2016. In July or August, I was promoted to an adjuster, still in Rochester, of 2016, and I was in that role until probably January of 2018 when I was promoted to a senior adjuster, still in Rochester, New York. In July of 2018, I was promoted to a claims supervisor in the Rhode Island claims office, and I was in that role from 2018 to 2020.

September of 2020, I moved to Phoenix, still as a claims supervisor in Phoenix, Arizona. I was in that role until January of 2022, and I was promoted to a senior claims supervisor at that time, and I was in that role until September of 2022, when I was promoted to assistant PIP manager and we moved to Wesley Chapel, Florida, and I've been in this role since September of 2022.

**Q. Okay. So that's as thorough as I've ever heard from a witness.**

**Going back to the -- to the Amica roles that you've had, you started out as an associate adjuster after seven weeks of training. I've got that right?**

A. Yeah. We held the title during the seven weeks, so when I got hired, I was hired as an associate adjuster.

**Q. And then in July of 2016 -- you were an adjuster for a couple of years, it looks like. Tell me what kind of**

Page 9

**claims you were handling for Amica during that time frame.**
A. So I was in Rochester, New York, so I primarily handled New York bodily injury and property claims from, you know, wind and water losses to fire losses, bodily injury claims from soft tissue injuries, fractures, ankle degloving, surgeries, multiple different types of injury claims. And I also was -- handled a cat where I went to Houston, Texas, for three or four weeks in 2017 following Hurricane Harvey and handled property claims as a cat adjuster.
**Q. Okay. And then the -- your next job was as a senior adjuster. Tell me what roles you -- what kind of job duties you had at that time.**
A. As a senior adjuster, it was a lot of similar job duties as the adjuster, more experience, in some cases a little bit more -- like, with the fire losses, I had a couple of large fire losses that I handled. I was a mentor to a new adjust- -- an associate adjuster, new associate adjuster, but primarily job duties were about -- very similar to the adjuster role.
**Q. And it sounds like a lot of it was property damage. What's the percentage between property damage and personal injury-type claim?**
A. In New York, I was -- I was a multiline. I don't know the exact percentage. There was -- there's no --

Page 10

there was no, like, rhyme or reason to how they assign them. You know, I'd say 50/50, but that's probably not accurate, because nothing's really 50/50.
**Q. True.**
A. I feel like it was probably a little more on the property side, but it was because they closed quicker than some of the casualty claims, and New York has a serious-injury threshold, so a lot of claims you get in New York are bigger claims that take longer to resolve.
**Q. And then as a -- as a senior adjuster, did you supervise other adjusters --**
A. No.
**Q. -- other than the mentor? Okay.**
**And then as a -- in your next role, that was as an assistant -- I can't remember -- didn't remember the term you used. A PIP manager? What was it?**
A. That's my current role. That's -- that wasn't the next role.
**Q. The next role was what? Give it to me again, please. Sorry.**
A. It was claims supervisor.
**Q. And what was your job description there for Amica?**
A. As a claims supervisor, I had a team of auto physical damage handlers, and I had two multiline adjusters when I first started.

Page 11

The position changed a lot, so at one point I had a subrogation team that reported to me and I didn't have the APD team anymore. The adjusters changed quite a bit due to promotions or leaving, and then in, I think it's, April, maybe a little sooner, of 2019 I only had adjusters that I -- on my team that I oversaw in the New England region.
**Q. You were still handling your own claims, I take it, though, not just supervising.**
A. Yeah. I had a backlog of claims until probably March or April of 2019.
**Q. And we have some -- we have some information on your involvement in the Gaekwar claim that we're here with today, but first I want to know what information you've been able to review prior to this deposition.**
A. I reviewed my particular file notes that I put into this file, and I reviewed, I think it was, two interrogatory questions.
**Q. That's it?**
A. That's it.
**Q. In your current role, do you still have access to all of the files? For example, the entire Gaekwar file at Amica?**
A. I don't know. If the file is marked confidential, then I do not.

Page 12

**Q. But otherwise, in your current position, you could -- you could access that, or would you need somebody's permission?**
A. I would need somebody's permission if it's marked confidential. If it's not marked confidential, then I could access it.
**Q. So I had a background question that I was trying to get an answer to yesterday, but if a person such as yourself were to access an active file that you were not personally involved in, would that access show up anywhere in the Amica files anywhere that you -- that somebody accessed it? "Barkley Finsterbush accessed it on such and such a date"?**
A. Yes. There is a history tab that shows any person who enters a file.
**Q. And then we have in -- you said you answered some -- you participated in some answers to interrogatories, and I take it that, during the period of time -- well, let's just -- let's just do this.**
**You have -- I want to bracket your involvement in the Gaekwar case. What we have is a -- is a 5/5/21 initial involvement and your last involvement at 7/25/22. Do you need to look at the -- at the claims file pages for that?**
MR. LEID: Object to the form. Go ahead.
A. I reviewed my file notes, and those sound like the

Page 13

dates that were on those file notes.
BY MR. BALINT:
**Q. And other than those -- well, let's pull it up and take a look at the -- at the involvement so that we make sure we know what we're talking about.**
MR. BALINT: Reno, could you open that Exhibit 1, we'll mark it, which is the claims file?
(Exhibit No. 1 marked.)
BY MR. BALINT:
**Q. Okay. And we'll start with page Bates-stamped 2080. In the middle of that page, it has, "Barkley Finsterbush, 5/5/21," and can you read what it -- what it says there? I don't need you to read it, but I just want to make sure you can read what's on the screen.**
A. Yes, sir. I can read it.
**Q. To your knowledge, is that the first time that anybody ever notif- -- you had any knowledge or involvement of any kind with the Gaekwar claim?**
A. I'm sorry. Can you repeat your question, please?
**Q. Yeah. Sorry.**
**Is this the first time, whether official or unofficial, that you even heard of the claim from Mr. Gaekwar?**
A. Yes.
**Q. And what was the purpose of your initial**

Page 14

**involvement?**
A. This note is an initial supervisor note to Tom Grundy, who was assigned this file.
**Q. And at this time, 5/5/21, what was your -- what was your job description? Your title?**
A. I was a claims supervisor.
**Q. How many adjusters did you supervise at that time -- were you supervising at that time, approximately?**
A. Four or five.
**Q. Did it include Brittany Am within --**
A. No.
**Q. -- that group?**
**When you first got involved, this new assignment, what did -- did you review any part of the file before you made this entry on 5/5/21?**
A. I don't recall how much I reviewed when I made that entry.
**Q. For what purpose did you -- did you assign Mr. Grundy as opposed to keeping the adjuster who had been on the case prior to that time?**
A. I did not make the choice to reassign the claim.
**Q. Do you know who did?**
A. It would be in the file notes. I do not know.
MR. BALINT: Then, Reno, go to the next page, 2068, please. Okay. Are we there?

Page 15

BY MR. BALINT:
**Q. This is also a part of Exhibit 1. This looks like a note from you. I don't -- let's see if I have that. Yeah. These are in reverse order as they were Bates-stamped to me.**
MR. BALINT: So if you'd go to the -- to the previous page, 2067, please, Reno?
BY MR. BALINT:
**Q. What was the purpose of this note on, it looks like, 6/30/22?**
A. Are you able to move it to the next page? This note looks like it's cut in half.
**Q. Yeah. The next page was the one we just looked at before, 2068. As I say, they're in reverse --**
A. Oh.
**Q. -- Bates-stamp order.**
A. So you don't have page 29?
**Q. Let me --**
A. It looks like it goes from 28 to 30.
**Q. Well, 2067 is the -- is the first page. Let's see what the next page is here. No. I don't have that. I have 2065. Okay. Let's just take it from what this is on the previous page.**
**Did you -- at any time during these initial assignments to Mr. Grundy, did you at any time review the**

Page 16

**existing file that was -- that Amica had?**
A. I don't recall exactly what I reviewed at any point during these notes.
**Q. When you become a senior -- when you become a claims supervisor for, like, Mr. Grundy, to what extent, normally, do you -- do you actually review the materials that are being produced for a particular client, medical records in particular?**
MR. LEID: Object to the form. Go ahead.
A. Yeah. My role is to supervise the individual, the people. They handle the file. I don't supervise the file. I supervise the person.
BY MR. BALINT:
**Q. So in what extent -- to what extent were you consulted about any offers that were made by the claimant to settle the UIM or to resolve the UIM claim?**
A. Offers made by the claimant?
**Q. Well, let me -- let me rephrase that.**
**What sort of settlement authority during this time did Mr. Grundy have independent of trying to get permission from somebody else like you?**
A. I don't recall exactly what position he was at this time, but he had at least 25,000 in new-money authority.
**Q. Okay. So let's see here. Well, let me -- I'm**

