The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHANDRASI GAEKWAR,

       Plaintiff,

   v.

AMICA MUTUAL INSURANCE COMPANY,

       Defendant.

Civil Action No. 2:22-cv-1551-BJR

**ORDER DENYING AMICA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Chandrasi Gaekwar ("Plaintiff") brings this action against Defendant Amica Mutual Insurance Company ("Amica") for breach of contract, bad faith, and violation of the Insurance Fair Conduct Act ("IFCA"), as well as the Washington Consumer Protection Act ("WCPA"). Currently before the Court is Amica's motion for partial summary judgment on the bad faith, IFCA, and WCPA claims. Dkt. No. 26. Having reviewed the motion, opposition and reply thereto, the record of the case, and the relevant legal authority, the Court will deny the motion. The reasoning for the Court's decision follows.

## II.   BACKGROUND

### A.   Overview[1]

In January 2020, Plaintiff was involved in a rear-end motor vehicle collision with non-party Edgar Garcia. Plaintiff was injured during the accident, including injuries to his left knee, neck, and back. It is undisputed that Mr. Garcia was liable for the accident and his insurance company, Nationwide Insurance, accepted fault and tendered Mr. Garcia's $50,000 insurance policy limit to Plaintiff.

Plaintiff was insured by Amica at the time of the accident. The Amica policy provides $10,000 in Personal Injury Protection ("PIP") for medical expenses and underinsured motorist ("UIM") insurance in the amount of $300,000 per person. Amica concedes that Plaintiff was injured in the accident and that his initial medical treatment was reasonable, necessary, and causally related to the accident and, therefore, paid the $10,000 PIP limit. However, following the initial medical care, Plaintiff had left knee replacement surgery in December 2021. Amica disputes that the surgery was medically necessary because of the accident and, therefore, disputes that it is responsible for the medical expenses associated with the surgery.

### B.   The History of Plaintiff's Left Knee Issues

#### 1.   Pre-accident treatment

Plaintiff began receiving treatment from Dr. Robert T. Goldman in September 2014 for degenerative changes to his knees, including "osteoarthritis, subchondral sclerosis, joint space narrowing, cystic degeneration and osteophyte formation." Dkt. No. 27, Declaration of Isabella M. Foxen, at Ex. E, Declaration of Dr. Goldman at 2. According to Dr. Goldman, Plaintiff's right knee was consistently worse than his left, but he was able to treat both knees conservatively with

---

[1]   The following factual allegations are undisputed unless otherwise noted.

a series of Synvisc injections and physical therapy. *Id*. at 1. By May 2017, "[a]ctive symptomology of [Plaintiff's] left knee [had] resolved" but his right knee stopped responding to conservative treatment. *Id*. As a result, Dr. Goldman performed right knee replacement surgery on Plaintiff in May 2018.

Dr. Goldman states that from May 2017 through the date of the traffic accident in January 2020, the degenerative conditions in Plaintiff's left knee were "dormant" and Plaintiff "had no complaints or active symptoms in his left knee." *Id*. 1-2. Indeed, Plaintiff claims that he went on a "world tour" and hiked in the Himalayas three months before the accident and "experienced no knee problems" during this time. Dkt. No. 29 at 5. However, there is evidence in the record indicating that Plaintiff was also considering replacement surgery on his left knee before the accident. For instance, December 13, 2018 clinical notes from Plaintiff's treating physician, Dr. James D. Kriseman at Overlake Medical Center & Clinics ("Overlake"), state that Plaintiff was planning to have the surgery in 2019. Dkt. No. 27, Ex. F at 25 (Plaintiff "will be going to New Jersey next year to have [his] left knee replaced"). In addition, Dr. Goldman's own treatment notes indicate that Plaintiff was considering replacement surgery on his left knee before the accident. Dkt. No. 27, Ex. G at 1 (Plaintiff "was planning to have a [left] knee replacement done a year and a half ago, but it was cancelled due to the COVID pandemic[.]").