Page 17

**going to go back to that in a little bit.**
MR. BALINT: So, Reno, you can take that off the screen for now.
BY MR. BALINT:
**Q. During the time frame that you were involved in the -- in the Gaekwar claim, we've already talked about your relationship to Brittany Am and to Tom Grundy. What was your relationship to Thomas Van Kooten?**
A. I did not have a working relationship with him. He was not on my team, didn't report to the same supervisor.
**Q. Did you report to him?**
A. No.
**Q. And he didn't report to you?**
A. No.
**Q. Do you know who he is, though?**
A. I know who he is. We don't -- we're not -- like, we're not connected.
**Q. During this Gaekwar claim period, did you have independent settlement authority?**
A. Yes.
**Q. How much? What were the limits?**
A. I had up to 30,000 until January of 2022 when it went up to 35,000.
**Q. So if there was -- if there was a demand for new**

Page 18

**money in excess of those amounts, where did the -- where did the -- where did the claims adjuster and you have to go to get more authority?**
A. For a demand, we did not have to go get more authority.
**Q. So if the demand was for $140,000 new money, where would that go?**
A. It would go to Tom Grundy, the handler of the file.
**Q. But he didn't have the authority to accept that. Did he?**
A. No, he did not.
**Q. Who did?**
A. He had the authority to evaluate the claim.
**Q. And then who had authority to accept or reject the 140-?**
A. Tom has -- had authority to reject the demand.
**Q. And who had authority to accept it?**
A. So who had authority of 140-?
**Q. Yes.**
A. I don't know exactly how high that goes, but it'd probably have to be reviewed by our home office.
**Q. Do you have any information for me on who at the home office during that time had that authority?**
A. This -- so this is a Washington case, so it was

Page 19

probably Alex Rottler.
**Q. Do you have any idea what his authority was?**
A. No, I do not.
**Q. While you were involved in this claim, during the time frame you were involved in the Gaekwar claim, was there a claims committee at Amica?**
MR. LEID: Object to the form. Go ahead.
A. What is a claims committee?
BY MR. BALINT:
**Q. Okay. Well, I guess that answers the question.**
**If an adjuster like Tom Grundy had any questions, if he had any questions about a particular claim or needed advice, would he go to you or somebody else?**
A. Yeah. He would go to me. I was a resource whenever he needed me.
**Q. And whenever he needed you, if you were consulted, I take it that should be in the claims file. Correct?**
A. Yes.
MR. BALINT: And then, Reno, if you could pull up the Exhibit 1 again? I want to bracket this witness's involvement. 2056. There we go.
BY MR. BALINT:
**Q. And, Mr. Finsterbush, is -- to your knowledge, this is an entry of 7/25/22. Was that your last involvement in this file?**

Page 20

A. That was my last involvement pre-IFCA complaint.
**Q. Is there any continuing involvement that you would have in an -- once it got to this stage on 7/25?**
A. Yeah. I would have overseen the file until it was either reassigned or I -- or my promotion in September of 2022, but I don't know exactly where this file went after this July 25th note.
**Q. You have no memory or no knowledge of any continuing involvement you had after 7/25/22. Correct?**
A. No. I have no memory of this file.
**Q. While you were in these -- involved in this file, did you have any -- did you review the Amica training materials on Washington law?**
MR. LEID: Object to the form. Go ahead.
A. I reviewed training materials on Washington law every day. In specific relation to this file, I could not tell you if I referred to something specific in this file.
BY MR. BALINT:
**Q. When you were this -- in this position of the claims supervisor and you had four or five adjusters, what region of the country were you mostly involved in?**
A. I had about 27 states total that I oversaw, but primarily the West Coast. So California, Washington, Arizona, Colorado were the top four, but I handled everything west of Kansas, or rather I oversaw everything

Page 21

west of Kansas.
**Q. At any time when you were reviewing the file did you review the initial claim made by the -- against Nationwide, the underlying insurance company for the tortfeasor?**
A. I don't recall.
MR. BALINT: Okay. Reno, could you put up that initial letter to Nationwide?
COURT REPORTER: Will this be Exhibit 2?
MR. BALINT: Yes. Exhibit 2.
(Exhibit No. 2 marked.)
MR. BALINT: If you go to the last -- this is Exhibit 2. It's a letter, November 4, 2020. Reno, if you could go to the last page, please?
BY MR. BALINT:
**Q. A copy of this letter was sent to Amica. Do you see that note at least on this letter?**
A. Are we talking in -- oh, at the -- the, "CC: Brittany Am"?
**Q. Yes.**
A. Yes. I see that.
MR. BALINT: Okay. And then go up to the -- to the first page, I think, Reno? Okay.
BY MR. BALINT:
**Q. At this time, did --**

Page 22

MR. BALINT: Well, go down a page, I think.
BY MR. BALINT:
**Q. It says here, "The enclosed disc contains the following information," and then there's a document description list. Do you see that?**
A. Yes.
**Q. Is there any reason that the Amica file, if it received these documents, would not have received these records that are indicated here?**
MR. LEID: Object to the form. Go ahead.
A. Can you -- can you just clarify what you just asked me? I'm sorry. I'm not sure I understand what you're asking me.
BY MR. BALINT:
**Q. All right. I'm not sure I understand what I asked.**
**Okay. So here's the -- this is -- this is a letter. Do you ever recall reviewing this Exhibit 2 at any time during your claims handling or up to the present time?**
A. I don't recall.
**Q. If these records were provided to Amica, you would -- you would -- they would somehow be -- they would be transferred into the claims file. Would they not?**
A. Correct. Yes.
**Q. Would there be any reason why some of these**

Page 23

**records -- for example, the Proliance surgery records which I have document-indexed as 17.1 and their bills and the Overlake Primary Care Clinic records starting with July of 2015, is there any reason why these preexisting records, if provided, would not have been -- are nowhere to be found in the entire Amica claims file? What would be the reason for that if that's a correct statement?**
A. I don't actually know the inner workings of the scan center, and I'm -- I guess I'm assuming that you mailed these to the scan center. If -- or -- and you might have mailed them to a physical office. It not necessarily would have come across my desk. I don't really know the inner workings on how things go from mail to in the file.
**Q. Let's assume that the -- that Amica did not get these documents but got the letter. Would you agree with me that before any claims are accepted or rejected or settled that Amica would have a duty to thoroughly investigate available documentation?**
MR. LEID: Object to the form. Go ahead.
A. I don't know what the duties are, but what -- you know, when we get the letter of this nature, we would want to make sure that we have these documents that were outlined by plaintiff counsel, and if we didn't get these documents, we would want to request these documents from plaintiff counsel, but not limited to these documents if we

Page 24

were aware of something else out there that we might be seeking.
BY MR. BALINT:
**Q. Go ahead. Sorry. I don't want to interrupt.**
A. Yeah. And as -- you said, "Do we have a duty to investigate?" Again, I'm not sure what our duty is, but as far as investigation, is we would look at liability. In a UIM claim, as we're talking about here, we have a responsibility to step into the tortfeasor's shoes, so we'd want to make sure liability was there and check for any coverage issues and then review medical records and whatever else was needed on a -- obviously, it's a case-by-case basis.
**Q. So would you agree with me that when you're -- when you're trying to evaluate a personal injury claim for UIM purposes that it would be important to know if an injury claimed by a claimant such as Mr. Gaekwar had any active preexisting conditions prior to the crash?**
A. It would be important to understand if the claimant had any preexisting injuries related to the injuries being claimed.
**Q. Is there any indication that you've ever seen in the file that Amica asked for any precrash tort -- when I refer to "the crash," I refer to the underlying tort. Is there any reason why Amica -- there's nothing in the Amica**

**file to ask for any records prior to the demand for -- the IFCA demand?**
MR. LEID: Object to the form. Go ahead.
A. I don't recall, but the -- Step 1 of the review is to review the medical records that were provided, and in case -- you know, many cases you can review those medical records and medical bills, and you can review, you know, the other things in the file -- liability, what actually happened in the accident -- and you can make an evaluation, so I don't recall why or if preexisting records were ordered or why they were or weren't.
BY MR. BALINT:
**Q. What I'm asking about now is you said you review Washington -- at this time you reviewed Washington responsibilities for insurers almost daily. Do you know the difference in Washington law between aggravating a preexisting condition or lighting up a dormant preexisting condition?**
A. I mean, I don't know off the top of my head today. I haven't handled one of these cases in nine, ten months at this point, but at that time, you know, we were handling cases in Washington and settling them every day. So I'm sure at the time I was probably familiar with that, but today I couldn't tell you the difference. I don't know.
**Q. It doesn't sound like it, but do you have any**