2.      **Post-accident treatment**

Two days after the accident, on January 27, 2020, Plaintiff sought treatment at Overlake where he complained of left knee pain, lower back pain, and right neck pain. On January 31, 2020, he underwent imaging on his left knee that showed moderate to advanced tri-compartmental osteoarthritis and diffuse demineralization of the knee. He was referred to physical therapy and ultimately attended 61 sessions. Medical records from Overlake dated March 26,

2020 state that Plaintiff "is having no physical complaints at this time. His is strong and good…He recently went on a hike at altitude…." Dkt. No. 29, Ex. 8 at 3. Treatment notes from Plaintiff's physical therapy dated March 2020 likewise indicate that he was not feeling discomfort and had returned to cycling for exercise. Plaintiff was discharged from physical therapy in September 2020 with at-home exercises to manage any ongoing knee pain. Plaintiff also received Synvisc injections in his knee during this time.

Plaintiff claims that he continued to have knee pain and stiffness after September 2020, so he met with Dr. Trevor Scott at Proliance Orthopedics & Medicine in December 2020. New x-rays were taken, and Dr. Scott noted that Plaintiff's knee condition was severe enough that the Synvisc injections would no longer be sufficient to control the pain and that Plaintiff would benefit from a total knee replacement.

On October 21, 2021, Plaintiff consulted with Dr. Goldman. Dr. Goldman ordered x-rays of Plaintiff's knee, which showed "severe osteoarthritis of the left knee and confirm[ed] subchondral sclerosis, joint space narrowing, cystic degeneration and osteophyte formation." Dkt. No. 27, Ex. G at 2. The doctor noted that "multiple cortisone shots and hyaluronic acid injections" had not been effective and recommended that Plaintiff receive a left knee replacement. *Id.* at 3. Plaintiff underwent knee replacement surgery on December 13, 2021.

**C.    Amica's Handling of Plaintiff's UIM Claim**

Amica opened a claim for Plaintiff in January 2020 and paid his medical bills through May 21, 2020, but ultimately determined that Plaintiff's left knee replacement surgery was unrelated to the accident and declined to pay for the surgery or related medical services. On November 4, 2020, Plaintiff sent Nationwide a settlement demand for $50,000 (*i.e.*, Mr. Garcia's policy limits) and cced Amica on the demand letter. In the letter, Plaintiff acknowledged that he

had "preexisting congenital defects in both knees" before the accident but that he had "no left knee symptomology whatsoever" and led a "very active lifestyle" including "a rigorous routine" of long-distance bike rides on the weekends before the accident. Dkt. No. 29, Ex. 3 at 4-6. Plaintiff also provided his medical records, including records that predated the accident. *Id*. Nationwide paid out the policy limits after receiving the demand letter.

On February 9, 2021, Plaintiff sent Amica a demand letter for $140,000 to resolve his UIM claim. *Id*. at Ex. 4. At the time, his total medical expenses were $20,925.38 but he indicated that per his treating physician's recommendation, he will need a full knee replacement surgery soon. Amica responded to the demand letter on March 4, 2021. Amica disputed that the accident caused Plaintiff to need left knee replacement surgery; instead, Amica argued, Plaintiff's ongoing knee issues were related to degenerative conditions that pre-dated the accident. Amica further noted that it had already paid the full $10,000 PIP limit and Plaintiff had already received $50,000 from Nationwide; thus, Amica offered Plaintiff $1,000 in new money to settle his claim.

Plaintiff rejected the offer, so Amica retained Dr. Sean Kearney to perform a medical records review of Plaintiff's case. Dr. Kearney did not review any pre-accident records but did review Plaintiff's medical records from right after the accident through September 2020. The doctor concluded that the motor vehicle accident resulted in a "strain/contusion" of Plaintiff's left knee" and that this diagnosis had been resolved through treatment by May 21, 2020. Dkt. No. 27, Ex. M at 7. Dr. Kearney further concluded that the "moderate-to-severe tricompartmental osteoarthritis with noted varus malalignment" that was seen on Plaintiff's left knee x-rays after accident was "pre-existing and [was] neither caused by nor permanently aggravated by the motor vehicle accident". *Id*. Dr. Kearney noted that "[t]he natural history" of "tricompartmental osteoarthritis" is that "the condition would continue to worsen over time, especially given the

moderate-to-severe changes noted on imaging." *Id.* at 8. Lastly, Dr. Kearney determined "any surgery proposed for this condition would be considered unrelated to the motor vehicle accident" and proceeding with the "left total knee arthroplasty, [] would be considered outside of the claim." *Id.* at 9.

Based on Dr. Kearney's finding, on December 6, 2021, Amica increased its settlement offer to $5,000, which Plaintiff rejected. Thereafter, Plaintiff instituted this lawsuit on October 6, 2022.