**legal training other than at Amica for the training manuals that they have?**
A. No. Just through Amica -- what Amica's offered and then through The Institutes, like the, you know, insurance designations that I've accumulated during my time at Amica.
**Q. Do you have any medical background?**
A. No.
MR. BALINT: So, Reno, if you'd go to the next page of Exhibit 2, please? Keep going. 3, I guess. I'm sorry. I don't have a physical copy with me right now, so --
BY MR. BALINT:
**Q. If Amica was aware, as is shown in the last paragraph of that page, page 4 of Exhibit 2, that prior to the crash Mr. Gaekwar was very healthy, had no active preexisting back, neck, or left-knee symptomology whatsoever, would that be something that would be factored into -- should be factored into an evaluation of a claim made by Mr. Gaekwar under UIM coverage?**
MR. LEID: Object to the form. Go ahead.
A. The adjuster would review the actual medical record that's referred to here. I apologize. I don't know which date you were reading from, but whatever the date was, the adjuster would review the actual medical record as



well as the claim file, and the evaluation would be based on, you know, everything that's in the file.
BY MR. BALINT:
**Q. But if an attorney for a claimant made such a representation that you see in that paragraph at the bottom of page 4, would it be the standard at Amica to ask for the supporting documentation if it was not already provided?**
MR. LEID: Object to the form. Go ahead.
A. It would be the standard to review the medical records that were provided by the attorney or the claimant, and if the medical records were inconclusive, then it would be something we would want to potentially, you know, request.
Again, I can't really speak to whether or not we did in this case or the "why." I don't recall this case, but as far as just hypothetical standard, we would review the medical records, and if the medical records led us to believe that there was something else we needed, we would request them.
BY MR. BALINT:
**Q. Or something that was missing that was represented to you as being existing. Correct?**
A. As in if you put -- if you put a medical record in your list that you showed me previously and it wasn't there, we would certainly be interested in it. It doesn't



mean you can't evaluate a case without a single record in some cases. It's a case-by-case basis.
**Q. When a UIM claim is formally opened, does -- is there any procedure at Amica to review the PIP file?**
A. I don't recall what the rules are in Washington. I know there are some states where you have full access to the PIP or med-pay file, and there are some states you don't. I don't recall Washington's rules, but when we're evaluating or adjusting a claim, we -- you know, we focus on the insurance policy in that state, any endorsements in that state, and any laws or regulations in that state.
MR. BALINT: Okay. Let's go to the next page, page 5, Reno, Exhibit 2.
BY MR. BALINT:
**Q. In this portion of the letter, a copy of which was sent to Amica, it describes the difference by reference to the pattern jury instructions here in Washington, the difference between a preexisting dormant condition and a preexisting active condition that's been aggravated by an incident. Are you familiar with that language?**
A. No.
**Q. If a representation was made to an adjuster under your supervision that there was certain Washington law that was important to understand before adjusting a claim, what would be the procedure for checking that out? Checking out**



BUELL REALTIME REPORTING, LLC
206.287.9066 l 800.846.6989

**the accuracy of such a paragraph like is in this one here?**
A. Yeah. I don't really know what the specific need would be. I mean, we handle cases in Washington, in western Washington, Seattle, Washington, King County every day. We settle them every day.
So I don't know that, a specific legalese in a demand letter, is it required to go look it up, because I know we focus -- like I said, we focus on the insurance policy, we focus on the state laws and regulations, and we do it every day, and -- yeah.
**Q. Is there any indication at any time prior to the filing of the -- of the IFCA complaint, other than a paper review by Dr. Kearney, K-E-A-R-N-E-Y, is there any indication that an adjuster sought assistance in interpreting medical records in this case?**
MR. LEID: Object to the form.
A. I don't recall.
BY MR. BALINT:
**Q. And what about seeking legal assistance in interpreting anything in the file, including Washington law?**
A. I don't recall.
**Q. If assistance was requested, that would be documented in the claims file. Would it not?**
A. Yes.



**Q. At any time in your involvement -- we have the pages that we've already gone through from the claims file -- did you discuss the settlement demands with the adjuster, Grundy especially?**
A. I don't recall, but any of my involvement would be in the file.
MR. LEID: Good time for a break, Counsel?
MR. BALINT: If you want, yeah.
MR. LEID: Is that all right?
MR. BALINT: Yes.
COURT REPORTER: Off the record?
THE WITNESS: Fine with me.
MR. LEID: We'll go off the record.
(Off the record from 12:49 p.m. to 1:00 p.m.)
BY MR. BALINT:
**Q. Just a question for you is at any time that you're aware of in the claims file, including the times you were directly involved, as we bracketed before, was there ever any request to interview, whether recorded or not, Mr. Gaekwar, the claimant?**
A. I don't recall.
**Q. What is the procedure at Amica for asking for a recorded statement from a claimant? UIM claimant?**
A. The policy allows us to ask for one if we feel we need it for an investigation.



**Q. Right.**
A. There's not, like, a blanket policy on when to ask for one or how to ask for one. We would put a request, either, you know, make a phone call and say, "Hey, can we -- we'd love to get a statement from you," or we might put it in a letter. There's not, like, a one-size-fits-all.
**Q. Does that require an adjuster such as Brittany Am and then Tom Grundy to ask permission from somebody higher up to do -- conduct an interview?**
A. So I can't speak to what Brittany Am had authority to do. I did not oversee her. Tom Grundy can certainly make a decision. If he wants to get a recorded statement, he can get a recorded statement without authority. He has that ability.
**Q. And did Mr. Grundy have authority to demand an examination under oath?**
A. No.
**Q. How would that work if an adjuster such as Mr. Grundy felt that he wanted to do an examination under oath? That it was prudent?**
A. So it depends on who's asking for the EUO, if an attorney is asking for an E- -- like, if we have a defense attorney on the file and they're looking for an EUO versus if we wanted to get an EUO or examination under oath



pre-suit. Pre-suit has to be reviewed by the examiner, and in this case, that would be Alex Rottler in the home office.
**Q. Who has authority to -- who has authority to -- let me look at this here.**
**Who has authority to order a physician's examination, defense medical examination, of a claimant?**
A. So in -- for, like, an IME? Is that what we're referring to?
**Q. Yeah. I refer to it by a different acronym, but IME will do for you. Okay.**
A. So Tom has the authority to recommend an IME, and the supervisor on the file has the authority -- or at least I had the authority to approve IMEs. I can't speak for all supervisors across the company. Again, it's not really one-size-fits-all, but I would have had the authority to approve an IME.
MR. BALINT: Okay. So, Reno, if you could go to Exhibit 1, page 2080. Okay.
BY MR. BALINT:
**Q. We've looked at this page of Exhibit 1 before. It's your initial involvement, 5/5/21, and it looks like you're recommending to Mr. Grundy that he wants -- "We may want to consider an IME at this point." See that?**
A. Yes.

Page 33

**Q. Why were you making that recommendation to him, which is really his first day on the job?**
A. First day on this file.
**Q. Yeah.**
A. So I don't recall exactly what I looked at, what documents or records or anything that I reviewed when I made this note, but the note, "Plaintiff counsel" -- PC, plaintiff counsel -- "is alleging the need for a future surgery and injections every six months. We may want to consider an MRR" -- which is a medical record review -- "or an IME" -- independent medical examination -- "at this point," that simply means that, "This appears to be where we are, and when you do your investigation, these may be things we want to consider." It is not a direction to do them. It's a -- it's a, "Hey, keep these in mind. We might want to do them."
**Q. What would it take for Mr. Grundy to actually order a medical records review?**
A. So once he reviewed the file, reviewed the medical records that were in the file, and did his evaluation, he would submit a request to me, and he would say, "Hey, Barkley. I recommend that we proceed X, Y, and Z."
**Q. That request would be -- if it was made, it would be in the claims file somewhere. Would it not?**
A. It should be in the claims file, and there are