### III.    STANDARD OF REVIEW

"The standard for summary judgment is familiar: 'Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact.'" *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (quoting *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016)). A court's function on summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If there is not, summary judgment is warranted.

### IV.    DISCUSSION

As stated above, Plaintiff sued Amica for breach of contract,[2] as well as bad faith, and violation of the IFCA and the WCPA. Amica now moves for summary judgment on the extracontractual claims.

---

[2]    After reviewing Plaintiff's complaint, the Court notes that there is a significant question as to whether the complaint sufficiently alleges a breach of contract claim. The complaint does not set forth the relevant provisions of the insurance contract, nor does it make any allegations regarding Amica's alleged performance under the contract, including what provisions of the contract Amica allegedly violated. Even under the liberal pleading standard set forth in Fed. R. Civ. P. 8(a), Plaintiff

1

A.      **The IFCA Claim**

2

The "IFCA allows an insured who is 'unreasonably denied a claim for coverage or

3

payment of benefits by an insurer [to] bring an action … to recover the actual damages

4

sustained.'" *Hanson v. State Farm Automobile Insurance Company*, 261 F. Supp. 3d 1110, 1116

5

(W.D. Wash. 2017) quoting Wash. Rev. Code § 48.30.015. The Washington Supreme Court has

6

determined that to state a claim under the IFCA, an insured must show "that the insurer

7

unreasonably denied a claim for coverage *or* that the insurer unreasonably denied payment of

8

benefits." *Perez-Crisantos v. State Farm Fire and Casualty Co.*, 389 P.3d 476, 482 (Wash. 2017)

9

(emphasis in original) (quoting *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6 (Wn.App.

10

2014)). Thus, an insured cannot maintain an IFCA claim based only on the insurer's alleged

11

violations of the insurance regulations under the Washington Administrative Code; rather, the

12

insured must also demonstrate that the insurer also unreasonably denied coverage and/or payment

13

of benefits. *Id*. at 483; see also *Bennett v. Homesite Insurance Company*, 636 F. Supp. 3d 1267,

14

1274 (W.D. Wash. 2022).

15

Here, Amica argues that Plaintiff cannot maintain a claim under the IFCA because he

16

cannot establish that Amica unreasonably denied payment of his benefits; instead, Amica argues,

17

the undisputed facts establish that it reasonably disputes the value of Plaintiff's claim.[3] Amica

18

argues that it accepted all of Plaintiff's medical bills up to the knee surgery but that it reasonably

19

disputes whether the need for surgery can be reasonably attributed to the vehicle accident. Amica

20

points out that Plaintiff admittedly had degenerative issues with his knee before the accident, was

21

considering knee replacement surgery prior to the accident, and it retained a medical expert who

22

23

24

25

26

27

still "must allege some factual basis for [his] claim for relief[.]" *Burris v. Frito-Lay, Inc*., 2009 WL
10726006, *2 (W.D. Wash. October 20, 2009).

[3]      The parties do not dispute that Amica did not deny Plaintiff's claim for coverage.

reviewed Plaintiff's medical records and determined that the accident did not cause Plaintiff to need the surgery. Amica argues that based on the foregoing, no jury could reasonably conclude that Amica unreasonably denied Plaintiff payment of benefits.

Plaintiff counters that Amica is cherry-picking the evidence and failed to reasonable investigate his claim. According to Plaintiff, if Amica had reasonably investigated his claim, it would have learned that Plaintiff's left knee was asymptomatic in the months before the accident and therefore, it is unreasonable to for Amica to refuse to pay for the medical bills associated with his knee surgery.

As stated above, to maintain his IFCA claim, Plaintiff must establish that Amica unreasonably denied payment of his benefits. Amica argues that Plaintiff cannot meet this criterion because it has not *denied* Plaintiff's payments; rather, it disputes the *value* of Plaintiff's claim. However, the law is clear that "an unreasonably low offer of payment can constitute an IFCA violation even if the insurer eventually pays." *Bennett*, 636 F. Supp. 3d at 1274; *see also Morella v. Safeco Ins. Co. of Illinois*, 2013 WL 1562032, at *3 (W.D. Wash. April 12, 2013) ("[A]n insurer cannot escape IFCA simply by accepting a claim and paying or offering to pay an unreasonable amount."). Thus, whether Amica violated the IFCA by offering $5,000 to resolve Plaintiff's UIM claim is contingent on whether the offer is unreasonably low. The record contains contradictory evidence on this point. For instance, Plaintiff claims he hiked in the Himalayas three months before the accident without knee pain and Dr. Goldman testified that Plaintiff's left knee was asymptomatic before the accident, but Dr. Kriseman's treatment notes indicate that Plaintiff was contemplating left knee replacement surgery before the accident. Likewise, Dr. Kearney's conclusion that Plaintiff's degenerative knee issue is one that would continue to worsen over time, contradicts Plaintiff's and Dr. Goldman's claim that Plaintiff was pain-free