Page 34

times where people go on vacation, so it may not have been me. Even though I was the direct supervisor, somebody else could have reviewed it on my behalf, but if there was an authority request for an MRR or an IME, it should be in the file, but I don't recall specifically on this file what we might have asked for.
**Q. Do you know any reason why it -- such a records review wasn't requested up to this point in time in the file? In the adjusting of this file?**
MR. LEID: Object to the form. Go ahead.
A. No.
BY MR. BALINT:
**Q. At the time of this assignment to Mr. Grundy and your -- and the note we just looked at, the -- defense counsel has answered an interrogatory regarding reserves and says that, "As of 5/4/21, the reserves were set at $95,000," so I have several questions about the reserves at this time.**
**Number 1, did you have any say-so during this time period and under your supervisory authority, did you have any input on setting reserves?**
A. No, because reserves don't have anything to do with the evaluation of the claim.
**Q. In your understanding from all your years of working at Amica in various capacities, what components are**

Page 35

**there in setting a reserve?**
A. I've never set a reserve. I don't know exactly what they look at.
**Q. So when your statement is that the reserves have nothing to do with a claim, if you don't know what the component parts are, how do you -- how do you justify that statement?**
A. They don't have anything to do with the evaluation of a claim.
**Q. But they do -- they would have something to do with the value of a claim, would it not, for settlement purposes?**
A. No.
MR. LEID: Object to the form. Go ahead.
THE WITNESS: Sorry, Rory.
MR. LEID: Go ahead.
A. No. It has nothing to do with the value of the claim. It's an accounting function.
BY MR. BALINT:
**Q. So the accounting function does -- it's your testimony that, in your -- in your understanding, that the accounting function does not incorporate any estimate as to the risk to Amica of the value of the -- of the claimant's claim as far as his injuries are concerned?**
MR. LEID: Object to the form. Go ahead.

Page 36

A. As far as I know about reserves, they have no bearing on the evaluation of the claim. I don't know what goes into them. I've never set one. We don't set them when we're handling the claim. They're set at home office. The accounting function is because you take the money and you put it in a bucket so that it's available should it be needed, but it has nothing to do with the day-to-day operation or evaluation or handling of a claim.
BY MR. BALINT:
**Q. Or valuation of a claim? Would you include valuation of a claim? It has nothing to do with valuing the claim?**
A. Evaluation, valuation, no. It has nothing to do with that.
**Q. So you wouldn't have any idea why the -- why the reserves were increased from $40,000 to $95,000 on the day that Mr. Grundy got assigned to the file?**
A. No. I do not know.
**Q. You said it's an accounting function, but do you know who is involved in Amica at setting reserves?**
A. The claims examiners.
**Q. Do you know who that would be during this time?**
A. It was probably Alex Rottler.
**Q. Let's see here. Did you ever review the Dr. Sean Kearney report that he -- that he made on June 8, 2021? I**

Page 37

**ask that because that's during the time frame of -- we've bracketed for your involvement. Did you ever review that?**
A. I don't recall.
**Q. So if there's a -- if there's a paper review of the file, medical records review, is it the -- is it prudent for Amica not to give the examiner the totality of the records available?**
A. The -- you're saying the claims examiner?
**Q. Why would a record reviewer not be provided with all of the pertinent medical records?**
MR. LEID: Object to the form. Go ahead.
A. I don't know.
BY MR. BALINT:
**Q. Is there any policy at Amica to withhold any records? And, particularly, I'm -- is there a policy to withhold preexisting records? Preexisting tort?**
A. No.
**Q. So there would be no reason why Dr. Kearney would not have been provided with the records, medical records, that preexisted the date of the collision involved in this case. Would there be?**
MR. LEID: Object to the form. Go ahead.
A. No. If the records were in the file, then there would be no reason why they wouldn't have been provided to the expert.

Page 38

BY MR. BALINT:
**Q. Who makes the decision as to what to provide to the medical records reviewer?**
A. The adjuster who orders the medical record review would send all of the records that we have in the file.
**Q. In this case, the Dr. Kearney report was dated June 8, 2021. Is there any reason you know of -- this is during your bracketed time. Is there any reason why that report was not provided to the claimant's attorney until December of 2021?**
A. I don't know.
**Q. In your training and experience at Amica, do you -- would you agree that the -- that the claimant should be advised as to the status of the investigation on a timely basis?**
MR. LEID: Object to the form. Go ahead.
A. The claimant should be kept up to date of the investigation.
BY MR. BALINT:
**Q. Would you agree with the statement that the adjuster must keep the first-party insured informed about the investigation every 30 days?**
A. So I don't know Washington law. I'd have to refer to Washington to see what the time frame is, but we would keep the claimant up to date with the investigation.

Page 39

**Q. So you don't know anything about the time periods that internally Amica should inform a claimant regularly as to the status of an investigation? Is that your testimony?**
MR. LEID: Object to the form. Go ahead.
A. Maybe I misunderstood the question.
BY MR. BALINT:
**Q. Okay.**
A. We --
**Q. Go ahead.**
A. On our case, we don't have guidelines at Amica. It's, again, based on state regulations, state laws, and I don't recall at this moment what that is for Washington, so I don't know the time frame that we would be bound to other than the initial 30 days and then keeping the insured or the claimant up to date periodically after that. I just don't know the time frame.
**Q. When's the last time you reviewed the training materials that are provided to a new adjuster being trained?**
A. I mean, we review training every day. We do all kinds of training, so I'm not sure what specific training materials you're asking about.
**Q. The responsibility of an adjuster at Amica to keep a claimant informed as to the status of an investigation is the particular question.**

Page 40

A. I'm not really familiar with a very specific training on that. I'm not saying it doesn't exist. I'm just not familiar with it.
**Q. During your time frame in the case, Mr. Grundy's top offer to pay new money to resolve the claim was $5,000. Are you aware of that?**
A. Yeah. That sounds right.
**Q. Was that ever discussed with you before he proffered that offer to resolve the case?**
A. I don't recall. It's within his authority, so I don't recall.
**Q. What responsibility does an adjuster have who has made an offer to settle a UIM claim, what responsibility does he have, if asked, to explain the basis for such an offer?**
MR. LEID: Object to the form. Go ahead.
A. I don't know.
BY MR. BALINT:
**Q. So you don't know if an -- if an adjuster at Amica has a responsibility, if he makes an offer, to explain to a claimant how they arrived at that figure?**
MR. LEID: Same objection. Go ahead.
A. I mean, there's different laws in different states on what the requirements are, and at that time I had 27 states. I don't know the law in Washington, and if that

came up in Washington, I certainly would have looked it up at the time, but I don't know today.
BY MR. BALINT:
**Q. Do you feel that there's a responsibility, really in any state, for an adjuster to be open and honest with a claimant?**
A. Yeah. An adjuster should be open and honest with a claimant.
**Q. So if a claimant would ask for a reason, besides having just an arbitrary $5,000 thrown out there for an offer, would you think that it's within the standard of Amica just to ignore that sort of a request?**
MR. LEID: Object to the form. Go ahead.
A. It's within the standard of Amica to make an offer, and then to what degree we have to explain the offer, I don't know what Washington's specific law is, but it would be within our standard to provide some sort of explanation.
BY MR. BALINT:
**Q. If the explanation is simply a recounting of what the claimant has already recovered from the underlying tortfeasor's insurance company and waiver of PIP, the evaluation in this case of a $5,000 offer would include a total value of the case of 65,000. Correct?**
A. So yeah. I'm just going off memory here. You'd



have to show me that exhibit again, but I believe the underlying in the PIP was 60-, and then if you're talking about 5-, then 65,000 would be the full evaluation; but, you know, it could be that the evaluation was -- you know, the client -- the claimant was fully compensated by the underlying claim.
**Q. And who makes that determination that the claimant has been fully compensated by the underlying claim?**
A. The handler.
**Q. Which would be Brittany Am, initially, and then Tom Grundy?**
A. I can't speak to Brittany's authority, but Tom certainly has that authority.
**Q. He has that authority to just make an offer out of thin air?**
MR. LEID: Object to the form. Go ahead.
A. I don't believe Tom's offer was made out of thin air. It was made based on the information that we had in the claims file, and we settle claims in Washington every day, and Tom specifically settles claims in Washington every day. So it's based on, you know, the claim file and experience in that venue.
BY MR. BALINT:
**Q. Going back to the records review, would there be any explanation that you could offer us as to why the --**



**Amica had this records review in June of 2021 and did not provide it to the claimant until December of 2021 and then only after requested? The claimant requested it? What would be the reason for withholding the report from an independent medical examiner?**
MR. LEID: Object to the form. Go ahead.
A. I don't know.
BY MR. BALINT:
**Q. Is that the standard at Amica to withhold records reviews from claimants?**
MR. LEID: Object to the form. Go ahead.
A. I don't know that there's a standard, so not that I'm aware of.
BY MR. BALINT:
**Q. Besides asking for a records review and up until the time that Mr. Gaekwar had surgery on his left knee, is there any indication that you've seen in the file that Amica initiated any act of investigation?**
MR. LEID: Object to the form. Go ahead.
A. I don't recall.
BY MR. BALINT:
**Q. Is it the standard at Amica to rely on a claimant to document a claim, or is it the responsibility of Amica to investigate a claim of UIM?**
MR. LEID: Object to form. Go ahead.