before the accident.[4] This Court cannot determine whether Amica's offer was unreasonably low without resolving the foregoing disputes of material fact, something the Court cannot do on summary judgment. Thus, Amica's request for summary judgment on Plaintiff's IFCA claim is denied. *See Curtis v. State Farm Mutual Automobile Insurance Co.*, 2023 WL 5152560, at *4 (W.D. Wash. August 10, 2023) (denying insurer's motion for summary judgment on IFCA claim because factual disputes existed regarding whether insurer reasonably investigated insured UIM claim); *Spicher v. American Family Mutual Insurance Co. S.I.*, 2023 WL 5634210, at *3 (W.D. Wash. August 31, 2023) (denying motion for summary judgment on IFCA claim because "'[r]easonableness' can rarely be resolved at summary judgment, and the record here contains conflicting evidence as to reasonableness").

### B.    The Bad Faith Claim

The fiduciary relationship between insurers and policyholders gives rise to a duty of good faith. *American Manufacturers Mut. Ins. Co. v. Osborn*, 17 P.3d 1229, 1234-35 (Wn.App. 2001). An insurer acts in bad faith when it denies coverage based upon mere suspicion and conjecture, fails to conduct a good faith investigation of the facts before denying coverage, or denies coverage based on a supposed defense that a reasonable investigation would have proved to be meritless. *See Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 792 P.2d 520, 526 (Wash. 1990). The insured bears the burden of proving that the insurer acted in bad faith, and the insurer is entitled to summary judgment if reasonable minds could not differ that the denial of coverage was based upon reasonable grounds. *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003).

---

[4]    The Court also notes that Dr. Kearney did not review any medical records that pre-dated the accident.

Here, Plaintiff contends Amica failed to conduct a reasonable investigation before refusing to pay for the left knee replacement surgery. As stated above, Amica originally offered Plaintiff $1,000 to settle his UIM claim and then increased it to $5,000. Brittany Am was the claims adjuster assigned to Plaintiff's claim at the time that Amica extended those offers. She testified that before extending the settlement offers, she reviewed the medical records provided by Plaintiff (Dkt. No. 29, Ex. 7 at p. 24 lns. 5-12) but admits that she failed to note in her summary of the records that those records indicated that Plaintiff hiked "up to over 17,000 feet" in the Himalayas in the months preceding the accident without any knee issues. *Id.* at p. 44 ln. 17- p. 45 ln. 6. She further testified that she did not request that Plaintiff provide further pre-accident medical records. *Id.* at p. 53, lns. 4-6.[5]

In addition, after Plaintiff rejected that initial $1,000 offer, Amica retained Dr. Kearney to review Plaintiff's medical records and provide an opinion as to whether Plaintiff needed knee surgery due to injuries he incurred in the accident. As stated above, Dr. Kearney concluded that Plaintiff's knee injury from the accident had resolved by May 21, 2020 and, therefore, the need

---

[5]     The Court notes that Plaintiff's attorney, David Balint, frequently overstates and/or misrepresents the record testimony, including Ms. Am's testimony. For instance, Mr. Balint claims that Ms. Am "admitted she conducted no active investigation whatsoever, except to review the two demand letters and some of the records submitted by [Plaintiff]", citing to her deposition testimony at page 39. Dkt. No. 28 at 4. Ms. Am made no such statement. To the contrary, when asked "what independent investigation did Amica do during [her] time to settle this – to resolve this claim or analyze this claim?", Ms. Am responded, "I don't remember." Dkt. No. 29, Ex. 7 at p. 39, lns. 6-10. Likewise, Mr. Balint states that Ms. Am "could not explain how she calculated an offer of $1000 new money other than to recite the settlement with Nationwide and the Amica PIP waiver", citing to page 33 of her deposition testimony. Dkt. No. 28 at 4. Once again, the cited deposition testimony says no such thing.