A. I'm not really sure that I understand what you're asking. It's -- we open -- you know, when we open the UI- -- when the claimant presents a UIM claim, you know, we investigate the claim. We investigate liability. We investigate coverage, and then we investigate the medical records or evaluate the medical records and bills and evaluate the claim.
BY MR. BALINT:
**Q. In a situation like this where the -- well, let's back up.**
**Is it the -- do you feel it's the responsibility of the claimant to document a UIM claim, or is it the responsibility of Amica to investigate the claim independently?**
MR. LEID: Object to the form. Go ahead.
A. What do you mean by "document"?
BY MR. BALINT:
**Q. In this case, I'm just wondering why there's nothing that I can see in the file prior to the surgery where Amica asked for anything.**
A. Okay. So I'm still not quite sure I understand what you're asking me.
**Q. What does it mean to you to have an adequate investigation of a claim? UIM claim?**
A. So to step into the tortfeasor's shoes and

evaluate liability, review the insurance policy and evaluate coverage, review the state laws and regulations and the medical bills and the medical records and evaluate the injury. If the medical records or medical bills, you know, told us to do something else, then we would do something else.

**Q. Okay. And I'm really request- -- if the -- for example, with the letter we already looked at that was part of the Amica file that was to Nationwide and provided a copy to Brittany Am at Amica, is there any -- do you think it's the duty of the adjuster to get a complete set of records before rejecting any settlement offer?**

MR. LEID: Object to the form. Go ahead.

A. I think the burden of the proof is on the claimant to prove their injury.

BY MR. BALINT:

**Q. Okay. And so does -- would it be fair for an adjuster to reject a claim by citing individual medical entries and not consider the entire medical condition of the -- of the claimant, or is it --**

MR. LEID: Object to the form.

BY MR. BALINT:

**Q. -- is it proper in evaluating a claim to cherry-pick from the medical records only the items that are favorable to Amica?**



MR. LEID: Object to the form. Go ahead.

A. The adjuster would evaluate the entire medical record and make an evaluation based on the medical record.

BY MR. BALINT:

**Q. That's what they should do. Correct?**

A. Yeah. That's what they should do.

**Q. In this case, the surgeon who operated on Mr. Gaekwar provided a declaration on May 10, 2022, which is during the time you were still involved. Is there any reason why that declaration was not included in the evaluation of this case prior to initiating litigation?**

MR. LEID: Object to the form. Go ahead.

A. I don't recall what was in the other medical records. I don't recall what was in the expert opinion. I have no recollection of how the evaluation was done on this particular file, so I don't know.

BY MR. BALINT:

**Q. So let me -- let me go back to just a simple procedure. If Amica was aware of a surgeon's opinion, of a surgeon of a claimant's opinion, wouldn't that be something that you would require to know about before you start making offers or rejecting offers?**

MR. LEID: Object to the form. Go ahead.

A. Not necessarily, because the adjuster is reviewing the medical records that they do have in the file, and



they're reviewing the expert opinion, if there is one, and they're reviewing what happened in the loss. There's a lot of factors, case-by-case basis, but I wouldn't say they necessarily need a surgical opinion if it doesn't appear that the surgery is related.

BY MR. BALINT:

**Q. So if the adjuster, who has no medical training, says that the surgery is not related, then it doesn't matter to Amica that the surgeon says it is?**

MR. LEID: Object to form. Go ahead.

A. Yeah. That adjuster that has no medical training settles claims in Washington every day, so they know the value of these claims. They know -- you know, they relay -- they review medical records every day. They review medical bills every day, and they work in that venue every day, and they settle claims every day.

BY MR. BALINT:

**Q. Would it be proper -- in rejecting a claim, a settlement offer, would it be proper to ignore the opinion of the treating physicians if it was available to Amica?**

MR. LEID: Object to the form. Go ahead.

A. The adjuster would review the medical records, and in some cases, there is unrelated injuries or unrelated treatment, and that's part of the adjustment of the loss, to come to a fair and prompt resolution.



BY MR. BALINT:

**Q. So an adjuster, in looking at the medical records, you would agree that they should utilize all of the medical records in making an evaluation of a -- of a claim. Correct? You would agree with that.**

MR. LEID: Object to the form. Go ahead.

A. The adjuster should review the medical records and medical bills, and it does -- like I pointed out earlier, just because one medical record is missing, it doesn't necessarily mean they can't evaluate the claim. It depends on what that medical record is and whether or not it's related to the claim, but these adjusters, they review these claims every day. They settle claims in this venue every day.

BY MR. BALINT:

**Q. And so, I guess, I take it it's your opinion that these adjusters never make mistakes.**

MR. LEID: Object to form. Go ahead.

BY MR. BALINT:

**Q. In evaluating claims.**

A. It's my opinion that they handle claims in this venue, they settle claims in this venue every day, they understand these particular laws and regulations, and they are looking for a fair and prompt settlement.

**Q. But a fair and prompt settlement would require,**

Page 49

**would it not, being as knowledgeable as possible about the available medical records and information. Correct?**
A. Going back, again, there are certain -- if they review the medical records that they do have, it may mean that the medical records that are still being alleged are not related.
So they don't -- you don't necessarily have to review every record if the file is telling you or the medical records that have been provided are telling you that the -- in this case, you're referring to a surgery that I'm not quite familiar with the particular record you're referring to, but if the surgery is unrelated based on the other medical records, then that particular surgery record or surgery recommendation may not necessarily be needed. It's -- again, it's a case-by-case basis.
**Q. But do you think that if a -- if the opinion of the surgeon was available that it was -- that the surgery was related, do you think that an adjuster can just ignore that and meet any standards that Amica has?**
MR. LEID: Object to form. Go ahead.
BY MR. BALINT:
**Q. Do you think it's proper -- I want to just get to the heart of this. If a record is available, a medical record is available to Amica, is it proper in evaluating a claim to ignore parts of the record that are in the file,**

Page 50

**or can they cherry-pick whatever they want out of the file to say, "Well, it's not related"?**
MR. LEID: Object to form. Go ahead.
A. I'm saying that these handlers, Tom Grundy as part of it, or at least my handlers, Tom -- so Tom Grundy reported to me. They handle files in Washington. They settle files in Washington every day. Very few files go to litigation. They settle them every day. So they have the experience of what's related and what's not related, and in some cases, they bring in an expert to review, but they don't always need an expert, because they settle cases in this venue every day.
BY MR. BALINT:
**Q. If they don't need an expert, why would they try to hire Dr. Kearney for a medical records review?**
MR. LEID: Object to the form. Go ahead.
A. What I said is they don't always need an expert. Sometimes, in some cases, we get an expert opinion, but we don't always need one, because, you know, Tom is a Washington handler. He handles claims in Washington, settles claims in Washington every day.
BY MR. BALINT:
**Q. Well, in this case, the -- Amica did ask for a medical records review, so I assume that they wouldn't do something that they didn't feel they needed to do. Right?**

Page 51

MR. LEID: Object to form. Go ahead.
A. I don't recall exactly why this particular file needed a medical record review.
BY MR. BALINT:
**Q. But you would agree that it needed a medical review in the opinion of somebody who ordered it. Would you not agree with that?**
A. I would agree that somebody felt it needed a medical record review. I don't know --
**Q. Well, that --**
A. -- who that was.
**Q. Well, it was somebody at Amica. It wasn't somebody from the outside. Was it?**
A. It would be -- I mean, it -- I don't know when the medical record review was ordered, so I don't know if it was recommended by Amica, recommended by counsel. I don't know when it was ordered or by who.
**Q. Now, I'm going to ask you the question again. Do you think that it was somebody at Amica decided that they were willing and wanted to have an expert opinion and willing to pay for it? Would you agree with that, at least?**
A. So, again, I don't know who ordered this, and I don't know who recommended it. If it was somebody at Amica, then, yeah, they felt that they needed it; but I

Page 52

still go back to we don't always need an expert opinion, and in some cases, we do. Each -- it's a case-by-case basis.
**Q. And in this case, they -- somebody decided they needed it. Correct?**
A. That's what you're telling me. I haven't seen this expert report as part of the deposition, and I don't recall it.
**Q. But at least you recommended that they consider it, right, from the very first day that you got involved in the file?**
A. I believe my note said, "We may consider," as in don't --
**Q. Okay. Exactly.**
A. -- don't -- it wasn't a direction to get one. It wasn't a direction that we needed one. It's, "We may consider it."
**Q. Why would you even make that note, then, about considering a medical record review?**
A. Again, I don't recall exactly what I reviewed when I took over the file as a -- from a supervisor standpoint, but just going back to the note that you showed me that I wrote, there was a future surgery and, I believe, injections every six months, which is not a very common treatment path, so we may need to consider additional, you

know, MRR or IME. So that's all I can go on. I don't recall exactly what I reviewed on the day that this file was reassigned to Tom.