"An attorney does not simply act as an advocate for his client; he is also an officer of the court. As such, an attorney has a duty to good faith and candor in dealing with the judiciary." *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir. 1985). The effectiveness and fairness of this nation's judiciary system depends on this fundamental tenant, a tenant that Mr. Balint has breached. Any further violations will not be tolerated and will result in sanctions.

for the left knee replacement surgery could not be attributed to the accident. However, Dr. Kearney's report indicates that Amica did not provide him with, nor did he review, Plaintiff's medical records from before the accident. As such, Plaintiff argues, Dr. Kearney did not provide "a full and fair evaluation of [Plaintiff's] left knee condition, including whether it was causing him any problems prior to the [accident]." Dkt. No. 28 at 8.

Based on the foregoing, the Court concludes that a dispute of material fact exists as to whether Amica completed a reasonable investigation before refusing to pay for Plaintiff's knee surgery and the Court cannot resolve this dispute of material fact on summary judgment. Therefore, Amica's motion for summary judgment on the bad faith claim is denied. *See Bennett*, 636 F. Supp. 3d at 1275 (denying summary judgment on bad faith claim because the parties had "submitted competing evidence as to whether [insurer] acted reasonably").

### C.    The WCPA Claim

The WCPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. To prevail on a private CPA claim, Plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784 (1986). A violation of any subsection of the Washington Administrative Code 284-30-330 is a per se unfair or deceptive act under the WCPA. *James E. Torina Fine Homes, Inc. v. Mut. of Enumclaw Ins. Co.*, 118 Wn. App. 12, 20-21 (2003). An insurer's breach of its duty of good faith also constitutes a per se violation of the CPA. *See Moratti ex rel. Tarutis v. Farmers Ins. Co. of Wash.*, 162 Wn. App. 495, 511 (2011).

Amica argues that Plaintiff cannot maintain his WCPA claim because he has not identified any injury to his business or property and therefore cannot establish a casual connection between the alleged unfair acts and a cognizable injury. According to Amica, its alleged failure to pay Plaintiff the full insurance benefits to which he is entitled does not constitute an injury to Plaintiff's business or property for purposes of the WCPA. Amica's argument runs afoul of well-established caselaw on this point. In *Peoples v. United Servs. Auto. Ass'n,* the Washington Supreme Court considered a certified question regarding whether an insured can maintain WCPA suits against their insurance carriers for wrongful denials of PIP payments. 194 Wash.2d 771 (2019). The Court concluded that such a claim could be maintained:

> When parties enter an insurance contract, the insured obtains a legal right to benefits upon the happening of a particular event. An insurance contract also gives rise to a quasi-fiduciary relationship between the parties, which requires them to deal in good faith. An insured, therefore, has a legally protected property interest in benefits due under the contract and a related right to insurance dealings free from bad faith. Claims mishandling and wrongful denials of benefits invade this property interest, regardless of the type of event that triggers coverage.

*Id*. at 780 (internal citations omitted). Thus, the Washington Supreme Court concluded, "the deprivation of contracted-for insurance benefits is an injury to 'business or property'" for purposes of the WCPA. *Id*. at 779. Cases following *Peoples* have allowed insureds to maintain WCPA claims against their insurers for the wrongful denial of insurance benefits even when the denial is not exclusively based on PIP coverage. *Nielsen v. California Capital Insurance Company*, 2023 WL 6222537, *4 (E.D. Wash. Sept. 25, 2023); *see also Santiago v. GEICO Advantage Ins. Co*., 2023 WL 5802523, *2 (W.D. Wash. Sept. 7, 2023) (stating WCPA claim for alleged wrongful denial of UIM benefits). Here, Plaintiff alleges that Amica has wrongfully denied him the full benefit of his contracted-for UIM benefit. Thus, Plaintiff has sufficiently

alleged an injury to his "business or property" for purposes of the WCPA. Amica's motion for summary judgment on the WCPA claim is denied.

**V.**     **CONCLUSION**

For the foregoing reasons, the Court HEREBY DENIES Amica's motion for partial summary judgment on Plaintiff's extracontractual claims.

Dated this 28th day of November, 2023.


Barbara         Jacobs         Rothstein
U.S. District Court Judge