**Q. So the bottom line of all of this is you do not feel that it's a requirement at Amica to incorporate all of the available medical records in making an evaluation.**

MR. LEID: Object to the form. Go ahead.

A. No.

BY MR. BALINT:

**Q. You don't agree?**

MR. LEID: Same objection.

A. No. I think that the adjuster will review the medical records and they will evaluate the claim based on what's related to the incident.

BY MR. BALINT:

**Q. And if they -- if Amica is looking at the totality of available medical information, is it proper just to make a determination -- make a determination that it's not related and ignore any other information that's available?**

MR. LEID: Object to the form.

BY MR. BALINT:

**Q. I'm just really asking you does it -- do you think it's okay for Amica, an Amica adjuster, to ignore available medical information?**

MR. LEID: Object to the form.



A. I'm not sure what you mean by "ignore," because the adjuster takes into account everything that they have, everything that's in the file, and they make an evaluation based on it. It's not that they ignore something or cherry-pick something. They just may evaluate it and find that it's unrelated, and that's not cherry-picking, and that's not ignoring. It's acknowledging that it exists, but also acknowledging that it's not related.

BY MR. BALINT:

**Q. Is there -- okay. I'll go with that for now, but I want to ask a question. Did the surgeon's declaration ever be considered by Tom Grundy or anybody else at Amica as part of the evaluation?**

MR. LEID: Object to the form.

BY MR. BALINT:

**Q. Did they even -- did they even look at it?**

A. I don't recall.

**Q. Would it be proper just to -- would it be proper in the Amica family claims settlement for UIM cases not to consider available medical information?**

MR. LEID: Object to the form. Go ahead.

A. Again, we define the word "consider." They would review what's available, make a determination. Is it related or not? And if it's not related, then they don't -- it's not part of the evaluation from a -- from



that perspective, but I -- you know, it's -- they review it.

BY MR. BALINT:

**Q. Okay.**

A. And/or they make a recommendation that, if they don't -- the surgery recommendation, they don't have it, but the medical records indicate that this -- there's no surgery that's related to these injuries or necessary, then they don't have to look at that one record.

**Q. So I hope that we're on the same page now. I think that you've indicated they should review the -- all of the available medical information. They don't necessarily need to consider it all in making an evaluation as to a value of a claim. Is that your testimony in a nutshell?**

MR. LEID: Object to form. Go ahead.

A. No. I said they don't have to review all the medical records. There might be one-offs, one case -- like, specific medical records that they are aware exist but they are also aware are unrelated, and they can still evaluate the claim without that particular medical record.

So if the medical record in this file -- again, I don't recall this particular file, but if the medical records that they had in this file suggested that the surgery was unrelated, then even having the knowledge that



a surgery recommendation exists doesn't require them to go look at it, because every other record in the file suggested that a surgery was unrelated.

BY MR. BALINT:

**Q. So if Mr. Grundy was aware of the surgery and requested -- requested -- copies of those records, why would he even request copies of those records if he had already determined that the surgery was unrelated? Can you -- can you explain that possibility within the Amica family standards for adjusting a UIM claim?**

MR. LEID: Object to the form. Go ahead.

A. You'd have to ask Tom. I don't know.

BY MR. BALINT:

**Q. I'm asking you as a supervisor. Is that the -- is that the course of adjusting that you approve of?**

MR. LEID: Same objection.

A. To request a medical record but then not review it?

BY MR. BALINT:

**Q. Yeah. That's a -- that's a good way to put it.**

A. Again, I don't know everything that happened in this file. I don't recall this file, so to have a blanket statement of, "If you request a record, you must review it," I don't know that that's true, because other things can happen between when you request something and when you

Page 57

get something.
You know, I don't know if he -- hypothetical, I don't know when he requested it. So if he requested it on Day 1 and then got the MRR on Day 100, and the MRR and maybe the review of the medical records suggested that it wasn't necessary -- you know, I don't know what the reason for requesting it was.
If it was he requested it because you had it listed in the demand letter, maybe that's why he requested it, but when he reviewed the medical records, he realized, "Don't really need that." I don't know. You would have to ask him why it worked out that way. I don't know.
**Q. I'm having, I guess -- and I apologize for not getting through to you on the basic aspects of my -- of my question. I will -- I will represent to you that the -- that, in the note that you actually reviewed, that surgery was in -- was a possibility on that -- Mr. Gaekwar's left knee, and the adjuster, Grundy, asked for the documentation as to that surgery, which was provided to him, and it's part of the Amica record, but the -- but the declaration explanation for those -- for that treatment from the surgeon is not in the record.**
**Why is that? How is that possible that that -- that the adjuster would not even incorporate or reference the explanation of a surgery from a treating doctor?**

Page 58

MR. LEID: Object to the form. Go ahead.
A. I don't know.
BY MR. BALINT:
**Q. And just as far as a medical records review is concerned, would there be any reason you would know of to not provide the reviewer with all of the available medical records up to that point in time?**
MR. LEID: Same objection.
A. I don't know.
BY MR. BALINT:
**Q. Is there -- Amica has no standards? If you don't know, who does know about the standards at Amica for evaluating a UIM claim?**
MR. LEID: Object to the form. Go ahead.
A. Are you referring to evaluating the claim, or are you referring to sending medical records to a reviewer? And I -- when I say "reviewer," you're talking about an expert. Right?
BY MR. BALINT:
**Q. Well, I don't know anything about the one that Amica sent him to, sent the records to, but would you think it's prudent to send only partial records to a medical records reviewer and then rely on that reviewer's report to make an evaluation?**
MR. LEID: Object to the form. Go ahead.

Page 59

BY MR. BALINT:
**Q. Does that make any sense to you?**
MR. LEID: Same objection.
A. Yeah. To send the records we have, because when we -- when we send -- when we bring in an expert, we would send all the records related to that expert, so whatever records we have. If we don't have a record, but, again, we're not really -- we don't think it's related, we wouldn't necessarily send it.
And just because -- I mean, you can send -- you know, you can get -- you can send new records as they come if you find that that's necessary, but you don't necessarily have to include all the records you don't have. You don't have to wait until you have all the records. In some cases, you send what you have to get a review based on what you have.
BY MR. BALINT:
**Q. Let's assume that in a UIM case an adjuster has available to him all of the records to the point in time of the medical records review that pertain to the injury and then the expert is not provided with some of the records and then makes a report that the adjuster then relies on to make an evaluation. Is that something that Amica would tolerate if you knew about it?**
MR. LEID: Object to the form. Go ahead.

Page 60

A. I'm sorry. Can you rephrase or repeat what you just asked me? I'm not sure that I followed.
BY MR. BALINT:
**Q. I want you to assume that all of the records that have ever been made available were available to -- up to the time that it was referred to a medical records reviewer, those -- all the records that were available, that the adjuster or whoever made the decision to send records did not send all of the pertinent records. Is that something that you think is the standard that Amica would say that's okay?**
MR. LEID: Object to the form. Go ahead.
A. When we order a medical record review, we send all the related -- or all the records related to the injury we're having reviewed to -- that we have in the file to the expert to review. We don't hold records back.
BY MR. BALINT:
**Q. That's what should be done, correct, by Amica? That's what should be done.**
A. Right.
**Q. In your involvement in the case with -- at the time that Mr. Grundy was making a $5,000 offer, did you agree with that $5,000 new-money offer?**
MR. LEID: Object to the form. Go ahead.
A. I don't recall what my input on that offer was.

Page 61

BY MR. BALINT:
**Q. When you're asked by an adjuster such as Mr. Grundy for your advice as to a settlement offer, is it -- is it your standard not to review all of the medical records to see if that -- if that offer is reasonable or not, or would you just rely on somebody like Mr. Grundy to say, "Well, I've got all this experience. We evaluate hundreds of claims in Washington, and therefore what I say is reliable for a supervisor such as yourself"? Let me rephrase that.**
**Do you think it's -- do you think it's okay for you to approve a settlement offer without reviewing the underlying basic circumstances of why a particular offer was made?**
MR. LEID: Object to the form. Go ahead.
A. No. If I approve an offer, then I would review the medical records within the offer.
BY MR. BALINT:
**Q. Would you review the medical records or just the claims file? The claims log?**
A. Oh. No. I reviewed the medical records if I was approving an offer.
**Q. So in this case, if there was a $5,000 offer that you approved, it's your testimony that you would have reviewed all of the records that Mr. Grundy relied on in**

Page 62

**making his offer?**
MR. LEID: Object to the form. Go ahead.
BY MR. BALINT:
**Q. Is that your testimony?**
A. I didn't approve a $5,000 offer.
**Q. Did you approve any evaluation?**
A. No.
**Q. So all of the decision-making on a $5,000 offer would have -- would have stayed with -- would not involve you. It would -- it would be Mr. Grundy and perhaps someone else, but not -- but not you.**
A. It would be just Tom. A $5,000 offer is within his authority.
**Q. But we're not talking only about a $5,000 offer. We're talking about rejecting a $140,000 demand. That's his -- that's within his authority to do that, or would he ask for your super- -- did he ask for your help or anybody else's help, as far as you know?**
MR. LEID: Object to the form. Go ahead.
A. No. That's within his authority.
BY MR. BALINT:
**Q. At the time that this claim was being adjusted by Mr. Grundy and up to that point in time, did Amica have any medically trained personnel on its staff to help interpret medical records?**

Page 63

MR. LEID: Object to form. Go ahead.
A. No.
BY MR. BALINT:
**Q. So if there were medical terms in medical records that Mr. Grundy had, he would be the sole interpreter of what those medical terms meant. Correct?**
MR. LEID: Object to the form. Go ahead.
A. I mean, yeah. We do training every day, all the time. We do medical training, medical language, and then he's obviously got search that he can do, so yeah. He would have been the sole person in this file to evaluate what those are.
MR. LEID: Good time for another break?
MR. BALINT: Yeah. Sure. What time is it?
COURT REPORTER: Off the record?
MR. LEID: Off the record here.
(Off the record from 1:52 p.m. to 2:00 p.m.)
BY MR. BALINT:
**Q. Mr. Finsterbush, would you agree that an essential element of good faith handling of a claim is to complete a timely and thorough investigation?**
A. Yeah. A good faith handling of a claim would be to complete an investigation. I'm not really -- I mean, we'd have to define exactly what "thorough" means --
**Q. Well, to --**

Page 64

A. -- but to complete an investigation. Yeah.
**Q. What does "thorough" mean to you for an investigation?**
A. To review the -- you know, when you -- as a UIM, you step into the tortfeasor's shoes. You review liability. You review the insurance policy. You review coverage. You review any laws or regulations related to the state. You review the medical records and the medical bills that you have.
And there might be some other odds and ends things that the -- each -- again, it's a case-by-case basis, so there might be other things that you consider in the investigation or evaluation of the claim.
**Q. Okay. Would you agree with the statement that, according to Amica, a full and fair investigation should include investigation into all facts that would support the payment of benefits and not just an investigation of facts that might support a denial of payment or of benefits or an offer of compromise of a disputed claim? Would you agree with that standard as far as what is done at Amica for adjusting UIM claims?**
MR. LEID: Object to the form. Go ahead.
A. I --
BY MR. BALINT:
**Q. Do you want me to read that again? Do you want me**

**to read that to you again?**
A. Well, I was going to say I'm not familiar with that particular statement, so yeah. You want to read it again?
**Q. Okay. Do you agree that a full and fair investigation should include investigation of all facts that would support the payment of benefits and not just an investigation of facts that might support a denial of benefits or payment?**
MR. LEID: Same objection. Go ahead.
A. An investigation would include a review of all facts.
BY MR. BALINT:
**Q. That would support the payment of benefits as well as the facts that don't support a payment of benefits.**
A. All -- yeah. All the facts regarding that particular case. All of them.
**Q. So you agree with that.**
MR. LEID: Object to form. Go ahead.
BY MR. BALINT:
**Q. You agree with that -- I think you're agreeing with me, but I'm not sure.**
A. I'm saying that a good investigation would include a review of all the facts. I wasn't quite sure if you were saying either/or. So it's all the facts, whether they



support a payment or not, but it's a review of all the facts.
**Q. Okay. We've said -- you've said several times about your idea that -- your statement, I mean, that, in a UIM situation, the -- Amica steps into the shoes of the tortfeasor. Correct? That's your --**
A. Yes.
**Q. Okay. Does -- I hope you would agree that Amica had -- throughout the adjustment process had the duty to act in good faith in the handling of the UIM claim of Mr. Gaekwar.**
MR. LEID: Object to the form. Go ahead.
A. Yes.
BY MR. BALINT:
**Q. So you would agree that, at all times, Amica had the duty of good faith?**
MR. LEID: Same objection.
A. Yes.
BY MR. BALINT:
**Q. Do you agree that Amica had, during the adjustment process, the duty to have reasonable justification for the settlement offers it made to an insured or rejecting demands for resolution?**
MR. LEID: Object to form. Go ahead.
A. I'm sorry. Can you -- can you repeat that? I'm



sorry.
BY MR. BALINT:
**Q. Yeah. I think I said too much.**
**Do you agree that Amica had, during the claims process in this case, the duty to have a reasonable justification for settlement offers?**
MR. LEID: Same objection. Go ahead.
A. Yeah. I don't know what our -- what the duties are, but we -- you know, we look to make a fair and prompt settlement and to be able to support the offers. Yeah.
BY MR. BALINT:
**Q. Would you agree that Amica had the responsibility to give equal consideration to its insured's interest as to its own -- as to its own interest even in a UIM context?**
MR. LEID: Object to the form. Go ahead.
A. What do you mean by the word "interest"?
BY MR. BALINT:
**Q. Well, the -- you know, the interest of Amica in this case would be to minimize any payments. That's what I mean by "interest." So the -- stating it with that clarification in mind, do you -- do you think that Amica had a continuing duty to give equal consideration to its insured's interest as to its own?**
MR. LEID: Same objection.
A. Again, I'm just -- I'm not -- I don't really



follow -- you know, because if there's a coverage issue, it's in his interest to waive coverage, but we're not going to do that. You know, you follow the policy. So I'd say that, you know, our goal when we take a claim is to review the facts and come to a fair and prompt settlement on the claim.
BY MR. BALINT:
**Q. But I'm asking in terms of the -- of the way that these -- the facts are weighed. Do you -- would you agree that the -- that the adjuster should give equal consideration to the -- to the claimant as to its own interest?**
MR. LEID: Same objection.
A. I don't really -- I just -- in my experience, I've never really come up to a situation where there was a -- where it was a 50/50. I've never really truly seen a 50/50 when it comes to claims handling. So, again, our goal is to review the facts of the loss, review the claim file, and come to a fair and prompt settlement.
BY MR. BALINT:
**Q. I'm talking about the duties to give equal consideration, not that any particular claim is exactly 50/50. So do you -- are you agreeing or disagreeing with the idea that Amica has a continuing duty in a UIM context to give equal consideration to its insured's as to its own**

Page 69

**interest?**
MR. LEID: Same objection.
A. Yeah. I'm saying I don't really know what that means, because there's no two -- there's no situation I've experienced where it could go 50/50. So we give consideration to all the facts. We give consideration to the claim file, to the insurance policy, to the laws -- state laws, laws of the state. We evaluate the claim fairly and promptly.
BY MR. BALINT:
**Q. And what about to the interest of Amica to minimize claims? Do you agree that an adjuster should be trying to minimize the claims in order to save Amica money?**
MR. LEID: Same objection. Go ahead.
BY MR. BALINT:
**Q. In a UIM context.**
A. No. Our goal is not to make a claim worth more or less. Our goal is to fairly and -- fairly and promptly evaluate the claim and try and bring the claim to a resolution.
**Q. Would you agree that Amica in this case had the duty to not refuse to pay a claim without contesting -- conducting a reasonable investigation?**
MR. LEID: Same objection. Go ahead.
A. So would you agree that Amica had the duty not to

Page 70

pay a claim in order to not do an investigation? Is that what you just said?
BY MR. BALINT:
**Q. No. Let me -- let me rephrase it.**
A. Sorry.
**Q. Do you think that Amica has the duty to do a reasonable investigation before accepting or rejecting a claim?**
A. I believe it depends on the state laws as to what's required for an investigation. Our goal is to review the facts of the loss and to bring the claim to a fair and prompt settlement.
**Q. So you think there's some states that would not require a reasonable investigation?**
A. No. I'm saying I don't know how to define "reasonable." "Reasonable" could be defined differently in certain states than -- I don't know -- what I'm saying is we would investigate the loss. We would investigate the claim. We would review the claim file, you know, the way we would and look for a fair and prompt settlement, which, as I've pointed out, we do every day in Washington, so I feel we're very successful at that.
**Q. In this particular case, if the -- if you thought as a supervisor the claim was -- the investigation was not reasonable, would that be the basis for rejecting a claim?**

Page 71

**In other words, I'm really asking a particular question here. Let me rephrase it.**
**Do you think there's ever a situation where the investigation should not be reasonable?**
MR. LEID: Object to form. Go ahead.
A. No.
BY MR. BALINT:
**Q. "No" what? I'm sorry. I don't understand your answer, the one for is there -- is there ever a circumstance where an investigation should not be reasonable?**
A. No. There's never a circumstance where an investigation -- and, again, we have to define the word "reasonable." That could be different per state, but every investigation should lead to a fair and prompt settlement.
**Q. Should it be reasonable?**
MR. LEID: Object to form. Go ahead.
A. Can you define "reasonable"?
BY MR. BALINT:
**Q. How do you define "reasonable"? Let's just start with that, and then maybe I can -- I can refine my question a little bit to match what you're trying to say here. The question is how do you define "reasonable" in evaluating -- in doing an investigation?**
A. So a reasonable investigation would include

Page 72

stepping into the tortfeasor's shoes, reviewing liability, reviewing coverage through the insurance policy, reviewing the state laws, reviewing the medical records, reviewing the medical bills, evaluating the claim, any -- and if there's any other investigatory things in the file, reviewing the file in totality, evaluating the file, and looking to come to a fair and prompt settlement.
**Q. So a reasonable investigation would include reviewing all available pertinent medical records. You would agree with that, I hope.**
MR. LEID: Object to form. Go ahead.
A. It would -- again, we -- I feel like we've kind of talked about this already. There are some medical records you may not need to review based on what the other medical records in the file tell you. So if the other medical records in the file tell you that something is unrelated, you may not need that one record --
BY MR. BALINT:
**Q. Does Amica --**
A. -- on a case-by-case basis.
**Q. Do you think an adjuster has a continuing duty under Amica's standards to reevaluate a claim as new information comes in?**
MR. LEID: Object to the form. Go ahead.
MR. BALINT: Wait a second, Rory. How can

Page 73

I -- what's the form impropriety so I can correct that?
MR. LEID: Sure. I thought it was confusing.
BY MR. BALINT:
**Q. Do you understand the question, Mr. Finsterbush?**
A. I was thinking about the question. Now I'm going to ask you to repeat it, because we got off topic here.
MR. BALINT: Yeah. Could the court reporter repeat the question, please?
(The reporter read back as requested.)
A. I think that you don't necessarily have to reevaluate the claim if new information comes in, because you can get new information that's unrelated or that doesn't change the evaluation, so --
BY MR. BALINT:
**Q. I'm not asking --**
A. -- I don't necess- --
**Q. I'm not asking -- I'm sorry.**
A. So I don't necessarily think you have to reevaluate the claim every time new information comes in. You do have to review all the new information that comes in, but it may not change your evaluation.
**Q. Okay. When a new adjuster is assigned to a claim within Amica, and let's just -- because we're dealing with a UIM claim, let's confine it to UIM claims. When a new adjuster is assigned, is there any procedure within Amica**

Page 74

**for the new adjuster to consult with the adjuster who's been working the file previously?**
A. In an ideal world, yeah, you would want the new adjuster to get up to speed on the file. It doesn't always happen. There are different reasons files are reassigned, but in -- yeah. In an ideal world, you'd want them to understand where it is.
But that being said, an adjuster like Tom Grundy who's been doing it for as long as he's been doing it can review the file and understand what's going on in the file based on what's in the file.
**Q. And not consult with the previous adjuster. Right? That's what you're saying?**
A. Yeah. I'm saying that he doesn't necessarily have to. It's -- again, it's case by case. In a perfect world, yeah, you'd always want them to touch base, but there are tons of reasons why they might not be able to, and, again, somebody with Tom Grundy's experience, he can review the file and understand where it is.
**Q. I have a few more topics to discuss, so we're nearing the end.**
**And this may have been asked and answered, but I can't remember the answer. Who has authority to demand an examination under oath?**
A. It depends on who's recommending it, but if it's

Page 75

pre-suit, the examiner has to approve an examination under oath.
**Q. The adjuster?**
A. No. The examiner has to approve it.
**Q. Who's the examiner in this case?**
A. Alex Rottler.
**Q. Oh. Is that his formal title? Examiner?**
A. He -- I believe it's claims examiner, casualty claims examiner maybe. I'm not 100 percent sure exactly what his title is, but I believe it's either casualty claims examiner or claims examiner. I'm not 100 percent sure on that.
**Q. In the claims file itself, it contains the log of basically everything that happens in the file. Correct? Or it should. Correct?**
A. It -- yeah. The claims file should have a record of the process that the claim has gone through. Yep.
**Q. Okay. So in a -- in a situation such as Mr. Gaekwar's claim, going through the medical records, if you were reviewing the -- well, let me back up.**
**The claims file itself, then, records a summary of pertinent medical treatments, at least that the person who's making the entry in the record thinks are pertinent medical information. Correct?**
A. So the -- you're referring to the evaluation or

Page 76

the note or the actual medical record?
**Q. The actual -- well, the medical -- the claims file does, at certain points, summarize the medical records, like, "He's having -- he's supposed to be having surgery," or, "He had a new treatment," or whatever it is. The -- whatever the medical record is, the claims file summarizes those. Do they not?**
A. Yeah. The notes -- the records are typically summarized in the notes.
**Q. Okay. Going back to the preexisting conditions of Mr. Gaekwar, the -- in order to evaluate a claim of a new injury, would you -- would you -- is there any reason why you wouldn't take advantage of preexisting medical records to evaluate a claim?**
MR. LEID: Object to the form. Go ahead.
A. I think it depends on the claim itself. We'd have to go -- I mean, each claim is a little different. You have to go through the records that we have and make a determination. The -- you know, in these cases, we handle cases every day in Washington with these types of injuries, and we settle them fairly and promptly, so yeah.
I'd say there are times where you don't necessarily need preexisting injury records. It depends -- again, it depends on the file. It depends on the case. It's a case-by-case basis.

BY MR. BALINT:
**Q. Any reason you know of in this case why the -- there's no mention of the preexisting records that were available to Amica?**
MR. LEID: Object to the form. Go ahead.
A. Yeah. I don't recall.
BY MR. BALINT:
**Q. Is there anything you're aware of in the records as to how Mr. Gaekwar's left knee was functioning before he got involved in the automobile crash with the underlying tortfeasor?**
A. I don't know. I don't recall.
MR. BALINT: Okay. I think that does it for me. You've worn me out.
MR. LEID: So hold on. Let's go to Ms. Ziegler. Do you have any spellings for Mr. Finsterbush?
COURT REPORTER: I do not. Thank you.
MR. LEID: All right. Well, then we will reserve signature, please, and we will take a copy if ordered. No need for the exhibits. Mr. Balint already provided that to us, although, if it's going to be ordered, you're going to get the exhibits anyway, so sorry. Yes, please, and then that's good to go. Anything else you need from us, Ms. Ziegler?



COURT REPORTER: Mr. Balint, are you ordering at this time?
MR. BALINT: No. We already informed -- Buell has a great new system for costing out these depositions, so at this time we're not ordering the record.
COURT REPORTER: Thank you.
(Deposition concluded at 2:23 p.m.)
(Reading and signing was requested pursuant to FRCP Rule 30(e).)
* * * * *



C E R T I F I C A T E

STATE OF MINNESOTA
COUNTY OF DAKOTA

I, Ryan Ziegler, a Certified Shorthand Reporter for the State of Washington, do hereby certify that the foregoing transcript of the videoconference deposition of Barkley E. Finsterbush, having been duly sworn, on July 20, 2023, is true and accurate to the best of my knowledge, skill, and ability.

I do further certify that I am a disinterested person in this cause of action and that I am not a relative of the attorneys for any of the parties.

Reading and signing was requested pursuant to FRCP Rule 30(e).

IN WITNESS WHEREOF, I have hereunto set my hand and seal this July 24, 2023.

/s/ Ryan Ziegler
RYAN ZIEGLER, RPR, CRR
CCR #20107870